Alfred A. Arraj US Courthouse
901 19th Street
Denver, Colorado  80294

**F I L E D**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

APR 23 2018

JEFFREY P. COLWELL
CLERK

**Plaintiffs:**
Shawnee Ryan, her surviving heirs and estate

**vs**

**Defendants:**
**Colorado Department of Corrections, (CDOC)**
**Rick Raemisch** (in personal and professional capacity)

**State Bureau of Prisons**
**Travis Trani** (in personal and professional capacity)

**Federal Bureau of Prisons**
**Mark S. Inch** (in personal and professional capacity)

**\*Dr. Frost (current, acting Chief Medical Officer** (in personal and professional capacity)
**Dr. Susan Tiona** (in personal and professional capacity)
**Dr. Andrew Martinez** (in personal and professional capacity)

**Ryan Long** (in personal and professional capacity)
**David Johnson** (in personal and professional capacity)
**Terry Jacques** (in personal and professional capacity)

**Hilary Victoroff N.P.** (in personal and professional capacity)
**Laura Sommerschield N.P.** ((in personal and professional capacity)

**Correctional Health Partners (dba CHP, dba Correctional Health Companies, Inc., dba Correctional healthcare Physicians, P.C., dba CHC Companies, Inc., dba Correctional Corporation of America)** (in personal and professional capacity)
**\*\*Dr. Jennifer Miecks** (in personal and professional capacity).
\*Defendant "Frost" first name unknown, with CDOC, all avenues open to offenders, refusing to disclose first name. Court assistance requested.
\*\*Defendant "Miecks" (prounced 'Mix") spelling of last name unknown; refused by CDOC, all avenues open to offenders. Court assistance requested.

**Plaintiff's Representation:**
Shawnee Ryan #159496
DRDC-Infirmary-5
Denver, Colorado  80239

**All Defendants:**
**Unknown**

∧  **COURT USE ONLY**  ∧

**Case Number:**

**Div.:        Ctrm:**

## COMPLAINT WITH JURY DEMAND

**DEFENDANTS DEFINED:**
Colorado Dept. Corrections with past and present employees:  Rick Raemisch (Executive Director); \*Dr. Frost:  acting Current Chief Medical Officer (CMO,\*CDOC refusal to provide to Ryan, Frost first name. Court assistance requested); Dr. Susan Tiona, (former CMO); Dr. Andrew Martinez (former CMO); Ryan Long(current Warden Denver Complex); David Johnson (former Warden

Denver Complex); Terry Jacques (former Warden Denver Complex); Hilary Victoroff (current mid-level, general practice nurse practitioner Denver Complex); Laura Sommerschield (current mid-level, general practice nurse practitioner, Denver Complex)

State Bureau of Prisons et al; Director; Federal Bureau of Prisons and (Colorado) Director Mark S. Inch;

Correctional Health Partners et al; one of two insurance carriers for Colorado corrections (the other, is Medicaid) and **Dr. Jennifer Miecks (sic), M.D. in charge of CHP approvals and denials in Ryan's case (**CDOC refusal to provide to Ryan, Miecks correct spelling of last name prounced "Mix). Court assistance corrected)

## BACKGROUND:

Shawnee Ryan (*Ryan*) entered CDOC aprx. November 5, 2012. Currently pending special needs parole approval of parole plan and release date. Serving two six-year sentences, consecutive, on charge of theft, with 3 years mandatory parole. Ryan, in 2012, was 55 years old, in excellent physical health on initial CDOC screenings, labs and physicals. No history of any kind of substance, alcohol use or abuse, no violence and no behavorial issues. Classified as minimum secured with a CARAS rating of one point and low risk LSI scoring.    Ryan has consistently maintained an exceptionally good inmate record and remains carrying the same minimum security ratings and classifications as she did upon entry. As of April 1st, 2018, Ryan has served nearly two years past her PED and is two months shy of fully serving the governing six-year sentence.  She carries an additional credit of 23 months of earned time and achieved time in addition to served time. Ryan, on entry; was immediately sent to what would be her home facility of LaVista Correctional Facility (*LVCF; a minimum secured work camp facility*).  In March 2013, Ryan became ill and could not fully recover.  An astute M.D., after seeing high renal (*kidney*) insufficiency in a blood test, returned Ryan, along with case management assistance, on a progressive move back to Denver Womens Correctional Facility (*DWCF; a max-5 secured facility that is the only housing within Colorado that can house female inmates and give them access to complex, chronic medical care*) where she was placed on medical hold.  Ordered, by LVCF medical doctors, to specific diagnostic work; it took DWCF Clinical Services, after assigning Ryan to Nurse Practitioner (*N.P.*) Hilary Victoroff (*Victoroff, see Claim Two*), from June 1, 2013 until September 2013 to see Ryan in clinical, let alone do the initial simple 24-hour urine analysis required.  Due to high saturation of Bence Jones Proteins (*Lambda Light Chain Deposition Disease/monocolonal gammopathy*) within that sample; Ryan was ordered to be seen by a CDOC Nephrologist (*Dr. June Scott*), who had Ryan undergo ultrasound and biopsy testing where the result then returned as a (*by that time*) 30% atrophied right kidney and diagnosis of Light Chain Deposition Disease/monocolonal gammopathy/Bence Jones (*fatal, autoimmune*). It took CDOC until March 2014 for the second diagnosis of Multiple Myeloma blood cancer (*See medical information below (and) third part of Claim One*).  By that time, Ryan's blood levels were in Stage III on both diseases, with the following side effects *at that time*:  kidney insufficiency, cardiac issues, anemia factors and endangered immune system. All of which, Ryan did not have prior to incarceration. At that time, Ryan, solely through her own assertiveness through administrative processes, and strength of will to stay alive until release; was not receiving *any* medical care from DWCF clinical since initial diagnosis, and was being denied access to her CDOC Nephrologist.  Ryan filed her first request for emergency intervention to then Warden David Johnson, under CDOC AR 850-04 (*grievance procedures*) requesting a staffing to break the lack of any medical care access.  The result of staffing was that Victoroff was removed as assigned provider and Ryan's first board certified, licensed CDOC medical doctor was assigned in late March 2014.  From there, the path of CDOC medical care is; in the most extreme of events, *but far from all events encountered by all over the next nearly five years*; tracked below in claims. Ryan, has maintained extensive, sequential tracking records of *all* care.  Close estimation; to be backed up through compulsory process; of Ryan's medical costs to date, from November of 2012 entry into CDOC, to present day; is aprx. (5) million dollars; with close estimation of continuing annual cost of (1) million dollars for basic drugs and labs monitoring alone. Permanent damage to Ryan, resulting from extended chemo therapy is:  Deep vein thrombosis (DVT), severe dilation of left atrium of heart, ectopic rhythms, chronic orthothesis, bone lesions, hypogammaglobulinemia, anemia, pancreatic insufficiency, renal insufficiency, atrophy of right kidney, severe neuropathy in hands and feet, vision loss, edema.

## NATURE OF CASE:

That the Colorado Department of Corrections did, while Ryan was an inmate, for a period spanning aprx. 55 months, and does continue to present day; commit various aspects and types of fraud by violating the inmate catastrophic Medicaid clause of the Affordable Health Care Act by denying Ryan, for nearly 4 years; symptomatic, palliative, and life-saving medical treatment in the form of bone marrow transplant; various hospitalizations in facilities equipped to

handle her care and medical necessity; ordered by specialist treatments; and obstructed or denied life-saving and life-maintaining drug(s) that were fully covered and approved by Medicaid. That the Colorado Department of Corrections did; only when it finally served their own interests and *only under asserted legal duress from Ryan*; grant, in June 2017, *the use of the same Medicaid available since July 2014*, to give Ryan a bone marrow transplant. Over four years too late to prevent permanent and life-threatening damage to vital organs and her body. That the Colorado Department of Corrections, did, knowingly and repeatedly, continuing to present day, withhold; willfully and wantonly, the same Medicaid coverage to provide Ryan with ordered by outside specialist and standard protocol for her diseases; post-transplant care and medication. That the Colorado Department of Corrections, did, and continues through present day, knowingly use the outside private entity of Correctional Health Physicians (CHP) to approve and deny procedures and treatments; when, in fact, CHP has absolutely nothing to do with the new federal law and state regulations governing inmate Medicaid approvals and denials (and) CHP has absolutely nothing to do with CDOC security and day-to-day clinical services operations. CHP is also, not on the Medicaid power of attorney Ryan signed in 2014 (*as instructed by CDOC to do*). Ryan and CDOC are the only parties accessing payment, approvals and denials of Medicaid. CHP, is nothing more than an outside private corporate entity that is in place to handle approvals and denials of care for CDOC cases *not otherwise insured. CHP, is, however, the long-standing private entity that the CDOC has paid and continues to pay and/or move health care funds through.* The new federal law, at least in Ryan's case, has altered that relationship in that Ryan's hospitals and in-hospital hematology and oncology teams direct bill Medicaid when applicable, and utilize the liaison of Ryan's clinical nurse case manager rather than CHP when they do so. That the Colorado Department of Corrections, did and continues to present day, to willfully disregard the certification and licensing requirements of mid-level, non-specialized, and verifiably grossly under-trained in complex care nurse practitioners to handle all aspects of care for complex medical cases, which Ryan is. And execute that care, without a board certified, licensed medical doctor on shift, on staff, and immediately available to approve all decisions made. That the Colorado Department of Corrections knowingly allows the same practitioners to access monitoring and dosing levels control over Ryan's highly toxic and dangerous but life-maintaining, Class V chemo narcotic, in the form of the DEA federally regulated drug, Revlimid. Which contractually with DEA, only Ryan and her oncologist control dosing levels and monitoring. That the Colorado Department of Corrections, whose only role with Revlimid and DEA is to provide security and safety for the drug, does violate security and safety when they knowingly allow the same practitioners to act, without a licensed, board certified M.D. on shift, on staff and in direct supervision of them to control the drug's actual dosing, rather than the same practitioners simply following all orders from Ryan's oncologist. That the CDOC further violates federal regulators security directives when Ryan is endangered from orders and care not being followed, or verbally intimidated to "not get" the drug if she does not conform to same practitioners alleged reckless handling; and when CDOC refuses to provide standard security and safety for Ryan even in the most simple form of their physical presence in a treatment room in order to deter physical harm to an inmate (*Ryan*). That the Colorado Department of Corrections, State and Federal Bureaus of Prisons knowingly allow alleged fraudulent use of administrative grievance policies governed by Colorado State Supreme Court (and) medical affidavits available to inmates and binding upon CDOC and its employees. That the Colorado Department of Corrections, State and Federal Bureau of prisons and all designees are guilty of complicity with subsequent deliberate indifference, willful ignorance and gross negligence as a result of that complicity. Complicity, spanning years in this case, of silence of people not only in power but also in full control of all operations and responsibility for safety of all parties through responsibility to duty; who allow the practices above to continue even after they have been made fully aware of all activity of those under them. With regard to Defendants Bureaus of Prisons; the direct oversight and duty of the State Bureau of Prisons and Federal Bureau of Prisons to provide technical assistance and oversight, carries or should carry the same liabilities as the Colorado Department of Corrections, as each, either has, or should have, or has the capacity to have; the same exact awareness and information regarding all claims within this lawsuit and are bound, to uphold the same state and federal statutes and constitutionality.

**It is a moot point, whether one agrees with, or believes in, the validity of the spirit and intent (or) the legislative wording behind 'Obamacare' (AHCA) and specifically, the inmate catastrophic Medicaid clause. The fact that this new federal law, adapted by the State of Colorado, is contentious in the extreme on political and socially accepted levels; is also moot. Reality, is that it is, was and remains the law at the time of Ryan's diagnoses while incarcerated, and as law; must therefore be upheld.**

It is also a moot point, unfortunately, that previous federal and state political administrations (and) present administrations; in concert with legislators both federal and state; obviously, utterly failed and remain failing, to 'think' of 'how' to implement the new federal law into our correctional system and 'how' to reformat their now former relationship with private contractors such as, CHP. All, held not only a duty then, but remain holding a duty to uphold and execute the order of law. If anything, the failure of the Bureaus of Prisons to provide technical support *in something that is the magnitude of the new law*, becomes even more of a duty to *uphold* than their basic duty to *ensure* law is upheld in day-to-day operations.

### MEDICAL FACTS; RELATED STATEMENTS, *RELEVANT TO UNDERSTANDING MEDICAL NATURE AND CLAIMS*:

1. (A):  Ryan's single event diagnoses are blood and bone marrow oriented. Fatal, with no cure known. All treatment, is symptomatic, palliative and life-extending; not curative. Multiple Myeloma is a cancer that is defined, for lab result purposes, as an 'M Protein'. Monocolonal gammopathy/Light Chain Deposition/Bence Jones is defined for lab result purposes, as a "lambda light chain" (or) 'Bence Jones' Protein. Levels of immune system weakness are tracked and known as immunofixation i.e. IG's. Routine monitoring must and does include symptomatic neutropenia, anemia, white cell, platelet and electrolyte monitoring. Drops in these areas are routine happenings and are daily corrected, *in order to continue to still receive* life-maintaining treatment drugs (lifelong); through increases or decreases of other medications and/or IV supplements and transfusions that bring Ryan's declined levels back up to safe dosing levels.

    2. (B):  **There are three phases to treatment: Phase One** is intensive chemo therapy. Average range of up to 12 rounds before entering **Phase Two** which is bone marrow transplant, either by donor or autologous stem cell transplant. **Phase Three** is post–transplant which requires, for life, the same routine monitoring of blood levels and drug maintenance and includes, in Ryan's case, the Class V form narcotic known as Revlimid. An extremely dangerous chemo narcotic and one, which is the only FDA approved standard drug for maintenance of Ryan's diagnoses. Revlimid is DEA and federal regulated controlled. Further controlled *contractually* between DEA, Ryan's oncologist (*Rocky Mountain Cancer Center/RMCC*) and Ryan herself. Ryan's blood levels, are <u>DEA required to be regulated</u> (*solely through RMCC*). When levels fall into certain ranges; DEA requires the drug Revlimid to be held and not given until Ryan's levels come back into *safe for her* range. Every patient is different and there is no set and automatic 'level' that magically governs all needs. *Revlimid, due to Ryan's secondary diagnosis of Lambda Light Chain/Bence Jones Proteins; is,* simultaneously; *a <u>life-saving/maintaining drug</u> and a <u>life threatening drug</u> depending on the* <u>competency</u> *and* <u>security</u> *of the hands actually in physical control of giving her the drug. RMCC is not allowed, when Ryan is incarcerated, to physically give* the PO (oral, daily) dose to Ryan; only CDOC and designees. Yet, only RMCC can order, regulate, monitor and control the dose. *The obvious, is that continual communication between RMCC and CDOC, from* <u>competent, secure medical care that RMCC can trust</u>*; is imperative. In normal situations, without incarceration status, the only medical provider a patient such as Ryan would have; is her oncologist and the only dosing control is her own which is also contractually governed by DEA regulators. There are only two names on the Revlimid contract and they are: Dr. John Burke, M.D. (oncologist) and Shawnee Ryan. Time and again, over the years of Ryan's care, the only time that serious problems in care, labs and drug handling have been avoided is when Ryan is in the hands of CDOC's end, of <u>board certified, licensed medical doctors</u>.* The *contractual* role for CDOC, where Revlimid is concerned, is that CDOC is required to provide security for the drug **and the inmate dosing**, at any time it is prescribed by RMCC oncologists and the patient is in CDOC controls. Revlimid is an anti-embryonic and anti-cloning narcotic that must be secured away from women of child-bearing years, women who are pregnant and women who may wish to future become pregnant. Its toxic and strict regulated nature is also such, especially in a prison environment, it must be physically secured under lock. It is also an extremely expensive drug. One pill, which Ryan must take *daily* for the remainder of her life; ranges from aprx. $1,500 per to $3,800 per; depending on dose strength. Ryan has been on Revlimid for the entire duration of her diagnoses. So expensive and due to strict regulations that are DEA contractual; *hospitals* will not allow their pharmacies *to carry or give* the drug to Ryan and it must travel with her when necessary. Which also, requires CDOC security and pre-approval by hospital facilities. Ryan's hospitals of Aurora South and Presbytarian/St. Lukes are approved specifically for Ryan. Denver Health has not yet been CDOC approved and set up, for access by CDOC to provide Revlimid when Ryan is admitted to Denver Health.

