IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-00956-MSK-MEH

SHAWNEE RYAN,

      Plaintiff,

v.

CORRECTIONAL HEALTH PARTNERS,
DR. JENNIFER MIX, M.D. (personal and professional capacity),
HILARY VICTOROFF N.P. (personal and professional capacity), and
LAURA SOMMERSCHIELD N.P. (personal and professional capacity),

      Defendants.

---

## SCHEDULING ORDER

---

## 1. DATE OF CONFERENCE
## AND APPEARANCES OF COUNSEL AND PRO SE PARTIES

The Scheduling/Planning Conference pursuant to Fed.R.Civ.P. 16(b) was held on May 29, 2019, at 9:30 a.m., in Courtroom A-501, Fifth Floor, Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado, before Magistrate Judge Michael E. Hegarty. Appearing for the parties were:

Amy C. Colony, Esq.
Senior Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO  80203
720-508-6615
acolony@coag.gov
Attorney for Defendants Victorff and
Sommerschield

Edmund M. Kennedy, Esq
Hall & Evans, LLC
1001 17th Street, #300
Denver, CO 80202
303-628-3300
kenedye@hallevans.com
Attorneys for Defendants
Correctional Health Partners and Dr.
Jennifer Mix, MD

Shawnee Ryan
3531 South Logan Street, #189
Englewood, CO 80113
720-431-8319
shawneeryan216@gmail.com
*Pro Se* Plaintiff

## 2.  STATEMENT OF JURISDICTION

Plaintiff alleges this action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. §1983.  Plaintiff alleges the jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§§ 1331, 1343,1201. Plaintiff further alleges that pendent jurisdiction is invoked at 28 U.S.C. § 1367 as violations are substantial and have sequential commonality. Plaintiff further alleges jurisdiction as federal question specific to 42:1983 Civil Rights Act in violation of Eighth Amendment and 42 USCS (201) Title 42 Public Health and Welfare, Chapter 6A; specificity to Affordable Healthcare Act Inmate Catastrophic Medicaid Provision incorporated into Colorado State Law as HCPF 14-006.

### 3.  STATEMENT OF CLAIMS AND DEFENSES

a.  Plaintiff:

**NEGLIGENCE** against CORRECTIONAL HEALTH PARTNERS (dba Correctional

Health Partners, Inc.; Correctional Health Companies, Inc.; Correctional Corporation of

America; Physician Health Partners (CHP et al)

Supporting Facts:

- Plaintiff incorporates all of the statements made within Claim One and Claim Two as relevant to proving the charge of Negligence.

- On CDOC entry (Nov 2012) Ryan was screened in excellent health, fully immunized.

- On or around March 23, 2012, Ryan fell ill at LaVista Correctional Facility (LVCF); could not fully recover; a specific blood lab revealed kidney dysfunction; resulting in Ryan's EAO (Executive Authorization Order), progressive return to DWCF in May 2013; where she was placed on medical hold in November 2013.  Ryan remained on medical hold until her release to parole on October 4, 2018.

- From September 2013 through April 2014, various diagnostics confirmed (2) fatal diseases:  Multiple Myeloma (blood cancer) and Light Chain Deposition/Cast Nephropathy aka 'Myeloma Kidney' aka Bence Jones Proteins (blood autoimmune) aka Monocolonal gammopathy of unknown significance. All definitions of both diagnoses as fast moving, aggressive, uncommon and complex three phase treatment as standards of care required. Three phases are:  1) Intensive and varied chemo therapy.  Purpose as only palliative and symptomatic to reduce disease levels low enough to be able to give life-

3

extending second phase treatment of bone marrow transplant. 2) Bone marrow transplant. Either autologous stem cell (or) allogenic donor.   3)  Post-transplant recovery spanning two years with a rebuild of immune system.  Maintenance drug (anti-cloning, anti-embryonic Class 5 DEA contractually controlled/regulated and monitored by federal regulators) taken daily for remainder of life.  Both diagnoses are terminal and non-curable.  All treatments are symptomatic and palliative in nature and all result in lifelong extreme medical costs of care.

- At full diagnoses (April 2014) Ryan had advanced, since March 2013, to Stage III Multiple Myeloma and Stage IV Light Chain Cast.  Resulting in a then 30% atrophy of right kidney, endangered immune and Myeloma lesions (bone fractures).

- In January 2014, the federal law of the Affordable Health Care Act was enacted into law and subsequently adapted into Colorado state law (HCPF 14-006).  Included in the Act was and remains the Inmate Catastrophic Medicaid Provision.

- CHP (et al) is and fully represents themselves publicly as a private owned, for profit corporate entity that provides insurance and staffing services to various contracted correctional entities within the State of Colorado and nationwide.

- CHP (et al) is not a government entity.

- In Ryan's case, from onset of diagnoses in September 2013 through to release October 4, 2018; CHP (et al) conflicted their contract with CDOC, by actively denying catastrophic care that met the requirements of the new federal and state insurance laws and instead, only allowing, in Ryan's case, their own network of providers.

- CDOC remained as the administrative and clerical control of the new government Medicaid coverage.

- Ryan's CDOC clinical nurse case manager, who was assigned at Ryan's time of catastrophic diagnosing (and) a cardiac event in November 2014 was the oversight and payer of any Medicaid covered procedures and treatments directly billed to her by outside medical caregivers.

- Unequivocally, Ryan was among the first, if not the first inmate, in the State of Colorado, to encounter not only catastrophic but extreme and extended catastrophic medical care need at or around the same time as the CDOC was incorporating the new federal provision into administrative capacities.  Ryan's need was final diagnosed in March and April 2014 and the new law enacted in January 2014 with the State adaption enacting in or around June 2014.

