**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

Civil Action No.    18 – cv – 00956 – MSK-MEH

**SHAWNEE RYAN, Plaintiff**

**V.**

**Defendants:**
**CORRECTIONAL HEALTH PARTNERS (et al) (dba Correctional Health Partners, Inc.; Physician Health Partners, Inc.; CHP Companies, Inc.; Correctional Healthcare Physicians, P.C.)**

**DR. JENNIFER MIX, M.D.  (personal and professional capacity)**
**HILARY VICTOROFF N.P.  (personal and professional capacity)**
**LAURA SOMMERSCHIELD N.P. (personal and professional capacity**)

---

**PLAINTIFF MOTION FOR SUMMARY JUDGEMENT AGAINST STATE DEFENDANT HILARY VICTOROFF:  CLAIM FOUR (ECF119)**

---

**Plaintiff Shawnee Ryan comes now** and moves for Summary Judgement under FRCP R 56(b) against State Defendant Hilary Victoroff and the singular claim against her titled as "Claim #4" in ECF119 Fourth Amended Complaint.

**Preliminary Statement**

Claim #4 against Defendant Victoroff is a totally encompassed four days of an event spanning from Plaintiff's discharge from Aurora South Hospital on Friday February 3, 2017 through Tuesday February 7, 2017 when she was readmitted back to Aurora South Hospital.   February 3, 2017 marking a discharge date from Aurora South hospital after being given one of the most aggressive chemotherapy treatment drug therapies known:  DTPACE.  Plaintiff had been admitted for the procedure on January 26, 2017, directly from Rocky Mountain Cancer Centers under the orders of her oncologist and hematologist when she appeared for a regular chemo appointment in obviously debilitated condition and consistently lowered lab levels. Plaintiff was not returned into the care and custody of the CDOC and instead was direct admitted from Rocky Mountain Cancer Center Aurora to Aurora South same day.

1

36  On February 3, 2017 discharge from DTPACE treatment, Plaintiff was returned
37  into the hands of Defendant Victoroff, as the support care provider to Plaintiff's
38  primary specialist: Oncologist Dr. John Burke M.D of Rocky Mountain Cancer
39  Centers. That return into the hands of Defendant Victoroff was at aprx. 3:00 p.m.
40  on Friday the 3rd of February. Plaintiff's security detail pulled into the sally port at
41  DRDC Infirmary where it is standard procedure to return all hospitalized patients
42  for clearance by infirmary staff prior to their return to general population.
43  However, on Plaintiff's return, the C.O. (female Tafoya) was told that she was
44  halted from taking Plaintiff to the infirmary. She questioned the order. After
45  Master Control confirmed again with DWCF Clinic and Victoroff that Defendant
46  Victoroff wanted Plaintiff instead at the general population clinic at DWCF. Both
47  Security and Master Control protested the Victoroff directive. CO Tafoya turned
48  the van around and drove to DWCF sally port. Ultimately, as medical and security
49  staff cannot interface to the point of security being able to override medical; both
50  security and Master Control had no choice but to obey the Victoroff order.
51  Plaintiff was put into the care and custody of Defendant Victoroff around 3:30
52  p.m. on that day.
53
54  The primary difference between DWCF Clinic and care in the infirmary is that an
55  inmate cannot access medical care at DWCF unless specific orders are given, each
56  and every need/time by their assigned CDOC provider. In this case, Defendant
57  Victoroff. At DRDC Infirmary, vitals are regularly monitored throughout the shifts
58  and access is a call button away. DWCF is also a heavily dense populated
59  environment. Whereas, the most ill are briefly housed at the DRDC infirmary but
60  they are in segregated cells with limited to no access to others and the cleaning
61  materials and laundry materials used are things like chlorine bleach and
62  disinfectants that are not allowed in the general population environment of
63  DWCF. The ability to observe neutropenic masks, gloves, etc. are available in the
64  infirmary and are not available within the dense general population of DWCF. At
65  DWCF Clinic, a small and heavily crowded waiting area, where the ill or wounded
66  or contagious are sat until called. Whereas at DRDC infirmary, the precautions of
67  staff coming to the patient in each segregation cell is observed. The exposure to
68  harm is very limited in the infirmary.
69
70  As Defendant Victoroff ordered Plaintiff to return to general population on the
71  afternoon of Friday, February 3, 2017; she then proceeded to take three days in a
72  row off. Did not return to work until Tuesday, February 7th, 2017. There is some