    3. C:  Ryan's diagnoses require blood lab monitoring. Blood levels, for Ryan's diagnoses, can change either up or down, within a matter of hours. *Blood levels,* for these diagnoses, *govern every single aspect of support care, traverse through*

*all phases of treatment and are monitoring required for the remainder of Ryan's lifetime.* There is no other way to provide care for a patient with these diagnoses. **Miss a draw, take a draw inaccurately, assess a draw wrongly and it is,** and has, *life significant effects.* Ryan was given a port access, in 2014 due to the inability of CDOC to draw Ryan without continually physically hurting her and/or damaging the sample's integrity. Ports are surgically inserted, under skin, into the patient's carotid artery. Ryan's port, due to heart conditions, is a BARD power port. Standard ports are a 'reservoir' access with one hole which allows both 'in and out' drawing. Ryan's BARD has multiple access holes. One reservoir and the other for 'in' access only. One cannot draw blood *except through the reservoir.* Neither access can be seen by the eye, as the port is located under Ryan's skin. The BARD was inserted, chosen and authorized by two CDOC medical doctors (*June Scott and Dr, Adelina Longoria*), RMCC and the operating surgeon at Aurora South Hospital. Basic CBC and CMPD labs are drawn (*optimum for safety is weekly draw*) and analyzed locally. Once every 3 to 4 weeks, minimum, Ryan's specialty labs are drawn (*for nearly 5 years now*) and literally shipped back East for detailed analysis. Results take a little over a week to return to oncology (*RMCC/Burke*). There is thoroughly documented medical record of the utter inability of CDOC medical staff to draw from Ryan's port or peripheral (*veins*) without either failure to obtain blood (or) leaving physical marks and harm. There has never been a time that Ryan has been harmed or physically marked by her outside care teams nor ever a time outside professional nurses have been 'unable' to draw Ryan's blood.

- (D): **Phase One** "Rounds" of chemo, consisted of three medications in Ryan's case: Velcade or Carfilzomib, Dexamethasone (*either oral or IV*) and Revlimid. All requiring: correct labs, *accurately assessed and drawn* and full, complete support care consisting of: *(drug(s) given at same time every day,* nutrition levels maintained, critical IV given drugs (*potassium, magnesium, calcium that are only given by outside care; thus transport and security must be arranged at very short notice*), platelet and blood transfusions (*available at very short notice*); neutropenic conditions (*available at very short notice when levels fall*); and/or housed in clean/contagion lower environments at all other times (*due to the extremes of transient and disease-ridden dense filled society of a prison facility*). These requirements are not 'special' considerations. **They are mandatory to life considerations.** In a world of corrections, where the first thought and reaction of *all staff,* to any inmate's needs, is one of distrust; to add-on unsupervised nurse practitioners who are also lacking training in highly complex care rather than continuous care from board certified, licensed medical doctors; **there is simply no ability for CDOC to break rigid routines to provide just one inmate, out of multiple hundreds of inmates;** *any* **kind of fast and immediate care on a regular occurring basis that has no notice.** To "prove" need, an inmate such as Ryan, literally has to provide her blood and lab results each and every time she must get immediate medical care. To access blood from her body, there has to be, at minimum, medical staff who are **capable** of pulling access through a port and/or even doing a peripheral vein draw on a long-term cancer patient who is beyond a 'hard stick'. **First phase** Rounds lasted for three weeks per round. At minimum, depending on treatment plan, with twice per week IV's and lab draws. Oral medications taken at same time and dose according to daily blood level. All drugs must be given at same time and in concert with each other for effectiveness. **Unlike other cancers, blood cancer is high sensitive to being managed exactly the same way, all the time.** The only goal, is to bring and then keep, levels low. Ryan, prior to finally receiving transplant in June 2017; endured 41 first-phase rounds of intensive chemo and two more rounds of aggressive DTPACE chemo therapy for a total of 43 rounds spanning nearly 5 years now. *Average rounds for a patient such as Ryan, in the outside world, is 12 rounds.* The longer one is on chemo, the more damage to the body, as chemo does not target just the 'bad', it targets the entire body and all its functions and organs. Ryan's documented physical damage, so far, is: Deep vein thrombosis (DVT), severe dilation of left atrium of heart, ectopic rhythms, chronic orthothesis, bone lesions, hypogammaglobulinemia, anemia, pancreatic insufficiency, renal insufficiency, atrophied right kidney, severe neuropathy in hands and feet, vision loss, edema. **These diseases are fatal. They have no remission as other cancers and autoimmune do. They have, only** *a drop to levels to be maintained* **where life can be prolonged and sustained. There are no cures. Transplants are not curative; and are solely for extension of life. All treatments are strictly symptomatic and palliative in nature.** The rate of extension of life, by having transplant, varies with each patient. Ryan, is an intermediate risk; as her illnesses have a genetic foundation. She is missing a certain DNA factor that is shown to be a strong indicator for incurring these diagnoses. A further detriment, for Ryan, due to being in a prison environment, is that the CDOC does not allow clinical study and testing drugs or treatments, despite many being far less costly. Genetic factors that are seeing great strides in her diagnoses are something she is deprived of while incarcerated. **Rounds, IV's, port access for lab draws, accurately and regularly drawn per oncologist orders** (*to even get to a competent level of assessment and drawing*); were initially attempted to be done in-house at DWCF Clinic. A serious and life threatening event, on **January 27, 2015,** of CDOC nurse, Jennifer Dumpfert, attempting to inject (knowingly) an unstable (lethal) dose of Velcade into Ryan; prompted CDOC and RMCC to halt ***any*** oncology care to be practiced by DWCF/CDOC in-house and begin transporting Ryan, for safety purposes; to her outside oncologist for all injection and IV dosing. Also altering CHP approval and payment for Ryan's oncology care into '6 month blocks' of time (RMCC/Burke approved for 6 month periods).

Throughout all three phases, the treatments and drugs that Ryan must take, must also be given in regimented increments. The chemo drugs, including Revlimid, are *cumulative in nature and build up to certain levels in the bloodstream.* Thus, the drugs must be given *all at the same time and at same time every day as ordered and regulated by RMCC and CBCI.* They also work in concert with each other and each has a function that specifically targets Ryan's diseases. In a very similar tendency as misuse of an antibiotic, these chemo drugs, if not dosed exactly as ordered, can (and have in Ryan's case) become less effective as the diseased proteins in Ryan's system build immunity to the drugs. **Also, Ryan's blood levels can change within a matter of hours,** which can make *the cumulative level* of drug(s) become dangerous to Ryan. **There are strict parameters, for her safety, that must be observed and that are *solely controlled by DEA and federal regulators,* with Ryan's oncologist (RMCC/Burke) solely in charge.** It is, and has been proven many times over during the years of her incarceration; that the CDOC and institutional care simply do not have any capacity to single out one inmate with such meticulous needs. 'Med-lines', 'kites' to clinic and so forth are solely at the discretion *and timing* of the CDOC. The only housing CDOC has available that even comes to a measure of close ability to handle; is special needs housing within the Denver Regional Diagnostic Center (DRDC) infirmary which is located within the Denver Complex. Ryan's oncologist has ordered her to an infirmary level of care since 2015. Repeatedly denied by infirmary staff and former CMO Susan Tiona and only finally achieving after the near-death event stated in (*Claim Two-Victoroff*) (and) post-transplant.

4.  **(F): Second Phase treatment** of transplant and the chemo drug used (*Melphalan*) were highly successful (*2017*) in knocking back Ryan's levels. Ryan underwent an autologous stem cell transplant rather than a donor transplant. No other treatment or variation of chemo drugs, during phase one treatment had ever been as successful in doing so. All physical and permanent damage to Ryan, since first application for transplant in 2014, occurred due to prolonged chemo exposure. **Higher success, with less to no physical damage would have likely been achieved, overall costs would have been greatly reduced and Ryan's needs of care both pre-transplant and post-transplant; significantly reduced if CHP and CDOC had not denied Ryan a transplant for nearly so long.** A bone marrow transplant completely wipes out the patient's existing immune system; even though, in Multiple Myeloma, it does not wipe out the disease itself. A transplant simply brings all 'bad' levels down to a range that sustains life and must be maintained through lifelong drug care and blood monitoring. As a result, post-transplant, Ryan's immune system is as a newborn infants. All lifelong immunizations and antibodies wiped out. Ryan literally, has zero defense against any contagion and is highly susceptible to illness. It is not, until one year post-transplant, **(June/July 2018)** that oncology and hematology can begin the process of 'rebuilding' her system and begin, dependent on Ryan's blood labs and levels; to give her, again, all inactive immunizations she received as a child and as an adult. It is not until two years post-transplant **(June/July 2019)** that live vaccines, such as MMR, can be given. In short, the CDOC, with its extreme density of general population and the type of disease ridden and transient population they house; cannot safely, or legally (*according to State, Federal Health Departments and CDC*) place Ryan, until immunized, into any housing other than as safe, secure and segregated as they have. Simplistically stated, if Ryan was entering Kindergarten, she would not be allowed in. There is no religious reason that justifies her signing a waiver nor is Ryan herself 'at fault' and/or 'refusing' re-population into CDOC (*as CDOC medical services often claims*). Ryan is not being 'difficult' or 'insubordinate' in insisting outside specialists and standard of care for her diagnoses be followed. **Nor, when the only means of effective communication Ryan has; after days, weeks, months and at times, years** (*see second, third, fourth, fifth parts of Claim One (and) Claim Five et al*) **of** exhausting administrative processes available to inmates; is somewhat 'brutally honest' communication **within those same processes in order to be heard.** Ryan, when forced, in the absence of CDOC supervision of its staff, is capable and has, spoken very plainly, when necessary to protect herself from *blatantly obvious* incompetence or ignorance of medical ability in a staff member. Such communication is not being "disrespectful". *Ryan, is incarcerated in prison, is fatally ill, in extreme medical conditions of institutionalized medicine, attempting, quite simply, to just stay alive until release. Ryan, is not at a social event nor is she responsible, as an inmate, for the personal egos of any staff member hired by Society to do specific work from a position of trust that is clearly governed by statutes, constitutionality and well defined rules, procedures and protocol.* As can be seen, by Ryan's very good inmate record, Ryan still maintains the level of inmate behaviors she is required to uphold within her inmate status; she is simply, at times, having no other option but to speak very, very plainly and simplistically in order to receive the ordered by outside specialists care she needs to stay alive. **Ryan will not be fully immunized, as State Health, CDC and her medical needs require (and/or) as protected *back* to the same level she was pre-disease and on initial entry into CDOC; until the live vaccines are through full series. Which is, at minimum, fall of 2019.**

5.  **(G): Third phase treatment** of post-transplant maintenance and care then began in latter July 2017. Continued Revlimid monitoring and the new additional diagnosis of hypogammaglobulinemia becoming more sensitive to care needs. **At all times, the CDOC, CHP and both Bureaus of Prisons have either been fully aware of all**

three phase needs, or had the capacity to know and the duty to know. Any attempt to halt Ryan's needs for post-transplant recovery, that would be an attempt outside of the disease recovery parameters, places Ryan at high-risk. Currently, Ryan is housed in the DRDC infirmary. At the present time, despite up and down neutropenia, in addition to no high risk immune system precautions in place (and) with her precautions status recently taken from her housing; Ryan's struggle for safety until release has returned to being a daily struggle.

6. **(H): Ryan did not have any health issues prior to entrance into CDOC,** with exception of a congenital heart murmur. All diagnoses on file are _direct attributed_ to her Multiple Myeloma and Light Chain Deposition/monocolonal gammopathy/Bence Jones diagnoses. Deep vein thrombosis (DVT), severe dilation of left atrium of heart, ectopic rhythms, chronic orthothesis, bone lesions, hypogammaglobulinemia, anemia, pancreatic insufficiency, renal insufficiency, atrophied right kidney, severe neuropathy in hands and feet, vision loss, edema are all direct results of her diseases and her care, or lack of, over the years of incarceration.

7. **(I): Medical costs,** since diagnoses and as of **April 2018,** are estimated at aprx 5 million dollars. These costs do not include and are in addition to, normal incarceration costs and all security and transport costs for all outside medical care. For just Revlimid and blood labs alone; Ryan's medical costs, for blood labs and Revlimid alone, run annually, aprx 1 million dollars. Ryan's specialized care providers are outside contracted. They are: Rocky Mountain Cancer Center/Dr. John Burke/Dr. Sujatha Nallapareddy and their facility of practice/privileges of Aurora South Hospital (and) Colorado Blood Cancer Institute/Dr. Richard Nash and his teamat Presbytarian/St. Lukes Hospital.

8. **(J) Ryan has multiple allergies to certain drugs.** Amongst them are the most common forms of pain medications relief. Relevant to understanding the effect on Ryan, while incarcerated: CDOC also has a very limited range of medications ability (their policy) while simultaneously holding a very long-standing and well known tendency to "medicate" inmates, addicts, behavior, mental health issues and the _slightest_ 'physical pain' an inmate complains about. Ryan will be bringing forward media interviews evidence from Executive Director Rick Raemisch discussing the desire of CDOC to medicate these types of inmates, including when released back out into society. Public record statistics clearly show that over 92% of all CDOC populations contain addicts, behavioral and mental health society needs. Not commonly known, until society has these rankings of people returned to them on release; is that 'physical pain' complaints, 'mental health symptoms' and deliberate behavioral acting out are often fabricated by inmates for the very reason that addictive behavior exists. **In Ryan's case,** she has no, nor ever has had, any substance issues of any kind, no behavioral issues of any kind, and no mental health needs requiring medication of any kind. Simply stated, when Ryan states she has physical pain; she has, physical pain. Over the years since diagnosis, there have been many**, many times that CDOC clinical services has attempted to force Ryan into their medical control standards** by 'offering' Ryan copious amounts of pain type medications. Ryan, has always refused. Despite many times over, with multiple Myeloma lesions (bone fractures), severe bone pain characteristic of Myeloma, extreme neuropathy, side effects conditions, and severe pancreas and kidney pain; her being strongly in need of pain medication. **Ryan's reasoning, is that the types of drugs CDOC uses are also characteristic of 'sedating' (and) are highly addictive. The verifiable reputation of CDOC that Ryan has thoroughly vetted, in then using medication of an inmate as punitive, where conditions, parole and any kind of release are concerned; is very strong.** Simplistically stated, the premise of dealing drugs of the types that CDOC does, is a trap very difficult for inmates to recover from. In short, if one is already an addict, they are going to likely leave CDOC just as addicted as when they came in, or worse. If able to be let out at all (which many are not), due to community and parole boards believing the inmate's high level of medication are a detriment to Society. **Ryan has existed, with her medical list of needs, for nearly 5 years now, on only Tylenol for pain relief.**

### MY ASSETS AND THEIR VALUES ARE LISTED BELOW:

I no longer have assets, of monetary value, of any kind.

### LIMITATIONS:

Tolling is within all limitations. To Ryan's knowledge, there are no limitations in the substantive aspects of Ryan's claims, though they may need revision in order to meet form requirements and/or additional law that Ryan has found, is somewhat uncertain, _for initial filing purposes_; whether correct form is present now to present to the court. **Though she fully understands she is on her own should counsel be denied;** Ryan is not an attorney and does plead this court to grant her assistance of counsel. As initially Pro Se, and possibly continuing Pro Se; Ryan requests her filing(s) to be interpreted and ordered liberally. "Pleading of Pro Se plaintiff must be read liberally and should be interpreted to raise strongest arguments that they suggest." Gray v Internal Affairs Bureau

S.D.N.Y. Nov 17, 2003, 292 F. Supp 2d 475; (and) "Although inmates complaint was terse and disjointed, especially with respect to "who did what to whom, when, where and why," court construed complaint liberally…light of prose status and determined that it gave sufficient notice to prison medical personnel pursuant to Fed R. Civ. P 8(a)." Carter v Newland (D.Mass. June 26, 2006), 441 F. Supp 2d 208.