- Ryan's medical need, Ryan, all of her outside assigned specialists, clinics and hospitals and at times three CDOC employed licensed medical doctors went on, from diagnoses beginnings in November 2013 through to June 2017; applying to CHP (et al) for second phase treatment of transplant.

- Five times, spanning those years, CHP (et al) denied all orders and appeals for transplant.

- During same time span, never once informing Ryan (or) to Ryan's knowledge CDOC; that Medicaid was available and that Ryan fully qualified for transplant in second phase standard of care.

- Medicaid has, for more than a decade, approved and covered the type of phased care for Ryan's diagnoses.

- Medicaid has no networks nor discriminates against Ryan in her status as an inmate.

- CDOC then went on, in or around May 2017, after Ryan's near death in February 2017, and under direct pressure from Ryan to provide under Medicaid; to grant Ryan an autologous stem cell transplant in June 2017.

- Authorized and fully covered under the same AHCA Inmate Medicaid Provision, available in August 2014 when transplant was first applied for.

- Direct billings by qualifying and involved entities verifiably then went through Ryan's clinical nurse case manager (internal) at CDOC.

- Transplant successfully completed, Ryan's body then went on, to affect the third phase recovery process.

- CHP (et al) continued negligent actions as they remained in place to continue to approve and deny all ongoing medical care for Ryan, including post-transplant vital medical care, requested, at times, by specialists to be hospitalized. Requests that were also fully covered under the Inmate Medicaid Provision.

- The medically documented damages, to Ryan, resulting from the years of CHP (et al) using its authority in denying Ryan full treatment and exposing her to prolonged and intensive high doses of chemotherapy drugs is as follows:  severely dilated left atrium of heart, tricuspid regurgitation; aortic valve regurgitation; pulmonary hypertension; chronic renal insufficiency and anemia with atrophy of both kidneys; detached retina in left eye;

detached vitreous in both eyes; vision loss; hypogammaglobulinemia; chronic neutropenia and chronic pancyptopenia; multidysplasia/'CHIP' syndrome; hyperlipidemia;  acute pancreatitis; chronic orthothesis; Deep Vein Thrombosis; severe neuropathy in hands and feet.

**EIGHTH AMENDMENT** PROHIBITING AGAINST CRUEL AND UNUSUAL PUNISHMENT against CORRECTIONAL HEALTH PARTNERS (dba Correctional Health Partners, Inc.; Correctional Health Companies, Inc.; Correctional Corporation of America; Physician Health Partners (CHP et al)

Supporting Facts:

- Plaintiff incorporates all statements made within Claim One as additional foundation showing the Defendants and the combined effect of their policies, procedures, habits and privately contracted means of business, with their prolonged denials of adequate care; were tortious and cruel in the effect result of damages and injuries to Ryan.

- From September 2013 through November 2013, Defendants became aware of the first diagnosis of Light Chain Deposition Cast aka monocolonal gammopathy aka Bence Jones aka Myeloma Kidney; through a CDOC Nephrologist performed in-house ultrasound biopsy of Ryan's kidneys.  At the time, Ryan's right kidney showed 30% atrophy.  Her left kidney appeared normal.

- The diagnosis either should have been as Defendants represent themselves as medical professionals (or) was as simple as an internet search away, known to Defendants as a

rare, uncommon condition requiring a very specific and well established standard of care in order for the patient to prolong life.  Also, that the diagnosis is fatal and terminal.

- That standard of care is described above within Claim One.

- In March 2014, the second diagnosis of Multiple Myeloma was made known to Defendants through specialized oncologists and hematologists in the outside medical community.

- The diagnosis either should have been as Defendants represent themselves as medical professionals or was as simple as an internet search away; known by Defendants to require the same exact standard of care, lifelong, as the Light Chain diagnosis.

- The standard of care is described above within Claim One.

- In August of 2014, Ryan's specialized oncology and hematology put the first order for second phase treatment of transplant, in for approval.

- Appeal was put in and was denied by Defendants as being no medical necessity and Ryan doing 'fine' on chemotherapy.

- At the time, Ryan had only endured aprx. 8 rounds of chemotherapy drugs.

- In November of 2014, Ryan's first cardiac event happened.

- The nature of these diseases is that the Light Chain Cast first attacks kidneys, then either heart or liver. Leaving whichever organ not chosen as the final organ to attack and fill to atrophy, which then leads to system complete failure and death.

- From August of 2014 through to June 2017, five different orders by various CDOC licensed M.D.'s, a CDOC licensed Nephrologist M.D., multiple oncologists and

hematologists were put in and subsequently denied by Defendants. Appeals that were put in were also denied.

- As these denials continued, at no time, did Defendants relieve Ryan by informing her or any of her internal or external providers or CDOC that Ryan fully met the qualifications for transplant through the AHCA and Inmate Catastrophic Medicaid Provision.

- A range, but not limited to, of excuses to not approve ranged from: "inappropriate requests", "offender on chemo"; "no medical necessity" and "provider not within our network". Medicaid has fully approved and paid for all phases of Ryan's needed standard of care for more than a decade. Medicaid does not have a "network" nor does Medicaid discriminate against Ryan as an incarcerated individual which is shown by the AHCA provision and provision adapted into Colorado law.

- Throughout all six years of incarceration, no one or any other entity other than Medicaid when allowed to use; had equal power as Defendants to approve or deny medical care to Ryan. That also means, that Defendants had to deal with all the medical care during those years that resulted from the damages to Ryan that were being caused by chemotherapy drugs and treatment.