2

73  alleged evidence not yet produced by State AG, though repeatedly asked for, that
74  Defendant Victoroff claims to have been assigned on call *for behalf of the Plaintiff*
75  on Monday February 6th, 2017.  Regardless, at no time after discharge on
76  February 3, 2017 through February 7th, 2017, did Hilary Victoroff leave any orders
77  whatsoever for ongoing vitals monitoring of the Plaintiff (or) order access to clinic
78  (or) act upon any medical information arising during that time frame until aprx.
79  18:30 (6:30) p.m. on Tuesday February 7, 2017.  According to Hilary Victoroff's
80  time sheet, she was present at work on Tuesday, February 7th, 2017 from 7:45
81  a.m. to 7:45 p.m. and titled herself as having worked on "kites and medication
82  refills". Hilary Victoroff was not present at DWCF Clinic or DRDC Infirmary on the
83  4th, 5th, 6th of February 2017.  Nor was Plaintiff assigned to an acting provider
84  during that same time frame.
85
86  On Saturday, February 4th, 2017 Plaintiff knew she was feverish.  Risking her
87  inmate security status with security staff, she "pitched a fit" demanding to be
88  allowed to have her temperature taken at the clinic.  When finally reaching the
89  clinic same day; R.N. Amy Dixon, who knew Plaintiff well and that Plaintiff was
90  fortunate enough to encounter her being on shift, did consent to take her
91  temperature.  Plaintiff did have a temp measuring not even a full degree under
92  and being just under the 100 degree mark (cut-off high risk order from Burke
93  being 100.3 as ordered at discharge.  At 100.3 Burke's orders were for "30
94  minutes or less to the Emergency Room at Aurora South Hospital).  Plaintiff
95  returned to her cell.
96
97  On Saturday the 4th, Sunday the 5th, Monday the 6th and on into Tuesday the 7th;
98  Plaintiff grew increasingly ill.  Plaintiff's Deposition of October 18, 2019 reveals
99  that during that time spanning those four days, Plaintiff ran the gamut of in and
100 out of coherency, responsiveness, kidney and bladder control and has very few
101 cohesive recollections of being removed from her cell by staff as unresponsive
102 and in medical distress, and taken back and forth to the DWCF clinic or of being
103 transported to emergency room on night of the 7th.  Same broken recollections
104 also cover triage at the DWCF clinic.  All memories of February 4, 5, 6, 7th are
105 disjointed and dim in detail; the detailed descriptions being given within this filing
106 all come from factual based medical records.  By the time Defendant Victoroff had
107 finally relinquished control and ordered Plaintiff to the infirmary at aprx. 18:30
108 (6:30 p.m.) on February 7$^{th,}$ the blood lab counts (drawn 28 hours earlier on
109 February 6th with a "STAT" order to LabCorp (attached)) revealing a white blood

3

110 cell count of 0.2 and a bottoming out neutrophils count. All levels within the
111 draw are significantly lower than the stable levels Plaintiff was discharged with on
112 February 3, 2017. The WBC is a mortally critical level. Subsequent hospital
113 records reveal Plaintiff's temperature was dangerously high and that it was
114 obvious to the physical eye she was ill and in medical distress. Classified within
115 records as "tenuous". Board certified, licensed M.D. Dr. Muthulakshmi Yeggapan,
116 as soon as she had Plaintiff in her hands at the infirmary; picked up the phone to
117 notify the Plaintiff's primary physician, Dr. John Burke M.D. to receive his orders.
118 Plaintiff was given Tylenol for fever and ordered by Dr. Burke to be immediately
119 transported to the Emergency Room at Aurora South Hospital. That call to Dr.
120 Burke was the first call he had received after Plaintiff began running a temp
121 (Saturday February 4, 2017) and becoming ill post-DTPACE. Arriving at Aurora
122 South Hospital Emergency Room at aprx. 8:30 p.m. on the night of Tuesday
123 February 7th, 2017 where Plaintiff presented with a coming down temp due to
124 Tylenol treatment at DRDC infirmary and her blood levels having dropped even
125 lower to 0.0 neutrofils. Listed as progressive to critical care, she remained as
126 admitted. The diagnoses of Influenza A, sepsis from a wound on her right hand
127 that turned rapidly to MRSA, Pancyptopenia and deep neutropenic fever were the
128 primary diagnoses.
129
130 The relevant to medical fact Aurora South records, regarding how rapidly Plaintiff
131 came close to death, are attached to this motion. Full and complete Aurora South
132 medical records are in the hands of both Plaintiff and the State. Pages 34 and 35
133 of the attached exhibit are the DWCF LabCorp draw which is part of the
134 potentially pending inadmissible evidence that is the CDOC gathering of records
135 by Attorney Colony. The same DWCF draw can and will be obtained directly from
136 LabCorp should the claim go to hearing or trial. It is given from the CDOC
137 documents at issue, to prove a point now that Defendant Victoroff and her
138 attorney are lacking in candor in saying that "no such orders" and "no such
139 evidence exists" for Claim #4 (note State's Bates coding on pages 34 and 35 of the
140 attached).
141
142 The time sheet of Defendant Victoroff is also attached. Revealing that despite
143 arriving to work on Tuesday February 7, 2017 at 7:45 in the morning, it took her
144 until toward the end of her shift at 7:45 p.m. to order and remove Plaintiff from
145 general population and into the care and custody of CDOC M.D. Yeggapan.
146 Defendant Victoroff using the blood labs drawn over 28 hours earlier on Monday