**RESTRICTIONS:**

**Ryan asks this court to please provide relief and safe ability to proceed;** by granting the attached motions protecting evidence and protections of her person and medical care in the forms of injunctions and restraints. Ryan's injunctive requests, protection requests and restraint requests are all necessary for her to proceed safely and for this court to ensure ability to provide a judicial process that is of; integrity.

**As initially Pro Se,** Ryan also requests her filing(s) to be interpreted and ordered liberally. "Pleading of Pro Se plaintiff must be read liberally and should be interpreted to raise strongest arguments that they suggest." Gray v Internal Affairs Bureau S.D.N.Y. Nov 17, 2003, 292 F. Supp 2d 475; (and) "Although inmates complaint was terse and disjointed, especially with respect to "who did what to whom, when, where and why," court construed complaint liberally…light of prose status and determined that it gave sufficient notice to prison medical personnel pursuant to Fed R. Civ. P.8(a)." Carter v Newland (D.Mass. June 26, 2006), 441 F. Supp 2d 208.

**STATUTORY AND CONSTITUTIONAL MERITS MET:**

Outside of not being an attorney and Ryan also applying for representation; she believes she can meet all required prongs covering questions within all claims; including whether Defendants have governmental immunity; or not.

**PROCEDURAL DUTY TO SERVE DEFENDANTS:**

Ryan, as indigent, is reading and understanding the rules of procedure that she can and/or must request service of summons by US Marshals *once her case is accepted and filed.* All Defendants who are current employees of Defendant CDOC (or) previous employees of CDOC, Ryan understands are to be served upon CDOC as one. Ryan, as she has not yet been able to receive answer from her Denver Complex Litigation Coordinator Major Lucille Reux (and) the AR and Legal Access directives are not the same as the directives the court issued in packet sent to Ryan; has simply opted to enclose service copies and summons sheets for all Defendants listed and does so, with her original filing to the Clerk of Court. Ryan asks for verification that her understanding of service, at this time, is accurate. Ryan is also, after months of trying every avenue available to her in a segregated infirmary environment, is not able to obtain the first name of defendant and current acting CMO Dr. Frost. Or, the correct spelling of the last name of the CHP M.D. who is and has been for years, in charge of approvals and denials of care in Ryan's case; Dr. Jennifer Miecks (pronounced "Mix"). Ryan requests court and Marshals assistance in obtaining both.

**COURSE OF ACTION:**

**CLAIM ONE: NEGLIGENCE AND NEGLIGENCE THROUGH FRAUD; AGGRAVATED**
(Defendants: CDOC, Rick Raemisch, CHP et al, Dr. Jennifer Mieks (sic), State Bureau Prisons, Travis Trani, Federal Bureau Prisons, Mark S. Inch, Dr. Andrew Martinez, Dr. Susan Tiona, Dr. Frost (sic), Ryan Long, David Johnson, Terry Jacques)
**Primary Authorities:**

- **Title 42 C.F.R. Part 435, 1009 (a) (1)** *(Affordable Healthcare Act, Inmate catastrophic Medicaid provisions); adapted into State of Colorado:* **Colorado Department of Health Care Policy & Financing HCPF 14-006**

- **CDOC AR 700-02**...*where no inmate can be denied care that would prevent a full recovery upon release; where Refusal of Care forms (CCI form 31213) are required to be given, on inmate request and a copy to offender...where all clinical standards are required to be consistent with current professional practices...where special medical needs nursing care for patients who are unable to be managed medically in any other correctional facility .. will have access to a physician 24 hours per day in compliance with applicable state statutes and local licensing requirements...where (emphasized) specialty care is provided by contracted providers (2-CO-4E-01)...where unimpeded access to care by offenders to Clinical Services.., where requiring that only health care professionals make the determinations regarding medical appropriateness of health care delivered...when health care is rendered against the patient's will, it is in accordance with state and federal laws and regulations only in an emergency situation....where DOC clinical standards and procedures will be reviewed annually by the chief medical officer and the assistant director of Clinical Services....*

- **Negligence, partially defined**: *"...causes injury by failing to have and use the knowledge, skill and care ordinarily possessed and employed by members of the profession in good standing...........to **avoid malpractice** ... the doctor must utilize ordinary knowledge, skill and care in both diagnosis and in treatment. Medical personnel who undertake to treat specialized problems are held to the standard of care applicable to those specialties even if they do not claim specialized expertise..."*

- **"Res ip'sa lo'quitur"** *"The Thing Speaks for Itself" doctrine in negligence law (a) ..."when the event does not occur in the absence of negligence....." .. (c) "...the indicated negligence is within the scope of defendant's duty to the plaintiff..."; (Restatement (Second) of Torts 328 (D) (1)*

- **Actual Fraud, partially defined:** "Any false representation or contrivance which misleads another to his hurt...so many circumstances unsatisfactorily explained is an inference of knowing one is acting wrongly, or in other words; a contrivance.

  - *Particularity requirement of Rule 9(b) cannot be avoided through general averment that defendants knew earlier about matters that later turned out badly; rather, complaint must set forth specific facts that make it reasonable to believe that defendant knew that statement or action was materially false or misleading Shaw v Digital Equip Corp (1st Cir Mass May 7, 1996) 82F3d1194, 35 Fed R Serv 3d (Callaghan) 55, Fed Sec L Rep (CCH) P99217*

  - *To plead cause of action for fraud, plaintiffs need not allege evidentiary details that will be used to support claim at later date; they need only set forth basic outline of scheme, who made what representations. Caliber Partners, Ltd v Affeld (N.D. Ill Apr 4, 1984), 583 F Supp 1308, Fed Sec L Rep (CCH) P91618*

  - *Fraud allegations are sufficient for purposes of Rule 9(b) where (1) course of fraudulent activity is chronicled, including variety of misrepresentations and omissions, substance of which is described in complaint, (2) relative knowledge of parties is outlined, and (3) perpetrator of fraud identified, since such allegations are sufficient to place defendants on notice and allow them to respond In re Catanella &E.F.Hutton & Co., Sec Litigation (E.D. Pa. Apr 9, 1984), 583 F Supp 1388, Fed Sec L Rep (CCH) P91497*

  - *Attorney's motion to dismiss fraud claim was denied because complaint adequately alleged who, what, when and where of alleged fraud asserted against attorney, as required under Fed R. Civ. P. 9(b); Brugos v Nannenga (N.D. Ind Dec 5, 2005), 36 Employee Benefits Cas (BNA)2041, 2005 US Dist LEXIS 31148.*

  - **18 USCS 4042:  Duties of Bureau of Prisons**: *In general, the Bureau of Prisons, under the direction of the Attorney General, shall, (4) provide technical assistance to State, Tribal, and local governments in the improvement of their correctional systems..."*

  - **C.R.S. 12-38-11.5** Requirements for advanced practice nurse registration – legislative declaration – definition- advanced practice registry:... *(6)...shall practice in accordance with standards...and have a safe mechanism for consultation or collaboration with a physician..."*

  - **C.R.S. 12-38-111.6** *Prescriptive Authority – advanced practice nurses – rules: (I) (A) Once the provisional prescriptive authority is granted....(II) ..shall develop an articulated plan for safe prescribing that documents how the...intends to maintain ongoing collaboration with physicians...in connection...within his or her role and population focus....plan shall guide the....prescriptive focus...the*

*physician ....shall provide his or her signature and attestation on the articulated plan to verify....plan is subject to review by the board....shall provide the plan to the board upon request...fails to develop the required articulated plan within three years or otherwise fails to demonstrate competence as determined by the board...": (8) (a)..." the scope of practice for an advanced practice nurse may be determined by the board in accordance with this article....(c) (1)..prescriptive authority....shall be limited to those patients appropriate to such nurse's scope of practice. Prescriptive authority may be limited or withdrawn and .....subject to further disciplinary action in accordance with this article if such nurse has prescribed outside such nurse's scope of practice..."*

- **C.R.S. 12-38-117:** Grounds for Discipline*: (I) (h).....has falsified or in a negligent manner made incorrect entries or failed to make essential entries on patient records..."*

- Under Rule 8(a), *pleader need not allege legal theory on which he relies.* **Hostrop v Board of Junior College Dist. No. 515 (7th Cir Ill. Sept 24, 1975), 523 F2d 569, 21 Fed R Serv 2d (Callaghan) 78, cert denied, (US 1976), 425 US 963, 96 S Ct 1748, 48 L Ed 2d 208.**

- **Complaint is not to be dismissed** *because plaintiff has misconceived proper legal theory of claim; it is sufficient if it shows that plaintiff is entitled to any relief which court can grant, regardless of whether it asks for proper relief.* **Jenkins v Fidelity Bank (E.D.Pa. Sept 20, 1973), 365 F Supp 1391, Fed Sec L Rep (CCH) P94373**

**FIRST PART OF CLAIM ONE:** In August of 2014, Ryan's first phase chemo therapy treatments (*aprx 8 rounds at the time*) had lowered her M Protein (*Myeloma*) and Lambda Light Chain (*Bence Jones Proteins*) to bone marrow transplant ready stage. RMCC applied to CHP and CDOC for transplant at Presbytarian/St. Lukes Hospital.

**(NOTE:** *It is important to understand, that CDOC requires (despite new Medicaid law) all medical needs of inmates to travel through CHP for approvals and denials of any type of care. Also important to note that CHP is strictly a clerical entity and does no direct examination or have any access or direct knowledge, except through clerical means or at the word of the assigned practitioner, of an inmate's health needs).*

Ryan, in August 2014, was denied by CHP as procedure not being medically necessary. CDOC and Dr. Andrew Martinez (*Chief Medical Officer (CMO) at the time*); concurred, on **October 25, 2014**, by claiming that Martinez had done an extensive staffing of all parties, when in fact, he had not done more than a CDOC, *not all files available*; file review. Martinez notified Ryan of his finding, in written letter format, did so as he was resigning and as Dr. Susan Tiona took over as CMO. Ryan actually receiving the letter months after it was written, from Tiona, and allegedly unsigned by Martinez. Tiona, later went on and denied, in writing, CDOC ever denying Ryan a transplant.

The inmate catastrophic Medicaid clause, which would have (*and later did*) governed all approvals, denials and covered costs of all of transplant procedures; **was already enacted into law in August of 2014.** Over the years, and as **recently as Feb. 2018**; Ryan has persistently tracked her Medicaid coverage through both her clinical nurse case manager at CDOC headquarters and also through Department of Human Services. Ryan consistently, unless CDOC obstructed, also utilizes her inmate right to review her medical files for thirty minutes, every thirty days. Ryan contends that a strong legal argument in this case is the obvious fact, when one looks at sequential tracking of where Ryan's needs 'went' in the billing, approvals and denials processes; that CHP, for many, many years *prior to the new federal law*; enjoyed unilateral control not only over approvals and denials of inmate care; they also controlled billing, payment disbursals and payment to themselves for services rendered. And, despite having absolutely nothing to do within the Medicaid system, do, to this day, in Ryan's case, interject themselves into all approvals and denials for any and all care; even when that care will be hospitalized and qualify under the new Medicaid law.

**In August 2014:** Ryan's criteria under the Affordable Health Care Act's inmate catastrophic Medicaid clause and the Colorado Dept. of Health Care Policy & Financing HCPF 14-006; was met in all areas *with the exception* of one *overnight hospital stay* under her single event diagnosis. **A bone marrow transplant consists of literally**

**multiple weeks to months of hospital admittance and would have more than met the last requirement.** Ryan's specialists appealed CHP and were denied. At the time, the CDOC, forced all inmate care, including the new Medicaid care, through CHP for approval and denial; *rather than Medicaid*, who is, under the new federal law, and as adapted by State of Colorado; the governing insurance body and the sole discretion of approval or denial for payment *when related to catastrophic inmate needs*. CHP made no reference, nor did CDOC, as to Medicaid availability.

Additionally, her CDOC Nephrologist, Dr. June Scott (*June Scott*) also put in as medically necessary and was denied. Appealed and was denied. Concurred by CDOC. Again, through CHP. CHP made no reference, nor did CDOC, as to Medicaid availability.

Ryan's CDOC general M.D. Dr. Adelina Longoria (*Longoria*), that she had 'won' through emergency intervention in March 2014 as nurse practitioner (*Victoroff*) was removed from Ryan's case; put in as medically necessary and was denied. Appealed and was denied. Again, through CHP. CDOC concurred. CHP made no reference, nor did CDOC, as to Medicaid availability.

During this time, CMO Martinez was replaced by CMO Dr. Susan Tiona (*Tiona*), who then went on, multiple times, to concur with Martinez rather than Medicaid; and always forced Ryan's case through CHP rather than Medicaid and new law; until Tiona was removed from the office in latter 2016.

In **November of 2014**, Ryan was emergency admitted, due to a cardiac event, to Aurora South Hospital for a full cardiac evaluation and work-up. She was kept overnight with her single event diagnosis of Multiple Myeloma with the drug Revlimid determined the likely cause of cardiac distress. The overnight stay, in addition to multiple hundreds of thousands of dollars already spent on her diagnosis; gave Ryan fully met AHCA and State requirements. *The CDOC did, through the new law and Medicaid, choose to enact and pay for this one emergency admittance, with Medicaid and no CHP interaction; while simultaneously continuing to deny Medicaid, through CHP, for transplant despite transplant also being fully hospitalized and in excess of $100,000 in costs.* Ryan, was actually one of the first CDOC special needs and chronic care inmates in the State of Colorado to be made to sign a power of attorney over to CDOC for Medicaid purposes. Until CDOC learned how to utilize the new federal law, they activated and deactivated Medicaid at will. In **January of 2017**, with CDOC finally having all chronic care inmates sign power of attorney for Medicaid access; the CDOC no longer deactivates when not in use. **Sequential tracking of this time does reveal that requests and appeals for transplant were ongoing at the same time as the cardiac event.**

CDOC then held Ryan's Medicaid account open until **January 2015** before deactivating the account.

During that same time of the cardiac event in **November 2014**; some of the above requests for transplant and subsequent appeals were ongoing. CDOC cannot say that they did not know the coverage and new law existed nor can they say, with truthfulness, that CHP had any involvement with anything that would be the magnitude of Ryan's transplant and thus covered by Medicaid. At the same time, Ryan, doing her part, went through all administrative processes available to her, followed all orders and medical orders and wrote detailed requests for medical care all the way up the chain of command within CDOC. *At no time, can it be said, by anyone on medical levels, security levels, facility levels or administration levels that they did not know of Ryan's case; including this time frame of 2014 when CDOC and CHP selectively chose what they would, and would not 'give' Ryan in medical coverage.*

Also during this time, Ryan was undergoing normal ranges of side effects and difficulty associated with intensive chemo therapy. In addition to: kidney insufficiency, cardiac issues, anemia factors and an endangered immune system. *She had not yet suffered the following physical damages, all verifiably caused by extensive and prolonged exposure to chemo therapy drugs and treatment:* severely dilated left atrium of her heart, loss of pancreatic function, Stage IV renal insufficiency, deep vein thrombosis, severe and chronic anemia, hypogammaglobulinemia, peripheral neuropathy in feet and hands, vision loss and permanent damage(s), chronic orthothesis and ectopic rhythms, myeloma lesions (*bone fractures*) and high risk of incurring other forms of cancer in her lifetime due to prolonged use and higher doses of the drug Revlimid. *All of which, over the course of the*

*next 3 to 4 years, came to pass as permanent damages the longer the transplant was delayed and the ordered levels of diagnostics, care and drugs denied or obstructed to be given as ordered.* Overall, Ryan ended up enduring 41 rounds of chemo therapy, 2 rounds of intensive chemo therapy (DTPACE) in a total of over 4 years and since initial onset of disease in **March 2013** at LVCF.