- The autologous stem cell transplant granted to Ryan by CDOC in 2017 was highly successful and the transplant itself, along with many of the diagnostics were billed directly to and fully covered by Ryan's Medicaid.

- The toll of physical damage and injury to Ryan caused by prolonged chemotherapy is: severely dilated left atrium of heart, tricuspid regurgitation; aortic valve regurgitation;

pulmonary hypertension; chronic renal insufficiency and anemia with atrophy of both kidneys; detached retina in left eye; detached vitreous in both eyes; vision loss; hypogammaglobulinemia; chronic neutropenia and chronic pancyptopenia; multidysplasia/'CHIP' syndrome;  hyperlipidemia;  acute pancreatitis; chronic orthothesis; Deep Vein Thrombosis; severe neuropathy in hands and feet.

**DELIBERATE INDIFFERENCE** TO LIFE ESSENTIAL NEED OF MEDICAL CARE against CHP (et al) employee Jennifer Mix M.D.

Supporting Facts:

- At all times of Ryan's incarceration and onset of diagnoses (November 2013 through October 4, 2018), Defendant Mix was the sole final authority over what medical care Ryan received or was denied.

- Defendant Mix is not governmental immunized and is a private society employee of the private, for profit corporate entity of CHP (et al).

- Defendant Mix is a general practice licensed medical doctor without the equal or higher qualifications of all of Ryan's CDOC assigned specialists, surgeons and professionals.

- At all times, from March 2014 through October 4, 2018, Defendant Mix was aware, through the administration of CDOC, the contact she had with internal assigned CDOC physicians and practitioners, all administrative processes and Ryan's outside specialists, surgeons and professional caregivers themselves; of all of Ryan's diagnoses and medical needs.

- Over the periods of time in question, Defendant Mix personally denied life essential transplant and appeals five times.

- In May 2017, Defendant Mix was made aware by CDOC administration that her previous denials were over-ridden and transplant would be provided under Medicaid.

- From on or around October 2014, with the hiring of former Chief Medical Officer Tiona; Defendant Mix engaged directly with Tiona, in the denials of transplant and life essential care to Ryan.  A specific incident in or around January 2016 of an email between the parties, was so offensive to Ryan's

     then CDOC physician, Dr. Ariola-Tirella, that he showed and read Ryan the email itself.  Due process will reveal, in part, that the firm contention of both was that no transplant would ever be given to Ryan.  At the time, both Defendants Mix and Tiona were aware of the written order from CDOC in Fall 2015 that if denied special needs parole; Ryan would be given a transplant and treatment under Medicaid.

- By holding herself in as equal or above the highly specialized outside providers, Defendant Mix violated her licensing and legal parameters as a general practice M.D. and is held accountable in equal capacity.

- At no time, can Defendant Mix or her employer achieve a claim that they were unaware of the availability to Ryan and CDOC of Medicaid coverage adequate to meet Ryan's medical needs. By denying life essential medical care to Ryan, Defendant Mix willfully, knowingly and wantonly caused physical harm to Ryan's person.  The results are stated within Claim One of this filing. Defendant Mix, in her full personal, professional

11

capacity, has her signatures, statements and/or fully documented by outside and internal

care givers statements denying all transplant requests spanning the years they were

requested.  At no time, can Defendant Mix achieve a claim that she had government

immunity nor was not involved in the denial of life essential medical care for Ryan.

**DELIBERATE INDIFFERENCE** RESULTING IN GROSS NEGLIGENCE against Hilary

Victoroff N.P.

- N.P. Hilary Victoroff was the CDOC assigned internal provider to Ryan at the time of

  this incident.

- End January 2017, Ryan was direct admitted to Aurora South Hospital

  under the medical power of her CDOC assigned oncologist and hematologist for

  aggressive DTPCE chemo therapy.  Direct admitted from the Rocky Mountain Cancer

  Clinic/Aurora and not returned to facility custody.

- At discharge on Feb. 3, 2017; Defendant Victoroff ordered Ryan's return,

  under the strong objections of Ryan's CDOC security detail and transport questioning

  'why' the standard policy of hospitalized inmates returned for exam to DRDC Infirmary

  was being overridden.

- Ryan was delivered, on this Friday date, at aprx. 3:00 p.m. and directly into the hands of

  Defendant Victoroff.

- Victoroff was clearly instructed, by the written discharge orders and by Ryan that Dr.

  Burke (Ryan's oncologist) wanted Ryan in the infirmary and had verbally instructed

  Ryan that his orders for neutropenic fever are "30 minutes or less to Aurora South

emergency room if temp reaches 100.3 or higher.  Victoroff had in hand, on Ryan's return, the written discharge orders and also was clearly and directly told by Ryan of Burke's verbal order. To which Defendant Victoroff clearly replied and was overheard by clinic staff as "I believe you."

- Victoroff then left, for her regular Saturday, Sunday and Monday days off (and) left no orders for vitals monitoring or care for Ryan until her return on Tuesday.

- Which, per CDOC Clinical *and* Security policies; left Ryan with no ability  to access medical care unless Ryan could get a staff person (non-medical staff) to verify need and allow Ryan to access the clinic and medical staff.

- Ryan, by Saturday, knew she had a temp.

- Asserted herself, at personal risk with security staff, into the clinic where an R.N. who knows Ryan well consented to monitor her temperature and vitals.

- Ryan registered just under the 100.3 benchmark and could not have and did not receive care because no orders from Defendant Victoroff had been left.

- The next day, Ryan was found unresponsive in her cell by security staff, removed to clinic, where she spent the entire day in and out of coherency, loss of kidney and bladder functions and increasing fever.