4

February 6, 2017 as reasoning for finally getting Plaintiff to infirmary care. At no time, post-discharge from DTPACE on February 3, 2017 did Hilary Victoroff actually physically examine the Plaintiff. The attached lab records of Aurora South reveal that in those 28+ hours, Plaintiff's levels had dropped markedly lower into the 0.0 in multiple areas and critically low levels within other markings. (see page 3 of Aurora South's lab draw taken during triage at the Emergency Room). Note also on Page 3 of the attached, the next Aurora South draw from the early hours of the morning on February 8, 2017 that Plaintiff was continuing a marked decline in levels.

## Grounds and Authorities

A. Plaintiff joined Claim #4 to state statutes concerning negligence claims in order to allow for both state and federal ability to file: (ECF 133 and ECF 137). Defendant Victoroff acted under the color of both state and federal laws during this entire event spanning from February 3, 2017 through February 7th, 2017. The required Certificate of Review is filed in this case as ECF137.

B. The Statute of Limitations on Claim #4 is met. This case was filed on April 23, 2018.

C. The damages CAP does not exceed $300,000.

D. Hilary Victoroff does not have state or federal governmental immunity or indemnification as a government employee due to her actions being solely her own, they were willful, negligent and wanton. Repeated action spanning a five-day period of time in which the Plaintiff nearly lost her life as a result. She is claimed against in her personal capacity and in her professional capacity as an individual licensed to practice healthcare within the State of Colorado.

E. CDOC AR 700-02: "..where no inmate can be denied care that would prevent a full recovery upon release…will have access to a physician 24 hours per day in compliance with state statutes and local licensing

5

  requirements…where all clinical standards are required to be consistent with current professional practices…where unimpeded access to care by offenders to Clinical Services is to be made available…"[1]

F. C.R.S. 12-38-11.5 (6) "…shall practice in accordance with standards… have and use a safe mechanism for consultation or collaboration with a physician…"

G. C.R.S. 12-38-117: "…has willfully or negligently acted in a manner inconsistent with the health or safety of persons under his or her care…has negligently or willfully practiced nursing in a manner which fails to meet generally accepted standards for such nursing practice…".

H. Under Federal Rule 8 (a), pleader need not allege legal theory on which he relies. *Hostrop v Board of Junior College Dist No 515* (7th Cir Ill. Sept 24, 1975), 523 F2d 569, 21 Fed R Serv 2d (*Callaghan*) 78, cert denied, (US 1976), 425 US 963, 96 S Ct 1748, 48 L Ed 2d 208.

I. "Complaint is not to be dismissed because plaintiff has misconceived proper legal theory of claim; it is sufficient if it shows that plaintiff is entitled to any relief the court can grant, regardless of whether it asks for proper relief." *Jenkins v Fidelity Bank* (E.D.Pa. Sept. 20, 1973), 365 F Supp 1391, Fed Sec L Rep (CCH) P94373.

---

[1] **"Clinical Services Standards and Procedures" are the line item listed procedures clinical services are ordered to follow. They are extensive and are housed in multiple binders within all clinical services locations including DWCF and DRDC Infirmary. Within those standards, are the rules governing the guidelines for an inmate coming out of the hospital to be screened first through the infirmary before being removed to general population. Plaintiff is blocked by State AG from obtaining any of her own CDOC discovery or enacting her Subpoena Duces Tecum; she is not being allowed to review the policy(ies). Which, the court knows Plaintiff believes is obstruction. What Plaintiff does have with regard to infirmary screening at hospital discharge is first-hand knowledge as the 2/3/17 discharge was not the first hospital discharge Plaintiff experienced. All previous discharges were run through infirmary first. Attorney Colony's latest extension of time to allegedly gather it all has not, amongst other discovery requested, provided the Clinical Services Standards and Procedures discovery. No viable claim exists that all the standards would be security related or sensitive thus warranting privilege. They contain (Plaintiff has viewed a few with first-hand eyes) medical procedures no different than any hospital or clinic or private practice in the nation. At minimum they are available in-camera court review or upon specific CDOC administrators testimonies under oath before the court.**

6

Case No. 1:18-cv-00956-MSK-MEH Document 212-1 filed 12/31/19 USDC Colorado pg 7
Case 1:18-cv-00956-MSK-MEH Document 180 Filed 11/09/19 USDC Colorado Page 7 of 18
of 18

J. "Medical personnel who undertake to treat specialized problems are held to the standard of care applicable to those specialties even if they do not claim specialized expertise" (and) "obliged to exercise the same standard of care while working in a prison as a hospital…" *(District of Colorado v Mitchell* 533 A.2.d 629, 648 (D.C. 1957); *Moss v Miller* 254 III App 3.d 174.