**In late spring of 2015,** Ryan and her outside medical teams had asserted themselves enough that Dr. Susan Tiona, then Chief Medical Officer (*CMO*) of CDOC and Dr Jennifer Miecks (sic) (*pronounced "Mix"*) of CHP, granted Ryan, a consultation for transplant at CBCI at PSL. Through evidence Ryan will bring forward, the summary of that consultation was, that due to the specific maligning by medical staff of CDOC (*NP Jamie Harrelson* (*Harrelson*), a former HAS named Cheryl Curtis, and Victoroff; Ryan was painted as being "difficult" and "unwilling to receive care" from CDOC who was "giving her everything" and "providing great care". Despite the obvious in that none of those 'reasons' have anything at all to do with a transplant that is black letter standard of care for Ryan's diagnoses (and.or) Ryan's medical needs being met (*which, according to factual diagnostics; were not*), Ryan attended consultation with no personal knowledge of the maligning. The conclusion, was that despite factual medical records and written recommendations from Ryan's hematologist (*Dr. Richard Nash/CBCI*); 2% of the transplant team (*the transplant coordinators in communication with clinical services, Harrelson and Victoroff (and) Ryan 'not having sufficient post-transplant support and care', declined transplant for Ryan).* 98% of the remaining team, including Nash, pushing hard, as verified in records, for the transplant to be given. CBCI requires 100% of their team to approve a transplant and has had very rare opportunity to have a CDOC inmate in their care. Thus, very limited to no experience in the practical knowledge of what and how CDOC medical services operate. Additionally, they are located at Presbytarian/St. Lukes Hospital (*PSL*) who also has extremely limited, (compared to other hospitals) ability and experience to handle CDOC in any manner, as they rarely have CDOC patients. 98% of the CBCI team, **in 2015,** approved transplant for Ryan as medically necessary and expressed strong desire to move forward. 2%, in the transplant coordinator and care evaluator for the team; denied; citing Harrelson, Curtis and Victoroff claims that Ryan's alleged history of being 'difficult' 'unwilling' and 'refusing already "great" care" would be problematic. Also, <u>citing *a lack of adequate support care post-transplant.*</u> NOTE: ***Ryan, post-transplant, would have been under the sole care of the CDOC, Harrelson, Curtis and Victoroff.***

**(NOTE:** (*It is relevant to note at this time, that the difficulties painted by Harrelson, Curtis and Victoroff in 2015, were eliminated, <u>by CBCI and PSL,</u> in 2017. Eliminated despite Harrelson then also being present as rotating infirmary (2017, where Ryan was then housed) staff. CBCI removed the transplant coordinator, for cause, from Ryan's case, during the harvest portion of the transplant in summer 2017, (and) placed RMCC, (who is seasoned in dealing with the CDOC and their medical staff), in 'front' of CBCI as the medical liaison. There was still, some (verifiable) mischief from practitioners Victoroff (Claim Two) and Harrelson with transplant coordinator communications prior to that person being removed by CBCI for cause. In 2017, Ryan, was still then technically assigned to Victoroff despite living in the infirmary and Harrelson was the then rotating infirmary staff. Ryan, was no longer naïve at this point in 2017 and had learned, over the years, that the very best way to maintain an excellent inmate behavior record while dealing with such juvenile nonsense, is to make certain that the outside medical providers she needs come to know her personally rather than third-party. Ryan personally made certain that all staff at CBCI and PSL came to know her and her case as individuals. Ryan, at this point in all the years, had also fine-tuned sequential evidentiary tracking of verifiable trails, of all events, including nonsensical ones, all the way up the chain of command of CDOC; which simultaneously makes it very difficult for any third-party mischief to gain footing (and) also eliminates, eventually, any third party personally putting forward the subtle pressures on an inmate that only CDOC staff can do. The end result, in June 2017, was that after one obvious attempt by the transplant coordinator; the transplant coordinator was removed, by CBCI team, for cause, from Ryan's 2017 transplant and all, including Ryan, were able to finally move forward to transplant without hindrance and with Ryan's oncologist in the lead of supervision. Overall, Victoroff and Harrelson, in 2017, caused an additional estimated month or two of delay (March 2017 to May 2017). The 'for cause' incident was solely an act, by the coordinator, that occurred at PSL, at stem cell harvest time and in-hospital admittance. <u>Ryan emphasizes,that she in no way holds PSL or CBCI at fault for the 2015 or 2017 incidents. Removal of the individual from Ryan's case, in 2017 was immediate and enabled Ryan, her transplant team and all CBCI and PSL staff to move forward to successful transplant.</u> There were also, and as testimonies and evidence from over the years, including that one; Ryan's hospital stays in multiple hospitals can prove no issues whatsoever with the 'real Shawnee Ryan' once Ryan*

was able to be seen as herself (and) *her actual medical records of fact* were able to be completely and thoroughly reviewed, by competent professionals, without the input of CDOC nurse practitioners Harrelson or Victoroff.

**Timeline returns:**  **After the 2015 denial** for transplant and in **early winter of 2016**, as Ryan and her outside contracted care team continued to push for transplant (*either back to CBCI or to University Hospital, which was then, in a new approach by CHP, cited by CHP as 'out of network for CDOC'*) and did so due to Ryan's health and vital organ damages continuing to plummet downward.  Ryan was read an email trail between Tiona and Jennifer Miecks (*sic, pronounced "Mix"*) in **early  2016**, by her then assigned CDOC general M.D. Dr. Ariola-Tirella (*Tirella*); (*who later went on to CMO  position and who also remained in CMO position while **Ryan's 2017 transplant went through.**  His replacement became acting CMO Frost who is named in this lawsuit*).

Ryan, had just received a letter from Tiona **dated October 5, 2015. A letter forced, by Director Raemisch through Offender Services, upon Tiona to write;** clearly citing that Ryan had "never been denied a transplant" and "if" (*Ryan*) was denied Special Needs Parole, the "CDOC" would move the transplant forward.  **At close to the same time, the email between CHP and Tiona *was also executed*** and outside of Ryan, Raemisch and offender services eyes.  Obviously covertly done and with Tiona and Jennifer Miecks (*sic, pronounced "Mix"*) likely never thinking that it would ever be seen or exposed to Ryan.  It is important to note, what these types of promises, not later kept, did to Ryan not only physically but mentally and emotionally, as well.   An email denigrating and shocking enough to Tirella that, mid-winter 2016, he read it to Ryan.  In that email, Tiona and Jennifer Miecks (*sic, pronounced "Mix"*) were *personally* discussing Ryan, clearly stating that "no one would ever give "her" (*Ryan*) a transplant".  Statements said in such a way that the tone was denigrating, disheartening and frightening to Ryan.  When one is fatally ill, with no control over care, and control of something as vital to life as a bone marrow transplant is in the hands of such people; there is an utter helplessness in not knowing if one will live or die by their own body's failure; or simply at the hands of others choices.

**Special Needs Parole was denied as 'no medical necessity' i.e. Ryan would not "die" without a transplant.**  *CDOC, through Tiona and Jennifer Miecks (sic, pronounced "Mix"), (and) after (unknowing to them until now) exposure of the email trail to Ryan;* then went on in **early 2016** and **again denied** Ryan a transplant **despite Ryan's October 2015** Tiona letter in hand.  CDOC and Raemisch, then made fully aware, by Ryan, that Tiona and CHP had defied the letter of **October 2015. Raemisch, after notification, did absolutely nothing to enforce his order from 2015 to Tiona;** Ryan heard back from no one and no response to the latest denial was given.

Ryan, in order to at least try to save her own life and obtain a transplant, then had no choice but to move forward to release through community corrections. A process she had previously waived. That process began, in **late January 2016,** through case management and after Tiona not honoring the **October 2015** letter of approval and after Tirella had exposed the email between Tiona and Jennifer Miecks (*sic, pronounced "Mix"*).

Ryan entered community corrections (*ACRC Littleton*) aprx April 6, 2016.  Timeline then moves to **aprx. May 22, 2016** and after Ryan had spent aprx. 2 months attempting to obtain ID, etc. that CDOC had told her she was being sent out with but did not provide. Thus, Ryan could not obtain Medicaid until end May.  **At the time, CDOC was also still not honoring the new federal law to the full effect the State of Colorado had set up.**  Ryan, as soon as she received Medicaid in late May 2016; immediately set up hematology consultation, through her oncologist Dr. Burke, with University Hospital, who, after one appointment **aprx. May 22, 2018**; set her on a new chemo regimen designed o reduce levels down to transplant readiness (*aprx. 56 days after that appointment, which would have been late August, 2016 and which Ryan accepted because she would have been completely through ACRC program and in her own residence*). **Aprx. 24 hours later, CDOC arrested Ryan on a technical violation for allegedly "not signing a medical release of information form"** (*which was clearly on file and which, as CDOC and still in charge of Ryan while at ACRC, had full access (for years) to all medical records). Authorizations had been in place, for all CDOC, to all care of Ryan, spanning aprx three years at the time*). Technical violations, since the State enacted into law the Colorado Violation Decision Making Process (CVDMP) in 2012 and 2013, are not arresting offenses.  Ryan, however, was arrested and then denied any and all due process that CVDMP *requires as mandatory* (and) that black letter law also *requires before revoking liberty.* (*See Young v. Harper 117 S. Ct. 1148 (1997) which establishes that once offenders are granted a liberty interest analogous to*

*that of parolees, regardless of the name given to inmate status, that liberty interest could not be taken away without the same due process afforded to parolees) and (See Morrisey v. Brewer 92 S. Ct. 2593 (1972) case which establishes that once a liberty interest is given to offenders it cannot be taken away without due process). Both citations found as CDOC used authorities for all AR (administrative regulations policies) used by CDOC governing the handling of technical violations and technical parole violations.*

After arrest and denial of all due process, CDOC removed Ryan's status established at University Hospital. CHP later citing that University was "out of network" for CHP. Again, Ryan's transplant is an extensive, very expensive hospitalized procedure fully covered by the new federal inmate catastrophic Medicaid clause of the AHCA act, which has zero "networks" or discriminations of any kind and which, CHP has absolutely zero authority to govern.

Ryan was returned to DWCF, a Max-5 prison and still holding, as always, her exceptionally low risk ratings; **on June 3, 2016.** Ryan, now classified as having "failed at community corrections" (*a taint that CDOC staff, parole and CDOC administration commonly and often uses punitively(and) repeatedly cites to Ryan to current day*) was **denied all chemo treatment and was told she "had to get approved"** for chemo, oncology and hematology, by CHP and CDOC, "again". Ryan basically, as an inmate, had to start all over again. **Finally, through her persistence and her *body's rapid decline* from that point forward, she once again declared for emergency intervention under AR 850-04. This time, directly to Raemisch. Medical records of fact, in blood labs and outside specialist evaluations, show the many fluctuations in health during the weeks and months this took and that Ryan has never fully recovered from. Resulting, in more and more aggressive chemo treatment being needed and those aggressive drugs causing permanent effects to Ryan's body. It took Ryan, *through very, very difficult conditions for her, on all levels of her being;* dealing with CDOC/DWCF administration, until *late January 2017* to finally get to the chemo care she now needed.**

**Transplant timeline moves forward to late January of 2017:** Ryan's health and levels declined to such extremes, that she was ordered into intensive aggressive chemo therapy at Aurora South Hospital for two rounds of DTPACE chemo therapy. Ryan was *direct admitted* for this treatment, on a routine visit to RMCC. She was not returned to facility nor did she have to endure what would surely be another denial by CHP and CDOC for the treatment. As the goal was to decrease disease levels in order to stabilize Ryan but which also would then have put her low enough to have transplant, a denial from CDOC and CHP was a likelihood. **A transplant, which, by then, CBCI, in communication with RMCC; was willing to give.** RMCC direct admitted her, in concert with her hematologist (*CBCI/Nash*). The authority of the physicians asserting to CDOC admitted her, not the authority of CHP or CDOC. Ryan also, was continuing to push back to receive transplant at University, which CHP denied again, claiming again, that University is "out of CHP and CDOC 'network'".

On completion of the first round of DTPACE; Ryan was transported out of the hospital. (*See Claim Two, Victoroff*) The normal protocol for any inmate coming out of the hospital, let alone coming out of intensive treatment, would be admittance in the Denver Complex's infirmary at Denver Regional Diagnostic Center (*DRDC*). Which is located on the same grounds as DWCF. *Ryan, however, though her security officer strongly questioned master control, was ordered, by DWCF and her nurse practitioner (Victoroff) at the time, to instead be returned to general population.*

Over the next 72 hours (*see Victoroff, Claim Two*) Ryan endured a near death event that put her into Aurora South intensive oncology care. Ryan then went on, after recovery from that event and in **March 2017,** to do the admitted to hospital second round of DTPACE. On release, after both the near death event and the second round of DTPACE, she then went, without question from CDOC, to the infirmary for care afterward. *By this time, all other damages to Ryan's body, with the exception of damages stated in Sommerschield, Claim Two, were in place.* Medicaid covering all costs and approvals for both rounds of DTPACE and the near-fatal intensive care event; not CHP.

Ryan, in **early 2017, after the two rounds of DTPACE and despite the willingness of CBCI and PSL; was *still*** stalled transplant by **CHP**; claiming, again, lack of medical necessity. In layman terms, their argument all along is that at each phase of each treatment, Ryan is 'cured enough' and 'doing just fine' without a bone marrow transplant or further medical care. The push, each time, and continuing to present day, then became to 'show' Ryan

as 'just fine' by attempting to remove outside specialists, treat Ryan "independently" with mid-level—non-specialized—general scope of practice nurse practitioners and without a board certified, licensed M.D. on staff, on shift and in direct supervision at all times in complex cases. The only 'way' to do that, is to remove outside specialists and care (and) to push Ryan out of infirmary safe housing. Both being done by a constantly changing staff turnover at all levels of CDOC. All with different theories of how to handle her care, thus ever-changing treatment 'ideas' designed, in what Ryan believes are designed to show CDOC in a more positive light for Ryan's case

(**Note**: It is to be clearly reminded, that at all times, whether Medicaid in place to cover or not, the CDOC runs medical inmate need through CHP. Ryan further contends that the new Medicaid law is not justs in effect to 'pay after the fact'. In other words, when a procedure is obviously to be hospitalized, is obviously expensive, the CDOC has an absolute obligation under the new law, to gain approval or denial through Medicaid as the insurer who will be paying the bill. Simplistic questions arise: "What, exactly, does the privately contracted CHP, have to do with, in any way, an approval or denial of a procedure solely under the governing of state and federal authorities (Medicaid)? (and) "Are there any controls whatsoever, to prevent a private, for profit, third-party contracted entity like CHP, from potentially purposely acting self-serving by steering, through approvals and denials of care; inmate procedures into their own hands and networks? "What are those procedures and who, exactly, is in continual oversight of every inmate case?)