- By the time the staff received an order from a provider for a routine CBC (which proved deep neutropenia) and made the on-site call to send Ryan to the DRDC infirmary; Ryan's temp was 103.8.

- Ryan preserves the ability to move for *res gestae* evidence, specific to Hilary Victoroff.

13

- The diagnoses of:  critical neutropenic fever, Influenza A, a spider bite to a finger on Ryan's right hand that had occurred while unresponsive in dense population cell and that had rapidly turned into a staph infection that then rose to MIRSA in location of the bite were made by Dr. Burke and his team at Aurora South.

- Hilary Victoroff is a mid-level general scope of practice registered nurse practitioner.

- Ryan lived.

- Discharged aprx 10 days later.  Returned to facility at DRDC and recovered at DRDC Infirmary.

- At no time, during this event, did Hilary Victoroff act within the standard operating procedures of CDOC nor did she act within her licensing and medical capabilities in her decision making. Defendant Victoroff willfully, knowingly and wantonly held herself to an equal or greater standard of ability and medical authority as Ryan's outside attending specialists; assigned to Ryan by her employer CDOC. As such, Defendant Victoroff is accountable to be held to the same standards as those specialists and hospital.

**VIOLATION OF C.R.S. 12-38-117** against Defendant Hilary Victoroff N.P.

Supporting facts:

C.R.S. 12-38-117:  (1)  "Grounds for discipline as used in this article, means any action by any person who:… (e)  Has violated any provision of this article or has aided or knowingly permitted any person to violate any provision of this article; … (h)  Has falsified or in a negligent manner made incorrect entries or failed to make essential entries on patient records.."

1. Defendant Victoroff, from May 31, 2013 through on or about March 20th, 2017, was intermittently and sporadically rotated as the general care provider for Shawnee Ryan, within CDOC Clinical Services at DWCF.

2. Defendant Victoroff, from May 31, 2013 through to Ryan's release to parole on October 4, 2018 also had access and continued participation with other medical staff regarding Shawnee Ryan's medical care.

3. Defendant Victoroff, from May 31, 2013 through to Ryan's release to parole on October 4th, 2018 was fully and completely aware of Shawnee Ryan's diagnoses of record and Ryan's specialized needs and care being provided by the outside medical community aprx. 90% of the time, which included multiple weekly trips outside of the facility in order for Ryan to have access to same specialists, hospitals, clinics, diagnostics and specialized treatments.

4. Defendant Victoroff, at all times from onset of Ryan's diagnoses through to current day, knew and knows that Ryan's medical needs were simultaneously life essential and life threatening if not followed per governing standard of care as ordered by the specialized providers, hospitals, clinics, diagnostics and specialized treatments.

5. Defendant Victoroff, at all times from onset of Ryan's diagnoses through to current day, knew and knows that Ryan's diagnoses are fatal, terminal and will be with Ryan lifelong.

6. Defendant Victoroff, as all rotating providers within CDOC do, had and remains having unbridled access to Ryan's medical records and knew, spanning years, of any outside community orders for care being issued on behalf of Ryan.

15

7.  Defendant Victoroff, despite her inherent knowledge gained from years of access to Ryan's medical information; did, from February 1, 2019 through to May 29th, 2019 knowingly and directly mislead her counsel in this lawsuit into unawareness that any relevant medical records, other than generated from internal CDOC exist.

8.  Defendant Victoroff, as a result, allowed her Answer to Complaint to be filed with that false information as the foundation for beliefs by her counsel which also, in turn, misleads the processes of the court, the Plaintiff and any other counsels and parties present in the case.

9.  Defendant Victoroff, despite the span of time at hand, did not correct herself. Correction occurred only when Plaintiff confronted Defendant Victoroff's counsel.

**FIVE COUNTS OF VIOLATION(S) OF HIPPA** against Defendant Hilary Victoroff N.P.

Supporting Facts:

Claim Five paragraphs are incorporated into Claim Six as statements of fact supporting this charge.

1.  From February 1, 2019 through to May 29th, 2019, Defendant Victoroff was being required to Answer the charge within Claim Four of this Complaint.  And do so, through her counsel of record which is State AG and Ms. Amy Colony.

2.  From March 21, 2019 through May 29th, 2019, Ryan was in direct contact with Defendant Victoroff's counsel and no disclosure was given to Ryan that Defendant Victoroff's counsel had received "two boxes" of Ryan's medical records either directly from (or) through assistance of Defendant Victoroff.  Ryan only found out, due to what

she believes was an inadvertent statement made to record by Ms. Colony at May 29, 2019 hearing of having two boxes of Ryan's CDOC records already in her office.

3.   Defendant Victoroff is a party within this Complaint and her employer CDOC, is not.

4.   Count One:  Defendant Victoroff, within the same span of time, either directly (or) guiding the assistance of others, accessed and released, from the CDOC, the entirety of parolee Shawnee Ryan's CDOC medical history and records both verbally (and) literally, without a written or verbal release from Shawnee Ryan (CDOC Form 950-02A).

5.   Count Two: Defendant Victoroff, within the same span of time, directly or by guiding the assistance of others, physically located, gathered, copied and handled those inactive and stored CDOC medical records of Shawnee Ryan.

6.   Count Three: Defendant Victoroff, within the same span of time, directly or by guiding the assistance of others, physically removed, from the care and custody of CDOC, the resulting two boxes of Shawnee Ryan's medical records.

7.   Count Four: Defendant Victoroff, within the same span of time, either directly or by guiding the assistance of others, physically handed over the boxes of medical records to another party who also did not have written, verbal or waived release from Shawnee Ryan.