K. "Where the Court does not have to accept…staff's statements that "they did not know" a serious need if there is evidence either direct or indirect to the contrary…" *Vaughn v Gray* 557 F.3.d 904-909 (8th Circuit 2009).

L. Eighth Amendment where deliberate indifference to serious medical need of prisoners constitutes the unnecessary and wanton infliction of pain…" *Estelle v Gamble* 429 US 97, 104, 97 S Ct 285 (1976); *Erickson v Pardus* 551 US 89, 94, 127 S Ct 2197 (2007) (per curiam).

*M.* (Discussing under the Eighth Amendment; a prison official may not act with deliberate indifference to a substantial risk of serious harm to an inmate): *McGill v Correctional Healthcare Companies 13cv01080-RBJ-BNB (10TH Cir)..*"Two conditions must be met in order to show deliberate indifference: first the deprivation must be "sufficiently serious" under an objective standard; second, the prison official must have had subjective knowledge of the risk of harm." *See Howard v Waide, 534 F.3.d 1227, 1236 (10th Cir. 2008) (citing Farmer, 511 US at 834, 837).*

N. *Bernstein v Roberts,* 405 F Supp 2d 34, 41-42 (D.D.C. 2005) (*The tort of negligent infliction of emotional distress*): "…must show that Defendant acted negligently (2) That Plaintiff suffered either a physical impact or was "within the zone of danger" of the defendant's actions…"

O. *Sanchez v State of New York*, 99 N.Y 2d at 252; *Parlay v US.*, 349 F. 3d 418, 433-34 (7th Cir 2003) (discussing foreseeability); *Downey v Denton County Texas* 119 F.3d 381, 387-88 (5th Cir 1997): "…in general, prison officials owe prisoners a duty of care to protect them from risks, that, as prisoners, they have diminished ability to protect themselves from…medical personnel owe

7

the same duty of care to prisoner patients as they do to "free world" patients…".

P. (Discussing risk of inherent harm): *Farmer v Brennan* 511 US 825, 836 114 S. Ct 1970(1994) (and) *Helling v McKinney* 509 US 25, 33, 113 S. Ct 2475 (1993): "…a remedy need not await a tragic event…".

Q. ("Adequate medical care defined (in *DeCologero*)") *Fernandez v US*, 941 F2d 1488, 1493 (11th Cir 1991); accord, *US v DeCologero*), 821 F. 2d 39, 43 (1st Cir 1987); *Tillery v Owens*, 719 F. Supp. 1256, 1305 (W.D. Pa 1989), aff'd, 907 F. 2d 418 (3rd Cir 1990); *Howard v City of Columbus,* 239 Ga. App.399, 405-06, 521 S.E. 2d 51 (1999); *Barret v Coplan*, 292 F. Supp. 2d 281, 285 (D.N.. 2003): "…requires treatment by qualified medical personnel who provide services that are of a quality acceptable when measured by prudent professional standard in the community, tailored to an inmate's particular needs, and that are based on medical considerations…"

R. *"Res ip'sa lo'quitur" "The thing speaks for itself" doctrine in negligence law*: a)…"when the event does not occur in the absence of negligence…" (b) "…other responsible causes; including the conduct of the plaintiff and third persons are sufficiently eliminated by the evidence"…(c) "…the indicated negligence is within the scope of defendant's duty to the plaintiff…" (*Restatement (Second) of Torts 328 (D) (I)*).

**Relevant Summary Statements of record between the parties**

1. Fact based discovery is now closed as of November 1, 2019.

2. Plaintiff's offer to opposing counsels, after the October 7, 2019 discovery hearing before the court, to extend fact-based by another 60 days in order for the State to clean up her CDOC discovery issues, and for other parties and their counsels to have the ability to adjust to the significant changes to the case ordered on October 7, 2019; was refused by all. Instead, the State waited until October 31st and then applied to this court for an extension of time. Still self-serving, and state client serving, interpretations of Plaintiff's

8

SDT; with the end result being not providing the discovery being asked for (which the CDOC is aware exists (Plaintiff's first-hand knowledge spanning 6 years of extensive administrative interfacing while incarcerated)). Plaintiff has not been allowed *any* access to her own records for discovery use, including no answer from CDOC when trying to approach through open records.  State AG and Attorney Colony unilaterally control, as of November 8, 2019; all of Plaintiff's CDOC records and their admissibility.