**Ryan's diagnoses and standard of care,** despite being very complex, are, in a way, also simplistic. There is only one path with Myeloma and it is treated the same way every day for the rest of the patient's life. There is, at this time in medical knowledge, no 'silver bullet' changes for anyone to do, to that standard of care. Even if there were, as long as Ryan is under CDOC control; she is not allowed clinical studies treatments. Sommerschield (*Claim Two*) took over as non-rotating infirmary; in aprx **July 2017.**

**Timeline returns back to late May 2017.** CBCI at Presbytarian/St.Lukes team, at this point went on, after direct interview and workup of Ryan, and approved her for transplant. In **June of 2017,** there was no alternative, in order to sustain Ryan's life, but to give transplant. **CDOC** granted and Ryan underwent a successful autologous bone marrow/stem cell transplant **in June and July 2017.**

**NOTE: The most basic premise of this lawsuit, based on alleged fraud, is: *The CDOC, with CHP finally approving; used Ryan's Medicaid which paid for and covered all costs. And did so, utilizing the exact same AHCA law and exact same coverage, available to them in August of 2014 and prior to most all of the permanent physical damage Ryan now endures (and) prior to millions of dollars in cost to the Society that funds both entities.* Available to them and prior to:** 41 rounds of chemo, prior to 2 rounds of DTPACE; prior to Deep Vein Thrombosis (DVT), severe dilation of left atrium of heart, ectopic rhythms, chronic orthothesis, bone lesions, hypogammaglobulinemia, anemia, pancreatic insufficiency, renal insufficiency, atrophied right kidney, severe neuropathy in hands and feet, vision loss and chronic edema (and) prior to so many of the issues raised in this lawsuit. **All,** *could have been avoided* if the same federal law had been utilized by CDOC in **August of 2014. Any and all claims, by CDOC and CHP, citing in denials: "no medical necessity", "too expensive", "not within network of care", "procedurally denied as a repeated request"; are knowingly deceptive answers and therefore fraudulent as well. Medicaid does not discriminate against an inmate, nor has a network of any kind, and has, for many years recognized and covered in full, Ryan's diagnoses and the black letter standard of care Ryan's diagnoses require. The questions, in part, that Ryan is demanding answers to, are: Did CDOC, or did they not, have the ability under Medicaid in August 2014, to have Medicaid approve or deny a transplant ordered for Ryan by medical specialists? Did, CDOC, or did they not, allow CHP to bypass the governmental authority of Medicaid and deny Ryan, a transplant, not once, but numerous times spanning years thereafter? Did, CHP, or did they not, bypass governmental authority that they had no authority with, and deny Ryan transplant multiple time? Did, CDOC, or did they not (and) their agent CHP, at will, activate and deactivate Ryan's Medicaid for other needs and still avoid transplant? Did, CDOC when necessary to Ryan's life (or end of life), activate Ryan's same Medicaid coverage she had in August 2014 and use that same Medicaid coverage to fully approve and cover costs for Ryan's 2017 transplant?**

Ryan, is now, at the time of this filing; 61 years old.

**SECOND PART OF CLAIM ONE: (Goes primarily to post-transplant negligence)**
Tirella, who read Ryan the Tiona/CHP email above, went on to become (CMO) for CDOC in 2016 and 2017. Being highly competent enough to clearly understand the nature of Ryan's diseases and the care they require and having expanded understanding of Ryan as he had assumed Ryan's CDOC general care after Harrelson in 2015 and prior to CMO position; he protected, as CMO, the nearly (5) year protocol and all previous orders protecting protocol of care in Ryan's case. Doing so, by placing her on permanently assigned offender status (*PAO*) to the safe housing of the (*DRDC*) Infirmary. Also protected her and her outside oncologist (RMCC/*Burke*) governing and being able to receive the maintenance drug Revlimid. Doing so by simply obeying the standard medical industry of protocol and care required in Ryan's diagnoses and drugs. There is just simply, no other housing available, other than infirmary. There is just simply, no other provider, other than qualified M.D.'s and the team of outside specialists already in place. There is just simply, no other drug, other than Revlimid, despite all the side effects and additional problems it causes; that will keep Ryan alive. There is just simply, no ability for anyone to deny that Ryan no longer has any immune system, antibodies, or immunizations required by State and Federal law for citizens living in a dense population.

It took, less than a few days after Tirella quit the position of CMO and moved on, for a nurse practitioner then running the infirmary (*Claim Two (Sommerschield*)) to remove the PAO status, **on or about November 13, 2017.** And begin, **(on or around December 22, 2017)** *to effectively remove* Ryan's outside oncologist as the (*DEA contractually required*) supervising attending specialist and place herself, as (*her witnessed words: "independently treating medical in order to avoid lawsuit"*). Sommerschield then spending the next aprx. 7 months dismantling the long-standing and numerous, care and blood lab orders that keep Ryan out of neutropenia as long as possible so that Ryan can have daily Revlimid. (*See Claim Two, Sommerschield*)

 **From on or around December 22, 2017, it has taken Ryan,** through again forced administration assertiveness, *with this lawsuit the end result,* to get enough of the fragile balance back in place *to gain the return* of RMCC/Burke being in control of blood labs and support care IV's; rather than Sommerschield. Ryan finally achieved some recovery by gaining back RMCC and oncology in charge of labs and monitoring assessments **on Feb. 21, 2018.** During those months of struggle, Ryan's recovery *became, and remains;* sluggish, slow and jeopardized.

*That fragile balance is partially and temporarily back in place at time of this filing.* **Ryan files the attached injunctions to protect and fully return safety and care.**

Ryan's claim includes post-transplant recovery negligence on the part of defendants, through fraud, **as *they knew all along*** that phase three of Ryan's needs would be expensive maintenance, requiring special needs housing and care, and knew all along that they were utilizing nurse practitioner(s) acting outside of license parameters rather than on staff, on shift, in direct supervision at all times board certified and licensed medical doctors. All, also knowing, all along, that a nearly five year statistical and medical fact based record clearly showing the minimum of care Ryan needs daily is on file and in their control. **All also knowing, all along,** that the new federal law was in place since 2014 and that the State of Colorado had adapted that federal law into state law. **Administrative and supervisory defendants named in this claim were, also and at all times,** in direct and total control of all actions of the staff underneath them. **Administrative staff also fully aware, at all times, due to Ryan keeping them informed.**

**NOTE: The questions, in part, are:** Did, the CDOC and CHP, or did they not, know all along and from the first moment of diagnosis, that Ryan required a three phase treatment which includes post-transplant care? Did, the CDOC and CHP, or did they not, have complete access to all of Ryan's medical records which enabled them to know all of Ryan's needs? Did the CDOC and CHP, at any time, have full and complete access to the knowledge of highly specialized M.D.s who ordered such care to Ryan? Did, the CDOC and CHP, have the duty to know and act, the ability to know and act, and should have acted, on behalf of Ryan? Did, the CDOC, at any point in time, have control over CHP and duty to maintain control over CHP? What, exactly, are all the mechanisms, in place, within CDOC and both Bureaus of Prisons, to control, since the onset of the new federal law that is basically competition for CHP, the flow of approvals, denials and payment to CHP (and) exactly how are those mechanisms

enforced? Did, or did they not, (all defendants) ever cause harm to Ryan's person wherever those mechanisms in place failed (or) were non-existent?

**THIRD PART OF CLAIM ONE: (Goes to pattern of fraud and falsification of medical and inmate records)**

1.   Inmates have the right to refuse, for whatever reason, medical care and/or any aspect of their medical care that they feel or know is harmful to them. They also have the right to enforce, to whatever limited ability they may have; the medical orders from attending specialists, hospitals and established in their case caregivers. CDOC claims to utilize what is called, a two-part *(duplicate with white top copy for CDOC and canary yellow copy for inmate)* Inmate Refusal of Care Form (ROC). This form is solely created and word-crafted by the CDOC. 'If' an inmate is cognizant enough to understand 'what' the form actually is, they can see that it is a very clearly and attested, <u>once it is signed</u> by the inmate, legal and binding upon all parties **affidavit** that reads, in part: "To Whom It May Concern: This is to certify that I, *(inmate writes out their name)* refuse observation and/or treatment from the Colorado Department of Corrections Medical Services Department. I specifically refuse observation and/or treatment for the following: *(5 lines open where inmate is to write out their specifics)*. *(CDOC disclaimer, imprinted below the inmate specifics):* I refuse this at my own insistence and against the advice of the medical services staff. I have been informed of the dangers of my refusal regarding this treatment and observation. I release the Colorado Department of Corrections Medical Unit, its employees and officers, and my attending physician from all liability for any adverse results caused by this refusal of treatment and or observation." Patient signature underneath the above. Date and Time, with two staff witness signatures complete the document. Inmates are clearly told by 'blue staff' *(staff that is not medical in nature and is in uniform)* and by honest medical staff; that an inmate *cannot be refused an Inmate Refusal of Care Form nor can they be refused a copy of the form at the time of its execution*. CDOC AR 700-02 also very clearly states an inmate cannot be refused and must be given a copy at time of execution. CDOC AR also clearly cites that the form is an *original duplicate* form, with white copy to CDOC and canary yellow copy to inmate; not simply a single page black and white Xerox copy of the form that is in-house made.

2.   **This part of this claim pertains** *to alleged fraud through a facility practice, used for years, and* often used by questionable medical staff that *is forced* upon the inmate; with regard to ROC forms. There is, a small and brave minority of medical staff that refuse to engage in the practice and who will follow the obvious in the form, which is that the inmate refusing care fills out what and why they are refusing and then the inmate signs; *rather than the provider or other medical staff, as actors, filling out the form and pushing the inmate to sign what is not their words or reasons.* There is also a small and brave minority of medical staff who will and do, *openly* refuse to obey those who use the facility practice by questionable medical staff, who, at times, have *literally* ordered them to "write on the form", what they dictate. Which obviously, leaves the questionable staff the ability to later on deny their involvement, as "their handwriting", as an actor, is "not on the form". *(See Sommerschield, Claim Two)*. The inmate, when their reason is something that questions how a staff person is going to perform a procedure, and/or is refusing because of a fear based reason, **or a reason** *that questions in any way the competency of the staff person;* is **refused** a ROC form *and the* **ability to write it out themselves. They are also** *refused* a copy of what the then actor; who portrays themselves **to 'be the inmate' goes ahead and writes.** Leaving the inmate, with no ability to *prove* the acted and impersonated form *as it remains in the sole custody of the actor (See Sommerschield Claim Two).* The actors, then go so far, to tell the inmate, that the inmate is *basically disobeying a lawful order to sign* their form (and/or) *telling the inmate they will receive no further or subsequent related care, including life maintaining labs, diagnostics, surgeries or drugs, if they do not sign a statement that is not theirs.* The actor's actions basically amount to threats and/or attempts to intimidate by using the most vulnerable aspect of life; which is, the ability to obtain **appropriate** medical care. The threat(s) written on the form by the actor, generally, are combined with words of fear-mongering such as "could result in death"; and **always paint the actor** in the favorable light the actor desires; whether a light that is reality and factual, or not. **Actors do so, despite the undeniable fact that these forms** *already have,* **imprinted on them and directly above the signature line of the inmate; a full and complete disclosure of liability release, designed by their employer (CDOC) on behalf of CDOC, and are absolutely not a form meant to allow** *the actor* **to plead their case for what they believe or want the inmate to represent in the inmate's medical records. Further, never once, in nearly 6 years now, has Ryan found any administrative staff or process that has ever looked into this practice of the staff underneath them.** Ryan contends that these ROC forms, are, once impersonated, a willfully and purposely done, false and inaccurate i.e. fraudulent medical records document. Many times over the years, Ryan has clearly stated

that she has no control whatsoever with any CDOC staff writing whatever they wish in her medical records, as long as the sequential track ability of truth and fact is not tampered with and remains available to disprove an actor's claim should she need to do so. Ryan also acknowledges that the CDOC is certainly free to create some other type of form that can be used as a platform by these people.   Ryan contends that they just cannot do so or make any entry by impersonating 'Shawnee Ryan' or making false claims of any kind in 'Shawnee Ryan's' medical records.   **Ryan further contends that once they do decide to impersonate and falsify her medical record (and/or) attempt in any way to force Ryan to *not* be specific when she is filling out the ROC; the CDOC crosses the legal lines in a number of areas: Falsifying a medical record, a record often then transmitted by fax or electronic handling through government owned equipment, operating outside of licensing parameters, use of implied force to give or remove medical care and at times; medical malpractice.**   When an inmate succumbs to this kind of pressure and does sign an impersonated ROC; the obvious occurs. They have just signed a sworn affidavit that is not the truth **of their reasons and needs and has done so under duress that should never have been inflicted upon them.**

3.   **In part, this section of Ryan's Claim, contends that these actors are knowingly committing fraud and further contends that using the reasoning that they are "told to", or going along with facility practice or "didn't know" is *knowingly false reasoning.*** Any medical care provider, standing in front of Ryan and ordering her to sign what basically amounts to an impersonated and thus fraudulent document, is **not "unaware' of what they are doing.** *Nor, are the entities above them in the chain of command and employment who silently, complacently allow the behaviors and practice.* The form is a very simplistic sworn affidavit that is binding on all parties and **if no one is doing anything wrong on medical's part; there should be no reason whatsoever for impersonation as an actor to be happening at all.**   Ryan, does not condone their behavior/reactions/entrenched practices; nor does she condone the unlawful and unscrupulous behavior of the actors. *In one aspect, the observation above shows the court how Ryan is perceived as being 'too difficult to deal with' as she is not coming from poor behavior and judgment as so many are; she is coming from herself as an intelligent, astute, cognizant and non-institutionalized individual aware of what is happening to her.*   In short, she does not meet the standard norm of most inmates who make being institutionalized a way of life.

4.   In another regard, the previous statement is given as background that assists in showing, as suit moves forward bringing in future evidence, how many times Ryan has been exposed to the practice and how deeply the practice has affected her medical care over the years. **The following description of how Ryan *discovered* this practice by actors, is testimony of the first time Ryan was exposed:**

   Ryan's first encounter with a Refusal of Care (ROC) form, that held significance for her; was in **November of 2013.** Ryan, assigned to Victoroff, had just finally obtained the simple 24 hour urine test in **September 2013,** was awaiting release from medical in order to return LVCF. Sample showed Bence Jones saturation of her urine, she had been given a kidney ultrasound and then a right kidney biopsy. Ryan was then assigned also to CDOC Nephrologist, Dr. June Scott (*June Scott*). June Scott had just given Ryan the results of the biopsy, which had shocked June Scott at the time; as the diagnosis of 'Light Chain Deposition Disease' is very rare and June Scott was unaware of the relation between the biopsy diagnosis of Light Chain Deposition and/or "Myeloma Kidney". At the time, the pathologists had not completed the full analysis and June Scott had only given Ryan that initial finding. Telling Ryan that when she returned from time to time, they would make a plan and discuss. June Scott, Ryan felt very comfortable with, as her expertise and knowledge were obvious. Victoroff, Ryan did not. June Scott, specifically told Victoroff, when pathologists notified June Scott that they were also requesting Ryan be screened for Multiple Myeloma cancer; to NOT tell Ryan of the possibility of a secondary diagnosis of fatal cancer as well and that she would tell Ryan upon return. June Scott, aware of Ryan's skepticism of Victoroff abilities. Victoroff disobeyed. Called Ryan in to the DWCF Clinic, slammed her hand down upon her desk and: "Ryan, you're dead in 6 months". Shouted (witnessed, logged and verifiable) other grossly inappropriate comments, to the effect (as Ryan, in shock at this point, heard) 'that there was no hope' and she (Ryan) 'must do exactly' what Victoroff stated, *that (N.P.) Victoroff had already acted without (M.D.) June Scott* and scheduled Rocky Mountain Cancer Center's appointment, and had already 'made a treatment plan' without June Scott.   It is important to understand, that Ryan has never been truly ill.   At the age then of 56 years; nothing more than normal ailments we all have. Ryan's shock to all of it, including trying to adjust to an entirely foreign world of

incarceration; was deep. *To this day, at times when she has to find within, the ability to stay standing up in order to get the care she needs; Ryan involuntarily hears echoes of Victoroff's voice and words on that day.*

On this day, in **November 2013**, Ryan was assisted by the supervisor of Mental Health, who had been helping Ryan and Ryan's case management, in efforts to return to LVCF. A ROC form, that *Victoroff filled out and Ryan did sign*, was executed, on that day, in Victoroff's office and just after Victoroff's informing Ryan of fatality. That ROC, was somewhat vague but also clear, *to Ryan*, that all Ryan was refusing was the initial RMCC appointment made by Victoroff without June Scott. *Not all medical care.* Ryan, with the mental health supervisor witnessing; made it very clear, verbally, that she was stunned and "needed to think". Victoroff ignored, calling in Nurse III Jennifer Dumpbert as her witness to the signing and the form; and then went on, *for four months*, not allowing **Ryan to be seen**, *for any reason*, in medical. **Not allowing any of Ryan's kites to medical to be responded to. Refusing, up** *until the end of January 2014*; to allow June Scott to have *access* to Ryan. Finally, at the insistence and forcing by June Scott to Victoroff; *Ryan was allowed to be seen by June Scott and only June Scott*, at the **end of January 2014**, *for one appointment*. June Scott began to set up and encourage a treatment plan for Ryan. June Scott, however, *only held power over Ryan's kidneys* and Victoroff *held power over all care and whether or not June Scott could move forward*. (*NOTE: It is important to understand that when the CDOC provides zero daily controls, supervision (and) continual presence of a qualified M.D. on every shift; they so thoroughly enable and empower its medical services with virtually unbridled power and ability **that is used** by practitioners such as Victoroff. The only controls an inmate patient has, are ROC and grievance forms).* Ryan, then had to learn how to utilize, her first true enactment of the AR 850-04 grievance process. Ryan grieved and utilized, *for the first time*, the Emergency Intervention clause of that process and requested Intervention. Which led to a staffing in **late March 2014**, which led to the removal of assignment to Victoroff and Ryan being placed into the assignment of CDOC medical doctor, Adelina Longoria, M.D., who had just been hired. Ryan was then subsequently diagnosed and treated for Multiple Myeloma by Rocky Mountain Cancer Centers (RMCC); which began Ryan's relationship with the outside oncology team that continues to present day.