8.   Count Five: Defendant Hilary Victoroff, within the same span of time, directly violated her sworn affidavit to her employer to protect inmate medical privacy, which is contained, by administrative regulation and ACA standards, within Ryan's inmate care and custody (CDOC 950-02B).

**DELIBERATE INDIFFERENCE** resulting in Reckless Disregard against Laura

Sommerschield N.P.

Supporting Facts:

- Ryan preserves the ability to move for *res gestae* evidence, specific to Laura
  Sommerschield.

- Ophthalmologist surgeons; assigned to Ryan by CDOC on referral by CDOC assigned
  oncology specialist Dr. John Burke; verified in mid-October 2017 that the prolonged by
  years and extended use of the chemotherapy drug Dexamethasone caused aggressive
  growing cataracts in Ryan's eyes.  Cataract's so thick they could not see into Ryan's eyes
  at examination.

- Cataract vision loss began in July 2017.  Ryan reported to CDOC.

- Ryan reported to Burke, in August 2017. Burke referred to specialist care.

- Defendant Sommerschield, through CHP, scheduled an *optometrist* exam consult in mid-
  October 2017.  CHP approved for optometry.

- The Optometrist, when unable to see into Ryan's eyes, brought in on that day, an
  Ophthalmologist surgeon to examine.

- Orders for "immediate next" surgery to the left eye were entered by
  surgeon.

- October 25, 2017, in DRDC, Ryan then developed an additional, in right eye, two
  obvious to the eye hematomas.  Sommerschield placed a telephone call to the *optometrist*
  and then told Ryan, when Ryan later began to question 'why' it was taking so to fulfill

the "immediate next" orders of surgeon, that the *optometrist* had "told her" that a second opinion, if needed, was being "asked".

- In reality, on later investigation through specific questioning from Ryan to Denver Health; the optometrist had stated to Sommerschield that he felt the hematomas could wait for surgeon's second opinion on the hematomas because according to his computer screen at the time, Ryan was ordered for "immediate next" surgery.

- As more time and rapid vision loss went by; Ryan asked Burke to intervene. He did and directly to Denver Health surgeons. Ryan was then near immediately scheduled for pre-op on November 20, 2017.

- Surgeon then scheduled for "Urgent" surgery.

- Surgeon, verifiably, direct called Sommerschield and then reported not only directly to Ryan but also directly to her administrators at Denver Health; the specifics of that call. Surgeon showed Ryan, when Ryan expressed fear that Sommerschield would not obey "Urgent"; her written personal cell phone number on the print copy of Ryan's transfer and medical papers, given so that she could be reached directly (and) then had Ryan watch her hand those same papers to Ryan's security detail for direct return to facility.

- Even still, Sommerschield left her orders, with CHP verifying, for "April 2018" surgery to begin. Repeatedly through administrative processes and direct contact(s) to claim "no fault" as (quote) "DH sets all schedules" (end quote). Unknowing to Sommerschield until now, that Ryan's surgeon had reported Sommerschield and Ryan's case to Denver Health administrative review. The end result being that Denver Health has always offered choice to

CDOC in scheduling and now gives three options (given every time, for every inmate) of scheduler's offered dates to CDOC providers with those and subsequent CDOC provider choices now internally verified against Denver Health

recommendations and orders. Actions direct resulting from Ryan's surgeon acting.

- Also unknown to Sommerschield until now, Ryan was disclosed, by surgeons and staff, all actions and orders, while they still followed security guidelines, by Denver Health Eye Clinic for Ryan's medical needs.

  - The date of "April 2018" had been a personally chosen date by Sommerschield and was the farthest out, at the time, that Sommerschield could get.

  - Ryan was still not on schedule for urgent surgery and again went to Burke for intervention.

  - Ryan had surgery on her left eye on December 18, 2017.  On prep, the charge nurse commented how wonderful it was that at the age of 60 years Ryan had "only" minor kidney insufficiency.  Denver Health computers are directly tied to CDOC computers.  Startled, Ryan asked the charge nurse to verify Ryan's inmate number and date of birth.  Then, in order to proceed safely to surgery, Ryan listed her extensive history.  Which surgeons then determined to need their cataract specialist to have perform and special provisions in the minimal OR setting they had available.  Ryan was then bumped to end of day in order for cataract specialist to come in and prep to occur.

- At next day post op, surgeon delivered news of surgery failure due to extent of growth and having waited too long for surgery. That lenses must be corrected and the left eye surgery redone.

- Sommerschield was (according to surgeon) tested to see which of three offered by schedulers dates she would choose:  January 2, 2018; January 9, 2018 and latter January 2018.

- Sommerschield chose latter January 2018.

- Denver Health intervened and Ryan's second surgery on left eye was executed on January 2, 2018.  No allowance to Sommerschield, to choose right eye surgery was given and Denver Health schedulers executed right eye surgery date of January 11, 2018.

- A University Hospital specialist surgeon was brought in for the second surgery on Left eye.  Both remaining surgeries were done in the large and adequate for Ryan's high risks O.R.  As Denver Health now had, from the
   inmate (Ryan) and not CDOC; full medical history.

- Laura Sommerschield is a mid-level general scope of practice nurse practitioner.

- At no time, during this period of time, did Laura Sommerschield act within her licensing and medical capabilities in her decision making. Defendant

Sommerschield holds indirect and direct personal capacity liability as she willfully, knowingly and wantonly held herself to an equal or greater standard of ability and medical authority as Ryan's eye surgeon(s).  As such, Defendant Sommerschield does not have immunity and is accountable to be held to the same standards as those specialists and hospital.

b. *CHP Defendants*:

CHP Defendants deny Plaintiff states any cognizable claim against them upon which relief may be granted under either federal or Colorado law.  CHP Defendants also deny Plaintiff is entitled to any of the relief sought in her Fourth Amended Complaint.