3. Plaintiff has yet to see any active work from State that would reveal to her that State is desiring to answer with relevant medical facts or any relevant facts of any kind, to Claim #4 against Defendant Victoroff.  State's sole focus in this case to date, until ordered to containment by the court on October 7th, has been on representing the non-party CDOC regarding the gathering of Plaintiff's discovery and records.  Thus, Plaintiff believes the time has become ripe to end the claim in summary judgement on behalf of the Plaintiff (or) set it for trial. **Just because Plaintiff is filing for summary judgement now, in no way should the state and her client believe that Plaintiff abandons her pending motions of Bifurcation and Consolidation, Objections to not obeying orders of containment and Contempt of Court. Plaintiff does not.** This filing's outcome is the only possible altering effect upon those other pending motions and movement.

4. As of the date of this filing, Defendant Victoroff and her counsel have not provided a single fact that clears her, viably defends her, or even circumstantially defends in the claim against her.

5. The selectively chosen CDOC medical records of this event, in the custody of the State, are nothing more than *partial* chronological logs of *portions* of the event. Even still, if they could be used, Plaintiff would do so, as ***they do benefit*** the ***Plaintiff while simultaneously impeaching Defendant Victoroff.***  Benefit by confirming that the Plaintiff was not taken to the infirmary, no orders for monitoring were left, Plaintiff was not monitored and was not given medical care  other than a few hours of triage for a blood draw that did end up revealing deep neutropenia and pancyptopenia that was not treated or acknowledged when discovered and not acted upon until 28+ hours later.  It is a moot point that CDOC records gathered by

9

State may or may not be quashed or ordered into inadmissible: **due to the other first-hand evidence already in; of Defendant Victoroff herself repeatedly exposing that she did not allow Plaintiff to the Infirmary as discharge ordered her to do (or) as medical fact arose over the timespan of the days in question;** *speaks up for Plaintiff* **and is damning to defense given the extent of life-threatening injury to Plaintiff.**

6. Treatment did not occur, on the resulting mortally critical low levels of that blood lab, drawn on Monday February 6, 2017[2] until over 28 hours after draw. The sole physical examination and treatment of Plaintiff, prior to being ordered by Dr. John Burke MD as back to Aurora South for admittance; was given by board certified licensed M.D. Yeggapan on the night of February 7, 2017 from the moment Plaintiff was given into her hands at DRDC infirmary. That treatment consisted of being given Tylenol and Dr. Yeggapan swiftly moving into action to call Dr. Burke for orders. Hilary Victoroff gave absolutely no directives for care or treatment at any time during this event.[3]

7. As of the date of this filing, Defendant Victoroff's sole defense is her personal claim that no standard operating procedures exist that justified sending Plaintiff to the infirmary to be checked prior to return to general population on Friday February 3, 2017. Defendant Victoroff has never responded to questions asked regarding appropriate for infirmary care developing over the subsequent next four days. **See above footnote one**

---

[2] The 2/6/17 blood lab from DWCF and Defendant Victoroff was found by Plaintiff filed away from all other internal records of this event; was not disclosed noticeably and upfront as existing by Attorney Colony (reference Plaintiff deposition of Oct 18th where Attorney Colony repeatedly shows surprise that lab order existed). Found by Plaintiff within "Box One" (placed by someone unknown as of yet) was a fluke of chance. Found in "Box 2" within the section titled "paper files" (containing all other records as being from more distant past than this one lab order of Feb. 6, 2017). Far apart from the partial chronological State holds of this event, which are located within "Box One". The math calculation of "28 hours" is derived from the time and date stamp of LabCorp on pages 34 and 35 of the attached. This Feb. 6th draw has never been stated to Plaintiff, or to Plaintiff's knowledge to Dr. Burke as having been drawn and what the statistical results are (see attached pages 34 and 35).

[3] It is noteworthy that upon release from Aurora South Hospital in mid-February after this event was over; Plaintiff was placed into the DRDC infirmary and housed there for the next 18 months until released to parole on October 4, 2018. Hilary Victoroff never again assigned to treat Plaintiff in any way.

10

8. Defendant Victoroff has not once addressed through discovery and her responses to filings and service upon her; the unequivocal medical facts of blood labs and diagnostics surrounding the four days in question that are indisputable in showing Plaintiff becoming extremely ill, under Hilary Victoroff, and that are attached to this filing. Nor acknowledged or addressed the clear specialist's discharge orders of care. **See attached applicable excerpts of Aurora South and lab records.**

9. As of the date of this filing, Defendant Victoroff has not said a single word about why she would find it to be sound medical judgement to leave for three personal days off without leaving orders for access to the DWCF Clinic staff, for at minimum; access to a fever thermometer. Instead, Defendant Victoroff continually alleges that her defense suffices "as she called Dr. Burke" on the afternoon of February 3, 2017, after Aurora South discharge with stable labs, and that "Dr. Burke" had released Plaintiff in stable health and "told" her it was "not necessary"". If such a record exists, which according to Rocky Mountain Cancer Centers and the memory of Dr. Burke it does not; the claim is utterly irrelevant and is a self-serving attempt by Defendant and her counsel (**continually repeated by Attorney Colony: see Plaintiff Deposition of October 18th, 2019**). There is no dispute that Plaintiff was released on February 3, 2017 (**see attached discharge orders**) in stable condition with up-trending blood levels post-DTPACE.