5. Since, there have been many times, when Ryan is being attempted by others force, to have or do something Ryan knows is wrong or harmful to her; that Ryan has had to utilize a ROC form.

6. . **The purpose of the above general description of ROC practices by CDOC, for this portion of claim is:** That the CDOC, its designees, and the Bureaus, knowingly allow, in Ryan's case; the practice of impersonation by actors on these sworn affidavits *and* they allow it at both DWCF and DRDC clinical services. Abuse of care that often results. **Ryan contends that the practice is a falsification of medical records, which does violate the legal parameters of nurse practitioner's licensing and statute. Further contends the practice and allowance of is negligence through a fraudulent pattern of behavior.** That doing so in Ryan's case, has resulted in near-death events, such as Victoroff in Claim Two. Therefore, gross negligence.

**FOURTH PART OF CLAIM ONE: (Goes to the practices of CDOC handling of the grievance process)**

*1.* The administrative process known as the grievance process, is governed in rule and scope, by the State of Colorado Supreme Court; not the CDOC. That rule and scope is spelled out, for all parties, within CDOC AR 850-04 and in statute. There are very simplistically spelled out rules of time, rules of service and rules of binding on each party within that scope. In short, the point being made here, by Ryan, is that is not just the inmate who must follow. *The CDOC and its designees must also follow the rule of law of the court. Ryan contends that the CDOC, at the Denver Complex, shows a flagrant disregard for the process. The end result, is that an inmate, with regards to medical grievances, is utterly helpless to resolve issues timely or reasonably (and/or) enforce what may be resolved in the process. If, they are so fortunate as to actually get the CDOC/Denver Complex to complete or engage in the grievance process.*

2. Ryan has attempted to follow all procedures of AR 850-04. Problematic for inmates because *an inmate has no control whatsoever of the actions, choices and behavior of CDOC and its designees.* Every obstructive and delaying tactic, at least at the Denver Complex (*DWCF and DRDC*), is employed and used by staff when it comes to grievances. For inmates, forms must be obtained through case management (*case management fails to respond at all and/or timely. If inmate motivates themselves and makes a master copy form of their own; that is "insubordinate" in eyes of case management; even when the staff being grieved is 'out-of-time' in responding,*

*literally by weeks and months).*  If an inmate complains up the chain of command, there are many, many ways retaliation from field, medical and case management staff occurs. Not the least of which is the rampant gossip between all staff where the inmate is painted as a trouble-maker and/or difficult. Staff responds to grievances, if they respond at all, when they choose to. In mates cannot "move up" in steps because they are refused, by coordinators and case management, the grievance number automatically assigned when a Step One is filed; both claiming the inmate "has to wait for response", when (verifiably in Ryan's case) response, if given at all, is weeks, months and at times up to a year or more in coming. Reality, is that the CDOC/employer of these people have a very simplistic ability, in place, to retrieve a grievance number assigned at Step One. That process, amounts to simply turning on their computer and pulling up the number that is automatically assigned, by the system, the moment a Step One is filed and received by the grievance coordinator. Ryan maintains contention that ultimately, all those, in command above these people, despite their system being in place, are still accountable when they provide absolutely zero oversight and supervision to maintain that system.

3.  An inmate generally 'can tell' they have **a viable complaint** when they are 'procedurally denied' for nonsensical reasons and/or obstructed and delayed at field levels.

4.  The problem of getting through the administrative process continues when an inmate takes a medical grievance all the way to Step Three *(headquarters).*  The letter they will eventually receive back, in short, often and basically states the reviewing party *has no medical knowledge or background and cannot answer, yet does not feel the inmate has shown their point.*

5.  Medical grievances are routed through one grievance coordinator, while staff/'blue' grievances are routed through a different grievance coordinator. **A standard obstruction *by medical* is to route the grievance,** when an inmate grieves a 'blue' staff *(which includes administrative staff)* for *(say as example)* 'failure to enforce security over medical staff' (action)' **through the medical coordinator** *rather than staff coordinator where it will even reach the eyes of the person being actually grieved.* A very effective obstruction that keeps issues solely under medical's eyes. A great example, is the fact that every complicity grievance Ryan has filed against administrative staff, for being complacent over medical in Ryan's case; has likely never been seen *early enough to do anything about issues, by the staff being grieved, and, since Wardens all have never even bothered to answer a kite, attend a meeting or even introduce themselves to Ryan; possibly don't even know, until this lawsuit filing, that Ryan claims them to be complacent.* Which, Ryan further contends, **is a moot point** because same administrative staff is obligated to know, has the ability to know and many, many times over ultimately did know, because Ryan learned to back up her grievances with kites and letters notifying grieved staff; and did so all the way up the chain of command. To this day, not one Warden (Johnson, Jacques, Long) or CMO (with exception of Tirella who Ryan knew also as her M.D. and Frost) ever bothering to answer a kite, letter or even attend or speak to Ryan in her requested staffings to try to resolve. Going up the chain of command, a double edged sword for Ryan, despite her obviously having no other choice in a grievance system CDOC utilizes to fail; as retaliation from all staff does and did occur in the many forms available to them. The most obvious, are the claims within this suit, which are difficult to be seen other than that they were fully preventable if only CDOC followed parameters of law, policies and duty already in place. Again, Ryan credits these professionals with training and intelligence that, in the same manner as the ROC forms above; *they knew what they were doing within the actions or lack of actions they took. None, 'did not know' what they should be doing; therefore, the consequences now dealt are their own.* Ryan contends the ways that CDOC and its designees have handled the administrative process known as the grievance process is negligent and, at times, have recklessly endangered Ryan by such handling. The grievance process is mandated by the State Supreme Court, is long-standing law and practice. Therefore, any repeated mishandling is a pattern of behavior. **As a willful and knowing pattern, the behavior rises to the level of aggravated in addition to being fraudulent practice.**

6.  **Some, but not limited to, the ways that Ryan has been affected or harmed by dysfunctions in the grievance process (delays, obstructions, machinations of medical staff) are: 1)** At one point, an LPN named Tsehay Gezehagan, in concert with her supervisor, R.N. Jennifer Dumpbert, dosed Ryan with Revlimid when Ryan's creatinine level was 6.97 and orders on file mandated no Revlimid if creatinine was 2.0 or higher. For a female, kidney shutdown occurs at 7.0. Grievance not only denied, but virtually ignored as Dumpbert was named and handled two phases of the grievance process (informal and Step One). **2)** The breaking up of chemo oral dosing orders from specialists into different times

of day instead of targeted dosing all at same time, same time every day. A practice that effectively and verifiable caused Ryan's proteins to maintain control in her body and verifiably caused many months of additional rounds in order to regain control.  Control that never really came back into hand until transplant in 2017 and the drug Melphalan. 3) At another point in time, R.N. Jennifer Dumpbert and R.N. Robert Goprett (assisting) attempted to inject sub-q, an unstable chemo drug (Velcade) into Ryan, knowing full well its shelf life had expired and the drug thus became toxic. The only saving of Ryan was the fact that an astute Sergeant was observing and Ryan was not alone with Dumpbert. There is a signed and witnessed affidavit on file, requested of Ryan  by case management and mental health staff within CDOC, that states the entire incident. 4) Many seemingly small things, that have very large impact, such as:  failure to provide ordered nutrition (that assists greatly in keeping Ryan out of neutropenia);  failure to get Ryan to scheduled outside specialist appointments (thus missing blood labs and doses of chemo drugs); many times over, the obstructions and delays in getting, and often not providing at all, the drug Revlimid; failure and or altering of obtaining blood labs accurately; *are to name a few of the times grievances have been mishandled in Ryan's case.*

7.   Another preferred obstruction tactic utilized by DWCF and medical staff, is to periodically claim that an inmate is filing "frivolous" grievances.  The inmate is then sent a letter, citing that the inmate can only file limited grievances for a 90 day period of time.  The letter, is crafted to read, unless one looks at it closely, to sound like grievances are forbidden during that time and/or the inmate is in some type of 'trouble' for filing.  Reality, is that grievances cannot be denied to inmates and in Ryan's case, she has never filed anything "frivolous".  At one point, one of Ryan's Captains refused to allow a frivolity letter upon Ryan as it was plain and clear not one of her filings were frivolous in any way. This obstruction is, however, *a very effective delay in receiving medical care*. It is also a favored staff actic to paint the inmate as "difficult" and "never satisfied" despite the obvious fact that nowhere in sight is supervision of medical staff or staff compliance with the grievance AR 850-04.

**NOTE:  The purpose of the above general description of grievance practices by CDOC, for this portion of claim is:**  That the CDOC, its designees, and the Bureaus, knowingly allow, in Ryan's case, a blatantly obvious and traceable dysfunction within staff, especially medical staff, in handling the administrative process known as the grievance process. That many times over, in Ryan's case, her very fair and offered remedies of requested staffings, meetings, cease and desist; would have contained and/or stopped incidents that have literally resulted in excess monies having to be spent as a result of not stopping, permanent damage to Ryan's body that could have been avoided and at times, prevented. Some events ending up being life threatening incidents to Ryan. Ryan contends that the dysfunction is entirely preventable, totally unnecessary and should not be in place at all given the undeniable fact that the grievance process is simplistically defined and regulated by the State Supreme Court.  The CDOC, its designees and both Bureaus are not above the law or the court's rule.  The behavior is a pattern of behavior, carries certain aspects of fraudulent and deceptive behavior and therefore rises to not only the level of negligence, it arises to the level of gross negligence as it has gone on for years in Ryan's case and she had pointed the dysfunction out.  Unfortunately, the only means to do so….is within the grievance process under scrutiny here.

**FIFTH PART OF Claim One: (Goes to fraudulent use of a ranking of classification in medical records)**
        Another area of medical records, practiced in all inmate records, is known as "Qualifier Level".  A numerical ranking from 1 to 5. Five being someone with complex medical needs and pretty much constant contact with medical services.  Which, Ryan is and has been for years.  **A   four or five ranking is *mandatory*, with the qualifiers also of complexity, fatal, risk, etc.; to be placed with an M.D. assignment as the provider or in continual oversight, available to oversee practitioner.**  A 3 or under; is assigned a nurse practitioner or physician's assistant level of provider assignment.  The Qualifier Level is also flowed over into the security classification of an inmate as: M (medical) 1 through 5 ranked.  Where medical records cannot be viewed, without express release of the inmate, due to HIPPA; the classification of an inmate is viewed by many.  Security, courts, parole, community boards and staff, etc.  Overall, in her experience with CDOC Clinical Services to date, Ryan considers the ranking as one of the most powerful controls CDOC has over her at any given time they choose to point it out or display it.

        In Ryan's case, the Qualifier Level has been repeatedly misused over the years, causing Ryan the loss of assignment to a CDOC medical doctor, by three nurse practitioners and two HSA's (*Victoroff, Sommerschield*

*(Claim Two), a nurse practitioner named Jamie Harrelson, former HSA Cheryl Curtis and current HSA Tina Cullyford).* A misuse, that could only be done, by the individual practitioners of Victoroff and Harrelson allegedly deceiving the system by ranking inaccurately, by the individual practitioner of Sommerschield allegedly deceptive in how much she allegedly manipulates outside specialists and orders from (and) both HSA's, in Curtis and Cullyford knowingly allowing the practices to be done.

**Victoroff:** From **mid-2016 to on or around December 15, 2016**; knowingly kept Ryan at a 3 Qualifier level, despite Ryan in daily clinic contact, additionally transporting outside to RMCC multiple times per week, with multiple labs and IV infusions weekly. Again, since diagnosis in 2013, Ryan has never been less than a 4 or 5 level of ranking. The only way, Ryan got 'moved up' to a '4' level, by Victoroff, at that time, was *for Ryan* to firmly confront Victoroff and assert herself enough to be moved up. Even then, Ryan was not moved back over to available CDOC M.D. Tirella, nor to any agency M.D. working as temp staff. Ryan, had no idea, all the years prior, that "Qualifier" power even existed and had just learned how it worked, in one of her monthly 30-minutes allowed medical records reviewing when she by chance happened to ask medical records 'what' a Qualifier level was.

**Jamie Harrelson:** Is not named in this lawsuit due to Ryan's uncertainty of limitations tolling on the years of accumulated events concerning Harrelson. **She is named now as an additional example** of a nurse practitioner knowingly maneuvering a system of ranking and preventing Ryan from having an M.D. assigned. After Dr. Longoria left CDOC in late **November, 2014**, DWCF Clinical Services utilized, for a number of months, a temp agency M.D. named Dr. Martin. Who later went on, to stay temp agency and work the infirmary. Harrelson, Curtis and Dumpbert, when Ryan questioned 'why' she was not assigned to Martin, claimed that Ryan not only did not qualify, she could not be assigned to a "temp agency M.D.". During these 9 months of time, from **December 2014 through to August of 2015** *(when Dr. Tirella came on board)*, the stated mishandling of Ryan's **Spring 2015** consultation with CBCI and PSL *(first part of Claim One)* occurred under Harrelson; inability to be dosed accurately or effectively with Revlimid and support drugs occurred; Ryan's inability to even get regular treatment in the clinic *(Harrelson's direct order to "not submit kites unless in death throes on a concrete floor")*; an attempt to force remove Ryan's port; and the coordination of the chemo drug Velcede being done in-house under Harrelson which ended up in the attempt by Dumpbert to inject unstable Velcede; occurred. Harrelson supervised by a former health services administrator named Cheryl Curtis.

**Sommerschield:** As to Sommerschield handling the "M5" classification Ryan is finally recognized at, rather than a board certified, licensed M.D., her handling is laid out in Claim Two below and speaks for itself. Sommerschield supervised by health services administrator Tina Cullyford.

**NOTE:** All supervisory and administrative Defendants named in this claim were, at all times, in direct and total control of all actions of the staff underneath them. The dysfunction and misuse of the Qualifier Level ranking system has been specifically noted as causing issues as named above, but also causing issues with Ryan's access to Special Needs Parole (parole's claim of "no medical necessity") and an appellate attempt to gain appellate bond; which both were necessary to try for since Ryan was also dealing with CDOC and CHP denying her a bone marrow transplant. Rankings, classifications and the items in an inmate record that can be reviewed at a glance (such as Qualifier Levels) are the basic structure of how systems like parole and court's work. It is rare, that details, especially long-winded details as a case like Ryan's is; are taken the time to be reviewed. Thus, there is a great deal of power in the hands of people like Victoroff and Harrelson when they knowingly maneuver such a seemingly simplistic action. There also is no ability, at any time, for Defendants to prevail in any claim that they 'did not know' the Qualifier Level existed (or) that they did not have access to know in Ryan's case (nor) claim not to understand how powerful that one, seemingly very small ranking of classification, is. Defendants most certainly do know. As the issue has gone on, for years and through to current day; a pattern of behavior is seen and therefore, the failure to resolve is gross negligence through fraud.