CHP Defendants generally reject the version of events articulated by Plaintiff in this Scheduling Order and do not believe Plaintiff's assertions are supported by Plaintiff's medical records or the other evidence that will be presented in this matter.

Finally, CHP Defendants incorporate their defenses and affirmative defenses contained in her Answer to Plaintiff's Fourth Amended Complaint as if fully set forth herein.

c. *Defendants Hilary Victoroff and Laura Sommerschield*:

Defendants Hilary Victoroff and Laura Sommerschield (CDOC Defendants) deny Plaintiff's version of events and maintain that Plaintiff's allegations are not supported by the medical records or any other evidence. Defendants deny that they violated Plaintiff's rights or otherwise breached her duty of care to Plaintiff in so far as alleged in Plaintiff's Fourth Amended Complaint. Defendants deny that Plaintiff is entitled to any of the relief requested in her Fourth Amended Complaint.

Defendants incorporate their defenses and affirmative defenses set forth in their Answer to Plaintiff's Fourth Amended Complaint as if fully set forth herein.

### 4. UNDISPUTED FACTS

The following facts are undisputed:

1.      At all times relevant to this action, Shawnee Ryan, was a citizen of the United States of America, a resident of the State of Colorado, and an inmate incarcerated within the

Colorado Department of Corrections ("CDOC").

2.      At all times relevant to this action, Dr. Mix was employed by Correctional Health Partners as a Medical Director, responsible for reviewing requests from various Colorado Department of Corrections medical providers, including those providers treating Plaintiff, for approval for treatment outside the CDOC system.

4.      Upon a felony conviction in 2012, Plaintiff was incarcerated within facilities operated and controlled by the Colorado Department of Corrections.

5.      Plaintiff was transferred, on a progressive Executive Authorization Order for medical diagnosis and care to Denver Women's Correctional Facility on May 31, 2013, was placed on medical hold and remained until she was paroled on October 4, 2018.

6.      All Defendants, at all relevant times, were acting under the color of State law.

## 5.  COMPUTATION OF DAMAGES

a.  Plaintiff:

Plaintiff seeks damage against CHP Defendants as particularly specified as to each of them in the Fourth Amended Complaint. Plaintiff further seeks damages against CHP Defendants for negligence.

Plaintiff seeks compensatory damages against CHP Defendants for ongoing sequential physical injuries, including physical suffering and permanent disability; identified in the Fourth Amended Complaint.

Plaintiff seeks damages from CHP Defendants for Plaintiff's emotional distress, including cruel and unusual distress caused by non-disclosure by CHP Defendants and as described in Fourth Amended Complaint. Further including loss of quality of life, pain and

suffering, and other non-economic losses, past, present and future, as more particularly pled in the Fourth Amended Complaint, and as will be testified to or verified by sworn testimony by Plaintiffs experts, caregivers and guardians.

Plaintiff, against Defendants CHP and Laura Sommerschield, has also incurred special damages, including significantly medically related expenses.  Plaintiff will continue to incur further medical expenses and life care related expenses in amounts to be determined at the time of expert disclosures involving economic loss and life care planning and at trial.

Plaintiff, against Defendant Victoroff, has incurred special damages, including significantly medically related expenses. The delay to getting to care caused by Defendant Victoroff's actions, placed Plaintiff into the level of neutropenic endangerment that brought about such a decreased level of immune endangerment that Plaintiff has never fully recovered from and must continue to deal with daily as weakened marrow attempts to recover. For all time, the neutropenic fever that went untreated until hospitalized by others is classified in Plaintiff's medical records as "recurrence #1"  While punitive damages are not being sought against Defendant Victoroff, an amount to be determined by expert's testimonies and at ADR and/or trial to cover the drugs and IV treatments to re-boost immune levels to date are appropriate to seek against this Defendant.

Plaintiff, against Defendants CHP, has suffered lost past, current and future earnings, has impaired earnings capacity in ongoing amounts to be ascertained by an economic expert at the time of expert disclosure and at trial.  Plaintiff was 57 years old at the time of the first order for transplant made by specialists.  Plaintiff is currently 62 years of age.  Plaintiff fully expected, at time of incarceration, to not be deprived of any ability that would prevent her from full recovery

and return to normal life upon her release; Plaintiff intended and planned to continue to work until at least the age of 70 years.

Plaintiff is entitled to all fees and costs, pre-judgment interest and costs as allowable by federal law.

In addition to compensatory, economic, consequential and special damages; Plaintiff is entitled to punitive damages against CHP Defendants, in that the actions of the Defendants were taken willfully, with a reckless and wanton disregard of the constitutional rights of Plaintiff.  In the case of Defendant Mix her personal engagement in personal attack on the Plaintiff was done with malice and forethought.

Plaintiff seeks appropriate equitable and declaratory reliefs.

b.  *Defendant Jennifer Mix*:  CHP Defendants are not currently seeking any damages from Plaintiff at this time.  However, they reserves their right to seek attorney's fees and costs pursuant to applicable federal law.

c.  *Defendants Hilary Victoroff and Laura Sommerschield*:

Defendants Victoroff and Sommerschield do not currently seek damages but reserve the right to seek costs and attorney fees.

## 6.  REPORT OF PRECONFERENCE DISCOVERY AND MEETING UNDER FED. R. CIV. P. 26(f)

a.        Date of Rule 26(f) meeting:

The parties cannot agree as to when the initial Rule 26(f) meeting was held.  Conversations occurred on May 15 and 16, 2019 and further discussions were held on May 29 and June 16, 2019.  These discussions were held via email and Shawnee Ryan, Andrew Ringel, Edmund Kennedy, and

Amy Colony were all participants in these email exchanges.

      b.      Names of each participant and party he/she represented.