10. As of the date of this filing, Defendant Victoroff has not admitted that it took over 28 hours for her to respond to "STAT" **(pages 34 and 35 attached)** that showed the mortally critical levels of a 0.2 White Blood Cell count, a 0.7 neutrophils count and other critical levels of red counts having dropped sharply and rapidly since discharge on February 3, 2017. **See pages 34 and 35 attached and applicable excerpts of Aurora South and lab records attached.**

11. As of the date of this filing, Defendant Victoroff has turned down the ability to go into court recommended Alternate Dispute Resolution (or) Early Neutral Evaluation and remains defiantly demanding a trial. Which her state counsel supports.

11

12. The relevant time sheet of Defendant Victoroff's **work schedule is attached.**

13. **The act charged within Claim #4 against Defendant Victoroff is an act that she and she alone could commit:** 1. Not leaving any orders for monitoring or even inmate access to the DWCF Clinic for four straight days after hospital discharge. 2. Making the conscious decision and active choice to personally walk away from Plaintiff care, without ordering another provider to oversee while gone. 3. Not relinquishing control enough for any other DWCF Clinic staff, upon seeing the mortally critically low lab levels drawn on Monday February 6th at around 2:00 p.m. and the visibly obviously ill Plaintiff; to order Plaintiff to the infirmary as safety needed care. 4. Arriving to work at 7:45 a.m. on Tuesday the 7th of February, yet waiting nearly 11 hours more, before relinquishing control enough to get Plaintiff into the infirmary and a board certified licensed medical doctor's care. 5. No CDOC (or) outside witnesses from either side would be of any benefit to Defendant Victoroff as the charge is a singular act that only she could have made the decision to commit. 5. Even though State, up until October 7, 2019 did make repeated attempts to try, none of Plaintiff's prior to this event medical history, none of Plaintiff's personal history of criminality, behavior, security, relationships or her children or her family; whether factual or alleged; have anything whatsoever to do with or are relevant in any way, to the Claim #4 charge within this case and the four days in question.

14. Neither the Plaintiff nor the State are calling any expert witnesses regarding this claim.

15. There are no depositions past or pending, other than the Plaintiff's taken on October 18$^{th.}$

16. Attorney Colony has now closed fact-based discovery and Plaintiff's October 18th deposition, with her extension of time asked for at one day prior to scheduling order close; resulting in zero production of missing CDOC documents.

12

### In summary of relevant statements and facts

**There does not appear** to be a single procedural reason why Claim #4 against Defendant Hilary Victoroff cannot be judged to finality by Summary Judgement at this time. Motion for Summary Judgement is allowed to be filed at any time during the case.

**Alternately, and in anticipation that the State will once again** object as not yet ripe, or otherwise respond in objection to; the Plaintiff respectfully moves the court to set a hearing upon this Motion for Summary Judgement should the court find it necessary to gain more clarity over the facts provided.

**Plaintiff does plead that the court rule from the bench on this motion.**

### Compensatory Damage award requested

- **Mental anguish and emotional suffering:** At the time of this event Defendant Victoroff was fully aware of every single one of Plaintiff's long-standing health diagnoses; their complexity, their rarity, their nature of lifelong continuous and complex ongoing support care being needed and how physically difficult the entire time since diagnosis in November of 2013 had been on Plaintiff.

  **Within this one event that is charged,** Plaintiff felt the deepest fear she had experienced at any time since diagnoses onset in 2013 and 2014. For days during this time, Plaintiff faced mortality with deep fear of dying "like this". Fear beyond the natural fear of facing eventually terminal illness at some point in her life; but rather instead dying senselessly at the hands of another's incompetency, their direct disobedience against orders from far superior skilled physicians and specialists, the lack of sound judgement, the self-absorbed action of getting out on time on a Friday afternoon for leisure time off, or the outright cruelty in forcing a patient like the Plaintiff to physically suffer when there was obvious to the eye need for caregiving assistance and that assistance was immediately available within the same complex at the DRDC Infirmary. The act of knowingly allowing over 28 hours to lapse despite being physically present the entire day of February 7th, with the ability to act and doing nothing; yet holding the knowledge that mortally critical blood levels were being endured by an extremely ill Plaintiff who was alone in a

13

Case 1:18-cv-00956-MSK-MEH Document 180 Filed 11/05/19 USDC Colorado Page 14 of 18

single cell prison cell: is cruel and abusive.  Having the means at her fingertips, to get immediate adequate treatment to that patient in an infirmary just feet away from the office she sat in that day while fulfilling medication refills and logging in kites (see attached timesheet) and not doing so; is both an act of gross negligence and morally repugnant.  To her patient, the Plaintiff, the depth of fear was a primal and core fear.