**<u>CLAIM TWO:</u>    MEDICAL MALPRACTICE RESULTING IN GROSS NEGLIGENCE (AND) FALSIFICATION (FRAUD) OF MEDICAL RECORDS**
(Defendants: CDOC, Rick Raemish,, Dr. Susan Tiona, Dr. Frost, Nurse Practitioner Hilary Victoroff,  Nurse Practitioner Laura Sommerschield)
**Primary Authorities:**

- *Where...self-serving contention that they did not have the requisite knowledge **does not provide an automatic bar to liability in light of...objective evidence to the contrary..:  Scicluna v Wells, 345 F.3.d 441, 446***

  - *Where the court does not have to accept... staff's statements that "they did not know"...a serious need if there is evidence, either direct or indirect to the contrary...:  Vaughn v Gray  557 F.3.d 904-909 (8ᵗʰ Circuit 2009)*

  - **Legal standard of medical malpractice that defines:** *"Medical personnel who undertake to treat specialized problems are held to the standard of care applicable to those specialties even if they do not claim specialized expertise" (and) "obliged to exercise the same standard of care while working in a prison as a hospital.." (District of Colorado v Mitchell 533 A.2.d 629,648 (D.C. 1957); Moss v Miller 254 III App 3.d 174, 625 N.E. 2.d 1044, 186-87 (La App 4 Cir 1988)*

  - **Eighth Amendment** *where deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain...:  Estelle v Gamble 429 US 97, 104, 97 S Ct 285 (1976); Erickson v Pardus 551 US 89, 94, 127 S Ct 2197 (2007) (per curiam)*

  - **Medical Malpractice and Negligence, partially defined:** *"...causes injury by failing to have  and use the knowledge, skill and care ordinarily possessed and employed by members of the profession in good standing.........to avoid malpractice ... the (" doctor") must utilize ordinary knowledge, skill and care in both diagnosis and in treatment.  Medical personnel who undertake to treat specialized problems are held to the standard of care applicable to those specialties even if they do not claim specialized expertise..."*

  - **Concurrent negligence, partially defined:** *"The failure to exercise care by two or more persons, each of whom acts independently of the other, which combines to produce a single indivisible injury"*

    - **"lata culpa dolo aequiparatur":** *gross negligence is equivalent to fraud"*

- **Federal Rules of Civil Procedure P.9** *governing special matters....allegations concerning capacity fraud, mistake....conditions precedent, official documents or acts.....and special damage.*

- **"Res ip'sa lo'quitur" "The Thing Speaks for Itself" doctrine in negligence law:** *(a) ..."when the event does not occur in the absence of negligence....." (b)" ....other responsible causes; including the conduct of the plaintiff and third persons are sufficiently eliminated by the evidence..." (c) "...the indicated  negligence  is within the scope of defendant's duty to the plaintiff... ";(Restatement (Second) of Torts 328 (D) (1):*

- **C.R.S. 12-38-117:** *Grounds for Discipline: (II)....has willfully or negligently acted in a manner inconsistent with the health or safety of persons under his or her care; ...has negligently or willfully practiced nursing in a manner which fails to meet generally accepted standards for such nursing practice.....has falsified or in a negligent manner made incorrect entries or failed to make essential entries on patient records..."*

**<u>FIRST PART OF CLAIM TWO: (Victoroff)</u>**
NOTE:  At the time of the event below; mid-level, general scope of practice Nurse Practitioner Hilary Victoroff was under an explicitly worded, very clear ROC form, filled out by <u>Ryan</u>, that stopped, for (Ryan's) "physical safety"..."and "protection of (Ryan's ) transplant and oncology care...".  A ROC which Victoroff has never

obeyed, outright ignored and verifiably and literally scorned from day one of its execution; *__including during the event below.__*

**Note:** Victoroff, at the time of the event below, had also just been asserted by Ryan to raise 'Qualifier level' to 4. Ryan, was actually an M5 ranking. Even at a 4, Victoroff should have been under the continual direct supervision of a board certified, licensed medical doctor. Victoroff, has been an N.P. for many years and is also a very seasoned CDOC employee, who knows, or should know, when she is acting outside of her licensing, scope of practice and medical capability. **In the event below, Victoroff very clearly acted and presented herself at the same level as an M.D.**

**NOTE: Due to both of the above statements, in addition to the act itself; Ryan contends that Victoroff's level of negligence rises to gross. Ryan also preserves her right to motion for presentation of *res geste* evidence regarding Hilary Victoroff.**

**Victoroff: End January, 2017;** Ryan was direct admitted, under the authority of her oncologist, to Aurora South Hospital for the first of what would be likely; two rounds of DTPACE chemo therapy. A very 'old-school' standard of highly aggressive chemo drugs, consisting of (5) drugs, given by monitored IV, with a finishing dose of a drug called Neulasta. This type of therapy lowers the immune system into deep neutropenia, with the theory of Neulasta being the assisting drug that keeps the immune system from weakening too far. In Ryan's case, the Neulasta worked, but she still went into deep neutropenia; likely due to the previous 4 years and 41 rounds of chemo therapy already endured. At the time, Ryan was chosen for aggressive chemo due to body deterioration and continued refusal of CHP and CDOC to grant transplant.

Any board certified, licensed medical doctor **specializing, or being even *minimal trained* in** oncology and hematology; **would know that __DTPACE__ could and likely would,** require very close monitoring at discharge and for some time afterward as the immune system would rapidly, at discharge from intensive hospital monitoring; plummet downward. In Victoroff's case, Ryan's oncologist is a very highly respected in the field specialist who has cared for Ryan; for years. Knows her and her body and her case, in every detail and is always very clear that he is to be notified at all times when there is **any** question or need for his input. Victoroff, at the time of the incident below, later attempted in grievance process to claim that she "did not know" and that "discharge instructions said nothing" *__and__ that she "had "called" (Ryan's oncologist) on Ryan's return to facility (when in reality, the first call he had, was from the M.D. on duty in the DRDC infirmary, nearly 72 hours after discharge when Ryan had finally been sent over by DWCF clinic staff with a neutropenic fever of 103.8).* Ryan herself told Victoroff, *after discharge and as medical transport dropped Ryan off, as ordered, at the DWCF clinic;* that her oncologist had clearly instructed that any fever of 100.3 or higher was 30 minutes or less to the emergency room at Aurora South. *To which Victoroff clearly and directly replied to Ryan: "I believe you". Victoroff statement made immediately prior to then abandoning Ryan, with __no medical orders to monitor vitals and observe__ and no changes to medications as discharge allowed; __until Victoroff's return to work over 72 hours later on the following Tuesday.__*

The *standard CDOC procedure* for any female inmate leaving intensive hospitalization is to be taken, for evaluation, by their security detail, to the DRDC infirmary rather than a return to DWCF clinic and general population. Both facilities are part of the Denver Complex and are located on the same grounds.

Ryan's detail strongly protested, when they automatically went to deliver her to infirmary level of care, and when told by Master Control *that the clinic at DWCF* wanted Ryan delivered there instead of infirmary. Ryan, was delivered at aprx. 3:00 p.m. on **Friday, Feb. 3, 2017;** into Victoroff's control at DWCF Clinic.

Victoroff, specifically stated to Ryan that she "would deal with discharge, medications and forward" when she returned to work the following Tuesday. That it was "too late in the day" at that point. That Ryan was "fine" and "not neutropenic at time of discharge". Ryan, verbally asserted herself trying to at least get orders for monitoring of vitals, especially temperature; and **was *clearly told*** by Victoroff that all could wait. Victoroff's anger, which Ryan perceived as being present, because Ryan had been direct admitted by her specialist, to Aurora South for

DTPACE, with no involvement of Victoroff and CHP; **was heavily palpable** as Victoroff abandoned her until the following Tuesday. Shawnee Ryan, had known Hilary Victoroff, at that point, for over 4 years. Perception of personality and mood, by Ryan, is believable

**NOTE: It is important to understand the difference, at this point, between 'clinic' access and 'infirmary' access. At the DWCF clinic, no inmate can just walk in, or ask for an emergency without specific permission to do so. To access the clinic, an inmate must put in a 'paper kite' request that takes from 2 to 3 days and up to a few weeks to get a response to. <u>The infirmary, is a call button, with a nursing staff at hand and is a closed, rather than general; population.</u> Any inmate that comes in to the DWCF clinic, without kite and appointment authorization; is punished strongly. 'Written up' (an entire year of 'punishment' and a 'record'; loss of job, housing, etc) An inmate can; with what basically amounts to being lucky enough to see an act of God; be given 'blue staff' permission to call need to go to clinic. Or, an inmate must wait, if you do not have a kite authorize or an appointment; until you collapse or are unresponsive found by staff. The clinic is located within dense population and the infirmary is a segregated, controlled environment with one to two patient/inmates to each room.**

*Victoroff ordered Ryan's return to general population and left until the following Tuesday.* Leaving no instructions whatsoever for Ryan's monitoring, medications or care. Thus, Ryan had *no ability whatsoever* to ask to be seen during the next 72 hours after discharge and prior to Victoroff's return to work the following week. Ryan was also left with no discharge updates to medications and zero ability to be vitals monitored. In short, Hilary Victoroff left no orders anywhere near what discharge *and protocol* required. Ryan contends that a board certified, licensed M.D. would never have done same. In fact, as seen below and can be seen in verifying evidence; as soon as Ryan was later taken **to an M.D. at the infirmary**; Ryan's life, which was near death by that time; was saved.

By 24 hours (*just under*), Ryan had asserted her way into the clinic as she knew she had a temp. Asserted herself enough to obtain a nurse willing to monitor her vitals. Her temp, at that point, was registering just over 99 degrees and just under the 100.3 mark. The next morning; Ryan was found unresponsive in her cell by security staff. Clinic staff removed her to the clinic, where her temp had climbed past the bar mark, *but they had no orders or awareness of that mark and what to do as nothing had been left for them by Victoroff.* Ryan, remained in and out of coherency for the better part of the day and had also lost control of kidneys. By the time clinic staff had obtained an order for a routine CBC blood lab (*which showed the deepening neutropenia*) and made the call to send Ryan to the infirmary; Ryan's temp was 103.8 degrees. Ryan **still**, was attempted, by infirmary staff, to **remain in their care and they stated such when finally Ryan's oncologist was called from the infirmary.** It was at his insistence that Ryan be taken to Aurora South emergency room. Her oncologist prepared the hospital for her arrival. The call to Ryan's oncologist, was made by infirmary M.D., immediately on Ryan's arrival into the infirmary and was the first and only call made to Ryan's oncologist. Victoroff's later claim, in grievance response, that she had called is utterly, completely false. Even then, instead of ambulance, the much slower process of gathering security staff, dressing Ryan out in security clothing and transporting her in a CDOC vehicle, was chosen. Ryan, was barely conscious on arrival to Aurora South and cannot recall more than fragments of the next 24 hours until her fever was under a little bit of control and she was under the care of her specialized oncology team at Aurora South.

**The diagnoses:** Critical neutropenic fever, Influenza A, a spider bite to a finger on her right hand that had occurred while unresponsive in dense population cell and that rapidly had turned to staph and then to Mirsa in that location of the bite. Ryan underwent intensive care and treatment. Upon discharge; this time, was taken to the DRDC infirmary where she has been housed since.

**The claims of Medical Malpractice and Gross Negligence against Hilary Victoroff** are accurate and appropriate claims. **Victoroff knowingly placed herself in the same specialized arena of medical capability and acted as a licensed physician rather than the registered nurse with prescription writing authority that she is.** Thus held to the same accountability as a licensed physician would be held to. **Victoroff, knowingly, repeatedly, willfully and wantonly ignored her patient (Ryan) who obviously was trying to protect her own**

physical safety after intensive, hospitalized chemo therapy. Ryan contends that **Hilary Victoroff's choices in the event named above are deliberate and knowing choices; she was not ignorant when she made them.** Therefore, her actions in this incident rise to gross negligence.

**SECOND PART OF CLAIM TWO: (Sommerschield)**
**NOTE: During parts of this event below, Ryan had N.P. Laura Sommerschield under ROC form, barring Sommerschield from providing care to Ryan.**

The chemo drug Dexamethasone, verifiably due to such prolonged high dosing (41 rounds of chemo, 2 rounds of DTPACE, one autologous bone marrow transplant) caused fast growing cataracts in Ryan's eyes, which began to show post-transplant in **aprx. July 2017** after discharge from PSL transplant. Ryan's oncologist ordering a referral to ophthalmology in **aprx. August 2017**. By the time Ryan appeared before an optometrist (scheduled by Sommerschield) for consult in **mid-October 2017**, Ryan was nearing in ability to see at all. Her cataracts so fast growing and thick that the ophthalmologist that the optometrist had look at Ryan, could not even *see into* Ryan's eyes. The ophthalmologist surgeon scheduling Ryan, very clearly, as "immediate next" for eye surgery on the worst eye (left) with right eye to follow shortly after.

(**NOTE:** The eye physicians scheduled by Sommerschield are Denver Health. A facility that Ryan has not been treated at before and a facility where Ryan's specialists have no privileges to practice. Ryan, not released from either's care at the time. (Ryan is still, at current day, not released from either's care).

(**NOTE:** It is important to know, that the computer systems between Denver Health and CDOC and CCMF (Denver Sheriff) are tied to each other. It is important to know, that for as many years as Ryan has been ill within CDOC, she has listened to the 'story', from every nurse practitioner assigned to her, that "Denver Health schedulers 'dictate' when appointments for inmates are". It is important to know, that reality, is far different and that Ryan learned such, at no assertion of Ryan's other than the extremes she had to go through at Sommerschield's handling of Ryan's vision loss. Reality, is that every time an inmate is to be scheduled at Denver Health, Denver Health schedulers offer a range of appointment times for CDOC to choose from. Invariably, the pattern of choice is for the farthest out to be chosen. Schedulers at Denver Health, do not "dictate" "when" an inmate receives care nor does Denver Health discriminate against inmates by "offering" appointments that are far out in date. In Ryan's case, Ryan was clearly told and shown, by Denver Health, when Ryan nearly lost her sight and went through so very much over eyes; that Denver Health and Ryan's surgeons had clearly cited: "immediate next" and offered appointment ranges to meet the surgeon's order. Sommerschield, verifiably, chose "April 2018" (consult offering made in mid-October 2017). When surgeon's fee moved to "Urgent" on November 20, 2017 (which was a pre-op appointment done only due to Ryan's oncologist pushing Ryan forward and doing so directly to Denver Health surgeons); Sommerschield did not change "April 2018"). At that point, the eye clinic at Denver Health, under Ryan's surgeon, began an overall hospital administrative review of how Denver Health schedulers interact with CDOC practitioners. The entire way of handling scheduling for inmates, in complex and/or critical cases, ended up being permanently changed with Denver Health regaining control over watching "how" CDOC practitioners "choose" appointment dates for inmates. To this day, despite all eye issues below, one ER visit to be tested for influenza and/or NoroVirus and a consultation for pancreatic insufficiency; Sommerschield has never once provided the medical records/data requested and needed by Denver Health. Ryan, has asserted herself, in the only avenue available to Ryan of providing releases to obtain, to Denver Health, for Ryan's outside medical communities to provide the nearly 5 year history/records of medical data that have cost upwards of 5 million dollars. On file, Ryan can produce Sommerschield's personal angst, anger and retaliations, logged in kites, letters, ROC's and grievances for Ryan asserting herself to receive the care she needed from Denver Health. A facility, Ryan should never have been scheduled into, that verifiably questioned(s) Ryan being with them and why Ryan is not with facilities set up to handle her care and that not only know Ryan but also that Ryan's specialists are able to treat Ryan within.).