Shawnee Ryan for Plaintiff
Andrew Ringel and Edmund Kennedy for Defendant Mix
Amy Colony for Defendants Victoroff and Sommerschield

Plaintiff disputes the fact that Mr. Ringel was involved in any discussions concerning the Rule 26(f) meeting.

      c.      Statement as to when Rule 26(a)(1) disclosures were made or will be made.

Rule 26(a)(1) disclosures will be made by **July 15, 2019**.

      d.      Proposed changes, if any, in timing or requirement of disclosures under Fed. R. Civ. P. 26(a)(1).

The parties all agreed that Initial Disclosures will be made on July 28, 2019.

      e.      Statement concerning any agreements to conduct informal discovery:

None, but parties will discuss any requests for informal discovery in the future, if appropriate.

      f.      Statement concerning any other agreements or procedures to reduce discovery and other litigation costs, including the use of a unified exhibit numbering system.

The parties have agreed to use a unified numbering system for deposition exhibits.

      g.      Statement as to whether the parties anticipate that their claims or defenses will involve extensive electronically stored information, or that a substantial amount of disclosure or discovery will involve information or records maintained in electronic form.

The parties disagree as to the fact that their claims or defenses will involve extensive electronically stored information.

h.        Statement summarizing the parties' discussions regarding the possibilities for promptly settling or resolving the case.

The parties have not had talks of the possibility of settlement and/or mediation at this point.

## 7. CONSENT

All parties have not consented to the exercise of jurisdiction of a magistrate judge.

## 8. DISCOVERY LIMITATIONS

a.        Modifications which any party proposes to the presumptive numbers of depositions or interrogatories contained in the Federal Rules.

Each side shall be entitled to 10 total depositions.

Plaintiff may serve 25 interrogatories to each party Defendant.  Party Defendants are (1) CHP and Dr. Mix and (2) the CDOC Defendants.

Each Defendant Group may serve 25 interrogatories to Plaintiff.

The parties agree to endeavor not to serve duplicative written discovery.

b.        Limitations which any party proposes on the length of depositions.

7 hours per deponent.  Fed. R. Civ. P. 30(d) shall govern.

c.        Limitations which any party proposes on the number of requests for production and/or requests for admission.

Plaintiff may serve 25 Requests for Production of Documents to each Defendant group.

Plaintiff may serve 25 Requests for Admission to each Defendant group.

Each Defendant Party group may serve 25 Requests for Production of Documents and 25 Requests for Admission to Plaintiff.

These limitations on the Requests for Admission do not include Requests for Admissions concerning authenticity or genuineness of documents.  The parties also agree to discuss potential stipulations concerning authenticity or genuineness of documents informally on an as needed basis throughout the case.

        d.       Other Planning or Discovery Orders

If further discovery is required, the parties will work together in good faith to accommodate the needs of the case, and may modify this Order for good cause shown.

Before filing a motion for an order relating to a discovery dispute, the movant must request a conference with the Court by submitting an email, copied to all parties, to hegarty_chambers@cod.uscourts.gov.  *See* Fed. R. Civ. P. 16, cmt. 2015 Amendment.

### 9.  CASE PLAN AND SCHEDULE

        a.       Deadline for Joinder of Parties and Amendment of Pleadings: **July 15, 2019**.

Plaintiff does not believe this deadline applies to amendment of pleadings to add a punitive damages claim against health care providers under the HCAA, which must be brought in accordance with that statute's requirements.  As a result, Plaintiff believes that this deadline will be forty-five days prior to the discovery cut-off or **October 17, 2019.**  Defendants suggests a cut-off of **November 4, 2019**.  **Court:  Deadline for Amendment (absent a showing of good cause) August 26, 2019.**

        b.       Discovery Cut-off:  Plaintiff believes all discovery, including expert discovery, must be completed no later than **November 1, 2019.**  Plaintiff objects to any alterations of discovery and disclosures timing that extends past the Court's Order for a November 1, 2019 discovery deadline.

        As such, Plaintiff requests expert disclosures to be completed by **September 17,**

**2019**.

Defendants anticipate conducting all fact-based discovery prior to **November 1, 2019**.  However, based on the extent of Plaintiff's medical treatment, Defendants do not believe expert disclosures can be completed by **November 1, 2019**. Defendants therefore request expert disclosures to be completed by **February 17, 2020** but all fact-based discovery, including all written discovery, be completed by **November 1, 2019**.  **Court:  Defendants' deadlines are adopted except that February 17, 2020 is the expert discovery deadline, not the disclosure deadline.**

c.        Dispositive Motion and Rule 702 Deadlines:  **December 9, 2019**.

d.        Expert Witness Disclosure

1.        The parties shall identify anticipated fields of expert testimony, if any.

*Plaintiff*: Plaintiff currently anticipates retaining experts in the following areas:

Oncology, Hematology, Nephrology, Cardiology, Correctional Healthcare/Behavorial Health,

Economics and  other expert fields not presently evident to the parties.

*CHP Defendants*: CHP Defendants presently anticipate experts in the following

areas:  jail medical procedures and practices; standard of care experts for each of the areas of

expertise of the individual Defendants; vocational and rehabilitation experts, and experts in any

areas endorsed by Plaintiff.

*CDOC  Defendants:* The CDOC Defendants  currently anticipate they may retain

experts in some or all of the following areas: correctional healthcare procedures and practices;

standard of care experts for each of the areas of expertise of the individual Defendants,

vocational and rehabilitation experts, economics and experts in any areas endorsed by Plaintiff..