Should the question of compensation go before a jury or to hearing; even the distress of Plaintiff having to again relive this event step-by-step; is palpable. A now embedded memory of fear that she may at some point in time lose her life by being abused in that way again, is unlikely to leave her and heal until Hilary Victoroff is firmly placed into the past.  Within this event of Claim #4, Plaintiff's emotional and mental anguish of distress and fear; begun on February 5, 6, 7, 2017 was directly caused by Hilary Victoroff's personal choices made.  The choices were not "a lack of policy" nor a "lack of outside orders" nor able to be cowardly blamed on Dr. John Burke allegedly withdrawing his discharge orders on February 3, 2017. A _registered nurse with mid-level skill and licensing (and) limited prescription writing ability,_ in Hilary Victoroff, was solely responsible then and remains responsible to this day.[4]

At the time of the event, Plaintiff endured a high core level of fear and anxiety in thinking she may very well die without even being given the chance to receive, for treatment of whatever it was that had gone wrong; the competent, adequate medical care through her primary physician that she could and did trust, and his outside community of Aurora South Hospital. Or, from the board-certified licensed MD just feet away at the DRDC infirmary. That it would not be her terminal cancer diagnoses that would kill her but rather the preventable actions of a registered nurse the caliber of Hilary Victoroff.

**Defendant Hilary Victoroff is guilty of personally committing the acts within Claim #4.  Thus, Plaintiff requests $150,000 from Defendant Victoroff on**

---

[4] **Dr. John Burke M.D./Rocky Mountain Cancer Centers:** Medical Oncology and Hematology. Board Certified and licensed in Oncology, Hematology and Internal Medicine. **Education:** Baylor School of Medicine in Houston, Texas. **Residency** at University of California and San Francisco Medical School; San Francisco, CA. Fellowship at Memorial Sloan-Kettering Cancer Center in New York, NY. **Specialties include**: Benign blood disorders (anemia, clotting disorders, thrombocyptopenia, pregnancy related blood disorders and surgical clearances). Blood cancers (Acute & Chronic: Leukemia, Multiple myeloma, Hodgkin and Non-Hodgkin Lymphoma).

**grounds of compensatory emotional and mental suffering surrounding the specific dates within Claim #4.**

**<u>Under law, a claim of compensated negligence for mental and emotional anguish must be accompanied with having a physical injury within the claim. Plaintiff's physical injury and suffering is noted as follows</u>**

- Plaintiff verifiably **(see attached Aurora South records)** physically suffered from and developing since discharge on February 3rd : Influenza A, sepsis, deep neutropenia and pancyptopenia. She suffered in that high level of physical pain and medical need while alone in a prison cell with not only little to no medical help, but also the knowledge that *there would not be any help because she had been left without even any ability to access the DWCF clinic while Hilary Victoroff enjoyed her three personal days in a row off.*
When one has deep neutropenia and pancyptopenia (a marked decrease in all three blood types within the body) on top of a long-standing (by the time of this event: 4 years) diagnoses markers of hypogammaglobulinemia (little to no immune system), blood, bone and bone marrow cancer (on record for over 4 years at this point); a very rapid slide downward into deep neutropenia and pancyptopenia is very physically painful to endure. It physically feels as though one's body has the life energy just being 'pulled' out of it. When topped off with intensively aggressive chemotherapy drugs (DTPACE and Neulasta) which also cause physical pain within the vitals of the body's system, especially bone pain; the 'double down' physical pain is markedly noted. The skeletal (bones) system of the body are racked with aching pain and the digestive system is knotted with vomit and pain. The loss of bladder control is marked and the kidney pain, in a patient that is a Stage 3 renal failure, is markedly at the forefront. Add to the mix Influenza A body aches and physical pain, including a later diagnosed racking cough.

    Shawnee Ryan endured physical pain from the aforementioned while alone in a single cell prison cell for four days. Shawnee Ryan then endured another 10 days of the aforementioned while hospitalized in intensive and progressive care, with the admitting classification of "tenuous" at Aurora South Hospital (**attached Aurora South records**). She then was returned to the CDOC, this time to the DRDC Infirmary and endured roughly 3 more weeks of illness, physical pain and antibiotics.