**Timeline returns to on or about October 25, 2017,** Ryan's right eye developed two hematomas obvious to the naked eye to see. Sommerschield placed a call to the *optometrist* Dr. Williams and later claimed to Ryan that a "2nd opinion was "what Williams said" was "being requested on status of (Ryan's eyes), for need". Reality, was what Williams said, was that he felt the hematomas could wait to be seen (he was under impression from his computer screen that

CDOC was obeying "immediate next" orders, which Sommerschield was not as she still held to "**April 2018**") for opinion of surgeon at pre-op.

Ryan's oncologist, unknown at the time to Sommerschield, intervened and Ryan was scheduled for pre-op on **November 20, 2017** where surgeon scheduled surgery as "Urgent". Ryan expressed her concern to her surgeon that Sommerschield would not obey what was not a written order and her surgeon showed Ryan the "Urgent" written order.

Sommerschield, denied, to Ryan, that anything was urgent over Ryan's eyes and that no "Urgent" order was given. Sommerschield, unknowing, that Denver Health had begun administrative reviews. Ryan later learned that schedulers did follow surgeon orders and that Sommerschield was given dates to accommodate "urgent" surgery.

At Ryan, her oncologist and her surgeon's assertions override of Sommerschield's "April 2018" date; Ryan's left eye was operated on, on **aprx December 18**[th], **2017**. When Ryan arrived and was being prepped for surgery, the nurse doing prep commented on how lucky Ryan was, at her age, to "only have some minor kidney dysfunction". Ryan asked the nurse to read back Ryan's name, DOB and inmate number in order to make certain the nurse was looking at the right computer screen and patient. Discovering, that Sommerschield had sent Ryan out, with absolutely zero medical records data except "narrative notes and a few outdated blood labs". When surgeon learned of no data, Ryan, who had been scheduled early in day, was bumped to end of day and they called in their semi-retired surgeon who handles their difficult surgeries. Commenting during surgery that Ryan's left eye was one of the worst cataracts he had seen. The lens inserted, turned out to be the wrong lens, only because Ryan's vision was so bad, they could not see into Ryan's eyes for correct lens measurements. At post-op the next day, delivering to Ryan, the news that the eye must be redone with surgery to repair. Ordering Sommerschield for an urgent redo. Sommerschield was given three dates, one of them being in **latter January, 2018**. Basically, a test of Sommerschield to see what she would pick. Sure enough, Sommerschield **picked latter January, 2018** rather than the dates of **January 2, 2018 (and) January 9, 2018** which were also offered to Sommerschield. At this point, Ryan's surgeon took the added precautions of personally speaking via telephone to Sommerschield, very thoroughly reviewing the importance of following orders needed and why. Telling Ryan later that Sommerschield "seemed receptive". Only to have Sommerschield then choose **latter January, 2018**. Surgeon, at post-op even going so far as to provide her personal cell phone number, on orders Ryan took back to facility (via SOS Security). **On January 2, 2018**, at surgeon's intervention, Ryan's second eye surgery on her left eye was performed, in one of the large OR's available and with a surgeon from University called in to assist now that Denver Health knew the extent of Ryan's medical conditions.

Surgeon's then pushed again, for right eye surgery to be done, which it was, on January 11, 2018. It was, by that time, a much more difficult surgery to perform, in part due to the nature of the right eye itself (and) the fast growth of the cataract.

The end results, for Ryan's vision, is that the correct lens measurements beautifully corrected Ryan's distance vision. The prescription to correct reading and work space bifocals strengthened. Waiting too long, gave no ability to correct to better. The trauma of difficult surgeries on both eyes has caused permanent, unable to repair and likely premature in age of Ryan; vitreous detachments that are steadily worsening deteriorating (especially in Ryan's right eye). And a permanent damage detached retina in Ryan's left eye, treated with what will be Ryan's first, lifelong, laser eye surgeries . At this time, detached vitreous has developed in Ryan's left eye after the laser surgery.

**The claims of Medical Malpractice and Gross Negligence against Laura Sommerschield are accurate and appropriate claims. Sommerschield knowingly placed herself in the same specialized arena of medical capability and *acted* as a licensed physician rather than the registered nurse with prescription writing authority that she is. Thus held to the same accountability as a licensed physician would be held to. Sommerschield knowingly, repeatedly, willfully and wantonly ignored ability offered by Denver Health to**

place Ryan into their surgeon's care months earlier than Sommerschield chose.  Sommerschield blatantly disobeyed, even after a personal phone call from Ryan's surgeon, all surgeon orders to observe "immediate next"; then "urgent" orders to produce Ryan to them for surgeries; going so far as to then disobey revised Denver Health administrators changes to scheduling parameters for CDOC practitioners.  Sommerschield, knowingly and willfully allowed, over a period of months; Ryan to transport for care to Denver Health without providing anything more than "narrative notes" and a few copies of outdated blood labs when Sommerschield knew full well the depth and breadth of medical data Denver Health physicians would (and did) need.  Placing Ryan in very serious risk of life threatening harm, if not for Ryan taking charge while at Denver Health by going above Sommerschield and empowering same physicians to obtain, at least, outside specialist and their facilities medical data. Ryan contends that Laura Sommerschield's actions and choices in the event named above are deliberate and knowing choices; she was not ignorant when she made them. Therefore, her actions in this incident rise to gross negligence.

**THIRD PART OF CLAIM TWO:  (Primarily goes to medical records falsification and fraud)**
**Asserts that** outright falsy of medical statements and medical data (and/or) machinations of ROC forms, grievances, Qualifier Levels, assignments for or against temp agency medical doctors hired by CDOC (and) recording  to medical records (*both written and verbal*) by both individuals above; created a reckless endangerment to Ryan, on multiple levels and occasions and are direct violations of their nursing license parameters (*C.R.S. 12-38-117:  Grounds for Discipline: (II)....has willfully or negligently acted in a manner inconsistent  with the health or safety of persons under his or her care;...has negligently or willfully practiced nursing in a manner which fails to meet generally accepted standards for such nursing practice.....has falsified or in a negligent manner made incorrect entries or failed to make essential entries on patient records...").*

Further asserts that the lengths Defendants were willing to go, did go, and continue to go; are unlawful lengths.

**The machinations and falsity in action over Ryan's medical records caused, at minimum:  1)** At one point, Ryan went from Stage I cancer levels to Stage III levels, over a 4 month span of time when (*Victoroff*) unsupervised and Ryan was not allowed **any** medical care or access at all (*Third part of Claim One*). **2)** At another point in time, (*Sommerschield*) the 'Real Shawnee Ryan' was repeatedly attempted to be intimidated by staff (*and did have withheld at one point*) her life maintaining drug; Revlimid, if she did not go along. With Sommerschield, spanning months, refused to allow the enforcement of ROC and Ryan's oncologist to control her treatment. The sequential tracking is long, in how many times Ryan went without CDOC provider care and had delays in obtaining the fulfillment of M.D. orders, in addition to the joint machinations between Sommerschield and CHP to revert all care to "independent (*Sommerschield as primary*) medical treatments". **3)** At another time, (*Sommerschield*), spanning multiple months, held such a flagrant disregard of the ROC form removing her from care and placing others in Ryan's care; resulted in multiple obstructions that verifiably and seriously caused Ryan's recovery to falter. Going so far as to assist and encourage her HSA (*health services administrator*) Tina Cullyford to outright deceive CMO and others about Cullyford response to a grievance (*Step 2, Feb. 24, 2017:  "Accessing your port can cause..significant risk...status of your port and its usability in the clinic has been reviewed...directed going forth that your port is to be accessed for chemotherapy administration only..")*  in order for Sommerschield to gain

control of Ryan's labs away from RMCC and be assessed solely by Sommerschield with no M.D. supervision. Cullyford and Sommerschield deception over the grievance orders occurring in a conference with Ryan's oncologist and CMO Scott present **on Feb. 21, 2018**.

**Ryan further asserts** that even when the 'Real Shawnee Ryan' could manage to get a Refusal of Care (and/or) a grievance response in place that would contain, control and confine both defendants to safe parameters, the two Defendants in Victoroff and Sommerschield, each, openly, blatantly defied being bound by the affidavit or State Supreme Court authority. Sommerschield so persistent, she rises to the level of flagrant defiance. Simplistically stated: both felt so above authority, they ignored and willfully did as they personally pleased to do. That behavior then being not only fraudulent by the acts; but also willful and wanton as it went on for months and years. Behavior that should never have been allowed by all administrative defendants. **Ryan asserts that Claim Two allegations show not only knowing and willful actions outside of scope in procedures; they also show a pattern of behavior through falsification and/or misuse (fraud) of medical records.**

### FOURTH PART OF CLAIM TWO:

**Re: Claim of Medical Malpractice:** Both Victoroff and Sommerschield, knowingly and with callous and willful disregard for the undeniable fact that neither one is trained outside of a general scope of practice and within the area of oncology/hematology to the level of Ryan's existing specialists (and) the area of surgical opthamology to the level of Ryan's eye physicians/surgeons; set themselves clearly and firmly into the same levels **by acting as same.** Causing Ryan, in the case of Victoroff, a near loss of life (and) in the case of Sommerschield, permanent vision and eye damage. **Both, operating very far outside of their licensing parameters of mid-level, general scope of practice nurse practitioners with certain prescription writing abilities.**

**Re: Claim of Falsification (Fraud) of Medical Records:** Both Victoroff and Sommerschield know full well that every form they touch, in regards to Ryan's health, is a medical record. Both, know full well, as each falsified or disobeyed the ROC and/or grievance forms in question, knew they were committing a false and deceptive act. Both, also knew, each time and every moment they were acting outside the legalities and binds of those forms, that they were not only doing so outside of law; they were doing so outside of the parameters of administrative regulations of their employer, the Colorado Department of Corrections. Neither, was "unknowing". Both, acted willfully, wantonly doing so while also in a position of trust, to an at-risk adult not only under their care, but helpless to stop them.

***Demands* that the Defendants** : Colorado Dept. of Corrections, Rick Raemisch, State Bureau of Prisons, Travis Trani, Federal Bureau of Prisons, Mark S. Inch, Dr. Susan Tiona and Dr. Frost; **explain themselves to the court, a jury and Ryan;** on how and why these types of medical caregivers can get and remain so entrenched without supervision, that incidents such as these alleged in Claim Two can not only occur to the life of Ryan; *but also that the claims in all parts of Claim One were, over a period of years to be knowingly allowed to go on in front of them, with their direct participation, as a pattern of behavior and with all named in direct oversight.* Direct participation in the sense that all did know (*through events themselves and Ryan directly*), or should know, or have the duty and ability to know and supervise or understand all going on below them.

## CLAIM THREE: DELIBERATE INDIFFERENCE; WILLFUL IGNORANCE resulting in RECKLESS ENDANGERMENT; AGGRAVATED
### (Defendants: All Defendants)

Ryan contends that all claims stated within Claims One and Two, also meet the bar of standards and all prongs for Deliberate Indifference, Willful Ignorance resulting in Reckless Endangerment.

Arising to the extent to also meet bar standards and prongs for aggravated circumstances.

The arguments for Claim Three, are similar arguments that do meet all standards and prongs for each accusation in Claim Three and are specific arguments to the events already presented in Claims One and Two.

Therefore, Ryan does not feel the waste of the court's time and resources, *in this initial filing*, of her restating the same facts here in Claim Three; is useful to any party. Instead, Ryan adds the Claim Three accusations of Deliberate Indifference, Willful Ignorance resulting in Reckless Endangerment to Claims One and Two events and preserves her right to future argue same as aggravated.

Ryan is prepared to argue same in pre-trial and trial.

## CLAIM FIVE:  COMPLICITY, AGGRAVATED
**(Defendants: CDOC, Rick Raemish,  State Bureau of Prisons, Travis Trani,, Federal Bureau of Prisons, Mark S. Inch, Dr. Andrew Martinez, Dr. Susan Tiona,  Dr. Frost (sic), Dr. Jennifer Miecks (sic), David Johnson, Terry Jacques, Ryan Long)**

Ryan states that she believes she has met enough of the bar of standard for a claim of complicity by Defendants and has done so within all claims above.  Asserting the same, or similar facts again in Claim Five, Ryan believes to be a waste of judicial resource and not productive, at this time, to any party.

**In the cases of Wardens and/or former Wardens:** Johnson, Jacques and Long, each one had direct supervisory involvement, at specific and critical times in events made in claims.  And, each were clearly made aware, on a number of levels, but also specifically by Ryan, repeatedly, that the events occurred and she was requesting their aid.  To this day, not one of them has even bothered to introduce themselves to Ryan, attend a single grievance requested remedy or even answer a kite. Ryan understands she must bring forward more detail regarding the complacency of these three individuals who were in unilateral supervisory control of the entire complex and every staff person under them during their tenure.  **Ryan is prepared to do so.**

**In the cases of Defendants Bureaus of Prisons;** both are in full authority and held obvious knowledge of not only the new federal law of the inmate catastrophic Medicaid clause, they run all Colorado prisons with the same clinical processes, forms and types of staff they are in ultimate oversight of.  At no time, does either's scope of duty that is to provide assistance to CDOC, ever allowed to pick and choose what they wish to act on.  Therefore, both are culpable to the charge of aggravated complicity.

**In the case of CHP's Dr. Miecks (sic),** she is in full capacity and capability to know if and when her actions were wrong in the eyes of law.  Also has full and complete access to all of Ryan's case and should have, in such a high risk case, made absolutely certain at all times that she was acting rightly.  In the instance of her personal attack on Ryan, with Dr. Susan Tiona, Miecks (sic) acted far outside the bounds of professionalism and that action assisted in a very serious endangerment to Ryan's life. As to the parameters of CHP within the new federal inmate law governing Medicaid, she most certainly had access, ability and knowledge of how she was operating within.

**Ryan adds the Claim of aggravated Complicity to Defendants above.**

## PREVIOUS LAWSUITS:
There are no previous lawsuits.
## ADMINISTRATIVE RELIEF:
All administrative relief processes have not only been met; they have been repeatedly met and exhausted.  Every avenue available to an inmate and *any reasonable mind* have also been *repeatedly* attempted, fully met and exhausted.
## REQUEST FOR RELIEF:
Consequential monetary compensation for all damages, aggravated circumstances and acts including actual, exemplary and punitive damages, in amounts TBD, including award of all fees and costs. Also seeking protective injunctions, and restraint relief while Ryan pends parole release. Also requesting pro bono representation by counsel.
## JURY DEMAND:
Yes.
## DECLARATION OF PERJURY:

I declare under penalty of perjury that the information in this motion and affidavit is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Shawnee Ryan

Date: _Jan 17, 2018_

CERTIFICATE OF MAILING

I hereby certify that I have either mailed or served a true and accurate copy of this:

_Complaint with Jury Demand_

Upon the parties below by either service by Court/U.S. Marshals **(or)** by mailing same, postage prepaid and accurately addressed, to the parties listed below on this _17th_ day of _Jan_ , 2018.

Shawnee K. Ryan, Plaintiff

**Clerk of Court, Alfred A. Arraj US Courthouse**
901 19th Street, Denver, Colorado 80294

**Defendant:** Colorado Department of Corrections (and) the present and past employees of same:
> Rick Raemisch, Dr. Scott, Dr. Susan Tiona, Dr. Andrew Martinez, Ryan Long, David Johnson,
> Terry Jacques, Hilary Victoroff, Laura Sommerschield:

Colorado Department of Corrections
**Attn: Legal Services (and) Litigation Coordinator for Denver Complex: Major Lucille Reux**
1250 Academy Park Loop, Colorado Springs, Colorado 80910

**Defendant:**
Correctional Health Partners (and) Dr. Jennifer Miecks (sic) (prounced Mix; pending court assistance for correct spelling)
1125 17th Street Suite 1010, Denver, Colorado 80202

**Defendant:**
State Bureau of Prisons and Director of Prisons, Travis Trani
1250 Academy Park Loop, Colorado Springs, Colorado 80910

**Defendant:**
Federal Bureau of Prisons and Director Mark S. Inch
Englewood Federal Correctional Institution, 9595 Quincy Blvd., Littleton, Colorado 80123