2.        Limitations which the parties propose on the use or number of expert witnesses:

Six (6) specially retained experts for Plaintiff. Three (3) experts per Defendant party

group or six (6) collectively amongst Defendants. These limitations do not apply to treating or

non-retained experts including any of the named Defendants.

        3.     The Plaintiff shall designate all experts and provide opposing counsel and any pro se parties with all information specified in Fed. R. Civ. P. 26(a)(2) on or before **November 1, 2019**.  Plaintiff proposes that she shall designate all experts and provide opposing counsel and any pro se parties with all information specified in Fed. R. Civ. P. 26(a)(2) on or before **August 1, 2019**.  **Court:  November 1, 2019.**

        3.     The Defendants shall designate all experts and provide opposing counsel and any pro se parties with all information specified in Fed. R. Civ. P. 26(a)(2) on or before **December 2, 2019.**  Plaintiff proposes that Defendants shall designate alkennl experts and provide opposing counsel and any pro se parties with all information specified in Fed. R. Civ. P. 26(a)(2) on or before **September 2, 2019**.  **Court:  December 2, 2019.**

        4.     Defendants propose all rebuttal experts shall be disclosed and provide opposing counsel and any pro se party with all information specified in Fed. R. Civ. P. 26(a)(2) on or before **January 6, 2020**.  Plaintiff proposes that all rebuttal experts shall be disclosed and provide opposing counsel and any pro se parties with all information specified in Fed. R. Civ. P. 26(a)(2) on or before **October 1, 2019**.  **Court:  January 6, 2020.**

    e.     Identification of Persons to Be Deposed:

Defendants are presently determining their discovery needs.  Accordingly, the deposition schedule has not been set.  Defendants currently plan to depose Plaintiff and, perhaps, some of her treating physicians but such is not exhaustive.  Further, no dates and/or times have been set for any deposition.

Plaintiff's depositions are in process of being set and the following preliminary deposition

schedule for Plaintiff is set.  By including this list within this Scheduling Order, the Plaintiff is not stipulating that the depositions of the listed individuals is appropriate and does reserve the right to seek a protective order concerning the deposition of any listed individual.

Plaintiff wishes to depose the following:

Kellie Wasco, TBD, 9:00 a.m., 7 hours

Robert Frost, TBD, 9:00 a.m., 7 hours

Susan Tiona, 9:00 a.m., 7 hours

Jeff Archambeau, TBD, 9:00 a.m., 7 hours

Rishi Ariola-Tirella, TBD, 9:00 a.m., 7 hours

Adelina Longoria, TBD, 9:00 a.m., 7 hours,

Lacey Echalier, TBD, 9:00 a.m., 7 hours

John Burke, TBD, 9:00 a.m., 7 hours

Richard Nash, TBD, 9:00 a.m., 7 hours

Therese Stone, TBD, 9:00 a.m., 7 hours

Finally, the parties wish to retain the opportunity to reschedule depositions or take other depositions as may be suggested by discovery.

f.      Deadline for Interrogatories:

Served no later than 45 days before the discovery cut-off, on or before **September 16, 2019**.

g.      Deadline for Requests for Production of Documents and/or Admissions

Served no later than 33 days before the discovery cut-off, on or before **September 16, 2019**.

## 10.  DATES FOR FURTHER CONFERENCES

a.      Status conferences will be held in this case at the following dates and times:

_____.

b.      A final pretrial conference will be held in this case by Judge Krieger.

## 11.  OTHER SCHEDULING MATTERS

a.      Identify those discovery or scheduling issues, if any, on which counsel after a good faith effort, were unable to reach an agreement.

b.      Anticipated length of trial and whether trial is to the court or jury.

The parties presently anticipate a fourteen (14) day jury trial.

c.      Identify pretrial proceedings, if any, that the parties believe may be more efficiently or economically conducted in the District Court: None at this time.

## 12.  NOTICE TO COUNSEL AND PRO SE PARTIES

The parties filing motions for extension of time or continuances must comply with D.C.COLO.LCivR 6.1(c) by submitting proof that a copy of the motion has been served upon the moving attorney's client, all attorneys of record, and all *pro se* parties.

Counsel will be expected to be familiar and to comply with the Pretrial and Trial Procedures or Practice Standards established by the judicial officer presiding over the trial of this case.

With respect to discovery disputes, parties must comply with D.C.COLO.LCivR 7.1(a).

Counsel and unrepresented parties are reminded that any change of contact information must be reported and filed with the Court pursuant to the applicable local rule.

## 13.  AMENDMENTS TO SCHEDULING ORDER

This scheduling order may be altered or amended only upon a showing of good cause.

DATED at Denver, Colorado, this 10th day of July, 2019.

BY THE COURT:

S/Michael E. Hegarty
_____
United States Magistrate Judge

APPROVED:

s/ Shawnee Ryan
Shawnee Ryan
3531 South Logan Street, #189
Englewood, CO 80113
720-431-8319
shawneeryan216@gmail.com
Pro Se Plaintiff

s/ Edmund M. Kennedy
Andrew D. Ringel
Edmund M. Kennedy
Hall & Evans, L.L.C.
1001 17th Street, Suite 300
Denver, CO  80202
303-628-3300
ringela@hallevans.com
kennedye@hallevans.com
Attorneys for Defendants
Correctional Health Partners and
Dr. Jennifer Mix, MD

s/ Amy C. Colony
Amy C. Colony, Esq.
Senior Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO  80203
720-508-6615
acolony@coag.gov
Attorneys for Defendants Victorff and
Sommerschield

33