15

Case 1:18-cv-00956-MSK-MEH   Document 180   Filed 11/05/19   USDC Colorado   Page 16 of 18

All preventable or at minimum greatly lessened, if she had simply been given even an immediate minimum of nursing care at first signs on Saturday February 4, 2017 while in DWCF Clinic with RN Dixon, that was competent enough to follow simplistic hospital and specialist primary care physician orders at discharge. Such simplicity of prevention did not have a "monetary cost consideration" nor did such simplicity of prevention amount to any more effort than to pick up a phone on February 5, 6, 7th 2017 and let John Burke take over. A responsibility Plaintiff personally knows he would have gladly shouldered for his long-standing patient in Shawnee Ryan rather than losing her to fatality. *All that was needing to be done is order a **fever thermometer** at hand and a temperature monitored.*

Plaintiff, from the point of a thorough, intensive and physically painful triage at Aurora South Hospital throughout the night of February 7, 2017; suffered a high level of physical pain throughout her entire body as she was put through extensive triage out of necessity to find out what went wrong.

For Plaintiff to survive, she then had to physically endure being given multiple bags of whole blood and platelets through IV transfusions (attached Aurora South records). She had to endure the lancing and diagnosing of a wound on her finger and then be treated with strong antibiotics attempting to treat sepsis/MRSA (attached records). Antibiotic treatment that went on for weeks after discharge on February 3, 2017. She had to endure the entire scope of physical suffering focus that is Influenza A and then endure continuing those antibiotics for a number of weeks until assurance in testing by outside care revealed the influenza to be over. For a patient who is hypogammaglobulinemic, neutropenic and pancyptopenic; it takes a significantly longer amount of time for their body to fight back and recover. It is noteworthy that just the act of recovering from the aggressive DTPACE procedure would have been more than some could physically bear; Plaintiff had all of the issues of this event to also recover from at the same time.

For always, within the eventually terminal diseases she has, this *physical* event of Hilary Victoroff's is and will remain labeled in Plaintiff's specialist medical records as physically having developed: "Severe Neutropenic Fever One". Plaintiff has not had another neutropenic fever since nor contracted any contagion as severe as Influenza A, sepsis/MRSA, nor any open wounds.

16

Shawnee Ryan, on top of the internal body fight to make the physically painful DTPACE treatment successful so she could get to transplant, also had to now physically force her body and her strength of will to literally just survive. And then 'make' her blood levels and resolve return to safe stability and keep them there.

***Plaintiff Hilary Victoroff was the sole moving force behind the extremes of physical suffering endured by Plaintiff during this timeframe.*** **Hilary Victoroff's actions were willful, wanton, negligent and do rise to meet the bar level of gross negligence causing physical pain and suffering. Plaintiff is seeking a $150,000 compensatory physical pain and suffering damage award.[5]**

**Shawnee Ryan respectfully pleads to the court to review liberally on behalf of her Pro Se status and grant in her favor this Motion for Summary Judgement against defendant Hilary Victoroff. She further respectfully pleads that any other reliefs the Court is allowed to grant be given.**

**Respectfully filed this 9th day of November 2019.**

*S*/Shawnee Ryan
11309 West Exposition Drive
Lakewood, Colorado 80226
720-431-8319
shawneeryan216@gmail.com

---

[5] [5] As a Pro Se litigant, in a complex and large case; Plaintiff obviously lacks the skill of an attorney. It is fair to note now, that the only reason Plaintiff is seeking at or below the CAP of basic damages, despite the claim allegedly rising to the level of grossly negligent; is because she is not physically able to keep enduring the lack of a level field in this case where Defendant Victoroff and her counsel are concerned. Plaintiff is fully aware that this event of Claim #4 *could and should,* due to the level of alleged gross negligence rising within the facts; likely hold much higher damages awards if an attorney was representing it. ***Plaintiff is not freely moving forward now*** with summary judgement filing because she believes her case could not support a trial and further litigating. ***She is moving the claim forward,*** as once again, for the second time with Hilary Victoroff, Plaintiff must continue to force her body to maintain physical stability in order to survive. Which is not going to be possible to do, based on the past 8 months; while simultaneously trying to level this particular field into fairness.

17

**CERTIFICATE OF SERVICE**

I have served a complete and full copy of the foregoing via CMECF to the parties below on this 9th day of November 2019.

S/Shawnee Ryan
11309 West Exposition Drive
Lakewood, Colorado 80226
720-431-8319
shawneeryan216@gmail.com

Clerk of Court:  cod_cmecf@cod.uscourts.gov
Andrew David Ringel:  ringela@hallevans.com
Edmund Martin Kennedy:  kennedye@hallevans.com
Amy Colony:  acolony@coag.gov

18