1

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
    Case No. 18-cv-00956-MSK-MEH
3    _____

4    SHAWNEE RYAN,

5         Plaintiff,

6    vs.

7    CORRECTIONAL HEALTH PARTNERS, JENNIFER MIX, M.D., personal
     and official capacity, HILARY VICTOROFF, personal and
8    official capacity LAURA SOMMERSCHIELD, personal and official
     capacity,
9
          Defendants.
10   _____

11

12          Proceedings before MICHAEL E. HEGARTY, United

13   States Magistrate Judge, United States District Court for the

14   District of Colorado, commencing at 10:38 a.m., October 7,

15   2019, in the United States Courthouse, Denver, Colorado.

16   _____

17          WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

18   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

19   _____

20                       APPEARANCES

21          SHAWNEE RYAN, appearing Pro Se.

22          EDMUND KENNEDY and AMY COLONY, Attorneys at Law,

23   appearing for the Defendants.

24   _____

25                    DISCOVERY CONFERENCE

2

1                  P R O C E E D I N G S

2              (Whereupon, the within electronically recorded

3      proceedings are herein transcribed, pursuant to order of

4      counsel.)

5              THE COURT:  Case Number 18-cv-956, Shawnee Ryan vs.

6      Correctional Health Partners and others.

7              Ms. Ryan, please give us your name.

8              MS. RYAN:  Shawnee Ryan.

9              THE COURT:  Thank you.  And for the defense.

10             MS. COLONY:  Amy Colony for the DOC defendants.

11             THE COURT:  Okay.

12             MR. KENNEDY:  Ed Kennedy for the CHP defendants,

13     which includes Dr. Mix.

14             THE COURT:  Okay, thank you.  So Ms. Ryan, where

15     are you on your health?

16             MS. RYAN:  At this point dialysis is next.  We will

17     know, we're scheduling another biopsy, another kidney biopsy.

18     Both kidneys are affected and I'm holding at stage 4, which

19     is the preparatory severe stage.  Any higher and we're going

20     to either do -- hopefully it will be what they call a

21     preventive kind, you just do a few treatments of dialysis,

22     hopefully flush the kidneys out, get them working.  And what

23     that's going to do is lay the groundwork for transplant.

24             At this point there are five gene mutations.  The

25     one that is giving us a fit is the MDS, but it is still

1    holding at 3 percent.  If it climbs to 4 percent where it was

2    this fall and early on this year, earlier this year, then it

3    is an immediate go to transplant, we're ready for that.

4    Matching has been done, everything is ready, but we don't

5    want to go through that unless we get to that 4 percent mark,

6    and right now all I'm doing is trending downward in my labs.

7            So basically everything is --

8            THE COURT:  Is downward good or bad in that

9    context?

10            MS. RYAN:  Downward is bad for the diagnosis.

11    Upward is good for regular blood labs.  So it's a juggling

12    act.  The one that is the regular labs, I'm trending

13    downwards.  Right now I'm neutropenic and pancytopenic.  So

14    when that hits a certain mark -- Ms. Colony just received

15    some documents from Aurora South where she can actually see a

16    0.0 white blood count for the charge of defendant Victoroff.

17            That is -- when we get that, and it drops that low

18    that quickly, there is no recovery other than to do something

19    dramatic.  In that case, it was DT-PACE and a stem cell

20    transplant following that.  This time it will be an allogenic

21    marrow donor as I've explained before.

22            So the simplistic answer to your question is, I'm

23    holding my own, but when it comes, it will come with very

24    little warning.  There is usually about two to three weeks of

25    diagnostic tests is what I'm being told that has to be done,

1   so we would have a little bit of time, but not much.  And

2   then I will be incapacitated for three to five weeks,

3   hospitalized, and then another 120 days of 24/7 nursing care

4   in what they call a recovery type of a hospital environment

5   for orthopedic kind of things.  It's Craig Hospital,

6   Spaulding Rehabilitation, those might be some of the things

7   that you would recognize by seeing ads on TV.  At this point

8   that's as much as I can give.

9           THE COURT:  So what's -- what do you think in your

10   heart the timeframe will be for some of these things?

11          MS. RYAN:  In my heart I think that we are -- I'm

12   strong enough to be able to have the dialysis.  I'm looking

13   forward to just the agreement that I made with Dr. Cyjack

14   (ph) is we'll do a couple of treatments.  When my creatinine

15   and my GFR climb and -- or GFR lowers, creatinine climbs,

16   that's one of those balances.  Hopefully that will flush the

17   difficult disease of lambda light chain deposition, which is

18   the second terminal.  There are two terminal diagnosis.

19          And then my body will be able to work better, which

20   should give neutropenia and pancytopenia in the normal blood

21   up to where my body is battling.

22          So in my heart I think that we'll probably going to

23   be at dialysis somewhere around the holidays, first of

24   December maybe.  I'm told that it's exceptionally tiring.  I

25   have no idea how I'm going to react to it, but it is what it

5

1   is.

2           As far as transplant goes, I think that that will

3   be successful, and if my body is -- they've done some GI work

4   that has helped keep me out of neutropenia.  I was trending

5   downwards and I haven't sunk to the bottom like I had been

6   for so long.  So that GI work and those antibiotics and

7   medications have helped a lot to keep my levels up a little

8   bit.

9           THE COURT:  So if everything goes as good as it

10  possibly can, what is your expected longevity?

11          MS. RYAN:  What is my expected?  One of the reasons

12  multiple myeloma is the most expensive cancer to treat that

13  there is is because they live for so long.

14          THE COURT:  Okay.

15          MS. RYAN:  At 85 to around -- 80 to 85 is what my

16  life expectancy is if we have a successful transplant.

17          THE COURT:  And how old are you right now?

18          MS. RYAN:  I am 62, which is another factor in this

19  case.  I was 56 when I was diagnosed, and I am one of the

20  youngest that there is, that has been diagnosed with both of

21  these.  The light chain deposition is extremely rare.  The

22  multiple myeloma is uncommon.  The two together, usually

23  people in their 70s is the strong average for contracting

24  either one of those.

25          THE COURT:  So --

1          MS. RYAN:  And I did at 56.

2          THE COURT:  Would you potentially benefit from not

3    engaging in this lawsuit at the moment and waiting until all

4    that's on a track where you're stable and in the foreseeable

5    future there is no risk of you being incapacitated?

6          MS. RYAN:  I anticipated that question at some

7    point, so I've been continually bringing a copy of just one

8    of my Walgreens medications that says, Congratulations, your

9    insurance saved you $26,594.72.

10          I have a master's degree.  I am capable of making a

11   very good living.  I have to live at a sub-poverty level

12   right now.  $791, 600 goes to rent.  That lives $191 to live

13   on because I have to have Medicaid.  I can't be one day

14   without that life essential medication, plus half a dozen

15   more, and I see up to six specialists throughout 30 to 60

16   days.

17          There is nothing about this disease, the things

18   that I have, that is going to benefit from waiting any

19   longer.  The reason that we are so, in such bad shape with

20   organ damage and all the things that are on some of my

21   exhibit lists is because of waiting too long.

22          THE COURT:  Waiting, what do you mean waiting?

23          MS. RYAN:  For transplant.  I waited for almost

24   four years for the first transplant.  During that time the

25   damage from the chemotherapy -- the only way that these

1    diseases are treated are by chemotherapy and transplant.

2    Sometimes myeloma patients have multiple transplants

3    throughout their lifetime.  It extends life.

4           So my research for insurance is $1900 a month is

5    what the premium would cost me, cheapest that I can get, and

6    then I'm still 80/20.  That's with all of my other things

7    that have developed.

8           And the problem with that is that when I have to

9    suddenly go down, I'm incapacitated for months on end.  I

10   would never be able to sustain $20 -- 20 percent on an

11   average -- it's -- last year was $962,000 when I add up all

12   the financials of billings that are now available, that I

13   have given full access to all my medical records to Hall &

14   Evans, they can get those if they just choose to pull them.

15          The bottom line here is, is that if I choose to

16   never work again, never have a normal life, stay on

17   sub-poverty level so I can stay on Medicaid, it's -- it's not

18   the kind of life that I wish to be living.  The only way out

19   is through.

20          So the answer to your is, I wish it was, but it's

21   not.

22          THE COURT:  Okay.  So what do you think my question

23   was?

24          MS. RYAN:  I think your question was leading

25   towards putting this off --

8

1          THE COURT:  I'm not putting it off.

2          MS. RYAN:  -- this lawsuit.

3          THE COURT:  So I have another person who is a

4    plaintiff in a lawsuit and she needed a certain period of

5    time, and so that case is currently in what we call an

6    administrative closure, and at any moment when she wants to

7    come back in and litigate that case fully -- because we're

8    pretty close to being done with discovery in that case -- she

9    can, but it's her call.

10          So what I would not be that interested in is having

11    that judicial proceeding interfere with your ability to

12    improve your health, because there are mental and physical

13    aspects to our body, and this one I'm sure is very mentally

14    taxing.

15          So it's an option for you if you want and one I

16    would support for you.

17          MS. RYAN:  Thank you.

18          THE COURT:  And nothing would change in the

19    lawsuit.  It would kind of just pause.  Things like statute

20    of limitations aren't impacted, no new filing fees.  It's

21    just that when you may not be so distracted by trying to

22    live, you could say, I'm ready to go and I'm ready to go full

23    speed.  That's just an option that you -- you have and one I

24    would support.

25          So I want to see what your response to that is.

9

```
 1          MS. RYAN:  On another level, another reason that I
 2  would be -- that I am against that is that the very best
 3  place for treatment for me is Washington State, for me to be
 4  able to go back home to the Fred Hutchinson Cancer Center at
 5  University of Washington Seattle.  They're the best that
 6  there is.
 7          And as soon as parole is done, which is coming up
 8  soon --
 9          THE COURT:  When?
10          MS. RYAN:  I am eligible for early release November
11  1, when that earn time is credited.
12          THE COURT:  Like three weeks from now.
13          MS. RYAN:  Yep.  And Dr. Scatton (ph) and I have
14  talked about it.  He is my parole guy, and at this -- we've
15  even decided that if everything is in place, one of the times
16  that -- the only -- let's put it this way.  The only way that
17  I would consider your offer, Your Honor, as being beneficial
18  to me would be is, I go in for labs tomorrow, and John looks
19  at me and says, Sorry, you're in the tank, we have to get
20  going.  Then I pick up the phone and call my parole officer.
21  He has already put everything into place, that he will go
22  straight to the parole board and say we need to get her out
23  of here on an interstate or just let her go so that she can
24  go home to Washington and have her work done up there where
25  she has support, she has all of these things.
```

1        Then I would be able to see there being a good

2  result from the offer that you're making.  Otherwise, I just

3  don't see it.  I'm here in Colorado.  The lawsuit will keep

4  me here, even after parole is done.  And while I will

5  (inaudible) specialist decisions.  I have the best team that

6  there is and that's where my care is and I would stay.

7        So there really is no benefit to me at this point

8  in time.  As far as mentally taxing, yes, it is.  As far as

9  physically taxing, very much so, but I appreciate knowing the

10  offer.  I will relay it to Dr. Scatton and say, Well, I've

11  been told that we can also put the lawsuit on hold, go home,

12  have the transplant, if I have to go and have it done, and

13  then I come back to Colorado, finish the lawsuit and be done.

14        THE COURT:  Okay.

15        MS. RYAN:  Those are my logical things to me.  The

16  only benefit -- I don't see any benefit to the plaintiff in

17  stopping this right now.  I see a lot of benefit to the

18  defense.

19        THE COURT:  That's not my point.  My point was

20  focusing solely on you.

21        MS. RYAN:  Thank you.

22        THE COURT:  Okay.  That being said, in order for

23  you to really make an educated decision, you have to

24  understand there is no in between.  There is either we're

25  fully litigating and we can't put things off for you, or we

1   do put things off for you, but the hybrid just doesn't work,

2   like put some things off and not other things.

3            So you need to be physically able to be fully

4   engaged in this lawsuit at all times until discovery is

5   complete and then trial, or motions, or you need to take a

6   pause.

7            So if you're saying that your health is adequate

8   enough to fully litigate this case, then we're going to go

9   through and I'm going to make some decisions right now on how

10  that's going to happen, okay.  So I'm going to take your word

11  for it, you're an adult, and if you say you're ready to

12  proceed with the lawsuit, that's what we're going to do.

13           MS. RYAN:  I am.

14           THE COURT:  All right.  So then the first issue,

15  I'll ask the defendants, do you agree with me that there is

16  no governmental entity that's a defendant in this case?  Do

17  you agree?

18           MS. COLONY:  I would agree, Your Honor.

19           THE COURT:  Okay.  So she's free to contact the

20  Government, no matter who it is, just not your clients.  Are

21  we agreeable to that?

22           MS. COLONY:  I wouldn't be agreeable to that, Your

23  Honor.  Under the Rule 4.2, Comment 7 of the Rules of

24  Professional Conduct, I believe they use the word

25  "constituents."  I mean, these are key people in the lawsuit

1    and in the claims.

2           THE COURT:  Who are key people?

3           MS. COLONY:  Some of the people she has been

4    contacting.

5           THE COURT:  You mean they're witnesses?

6           MS. COLONY:  They're witnesses.

7           THE COURT:  Okay.

8           MS. COLONY:  But they are either current or former

9    CDOC employees.

10          THE COURT:  Okay.  What -- you have to read the

11   rule you're relying on, please.

12          MS. COLONY:  I apologize, Your Honor.  I don't have

13   it with me, but the comment goes into detail about -- for

14   example, if the plaintiff was contacting the CEO, RBP or

15   someone at CHP, I'm sure Mr. Kennedy wouldn't tolerate that.

16   That is a high level employee that involved --

17          THE COURT:  They're a party.  CHP is a party, and

18   there are ethical rules that govern whether you can contact a

19   party.  She could contact nonsupervisory people at CHP

20   because they're not CHP.  CHP speaks through its supervisors.

21   That's how I've always applied the rule.

22          Mr. Kennedy, do you apply it in I differently than

23   that?

24          MR. KENNEDY:  I've always thought all employees

25   have right to counsel.

1          THE COURT:  Yeah, I don't know.  I think only

2   supervisory employees are covered within the privilege.

3          MR. KENNEDY:  I might agree with that, Your Honor.

4   Even nonparties to (inaudible - not speaking into mic).

5          THE COURT:  Yeah.  So she simply can try to contact

6   nonparties and see if she can get them to cooperate with her

7   as her witness if she wants.  They're free to say no, I'm not

8   speaking to you.  I don't know of any other rule.  So --

9          MS. COLONY:  Well, they're obviously alarmed by

10   contact by a former inmate that they dealt with when they

11   were employed by DOC and they have concerns for their own

12   personal safety and they don't want to be harassed.

13          THE COURT:  Well, and there are, number one, civil

14   laws that prevent harassment, and, number two, I -- Ms. Ryan

15   is under my jurisdiction since she has voluntarily submitted

16   to that jurisdiction insofar as it regards anything in this

17   lawsuit.  And a judge has a right to control the manner of

18   discovery.

19          And so if she's engaging in discovery efforts that

20   you think are inappropriate, that's something I will hear,

21   but there is no ethical prohibition.  There are other rules

22   and regulations and policies that we apply.  So I just want

23   to establish that, there is no State of Colorado entity

24   that's a defendant.  There are only individuals and CHP, so

25   that's that.

14

1          Now, we can move on to the next issue.  What

2    harassment do you allege she is engaging in?

3          MS. COLONY:  Well, these employees reached out to

4    CDOC to advise them that they've been contacted by her and

5    then they reach out to me and let me know what's going on and

6    they forward me the correspondence, including written

7    discovery that she's trying to directly serve on these

8    employees without serving -- I mean, I'm unaware that you can

9    serve written discovery on a witness.

10          THE COURT:  You can serve a subpoena duces tecum, a

11    Rule 45 subpoena in which a person is required to appear and

12    answer questions, but if you're talking about

13    interrogatories -- is that what they're entitled?

14          MS. COLONY:  Right.

15          THE COURT:  So, Ms. Ryan, discovery in terms of

16    interrogatories, requests for production, requests for

17    admissions can only be served against a party, and the only

18    parties in this case, as far as I know, are Ms. Mix,

19    Victoroff, Sommerschield and CHP.  If you're going to serve

20    discovery against them, it has to be in a certain form.  It's

21    your discovery request, and it's served either on Ms. Colony

22    or on Mr. Kennedy, depending on who the discovery is directed

23    to; but nonparties, you don't just serve discovery on them

24    and they're not required to answer; they can throw it in the

25    trash.  So they can throw it in the trash.

1          MS. RYAN:  I have a question, Your Honor.

2          THE COURT:  Go ahead.

3          MS. RYAN:  First of all, I would like to -- before

4   I ask this question, I need to address the words alarmed and

5   contacting her.  Ms. Colony put in other own writing that was

6   Ms. Perecha was called by one of the -- her defendants, one

7   of her clients, and that's how she -- Audrey had had that in

8   hand, that letter from me for quite some time.

9          THE COURT:  You're using names that I have no idea

10  who they are.

11         MS. RYAN:  Okay.

12         THE COURT:  They could be --

13         MS. RYAN:  These are -- the two people that she's

14  referring to or Ms. Perecha and Dr. Terrella.

15         THE COURT:  Okay.

16         MS. RYAN:  And for Dr. Terrella, he was contacted

17  by the State.  Neither one of them called CDOC and expressed

18  alarm that they had been contacted.  They were startled that

19  they could be found.  And my response, which I gave to the

20  Court and everyone, is everyone can be found.  We don't have

21  phone books anymore; we have online phone books.  And they

22  haven't contacted me back except Dr. Terrella through medical

23  channels, and I am -- have not contacted them.

24         THE COURT:  Now, are these people who would -- do

25  you suspect the people you're talking about who you've tried

1    to reach out to would be in your favor or adverse to you?

2              MS. RYAN:  Well, Ms. Perecha was a personal

3    contact.  These are people -- two people that are former

4    employees that left DOC literally years ago.

5              THE COURT:  Right.

6              MS. RYAN:  And so -- and Dr. Terrella is still

7    involved in my medical consulting, but I never see him or

8    talk to him because he confers with physicians.

9              THE COURT:  But you're not answering my question.

10             MS. RYAN:  And so --

11             THE COURT:  Do you think they would be for you or

12   against you?

13             MS. RYAN:  They're absolutely for me.

14             THE COURT:  Okay.

15             MS. RYAN:  And I think that that's one of the

16   reasons this is being done.

17             To answer -- to ask you my question, if

18   interrogatories -- I did serve or sent in the mail -- I

19   didn't serve her -- Teresa Stone (ph), who is a very -- a

20   current DOC employee who is a very influential on my behalf

21   witness to this case.  I sent her interrogatories and I

22   called them interrogatories.

23             Would it have been appropriate for me to simply in

24   the letter that I wrote to her ask her if she would write a

25   letter for me and address certain concerns?

1          THE COURT:  Yes.  In fact --

2          MS. RYAN:  Instead of calling it an interrogatory,

3     I could still do something like that?

4          THE COURT:  Right, yeah.  I mean, all the time --

5     like, let's say you need an affidavit.  Ms. Colony and

6     Mr. Kennedy do that all the time.  So I'm trying to -- I made

7     a docket sheet and I'm just trying to call up a docket entry,

8     which normally we have, no big deal, but in this case -- and

9     it's going to tell me that I can't reach it.

10         So, yes, let's say a motion, for example, a motion

11    for summary judgment, they're going to bring one some day.

12         MS. RYAN:  Yes.

13         THE COURT:  And -- thank you.  What was the

14    problem?

15         UNIDENTIFIED SPEAKER:  It wasn't set to Acrobat.

16         THE COURT:  Okay, thanks.

17         And they're going to go out and collect affidavits,

18    they're going to go talk to a witness, What do you know?  I'm

19    going to write it down for you, will you sign it.

20         MS. RYAN:  Okay.

21         THE COURT:  And they'll look it over and they'll

22    say, Yeah, I'll sign that, the declaration, probably under 28

23    U.S.C. Section 1746, self-authenticating declaration.  So

24    that happens all the time and you are allowed to do that with

25    witnesses.

 1          MS. RYAN:  Okay.

 2          THE COURT:  But they don't have to talk to you.

 3    They can.

 4          MS. RYAN:  I understand that.

 5          THE COURT:  And if they don't want to, then you can

 6    subpoena them and you can make them testify.

 7          MS. RYAN:  Yeah.

 8          THE COURT:  That's the means that you use when you

 9    have a witness who you believe will say something good for

10    you, but they don't want to cooperate because they just don't

11    want to get involved.

12          So that's not that difficult, and I don't remember,

13    are you -- are you in forma pauperis?

14          MS. RYAN:  I am.

15          THE COURT:  Okay.  So the marshals would serve a

16    subpoena for you if you're IFP.  These are all very simple

17    things.

18          MS. RYAN:  Okay.

19          THE COURT:  And I know that our clinic downstairs

20    would help you walk through those.

21          MS. RYAN:  I do have that process down, I think,

22    very well.  Where it looks like it went off the rails is I

23    titled it an interrogatory, and for Ms. Stone all I have to

24    do is revise that and ask for her to write an affidavit

25    letter or a witness statement.

1        THE COURT:  Yeah, you can even draft the affidavit

2   yourself in the proper form, and if she agrees with

3   everything in it, you can ask her to sign it, and if she

4   signs it, it's done.  Do you guys see anything wrong with

5   what I just told her?

6        MS. RYAN:  She is able to have Ms. Colony, because

7   Ms. Colony would be a representative of CDOC.  The stumbling

8   block I think --

9        THE COURT:  Ms. Colony is not a representative of

10  CDOC.

11       MS. RYAN:  Okay.

12       THE COURT:  She represents CDOC as a lawyer when

13  she's called to.

14       MS. RYAN:  She's telling me that she needs to be

15  involved in everything for an employee or a nonemployee.

16  Like Ms. Stone, that it has to go through her.  Today I

17  discovered that's not the case.

18       So Ms. Stone can choose to do whatever she wishes.

19  If she wishes to call Ms. Colony, she can obviously.

20       THE COURT:  Right.

21       MS. RYAN:  If she does not, she does not have to.

22       THE COURT:  Well, so -- so with regard to current

23  employees --

24       MS. RYAN:  Okay.

25       THE COURT:  -- of any governmental agency --

20

1    Ms. Colony represents the Government, right?

2          MS. RYAN:  Uh-huh.

3          THE COURT:  And so she could -- I believe she could

4    tell you, Ms. Ryan, obviously you're free to petition your

5    government in any way you believe appropriate, but regarding

6    this lawsuit, if you seek evidence from anybody who is

7    employed with the State of Colorado, I would like you to go

8    through me.  That's permissible for Ms. Colony to say.

9          MS. RYAN:  To ask.

10         THE COURT:  As to ex-employees I would say that she

11   can't do that.  She can't tell you, You can't talk to them,

12   but she -- if an ex-CDOC employee calls Ms. Colony and says,

13   I have this Ms. Ryan calling me, what should I do, Ms. Colony

14   is free to tell her, You are free to talk to her or you're

15   free to not talk to her, whatever you choose.  That's the way

16   that goes in my opinion, my understanding of the law and

17   ethics rules.  Okay?

18         MS. RYAN:  Thank you so much.  So that this can be

19   finally, completely, and this discrepancy, because it's a

20   very, very big one --

21         THE COURT:  What discrepancy?

22         MS. RYAN:  This contention that Ms. Colony has put

23   in that she has to be a part of everything.  I understand

24   this now.

25         THE COURT:  Okay.

1        MS. RYAN:  And for the record, so that she hears it

2   now, Teresa Stone and Kelly Wasko (ph) are the only two

3   current employees.  And knowing Ms. Stone as well as I do, I

4   am absolutely certain that she is going to pick up the phone

5   and say, I have this, I'm going to answer it, I am fine.  If

6   she's not fine, I know her well enough that she will ask you

7   some questions or ask you to be involved.

8        THE COURT:  And so --

9        MS. COLONY:  May I speak, Your Honor?

10        THE COURT:  Hold on a second.  So generally the

11   rules are, you speak to me and then I speak to Ms. Colony,

12   Ms. Colony speaks to me and then I speak to you.  In a

13   proceeding like this, we don't normally have people speak to

14   each other.  Yeah, go ahead.

15        MS. COLONY:  Ms. Stone and Dr. Terrella do not want

16   to speak with the plaintiff.  That's what I have told her,

17   they do not want to be contacted by her.  And it's false to

18   the extent --

19        THE COURT:  Dr. what?

20        MS. COLONY:  Dr. Arolla Terrella.  It's false to

21   the extent that she contends that they didn't reach out to me

22   or CDOC, that I contacted them.  That is simply not true.

23   She has no way of knowing that.

24        CDOC contacted me and forwarded the e-mails to me.

25   Both of those parties have e-mailed me, including

22

1    Ms. Perecha, or I'm not sure how you say her name.  They do

2    not want to be contacted by her.

3              THE COURT:  Do you have the e-mails with you?

4              MS. COLONY:  Pardon?

5              THE COURT:  Do you have the e-mails with you?

6              MS. COLONY:  I don't have the e-mails with me, no.

7    I considered them attorney/client privilege so I didn't

8    attach them to the motion, but I understand as far as

9    subpoenas, those parties will expect them to be personally

10   served.  But as far as her letters or phone calls -- and this

11   includes the executive director's office as well.  She was

12   calling the executive director's office to discuss this

13   lawsuit.

14             THE COURT:  Executive director of?

15             MS. COLONY:  CDOC.

16             THE COURT:  Okay.

17             MS. COLONY:  Dean Williams.

18             THE COURT:  Okay.  So -- well, that -- that would

19   be the kind of person that I just said you've instructed her

20   not to contact, so that's just the rule for this case, okay,

21   because it was a current, especially supervisor of CDOC and

22   that's your client, although not a defendant, then you can

23   tell Ms. Ryan not to contact them about the lawsuit.

24             MS. COLONY:  Ms. Stone is a current employee as

25   well.

23

1          THE COURT:  Okay.  So -- so, Ms. Ryan, you have to

2     decide if you want to subpoena them and do a deposition.

3          Where are we on the discovery deadline in this

4     case?

5          MS. COLONY:  I believe it's November 1, Your Honor.

6          THE COURT:  So we're kind hurtling toward that.  So

7     you've really got to decide today if you want to take their

8     depositions.  And you can also take a deposition on written

9     questions.  You can actually submit written questions to them

10    in writing and require them to answer it.  It's called a

11    deposition on written questions where you don't have to have

12    an oral deposition, it's a procedure in our federal rules.

13         So what do you want to do?

14         MS. RYAN:  I've addressed that as well in

15    everything that I've brought forward in the last two weeks.

16    Depositions, as far as I'm concerned, I am -- if I have to

17    decide right now, I need to have answer from Mr. Kennedy

18    regarding if Dr. Mix and Mr. Archiba (ph) are going to

19    finally get their interrogatories answered, which they are

20    behind on; if I am finally going to get corporate disclosures

21    and insurance information that was due when Mr. Rengel

22    entered the case for ECF 119, the fourth amended we're

23    working under, which I still have not received, that are now

24    121 days late.

25         THE COURT:  So if you get written discovery, you

24

1    won't be taking depositions?

2            MS. RYAN:  If I get written discovery, the chances

3    of me taking a deposition of anyone with CHP are slim to

4    none.  I cannot decide until I see what their answers are.

5            THE COURT:  Okay, so let's move onto that then.

6            MS. RYAN:  As far as --

7            THE COURT:  Well, hold on, we're going to do it in

8    my order.  Where are you in written discovery according to

9    Ms. Ryan?

10           MR. KENNEDY:  Again, she mentioned the CEO.  She

11   wrote these written discovery directly to him.  We explained

12   to her that --

13           THE COURT:  To who?

14           MR. KENNEDY:  To the CEO of CHP asking him his

15   personal knowledge.  He has none.  She can do a 30(b)(6) or

16   she can do interrogatories toward CHP.  We tried to

17   explain -- this is stuff we tried to explain to her without

18   getting you involved, but she seems to be reluctant to take

19   any advice from opposing counsel.

20           THE COURT:  So let me take it from there then.

21           Ms. Ryan, when you serve discovery against an

22   entity, it's solely against an entity and the defendant, and

23   you can't name any specific person within the defendant.  You

24   say, Answer these questions, and then they sign as an entity.

25           So --

1          MS. RYAN:  Mr. Archiba is the entity, according to

2     all of his advertising, all of the information, the little

3     bit of discovery that Hall & Evans has produced with Dr. Mix,

4     very clearly reports to the CEO.

5          THE COURT:  Well, I know that the CEO is the head

6     of any corporation, I agree, but I think I've had enough

7     cases with CCA and CHP, that they're pretty big entities, not

8     one person.  They're not a one-person shop.  There are

9     corporations with -- how many employees does CHP have?

10          MR. KENNEDY:  I don't even know, Your Honor.  I

11     mean, hundreds.

12          THE COURT:  So, yeah, they can speak through a CEO

13     in some context, but in this lawsuit, you have to do it the

14     way it's set to be done or you don't get an answer.  So if

15     you don't want to play by the rules, then you're not going to

16     get what you want.

17          MS. RYAN:  Should I then change all of the

18     questions directed to Mr. Archiba as directed to the person

19     with the most knowledge?

20          THE COURT:  No.  That is assumed.  So --

21          MS. RYAN:  And anybody who is the person with the

22     most knowledge would answer the interrogatories.  Is that not

23     correct?  It doesn't have to be Mr. Archiba.

24          THE COURT:  Well, give me an example of a question

25     that you asked.

1          MS. RYAN:  The primary foundation of this case has

2  to do with HC -- Colorado's HCPF 14-006, and it's tied to the

3  inmate catastrophic Medicaid provision within Title 42, the

4  Affordable Health Care Act.  And all along it's irrelevant,

5  she hasn't got a case, she hasn't got a case.  From the

6  little bit of discovery that I got from Mix's CV is --

7  repeatedly states that she is directly in charge of keeping

8  in compliance with all health plans, healthcare and

9  legislation.

10          And when I blocked -- I don't know what makes up

11  the corporation of CHP because Hall & Evans hasn't --

12  Mr. Rengel hasn't obeyed the rule that when he entered, he

13  was supposed to give those disclosures, and I have nothing.

14          So I do have very strong and detailed questions for

15  Dr. Mix and --

16          THE COURT:  And I'm talking -- so --

17          MS. RYAN:  And then she is the person with the most

18  knowledge.

19          THE COURT:  Well, you can ask Dr. Mix

20  interrogatories, she's a party.

21          MS. RYAN:  I did.  And I'm not getting those

22  either.  I'm not getting requests for documents.  I'm not

23  getting anything from from Hall & Evans.

24          THE COURT:  Okay.  So Mr. Kennedy, what about any

25  documents -- any discovery requests directed toward --

1          MR. KENNEDY:  We have provided -- we have a second

2     set of documents.  We provided a first set of what she asked.

3     I don't recall specifically what was in that first set.

4          THE COURT:  No, but did you respond to the

5     discovery requests within the time permitted by the rules?

6          MR. KENNEDY:  Yeah.

7          THE COURT:  Okay.  And do you have those with you?

8          MR. KENNEDY:  I do not have them with me.

9          THE COURT:  Do you have their response with you?

10          MS. RYAN:  They have -- I do not have the first

11     response, but the second set was due on the 30th of

12     September.  I have --

13          THE COURT:  Well, hold on.  Are you aware of the

14     second set -- is Mix a doctor?

15          MR. KENNEDY:  She's a doctor.

16          THE COURT:  Are you aware of a second set to

17     Dr. Mix?

18          MR. KENNEDY:  I believe we did respond.  I can

19     look, Your Honor.  The issues I had was with the CHP ones

20     that she was using the CEO, and I just asked her to resubmit

21     them.  And some of the questions were very specific to him

22     and not to the company that anybody could answer.  She did

23     not do that.

24          And the second documents, which I believe we --

25          THE COURT:  Do you have your discovery request of

28

1    Dr. Mix?

2              MS. RYAN:  I do believe that I do.

3              THE COURT:  Why don't you show me.

4              MS. RYAN:  Okay.  I would prompt Ed's memory by the

5    fact that we're here today is because of your filing of 157

6    and your extension of time to be able to answer.

7              THE COURT:  Well, you're here today because

8    somebody wanted to be here today.

9              MS. RYAN:  Yes.

10             THE COURT:  And whoever wants to be here today will

11   be here.

12             MS. RYAN:  Can be here today, but it will hopefully

13   jog his memory there.

14             I asked you where Dr. Mix's was at and you asked

15   for a little bit more time and then you submitted 157.

16             And so --

17             THE COURT:  Ms. Ryan --

18             MR. KENNEDY:  That was separate --

19             THE COURT:  Hold on.  Ms. Ryan, it's a very simple

20   question.  I want to see the discovery request that you gave

21   to --

22             MS. RYAN:  I'm looking.

23             MS. COLONY:  -- to Ms. Mix.

24             MS. RYAN:  I am looking for it, Your Honor.

25             THE COURT:  Let's do one thing at a time.

29

 1          In the meantime, Mr. Kennedy, please call your

 2   office and determine whether you responded to a second set of

 3   discovery requests of Dr. Mix.

 4          And by the way, Ms. Ryan, could you remind me what

 5   your offensive conviction was.

 6          MS. RYAN:  Request for felony theft, two six-year

 7   consecutive.

 8          THE COURT:  Who was the victim?

 9          MS. RYAN:  The victim we seven people that were

10   taken out of my bankruptcy, and while you are discussing

11   that, let me address, if I can --

12          THE COURT:  I don't understand.

13          MS. RYAN:  Here it is, plaintiff's second set

14   defendant Dr. Jennifer Mix and they are entitled 33 --

15          THE COURT:  Chris, would you get that, please.

16          MS. RYAN:  And they were given to CHP on the

17   (inaudible) of September.

18          Any questions about my criminality or anything that

19   they want to know --

20          THE COURT:  No, no, I need to understand what the

21   underlying offense was, and it was theft from -- how did --

22   what was the alleged theft?  Was it theft --

23          MS. RYAN:  The alleged theft was money

24   white-collared crime.

25          THE COURT:  All right, thank you.

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

1          MS. RYAN:  To answer something for Ms. Colony and

2     Mr. Kennedy, they had some angst over my stating it's a

3     matter -- when asked, Are you felon, describe criminality,

4     blah, blah, blah.  I am still under active appeal, and

5     Ms. Colony can go back to her office and pull it up.  The

6     case number 18-ca-1740 and they can read all about my

7     children, my ex-husbands, my wife, my PSI report, absolutely

8     everything under the sun.

9          Ms. Colony, I still contend, it's -- she doesn't --

10    isn't going to need it, but we'll deal with that when

11    dispositive motion has come up.  Hall & Evans does need it

12    and they can access that information at any time.  It's a

13    matter of public record.

14         I do not have Mr. Archiba's.  They're actually very

15    similar to Dr. Mix's.

16         THE COURT:  Okay.  Yeah, I have it in front me, so

17    we're just going to see whether Mr. Kennedy has responded or

18    not.

19         MR. KENNEDY:  I was going to have my paralegal come

20    today because I figured questions, and she was in a meeting

21    at 11:00, so I might not get that -- I wanted her here

22    because I have thought --

23         THE COURT:  Sure.

24         MR. KENNEDY:  And you know how that goes.  I

25    believe we have -- the CHP ones we have not responded to.  I

1    believe we did respond to the other two, but, you know --

2         THE COURT:  Okay.  So why do you think you didn't

3    respond to the CHP?

4         MR. KENNEDY:  Well, that's the one we asked -- when

5    she asked for Mr. -- the CEO, asked for his.

6         THE COURT:  Well, I mean, she titles it:  Plaintiff

7    comes now with her fifth set of requests for production

8    against Correctional Health Partners, and nothing is directed

9    to an individual.  So --

10         MS. RYAN:  That's a second set --

11         MR. KENNEDY:  There is two sets to Dr. Mix.  I

12    don't know which one you're looking at.  One set to where

13    there is questions to Mr. Asin- -- how do you say his name,

14    the CEO?

15         MS. RYAN:  Archiba.

16         MR. KENNEDY:  Archiba.

17         MS. RYAN:  Archiba.  There are actually three.

18    There is Dr. Mix's second set that hasn't been answered,

19    there is the ones directed to Mr. Archiba, and then the fifth

20    set is the directed to CHP, could I please have corporate

21    disclosures and insurance that are overdue by --

22         MR. KENNEDY:  Is that the same one you asked for

23    the contract with the --

24         MS. RYAN:  No --

25         MR. KENNEDY:  -- department of Corrections?

1           MS. RYAN:  No.  And along with that fifth set, I

2     also provided documentation that is going to go to another

3     issue that I need to get resolved today.  I didn't just

4     blindly put in Physician Health Partners and all those other

5     entities alongside the CHP in my header.  My records, all the

6     outside records, financials, everything, list all of those

7     entities with CHP as a parent company.

8           In Jennifer Mix's own CV she states that she's

9     under contract not only with CHP, but Physician Health

10    Partners as well.  Physician Health Partners also has denials

11    of a transplant, which is what this case is about.

12          So without court disclosures, I don't have any idea

13    who did what to me.

14          MR. KENNEDY:  CHP --

15          THE COURT:  Okay, so hold on.  I mean, we're

16    devolving into something I've never seen before in a

17    discovery conference, so I've got to get control back here.

18          So plaintiff's second set of written

19    interrogatories defendant Dr. Jennifer Mix, first of all, has

20    some preference questions which you're not required to answer

21    concerning --

22          MS. RYAN:  I made my point.

23          THE COURT:  Yeah, I understand, but do you think

24    that you responded to the second written -- second set of

25    written interrogatories?

33

1           MR. KENNEDY:  Yes, I do, but I will check.

2           THE COURT:  Okay.

3           MR. KENNEDY:  It will be done this week if it's not

4   done.

5           THE COURT:  But you don't think you responded to

6   the fifth set to CHP?

7           MR. KENNEDY:  I don't believe so.

8           THE COURT:  Okay.  So you've got to get those in.

9           MR. KENNEDY:  I will.

10          THE COURT:  In fact, I want you to go ahead and

11  e-mail me by the end of the week the status of your responses

12  to Ms. Ryan's discovery request.  So, in fact, why don't you

13  go ahead and either scan and PDF -- yeah, why don't you do

14  that.  Scan and PDF your responses and attach it to that

15  e-mail so that I can be assured that you responded to all of

16  her discovery requests.

17          What do you contend they haven't responded to?

18  List them out, one by one.

19          MS. RYAN:  Dr. Mix's second set.

20          THE COURT:  Dr. Mix's second set.

21          MS. RYAN:  The interrogatories that I -- first set

22  that I a dressed to Mr. Archiba.

23          THE COURT:  Okay, and I'm going to --

24          MS. RYAN:  -- as CEO and that may have to be

25  adjusted --

34

1          THE COURT:  I'm going to strike that as directed to

2     the CEO and interlineate that it's directed to CHP.  However,

3     if a particular question could only be answered by -- is

4     directed to the CEO only within that person's knowledge, you

5     can -- well, I mean, it will be directed to the corporate

6     entity, okay.

7          MS. RYAN:  CHP?

8          THE COURT:  Yeah, CHP.

9          MR. KENNEDY:  So just treat every question as the

10    corporate entity and answer the best I can.

11         THE COURT:  I mean, so -- so, for example, I don't

12    think it would be an improper question for her to submit a

13    set of discovery requests to CHP, but a particular

14    interrogatory might say, Does your CEO know that blah, blah,

15    blah?  I mean, that's an appropriate question.

16         So you can say, The CEO has no responsive

17    information.  And, of course, if that's true, that's your

18    answer.

19         MS. RYAN:  So I'm talking -- in other words, revamp

20    that so that I am actually talking as if CHP was the person

21    sitting in front of me?

22         THE COURT:  Correct, I've just ordered that, okay.

23         MS. RYAN:  All right.

24         THE COURT:  Okay.  So I need every -- I need all

25    discovery responded to by the end of this week, and if that's

1    not possible, an explanation of why and then when it will be

2    responded to, okay.

3            MS. RYAN:  Okay, and then --

4            THE COURT:  So you listed to -- you listed the set

5    to the CEO, you listed the --

6            MS. RYAN:  Dr. Mix.

7            MR. KENNEDY:  Second set to publication.

8            THE COURT:  Mix, second set to Mix and the fifth

9    set to CHP.

10           MS. RYAN:  Yes.

11           THE COURT:  Of course, Mr. Kennedy, you know, I

12   assume I put limits on discovery, so if you think any of

13   these exceed the limits, then that's a proper objection as

14   well.

15           All right, those three we're talking about, right,

16   Ms. Ryan?

17           MS. RYAN:  Right.

18           THE COURT:  Okay.  Then I've set in course a

19   solution for that.

20           MS. RYAN:  So to answer your question about

21   depositions and what I'm going to do with them.

22           THE COURT:  Right.

23           MS. RYAN:  It's not what I would prefer to be

24   doing.  I would prefer to be able to have normal depositions

25   and be able to have an environment of that, but so far it has

36

1   been very contentious.  So I am not going to be doing

2   depositions.  You have me --

3            THE COURT:  Well, they're expensive by the way.  I

4   mean, an average deposition costs $1,000.

5            MS. RYAN:  I am -- everything on my end is in good

6   shape.

7            THE COURT:  Okay, good.

8            MS. RYAN:  But I am not going to be doing the

9   depositions on Mix and Archiba.  I am -- I am going to be

10  subpoenaing to bring them both -- to have witnesses at trial.

11           THE COURT:  And --

12           MR. KENNEDY:  Dr. Mix will be there because she's

13  --

14           THE COURT:  Look at me, Ms. Ryan, okay.

15           MS. RYAN:  Uh-huh.

16           THE COURT:  We will facilitate -- in the event that

17  the case goes to trial, the Court will facilitate any

18  subpoenas you need served, okay.

19           MS. RYAN:  Right.

20           THE COURT:  All right.  So I think that eliminates

21  the issue of deposition potential.  That was one of your

22  issues.

23           MS. RYAN:  There is also nobody else.  Everything

24  is going to go stone cold to trial.

25           THE COURT:  So any -- okay, good.  Now, what other

1  issues do you guys have on the defense side?

2       MS. COLONY:  Well, first of all, I want this -- I

3  would like the Court to enter an order stating that the

4  Attorney General's Office receipt of all of Ms. Ryan's

5  medical records and related CDOC records that were in CDO

6  custody was proper.  That's caused a huge problem in this

7  case.  I don't want to receive any more e-mails about that

8  topic.  I want that topic to be closed, I want it to end

9  today.

10       It has just been a repeat -- every single e-mail

11  brings it up, and it was not improper for me as CDOC counsel

12  to receive her records at the beginning of the case.  We have

13  shared everything we have that was turned over to me.  CDOC

14  has been transferred to her via compact disk.

15       And I would also like the order to state that I am

16  not required to give her an inventory that has repeatedly

17  come up all summer long that I was required by Court order to

18  provide an inventory of every single document I received from

19  DOC.  That seems to be an ongoing problem in this case where

20  Ms. Ryan represents repeatedly that this Court has entered

21  orders that it never has entered.  And it's very distracting,

22  it's very -- it's just making this case very difficult and

23  increasing the cost of this litigation far, far beyond what

24  it should be at this stage.

25       I think it would be very helpful at this stage to

38

 1    have an order state that if she desires specific materials

 2    from CDOC that she needs to go through me.  She keeps trying

 3    to cut me out of the process.  I need to be involved if she

 4    wants CDOC materials.

 5         I have provided several items of things that she

 6    has asked for in her subpoenas.  I've provided those to her,

 7    and that apparently makes her angry that I had my hands on

 8    them.  And it's just unreasonable, vitriolic and harassing,

 9    and I want it to stop.

10         I think in light of all the issues going on and all

11    the delays and problems that we've encountered, Mr. Kennedy

12    and I discussed this just prior to the hearing this morning,

13    we would suggest that it would probably be a good idea to

14    extend the discovery deadline.

15         We have had a problem with releases.  Ms. Ryan

16    wants to limit the scope of the releases.  The problem with

17    that is, is Mr. Kennedy and I don't know what has been going

18    on since she has been released from incarceration, and if we

19    don't know what has been going on since she has been released

20    from incarceration, we have no way to assess her alleged

21    damages.  And so we do need to see the materials that go

22    beyond --

23         THE COURT:  As far as you're understanding, she's

24    alleging continuing damages?

25         MS. COLONY:  That's the way I read her complaint.

1    If --

2            THE COURT:  Are you alleging continuing damages;

3    that anything that has happened by any of these defendants,

4    anything they did is causing you continuing harm?

5            MS. RYAN:  I cannot stop the daily life essential

6    medications that are simultaneously life-threatening.  I

7    cannot stop my kidneys from getting worse.  All of these

8    things, if we have -- change every day.

9            There is no way to assess economic damages until we

10   get to where, if you tell me -- if you were to say to me

11   today, Ms. Ryan, we're going to trial on May 1 for two weeks

12   and you'll definitely be done, then I could give a

13   projection.  I could go along and say, Well, this is X amount

14   of a range --

15           THE COURT:  Well, no, no, I'm not asking you for a

16   dollar amount.  This is a very simple question.

17           MS. RYAN:  They are, Your Honor.

18           THE COURT:  Okay.  So you are saying that you are

19   suffering continuing harm from the actions of the defendants?

20           MS. RYAN:  Exactly.

21           THE COURT:  So that means that they get to discover

22   continuing medical records.  That's just the law.  So --

23           MS. RYAN:  Here is the catch, Your Honor.

24           THE COURT:  Okay.

25           MS. RYAN:  Ms. Colony is implying that her clients,

1    I am asking for continuing damages.  I am not.

2              THE COURT:  Okay.

3              MS. RYAN:  Only Hall & Evans, only the CHP

4    defendant group.

5              THE COURT:  So when did the damages associated with

6    Ms. Victoroff and Ms. Sommerschield, when did those end?

7              MS. RYAN:  Those ended, for defendant Victoroff, on

8    the 7th of February of 2017.

9              THE COURT:  And what about Sommerschield?

10             MS. RYAN:  And Sommerschield, that ended I believe

11   that the retina tear was between -- it was late spring of

12   2017.  Ms. Colony has that information.

13             THE COURT:  Okay.

14             MS. RYAN:  And so where she's concerned, which

15   takes us into this problem of DOC that she's upset about, as

16   gently and as respectfully as I can say, I'll say it again, I

17   challenge anyone present to look at absolutely every word

18   that I have spoken regarding the DOC issues with Ms. Colony.

19             Never once have I said she is not entitled to see

20   all discovery.  I object strenuously to her being able to use

21   all discovery.  In her own words at hearings -- one of them,

22   let's see, I've got it right here.

23             THE COURT:  Well, let me make sure Ms. Colony

24   understands.  Do you understand that you're dealing with your

25   clients with a closed period of damages?

1          MS. COLONY:  Yes.

2          THE COURT:  Because that was and admission that the

3    plaintiff just made, it's binding, you can count on it, okay.

4          MS. COLONY:  Okay.

5          THE COURT:  Now, as to Mr. Kennedy, it sounds like

6    you're continuing with an open period of damages, and so you

7    would be entitled to ongoing records of her treatment as it

8    is associated with damages she alleges arise from CHP or Mix,

9    okay.

10         MS. RYAN:  Am I correct, Your Honor --

11         THE COURT:  Hold on, I have --

12         MS. RYAN:  Sorry.

13         MR. KENNEDY:  Ms. Ryan mentioned earlier that we

14   have access, that she gave -- we sent out standard releases.

15   She didn't want to sign those.  She signed some -- made her

16   own releases sent to us which aren't working.  So we don't

17   have the access.

18         THE COURT:  Well, I'll give you the access, but the

19   point, is it shouldn't be continuing.  I mean, we should

20   say -- I mean, do you have her medical records up to a

21   certain point right now?  Do you have any post-incarceration

22   medical records?

23         MR. KENNEDY:  Some that Ms. Ryan has sent, I

24   believe, but you have some.  I don't know if I've seen them.

25         MS. COLONY:  And I apologize, Your Honor.  We did

1   get some materials from Aurora South, but I believe they are

2   limited to a specific time period while Ms. Ryan was still

3   incarcerated.  I would have to go back and double-check

4   those.  My paralegal took a look at them and told me some

5   information about them, but I don't believe they contain

6   anything post-incarceration because when we sent a standard

7   release seeking, you know, up to date --

8   up-to-the-present-date information, Ms. Ryan refused to sign

9   that release and she sent back her own release with a very

10   limited time period.

11          THE COURT:  Well, so they're not going to come from

12   you, they're going to come from Mr. Kennedy.  Go ahead and

13   draft up releases that will get us current as of now, and

14   then you will be entitled to one more set of documents,

15   reasonable time before trial.  I mean, it has to stop

16   sometime.

17          She's going to -- she's alleging probably that it's

18   going to affect her for the rest of her life, but we have to

19   pick a date sometime before trial and the records will stop

20   there.  She's entitled to say it's going to go ongoing.

21   That's something we're all used to.  So we can't have all the

22   records up to the moment of trial.

23          MS. RYAN:  Your Honor, may I --

24          THE COURT:  Yes, go ahead.

25          MS. RYAN:  -- clarify a couple points here?

43

1          Ms. Colony's continued use of "we" as associated

2    with Correctional Health, you just hopefully resolved that

3    for all time.  Ms. Colony was given revised releases specific

4    to being contained, for example, to the days of Hilary

5    Victoroff and the days of Laura Sommerschield.

6          I would ask Mr. Kennedy to ask his paralegal again,

7    did she -- Marion was the one who e-mailed me and confirmed

8    her receipt of all of the releases that I gave him for

9    everything in my initial disclosures.  It is SKR01 is the

10   exhibit, and it absolutely gave you access to anything,

11   everything completely.

12          THE COURT:  Well, when was that, Ms. Ryan?

13          MS. RYAN:  When was that?

14          THE COURT:  Yeah, because --

15          MS. RYAN:  I will look here while I'm finishing.

16          THE COURT:  -- these releases tend to only last six

17   months and then they're stale.

18          MS. RYAN:  Actually mine until it is executed.

19   That's one of the phrases that I put in there so that they

20   wouldn't have this issue.

21          THE COURT:  Well, I know, but you don't control the

22   law; the law controls you.  And so if the law says anything

23   over six months is useless, that's just the law.

24          MS. RYAN:  Then I would be glad to redo them.

25          THE COURT:  Isn't it six months typically?

44

 1          MR. KENNEDY:  I believe so, Your Honor.  And I'll

 2   get the releases.  We'll do everything hopefully by the end

 3   of next week.

 4          THE COURT:  All right.  But do you think you have a

 5   sufficient list of healthcare providers to send those to?

 6          MR. KENNEDY:  I don't believe so.

 7          THE COURT:  Okay, good.  So why don't you draft

 8   those.  Send them to Ms. Ryan.  Ms. Ryan, I'm just going to

 9   require you to execute the releases that Mr. Kennedy sends

10   you.  If you don't do that, then I'll probably recommend the

11   case be dismissed because you're not cooperating.  We've got

12   to do it this way, okay, so --

13          MS. RYAN:  Does that include their request for the

14   two that I did not sign, that I said, no, you already have it

15   apparently because "we" has given it to you?

16          THE COURT:  Who?

17          MS. RYAN:  Ms. Colony has given it to them.

18   They're asking for full -- everything on my subpoena duces

19   tecum, they are asking CDOC to provide.

20          MR. KENNEDY:  Your Honor, we want --

21          THE COURT:  Now, all I'm saying is --

22          MS. RYAN:  And they don't need it.

23          THE COURT:  I'm going to trust the good faith of

24   Mr. Kennedy, he's going to provide you releases for only

25   those medical care providers that are at issue in this case,

45

1   and you sign those, that's all.

2            MR. KENNEDY:  I think what she's -- we also asked

3   for a release for our client so we could have access to CDOC.

4   We're not going send those releases out.  We want to make

5   sure she -- she has given us the right to look at her

6   document.  So she might be confused by that.  We did send her

7   releases that reflect what we've already got, but we

8   didn't --

9            THE COURT:  Well, I --

10           MR. KENNEDY:  With all the fighting going on, we

11   want to make sure we're allowed to look at it before --

12           THE COURT:  I will enter that order right now, you

13   don't need a release.  I enter the order that you are

14   entitled -- are they marked confidential under a protective

15   order?

16           MR. KENNEDY:  Yes, Your Honor.

17           THE COURT:  Okay, then treat them confidential, but

18   I'm going to order that you have access to her CDOC medical

19   records, all right, so we don't have to mess with that

20   anymore.

21           All right, what's the next issue?

22           MS. RYAN:  That would bring to mind --

23           THE COURT:  Wait a second.  I want to make sure,

24   Ms. Colony -- I did order, because Ms. Colony offered it,

25   that she turned over a CD with all your medical records, and

46

1    I assume that happened, Ms. Colony.

2              MS. COLONY:  Yes, some time ago, back in May.

3              THE COURT:  And I don't see -- I don't see ever

4    requiring an inventory, so that issue is --

5              MS. RYAN:  Actually, I can give you that where it's

6    at on the transcript, Your Honor.

7              THE COURT:  Yeah, that's fine, because I don't see

8    it.

9              MS. RYAN:  This is back to the June 24.

10             THE COURT:  I'm there.

11             MS. RYAN:  On page 26 we're discussing -- your

12   order ended up being to the extent plaintiff is asking --

13   seeking to prevent Ms. Colony, that is denied.  And I've

14   given my challenge.  That's not what I've ever said.

15             Page 27.

16             THE COURT:  Yes.

17             MS. RYAN:  -- to at least see what you don't have,

18   did --

19             THE COURT:  What line are you reading from?

20             MS. RYAN:  I don't have the transcript.  I do

21   actually, I can pull it up.  Because at that point nobody

22   knew what was in the boxes, Hall & Evans, the plaintiff,

23   nobody did.  And as my spreadsheets that I gave show, she had

24   had them in her possession since the end of March, and nobody

25   knew what was in them, and so that's the topic that was being

47

1   discussed.

2           So page 27, line 10.  The Court:  So what I would

3   like you to do is take a look at those records that you get

4   from Ms. Colony.  If you think you're missing something, then

5   you ask for another status conference or you can start

6   issuing subpoenas.

7           Now, when you issue subpoenas, we'll help you do

8   that, then you go on to number 21, line 21, to at least see

9   that you don't have -- what you don't have so you can be

10  educated and have pinpoint requests so that you don't

11  duplicate.

12          You then go on on page 28, when I ask:  What is

13  done then.  When I look through, you've ordered Ms. Colony to

14  give everything that she's got.  And the Court:  About you?

15  And I answer:  About me.  And then you go on to talk about

16  how she may have to redact.

17          So if she withholds it, then she puts it on a list

18  and she describes the document with sufficient particularity,

19  and then the entirety of page 29 is applicable, so is page

20  30, and that was June 24.

21          THE COURT:  Right.

22          MS. RYAN:  Nothing ever came to that.  And so

23  finally the things that I am missing and the things that I

24  repeatedly asked for, which are in my subpoena duces tecum, I

25  put onto the two spreadsheets that I submitted in 147 and

48

1    148.  I have maybe 40 percent of my medical records from DOC.

2         The irony of this is that I don't think Ms. Colony

3    understands.  I don't need them.  I need them for Hall &

4    Evans.  I need to be able to take my own data and properly

5    classify it, because on that spreadsheet the numerous things

6    that she put through, if we're not going to go down the road

7    with anything with the Court doing it, which is the only

8    reason I contacted Director Williams myself, was because I am

9    required to report when I think that my -- there has been

10   something wrong in AR 950-02.

11        Now that I've gotten that answer, I did go through

12   Ms. Colony, I have the e-mails to prove that.  She knew it

13   was going to Mr. Williams, she knew it was going to Major Rio

14   (ph).

15        And so where we are right now, I did the inventory

16   list, it's all done.  Every single document, and then I gave

17   a screenshot to the Court.

18        THE COURT:  How many are there?

19        MS. RYAN:  6400, something like that.

20        THE COURT:  Documents?

21        MS. RYAN:  Documents.

22        THE COURT:  All right.

23        MS. RYAN:  And that's only 40 percent, Your Honor.

24        THE COURT:  So, Ms. Colony, do you believe you

25   received her entire medical file from DOC?

1          MS. COLONY:  Yes, I do.  That's what --

2          THE COURT:  You turned over everything that you

3    have?

4          MS. COLONY:  Yes, I did.

5          THE COURT:  Okay, that's all I can do, Ms. Ryan.

6          MS. RYAN:  I understand.

7          THE COURT:  She said you got it all, you say it's

8    40 percent.  I'm not going to decide that.  I'm going to take

9    her word for it, because if an attorney says something to a

10   Court and they misrepresent it, they're in a whole lot of

11   trouble and I'm going to assume that didn't happen.

12         MS. RYAN:  It's honorable that you feel that way,

13   Your Honor.

14         MS. COLONY:  Your Honor, if I may, I have had a

15   number of discussions with management level folks and

16   clinical staff to explain to me, you know, where things are

17   kept.  And there have been specific items that she has asked

18   about, for example, related to nephrology, I think, was an

19   issue.  And I've been told over and over again, this is

20   everything, it's all kept in one place.  Those are the

21   records that were delivered to me at the beginning -- when

22   the AG's office became involved in the case.

23         And they have been -- as far as boxes, that's just

24   a printout of everything that we have electronically, and I

25   think that has caused some confusion.

```
 1            THE COURT:  Right.  Well, here is what you should
 2     know.  I had to represent a client such as yours when I
 3     practiced law, and an attorney develops an intuition whether
 4     they're getting everything or not.  So you have to use your
 5     intuition as to DOC.
 6            If you don't believe you've been given everything
 7     or maybe you didn't receive everything, you've got to get
 8     down there and look at the files yourself.  That's your
 9     obligation and that's what I did when I practiced.  You know,
10     they've just got to let me look at their records and see that
11     I've got everything because I did not want to stand in front
12     of a federal judge with a document produced at trial that I
13     didn't produce that came from my client's Bureau of Prisons'
14     files.  That's a terrible thing to happen.
15            So I'm taking your word for it.  You use that
16     however you feel you need to, but you've told me you have
17     everything from DOC, and if you assure yourself that's
18     correct, that's all we need to do; but if you think that
19     might not be correct, I think you ought to probably engage in
20     a little bit of investigation.
21            MS. COLONY:  Well, I will state that, Your Honor, I
22     have not had time to go through them and do a detailed
23     review, simply because of all these distracting discovery and
24     custody issues and chain of custody and all the things that
25     Ms. Ryan has repeatedly brought up again and again for the
```

1   last four months.  I have not had time to do a deep dive into

2   the medical records.

3           THE COURT:  Okay, but just -- you need to know I'm

4   counting on your word that you have produced all of her

5   medical records, not all that you have, not all that they

6   sent you, but all that exist in the history of the DOC.  So

7   that's what we're proceeding on, that you've already done

8   that, okay.

9           MS. RYAN:  Thank you, Your Honor.

10          THE COURT:  So what's the next issue?

11          MS. RYAN:  With that said, I think I can help a

12   little bit here.  Because I do not need, the plaintiff --

13   Shawnee Ryan is entitled to all of her records, and I can get

14   what's missing through open records.  I can go pay for it, I

15   can go do all of that.  And I also am not adverse to pointing

16   out, as we go along down the road, that these were the things

17   that were missing, this counter balanced this argument,

18   whatever you're going to bring forth at trial or ADR.  And if

19   you don't have it in your possession with this order today,

20   all I have to do is say you have a chance to go get it.

21          THE COURT:  Ms. Ryan, I've already dealt with that

22   issue.  I want the next issue.

23          MS. RYAN:  And so -- okay.

24          THE COURT:  What's the next issue?

25          MS. RYAN:  So there is Claims 5 and 6 against

52

1    Hilary Victoroff.

2              THE COURT:  Okay.

3              MS. RYAN:  And you mentioned developing an

4    intuition about her client.  I not only have an intuition

5    about that client, I have six years of experience with that

6    client.  And at this point in time the sole reason I

7    contacted Director Williams and Major Rio was because as a

8    parolee, I am first and foremost under the jurisdiction of

9    Colorado Department of Corrections, and it orders me in AR

10   950-02 to report.  That is what I did.

11             Finally I got a straight answer back from

12   Ms. Colony that says, The only investigation that will be

13   done will go through me, which I consider to be a conflict.

14             So my question for you, Your Honor, I am totally

15   taking my hands off with your order today the DOC problem of

16   not having my records.  Do I need to just simply keep a

17   subpoena out there in limbo in case -- because basically

18   she's defying it.

19             THE COURT:  Wait a second, I'm not sure what you're

20   talking about.

21             MS. RYAN:  I have a subpoena duces tecum that the

22   Court allowed me after a lot of discussion and all these

23   hearings prior to this one to be able to issue that subpoena

24   duces tecum.  The Court served the subpoena duces tecum.

25             THE COURT:  When?

1          MS. RYAN:  It was --

2          THE COURT:  On who and for what?

3          MS. RYAN:  It was the Colorado Department of

4    Corrections and it was listed -- let me find the ECF number

5    for you.  It would be easier than looking for it.  I don't

6    think I have it.

7          And so they have not answered that.  I have 40

8    percent of the documents, regardless of what Ms. Colony says.

9    So if Ms. Colony had her word taken, then that's where we

10   leave it.

11         The certificate of service by the clerk, for the

12   subpoena to produce documents, was given to me on -- sent to

13   me on 1 -- Document 141.  I can go back here and find --

14   actually, it should say the document number in the subpoena.

15   Your minutes ordering it were 138.

16         THE COURT:  So maybe 141?

17         MS. RYAN:  141 I think was just the -- my receipt

18   in the mail.  They sent me this, the copy of the certificate

19   certified mail that they used.  I believe it was end of June.

20   I did the fourth amended complaint, we had the hearing.  I'll

21   find it here in just -- just a moment.

22         So that is basically just sitting there and I've

23   been getting tremendous amount of pressure from Ms. Colony to

24   release DOC from their subpoena.

25         THE COURT:  What do you mean?  Give me an example

54

1   of what you're calling pressure.

2          MS. RYAN:  Pressure is repeated e-mails, and my

3   repeated statement with the very simple answer, no.  Until my

4   records are complete, no, I will not release the subpoena.

5          THE COURT:  Well --

6          MS. RYAN:  So that's the question, Your Honor.  If

7   you are going to take -- if the Court is going to take her

8   word that we have everything, and Ms. Colony says on the

9   record today that she hasn't even looked through the medical,

10  a deep dive she calls it, then I'm still in limbo, but I

11  don't know if that just means I leave that sitting out there.

12         THE COURT:  Okay.  Well, let me find out about

13  this.  So I see a subpoena, Document 141-2.  It's directed to

14  Colorado Department of Corrections and Executive Director

15  Dean Williams and it is dated June 28, 2019.

16         MS. RYAN:  Yes.

17         THE COURT:  And it has -- I'm talking to Ms. Colony

18  right now.  And it has a return date of 30 days, which would

19  be end of July.  Ms. Colony, what do you understand about

20  this subpoena as the DOC's response to it?

21         MS. COLONY:  As far as my understanding, Your

22  Honor, first of all, it's the CDOC's position that the

23  subpoena was never properly served on it, but we have

24  endeavored to honor it nonetheless, and I have worked through

25  each category of the requests for documents and provided them

1    through my office to Ms. Ryan.

2            THE COURT:  Wait a second.  Let's go backwards --

3    go back a little bit.  Do you understand -- have you seen the

4    subpoena?  Would you like a copy of it right now?

5            MS. COLONY:  Yes, I've seen it several times.

6            THE COURT:  Okay.  So it looks duly executed by our

7    Clerk of the Court.

8            MS. COLONY:  That doesn't have to be personally

9    served?

10            THE COURT:  Well, let's do one step at a time.

11    Does it looks like it's normal to you, duly executed by the

12    Clerk of the Court, Mr. Sheridan?

13            MS. COLONY:  I saw that it was executed by the

14    Clerk of Court, but my client was perplexed because they

15    received it in certified mail.  What their expectation would

16    be that it would be personally served.

17            THE COURT:  Okay.  I would say this, that maybe --

18    did you send it by certified mail?

19            MS. RYAN:  I didn't touch it, because Your Honor

20    ordered me in forma pauperis to let the clerk handle it.

21            MS. COLONY:  The clerk delivered it, Your Honor.

22            MS. RYAN:  Magistrate service or certified mail.

23            THE COURT:  You can't both talk at the same time.

24    I would say this, and I think Mr. Kennedy will back me up.

25    In my experience, this is how we've operated with the CDOC

1   and you're changing the rules right now, okay.  CDOC has

2   always cooperated with this Court in the past.  Is that your

3   experience, Mr. Kennedy?

4          MR. KENNEDY:  Yes, Your Honor.

5          THE COURT:  And so a subpoena that comes from the

6   United States District Court that's not a fraud and it

7   arrives by certified mail, I have never had a deputy or a

8   assistant attorney general, whichever that you call yourself,

9   tell me that it needs to be personally served in my 14 years

10  on the bench.  Are you saying that is how they are operating?

11         MS. COLONY:  Your Honor, it was just perplexing,

12  and I consulted with several people in the corrections unit

13  and my office, and they said they had never heard of that

14  before, a subpoena being served via certified mail, and CDOC

15  was perplexed about it and wanted to know what to do.  And

16  what we did was provide the documents, but we had been

17  providing the documents long before this arrived in the

18  certified mail because --

19         THE COURT:  So you believe you responded -- did you

20  respond --

21         MS. COLONY:  Yes.

22         THE COURT:  -- to it?

23         MS. COLONY:  We responded, we provided the

24  materials with the cover e-mail explaining to her what's

25  being sent to her.  I know we've sent her clinical standards,

57

1    we've sent her ACA audits, we explained to her that we've

2    already satisfied the portion of the subpoena that seeks all

3    of her CDOC records.

4            Long before they received it in the mail, we knew

5    about its existence because she has filed it with the Court,

6    she's attached it to e-mails and I've been steadily working

7    on it.

8            THE COURT:  So you believe you've responded to her

9    fully, you feel?

10           MS. COLONY:  We feel that we've responded to it

11   fully.

12           THE COURT:  Okay, so what am I supposed to do?

13   They said they've responded.  If you don't think they have --

14           MS. RYAN:  Correct.

15           THE COURT:  -- your option is to bring a motion for

16   contempt for violation of a court order, okay.

17           MS. RYAN:  Okay.

18           THE COURT:  But until you file something like that,

19   I believe that issue is resolved.

20           Now, what's the next issue?

21           MS. COLONY:  Your Honor, another issue that

22   Mr. Kennedy and I have with the progress of discovery relates

23   to the response that we've received from Ms. Ryan to our

24   written discovery.

25           THE COURT:  Okay.  Do you have a copy?

58

1          MS. COLONY:  I do.  Are these -- these are yours,

2     right, Ed?  I want to make sure I've got --

3          THE COURT:  Okay.

4          MS. COLONY:  -- CHP's separate.

5          MS. RYAN:  Your Honor, while she's looking, there

6     is one thing that pertains to this DOC issue that is not

7     addressed that I need to have addressed.

8          THE COURT:  Yeah, I've just got to do these things

9     one at a time.

10          MR. KENNEDY:  Your Honor, these are the two

11     discovery responses in the motion we filed (inaudible - not

12     speaking into mic).

13          THE COURT:  I do.

14          MS. RYAN:  I may have copies.

15          THE COURT:  A15 is plaintiff's response to the

16     State's first set of interrogatories and --

17          MS. RYAN:  19?

18          MR. KENNEDY:  And 19

19          MS. RYAN:  I have 19.

20          THE COURT:  (Inaudible).  Go ahead, Ms. Colony, or

21     whoever brought this issue.

22          MS. RYAN:  Thank you.

23          THE COURT:  A --

24          MR. KENNEDY:  A19 I believe is the other one.

25          THE COURT:  Yeah, go ahead.

59

1          MS. COLONY:  So A16 is her response to the State

2  defendants.

3          MS. RYAN:  A16?

4          MS. COLONY:  Interrogatories which I think is A15.

5          THE COURT:  Okay.

6          MS. COLONY:  And then --

7          THE COURT:  Wait.  So plaintiff's response to State

8  first set of written interrogatories?  Is that what we're

9  talking about?

10          MS. COLONY:  Yeah, A16 is her response.

11          THE COURT:  Right.

12          MS. COLONY:  Yeah, A16 is her response.

13          THE COURT:  I've got it.

14          MS. COLONY:  A18 is the interrogatories that CHP

15  served, and I believe A19 is the response.

16          THE COURT:  Okay, I'm ready.  You were going to

17  raise some issues with it.

18          MS. COLONY:  The answers are largely

19  incomprehensible is the main problem.

20          THE COURT:  Okay, point out an example.

21          MS. COLONY:  Because my set of exhibits, Your

22  Honor, that I brought with me today is missing my actual

23  questions, I am struggling with this, I admit, since I don't

24  have A15 in front of me.

25          MS. RYAN:  I do.

1          MS. COLONY:  Here is an example.  Like here is an

2   example, Number 5, I've -- in A16, I think -- and Ms. Ryan

3   did not include the questions, you know, type out the

4   questions before she answered so that's where I'm struggling,

5   Your Honor.

6          THE COURT:  Okay.

7          MS. COLONY:  But, for example, all six years -- I

8   think this must have been a question about, you know, support

9   for allegations.  She says all six years --

10          THE COURT:  Which number?

11          MS. COLONY:  Number 5 --

12          THE COURT:  Okay.

13          MS. COLONY:  -- in A16.  All six years of

14   administrative processes, dozens of records of staffing and

15   administrative --

16          THE COURT:  Well, let me get the questions first.

17          MS. COLONY:  Okay.

18          THE COURT:  So your questions are at what?

19          MS. COLONY:  A15, I think.

20          THE COURT:  Okay.

21          MS. RYAN:  A15 is CHP.

22          MS. COLONY:  Of CHP's discovery?

23          MS. RYAN:  Yes, it's not the State.  What you were

24   asking for, if I remember correctly, see if this jogs your

25   memory, was the question was something along the lines of

```
 1    what exactly do I believe is being withheld from my DOC

 2    records, and we've just been through all that.  So maybe the

 3    answer I gave makes a little bit more sense now.

 4              THE COURT:  All right.  So A15, question 5.  A15 is

 5    Ryan's answer -- sorry -- A --

 6              MS. RYAN:  But that's CHP, Your Honor, not the

 7    State.  She doesn't -- she didn't give you a copy -- any of

 8    us a copy of the first set of written interrogatories upon

 9    the plaintiff that I'm answering in A16.  We don't have the

10    questions is what I think -- I'm not trying to put words in

11    her mouth, but I think that's what she's trying to say.

12              MS. COLONY:  I don't have A15, Your Honor.

13              THE COURT:  I can call these up.  It's just a whole

14    lot of junk that are (inaudible).  A16 is plaintiff's

15    response -- you want A what?  15?

16              MS. COLONY:  A15 -- if I'm right about this, A15

17    is --

18              THE COURT:  A15 is plaintiff's answers.

19              MS. RYAN:  To defendant Correction Department.

20              THE COURT:  Yes.

21              MS. RYAN:  16 is my answers to the State.

22              THE COURT:  Yeah, but I need their questions is

23    what I need.

24              MS. RYAN:  And we don't have that, they're not

25    here.
```

1          THE COURT:  They're not submitted?

2          MS. RYAN:  She didn't --

3          MS. COLONY:  If they're not submitted, Your Honor,

4    it's in error on my part.  I thought that they were included

5    with the motion, but I may have just included the answers,

6    but I certainly intended to include --

7          THE COURT:  Yeah.  Well, so I'm in the dark.

8          MS. RYAN:  I'll continue to look.

9          THE COURT:  Obviously, it's hard for me --

10         MS. COLONY:  But I think the questions -- do you

11   have the answers to yours?

12         MS. RYAN:  Let me see if I can help her out.  Maybe

13   I do have a copy of it.  I don't know if I do or not.  I

14   didn't think to bring it with me.  I do not.  I didn't bring

15   them.

16         Mr. Kennedy, I did find the e-mail where you asked

17   for more time to answer Dr. Mix.

18         THE COURT:  Ms. Colony, give me the responses

19   you're saying are deficient so maybe we can work it out.

20         MS. COLONY:  These interrogatories, I know that I

21   asked the usual questions about the support for the specific

22   issues in the allegations in the complaint, and how she

23   responded was to continue to complain about how I became

24   about in possession of her records at CDOC.  You'll see that

25   in Number 5.  And I am missing --

63

```
 1              THE COURT:  Well, let me ask you this.  Are any of

 2   these matters -- can they be resolved by her deposition,

 3   because you have her deposition scheduled here, right?

 4              MS. COLONY:  We do.

 5              THE COURT:  So do you think a lot of this could be

 6   resolved by her answering questions under oath?

 7              MS. COLONY:  Hopefully, Your Honor.

 8              THE COURT:  Okay.  So why don't we reserve fighting

 9   over her responses until -- what day is that, by the way?

10              UNIDENTIFIED SPEAKER:  18th, I believe, Your Honor.

11              THE COURT:  18th.  And -- so that's -- I'm in

12   Chambers that day, so if you come across what you believe to

13   be evasive or nonresponsive answers, then you'll buzz us,

14   I'll walk into the jury room and I'll make rulings on the

15   record, okay.

16              MS. COLONY:  Okay.

17              THE COURT:  So it's only now -- so contemplate her

18   being under oath, you're having a full opportunity to ask her

19   questions.  What else can we deal with today that is ripe?

20              And then specifically, Ms. Ryan, your objections to

21   anything Ms. Colony has done with records are noted.  I do

22   ask that you please not bring those up again because you've

23   made a good record of those, and so please do not accuse

24   Ms. Colony or -- of anything improper with your medical

25   records or use that again in any kind of messages because we
```

64

1    need to move on.

2           MS. RYAN:  I will -- I will do that.  I was asking

3    that question in its entirety.  Claims 5 and 6.

4           MS. COLONY:  I'm not finished yet, Your Honor, and

5    it's my motion.

6           THE COURT:  Anyway, we're going to pick this issue

7    up again if we need to after your deposition.  Go ahead.

8           MS. COLONY:  I guess the only -- the other thing I

9    would ask for, as you advised plaintiff earlier in the summer

10   in this case, that she -- she wants materials from CDOC, that

11   she serve a written discovery request as opposed to a

12   subpoena.  That way it directly comes to me.  That's the

13   proper way to seek these materials.

14          THE COURT:  You mean on CDOC?

15          MS. COLONY:  Well, when she is asking for materials

16   related to her case, if she could put them in a written

17   discovery request as opposed to a subpoena, that would be a

18   lot cleaner and easier.

19          THE COURT:  True, but who would it be directed to?

20          MS. RYAN:  Exactly.

21          THE COURT:  Ms. Ryan, sorry, I don't need your

22   help.

23          MS. RYAN:  Okay.

24          THE COURT:  I've been doing this for 14 years.

25          MS. RYAN:  I'm sorry, I apologize, Your Honor.  Has

1    just been a very long haul.

2              THE COURT:  I understand.

3              MS. RYAN:  We've already just resolved all this.

4              THE COURT:  But I can't accept disrespect so you've

5    got to be quiet.  Go ahead.

6              MS. COLONY:  Typically it has been my experience in

7    cases where CDOC individual employees are named as

8    defendants.  When we get a discovery request directed to the

9    individuals that we're representing, we treat it like it is a

10   request to CDOC.  We don't play games with people and say --

11             THE COURT:  No, you're always right.  That's what I

12   brought up earlier, CDOC has always played straight out, I

13   understand, I agree.

14             So what you're saying is, if it's directed, you

15   want -- you want a request directed to CDOC, you'll accept

16   that?  Is that what you're saying?

17             MS. COLONY:  Well, technically it should be in the

18   names of Ms. Victoroff and Ms. Sommerschield --

19             THE COURT:  Okay.

20             MS. COLONY:  -- but I answer it --

21             THE COURT:  Understood.

22             MS. COLONY:  I answer it as CDOC because obviously

23   Ms. Victoroff and Ms. Sommerschield don't have custody of

24   materials.

25             THE COURT:  Agreed.

1          MS. COLONY:  But that's the way we've always

2     treated it in my office.

3          THE COURT:  All right.  So what are you asking

4     right now?

5          MS. COLONY:  I would prefer that she issue requests

6     for production rather than go through the subpoena process.

7          THE COURT:  Okay, very good.  So what -- in

8     essence, what Ms. Colony is doing is doing you a favor.

9     She's saying that although we're entitled to have you

10    subpoena DOC because they're not party, she will through her

11    two clients who are named, accept requests that are in

12    essence directed toward CDOC.  So you can just simply call

13    those discovery requests from now on to the extent you have

14    any left to use.  Is that what you're saying, Ms. Colony?

15         MS. COLONY:  I'm not sure if she does have very

16    many left to use.

17         THE COURT:  I don't know, yeah.  I'm not saying

18    right now whether she does or she doesn't, but if you do and

19    want information that probably more appropriately comes from

20    CDOC, you can direct it to either defendant Ms. Victoroff or

21    Sommerschield and ask documents or questions, and Ms. Colony

22    will treat those as against CDOC and respond.

23         MS. RYAN:  Thank you for clarifying that, Your

24    Honor.

25         THE COURT:  Okay.

1          MS. RYAN:  For the record, I have made discovery

2    requests of the three items that I have needed for defendants

3    Victoroff and Sommerschield exactly as Mr. Colony just

4    directed and as you have directed, and outside of the

5    subpoena duces tecum, which is -- duces tecum for my medical

6    records.  It doesn't have anything to do with Victoroff and

7    Sommerschield.

8          THE COURT:  Okay.

9          MS. RYAN:  And we have already resolved all of that

10   with all of your discussion prior to that.

11         THE COURT:  Okay.

12         MS. RYAN:  The only thing that is remaining, and

13   I -- my sense is that this is where this is headed.  We

14   have -- my understanding is we have resolved the issue of the

15   subpoena.  I will be filing a motion for contempt and I will

16   be detailed listing exactly where the documents that I need

17   are, what's at fault for what's already been given.  For

18   example, the standards of care are not AR's.  They are

19   multiple operational procedures that say things like, Hilary

20   Victoroff, you should take this person out of the hospital,

21   put her directly in the infirmary, not general population.

22         Those are things that I will list out specifically

23   as the Court has directed me that I'm able to do, and I will

24   reissue that.

25         THE COURT:  Okay.

68

```
1              MS. RYAN:  Lastly --

2              THE COURT:  Wait, wait, we were on Ms. Colony's

3    issues.  Go ahead.

4              MS. COLONY:  I guess the last thing that I would

5    ask the Court to address is the vitriolic and the harassing

6    correspondence.  If Ms. Ryan could --

7              THE COURT:  Could you give me an example.

8              MS. COLONY:  There is multiple examples that I

9    attached as exhibits to my motion.

10             THE COURT:  One issue.  I mean, I can't deal with

11   generalities, so give me a page.  Everything is documented at

12   the top as far as ECF numbers, so give me a number.

13             MS. COLONY:  A11 and A12.

14             THE COURT:  All right, hold on.

15             MS. RYAN:  Ms. Colony, your money and your cards

16   and everything fell out of your pocket on the floor over

17   there by Ed.

18             MS. COLONY:  Oh, thank you.

19             THE COURT:  All right.  Let's see, A11 --

20   Defendant's Exhibit A11.

21             MS. COLONY:  A1 --

22             THE COURT:  Let's do one or two at a time.  So you

23   told me A11, A12.

24             MS. COLONY:  A13.

25             THE COURT:  All right, we're going to stop there.
```

1          (Pause)

2          THE COURT:  Okay.  So, Ms. Ryan, you have some

3    experience with the criminal justice system, right?

4          MS. RYAN:  Yes.

5          THE COURT:  And you were accused of and convicted

6    of a theft crime, correct?

7          MS. RYAN:  Yes.

8          THE COURT:  So when you accuse somebody, including

9    a government official, or especially a government official

10   engaging in shady conduct, you understand what you're doing?

11         MS. RYAN:  I do.

12         THE COURT:  All right, I want you to do that.  If

13   you're going to do -- if you're going to make allegations

14   against Ms. Colony or anyone else who has acted illegally,

15   you can bring those through a proper motion.

16         MS. RYAN:  I did.

17         THE COURT:  But let's not engage in that kind of

18   discussion or speech anymore, okay.  It's not productive.

19   You -- what discovery is intended to do is ask questions and

20   receive responses, and it's not to get sidetracked on

21   personal attacks.  It detracts from what we're doing, it's

22   against the rules that we have as far as how we treat one

23   another.  If you have an issue that you think you deserve

24   relief on, file a motion, okay.  Is that okay, Ms. Colony?

25   All right, that's the ground rules on that going forward.  So

70

1    no more personal attacks.

2              What else Ms. Colony, from you?

3              MS. COLONY:  That's all, Your Honor.

4              THE COURT:  Okay.  And what else from you?

5              MS. RYAN:  That final portion, Claims Number 5 and

6    6, I did file them to the Court and that has been the

7    contention back from Ms. Colony.

8              THE COURT:  What do you mean you filed them to the

9    Court?

10             MS. RYAN:  I filed my complaints about an

11   accusation in Claims Number 5 and 6 in ECF 119.

12             THE COURT:  But that means they're formal claims

13   and so that's fine.

14             MS. RYAN:  They are, they are, which is -- you're

15   right, they are fine.

16             THE COURT:  Well, you've asserted them.

17             MS. RYAN:  I have asserted them.

18             THE COURT:  Okay.

19             MS. RYAN:  And so now we are done because the Court

20   today has resolved all of these issues except for this last

21   remaining one.

22             THE COURT:  Go ahead.

23             MS. RYAN:  If we are going to proceed based on Your

24   Honor taking the word of Ms. Colony that she has submitted

25   everything and that she's completed the process with DOC and

1    plaintiff is going to file a motion for contempt and list

2    those things out and let that avenue run its course, is it

3    possible -- since Ms. Colony I feel is conflicted in

4    investigating Claims Number 5 and 6 and she denies them and

5    DOC is saying, take it through Ms. Colony, is it possible,

6    then, the only next step I have is to take that to a law

7    enforcement agency or a regulatory agency the investigation

8    of those two claims, which I -- even more so after today am

9    firmly convinced that we have a problem.  I would be taking

10   it to the state nursing board, to DORA, and turning it over

11   the same thing I would have turned over under AR 9502.

12        One of the things that I did not give the Court a

13   complete copy of, but I did bring with me today is

14   Ms. Victoroff's signature that I got through giving a

15   discovery request to Ms. Colony on AR 950-02(b), which is a

16   sworn affidavit of what an employee can and cannot do with

17   medical records of an inmate.  And that's where I believe

18   that wrongdoing has happened.

19        And so it's completely out of the realm of the

20   Court right now.  You've taken it and given us directions and

21   we are covered, but I still have to investigate and get some

22   kind of closure answer on those two claims.  The only ones

23   left are DOC IG office or DORA.

24        THE COURT:  So you filed a motion already with

25   regard to Claims 5 and 6.

72

1              MS. RYAN:  Right.

2              THE COURT:  It's at docket --

3              MS. RYAN:  ECF 119.

4              THE COURT:  No, that's your fourth amended

5    complaint.

6              MS. RYAN:  And that's --

7              THE COURT:  Docket 147 --

8              MS. RYAN:  No, sir.

9              THE COURT:  -- which seeks bifurcation --

10             MS. RYAN:  No, sir.

11             THE COURT:  -- 5 and 6.  Well, it does do that.

12             MS. RYAN:  Yes, that's true, that is up today, but

13   the claims.

14             THE COURT:  That's not before me.  That's before

15   Judge Krieger.

16             MS. RYAN:  The claims are in ECF 119.

17             THE COURT:  Right.

18             MS. RYAN:  Claims Number 5 and 6, when that was --

19   amendment was put in, we had just gotten all of this starting

20   to come to the surface and I put those claims in and that's

21   what Ms. Colony and I have been going around and around on

22   for some time now.

23             And I haven't removed those in my proposed fifth

24   amended and I am not going to remove those until I have

25   discovery.  Ms. Colony is denying them on behalf of her

73

1    client.

2            THE COURT:  Denying what?

3            MS. RYAN:  Pardon me?

4            THE COURT:  You said Mr. Colony is denying them.

5    What is she dying you?

6            MS. RYAN:  She wants to -- she won't let DOC do the

7    investigation, which is what the AR that Ms. Victoroff's

8    affidavit -- sworn, signed affidavit says --

9            THE COURT:  Wait, so I'm dealing with discovery

10   issues.

11           MS. RYAN:  -- has to happen.

12           THE COURT:  I'm not dealing with the merits of the

13   case.  What discovery issues do you have?

14           MS. RYAN:  Exactly.  So the issue is, I cannot get

15   any discovery on what did happen here with these records.

16   Something did.

17           THE COURT:  Why can't you?  I don't understand.

18           MS. RYAN:  What still hasn't been answered by

19   Ms. Colony is exactly where did she get the records, two

20   banker boxes full.  Why were they held for months with nobody

21   seeing them, why were they paper, brought to you as paper

22   when I know for a fact that my digital records have been

23   given to every physician that I have retained since I left

24   parole.

25           Did your client or did she not?  Why are they

1    sporadic?  Why are they not in sequence?  They are not in the

2    format of the medical records custodian because they don't

3    match anything that the medical records custodian has given

4    to everybody else.  Where did you get the files that are

5    sensitive information for LSI classifications, mental health?

6    All of those things that have absolutely nothing to do with,

7    quote, medical records which you continue to say that you

8    have.

9              THE COURT:  So isn't this the same issue that I

10    said we're going to move on from.

11              MS. RYAN:  We are.

12              MS. COLONY:  Yes, Your Honor, that specific issue

13    you have addressed that there will be no more contention over

14    my office's receipt of the records and how that happened and

15    whether that was proper.  I do acknowledge that is the way I

16    interpret Claims 5 and 6, that it's just more of her

17    objection, another way for her to express her objection to

18    the fact that my office obtained her records.

19              And I guess if that conflicts me out as if these

20    claims are stated against me or I'm conflicted out as a

21    witness, I don't -- that seems to be what she is suggesting.

22              THE COURT:  Well, that's up to Judge Krieger.  So

23    nobody is entitled to create an issue that will disqualify an

24    attorney as part of the discovery process.  We can't stop

25    them in the first instance of trying to claim that, but there

1   are certainly dispositive motions you can bring that would

2   resolve that issue.

3           I don't know how to handle that at the moment

4   because, again, it's Judge Krieger's case, it's not my case.

5   So I think you'll just have to file a dispositive motion

6   at -- well, you can do that any time, you don't have to wait

7   until the dispositive deadline.

8           And if she -- if Ms. Ryan thinks that you're

9   disqualified, again, we have means of raising that to the

10  Court.  So those kind of things have to be done on motion.

11  It's not something that I would ever decide, even if I could,

12  in an oral record in a hearing like this because they're too

13  important.  So --

14          MS. COLONY:  Well, and I think she's referencing

15  discovery that she has served that seem directed to those two

16  claims, and the majority, if not the entirety, of the

17  discovery request seeks attorney/client and work product.

18  How I obtain the documents, who I talk to, who -- that's none

19  of her business.

20          THE COURT:  You assert the privilege.

21          MS. COLONY:  And I did.  I've asserted the

22  privilege.  I know she's very frustrated with that.

23          THE COURT:  Okay.

24          MS. RYAN:  And I've ended my frustration today.

25          THE COURT:  Okay.

76

```
 1          MS. RYAN:  This is the document that makes up the

 2    basis that I didn't get to you.  If I can have you take a

 3    look at.  Hilary Victoroff's signature, it's a sworn

 4    affidavit that says she absolutely will not do or engage in

 5    what had happened in Claims Number 5 and 6.

 6          And so all of this ends today.  Ms. Colony doesn't

 7    have to worry about me talking to her about any of it because

 8    I am filing my motion for contempt, the Court will deal with

 9    that in the due process that it is.  She states that she has

10    given me everything.  The Court has taken her word, and so

11    that's the end of it until something changes in the due

12    process possibly of the contempt motion.

13          THE COURT:  Is this a document everybody signs as

14    an employee?

15          MS. RYAN:  Yes.

16          MS. COLONY:  That's correct, Your Honor.

17          THE COURT:  Okay.  Well, it's not an affidavit, it

18    just --

19          MS. COLONY:  Right.  It said they're required to --

20          THE COURT:  It's not even signed under oath, it's

21    just a statement acknowledging application of certain

22    policies and rules.

23          MS. COLONY:  Right.

24          MS. RYAN:  Right.

25          MS. COLONY:  That's correct.
```

1            THE COURT:  Okay.

2            MS. COLONY:  I will add that even though I am not

3    obligated to do so, I have more than once informed Ms. Ryan

4    that Ms. Victoroff had nothing to do with the transfer of her

5    records from CDOC to my office.  Ms. Victoroff was not

6    involved in that in any way, so I --

7            THE COURT:  Okay.

8            MS. COLONY:  -- I don't know why the issue

9    continues.

10           MS. RYAN:  To finish, at that point now there is no

11   investigation through 950-02.  I'm clear with parole.  I did

12   obey the direct order from DOC by going directly to Director

13   Williams, and Director William and DOC, my parole, back to

14   them, she tried, she tried to obey your AR.  You wouldn't

15   allow it, the attorney wouldn't allow it.  We're considering

16   Ryan to be clear, she's not at fault.

17           THE COURT:  But Ms. Ryan, again, I'm dealing with

18   discovery issues.  What does this have to do with anything I

19   can issue an order on?

20           MS. RYAN:  Am I free to take my evidence that I

21   consider to be evidence that validates Claims Number 5 and 6

22   to the Department of Regulatory Agency State Nursing Board

23   for investigation.

24           THE COURT:  That's something I absolutely can't

25   answer.  I have no idea and I wouldn't answer it if I knew

78

1   the answer.

2           MS. RYAN:  Okay.

3           THE COURT:  So I have to deal with the issues that

4   are within my jurisdiction, so.

5           MS. RYAN:  Then my intent, Ms. Colony --

6           THE COURT:  Wait, no, no, no.

7           MS. RYAN:  -- is to do that.

8           THE COURT:  But that has -- again, that question to

9   me doesn't have anything to do with discovery.  So do you

10  have anything with regard to discovery that remains to be

11  discussed?

12          MS. RYAN:  At this point on Claims Number 5 and 6,

13  until an investigation is complete, Ms. Colony has completed

14  her end of discovery that she feels.  If I find -- if an

15  investigation finds any more, then I understand I'm capable

16  of bringing that to the Court and saying, Here you go --

17          THE COURT:  Right.

18          MS. RYAN:  -- this is what the nursing board turned

19  up and this is what I would like to do with Claims 5 and 6.

20  Otherwise, we are completely, totally done.

21          THE COURT:  Okay.  So just to reiterate the

22  overarching rule regarding how we proceed in court, cases are

23  won on the facts of the law and I would not look favorably on

24  any further contentious conduct.  Discovery is supposed to be

25  a cooperative process where parties ask for information, the

79

1    other side provides it.  If they don't provide it, they say

2    they don't have it, or they object, and then I handle those

3    objections.

4            These are the processes we're going to have to

5    engage in in this lawsuit, but I certainly don't want to see

6    starting on October 7 of 2019 any more inappropriate or

7    scandalous allegations.  Those have got to cease.  They would

8    be the subject of punitive court order if I see that again.

9            Okay.  Anything further, Ms. Ryan?

10           MS. RYAN:  Something with regard to the way, the

11   Friday filings were made electronically with Ms. Colony, and

12   I don't know if this is something that -- I don't think the

13   State has any interest in it.  She obviously just filed

14   straight through without doing Level 1.

15           THE COURT:  What Friday?

16           MS. RYAN:  On her filings of Friday where she

17   exhibited -- she put all of her exhibits in, the motion for

18   stay and protective order, et cetera.

19           THE COURT:  Okay.

20           MS. RYAN:  It's a -- it's something that -- an

21   observation that I would like to direct to Mr. Kennedy to see

22   what his view is on it.

23           My view on it is I -- I don't have any control over

24   how you all file to CMECF.

25           THE COURT:  Ms. Ryan, direct your comments to me,

1    please.

2            MS. RYAN:  Okay, but the bottom line with that is

3    that we are under a protective order and there is nothing in

4    this case that has even completed discovery yet, that has

5    anything concluded yet, and to -- I filed everything as Level

6    1 for the parties to be able to look at.

7            The reason that I do that is because I have been

8    getting a lot of help from the pro se clinic and external

9    attorneys, two -- two firms that are exceptionally familiar

10   currently, past with CHP.

11           This case, to everyone's knowledge that they can

12   come up with, they didn't reason know that HCPF 1406 existed.

13   They didn't even know of the inmate catastrophic Medicaid

14   provision.  They all have researched that law and very

15   thoroughly explained to me what the law says and the solidity

16   of my case.

17           THE COURT:  Wait.  Are you trying to say that the

18   Government is -- or any of the defendants are filing

19   documents that should have been restricted that aren't?

20           MS. RYAN:  No.  I think that -- Ms. Colony, all of

21   them can file however they wish, but there is a dual edged

22   sword there.  When you file documents that even though they

23   don't say confidential because they're not medical records,

24   you are putting out into the stratosphere a foundation of

25   this case.  For example --

1           THE COURT:  Well, wait a second, Ms. Ryan, we don't

2    have star chamber proceedings in the United States.

3    Everything that is filed is presumably open to the public,

4    the public gets to look at what we do.

5           MS. RYAN:  All right.

6           THE COURT:  Only if you had a legal reason to

7    restrict a document can you even do that so all these

8    proceedings are open.  That's just the way the lawsuit is.

9    It has been that way since we were founded.  What are you

10   saying?  I don't know what you're saying.

11          MS. RYAN:  What I am -- then let me -- let me

12   finish it.  I will stop worrying about the fact that this

13   case can become the poster child for are numerous inmate

14   cases just based on the release out into the stratosphere of

15   Jennifer Mix's CV materials.  No one has ever identified that

16   CHP is tied to -- whether they do it themselves or it's by

17   their contract or whatever, is responsible for conducting

18   business according to federal regulation -- to all

19   legislation, all health plans, state and federal.  And that

20   is what Jennifer Mix's documents do

21          THE COURT:  Again, I can't -- I can only deal with

22   discovery issues.

23          MS. RYAN:  And so -- yes.

24          THE COURT:  Do you have anything further with

25   regard to discovery?

82

1          MS. RYAN:  If -- would you please consider not

2     putting those materials out there without some level of

3     caution, because I want no more media contacting me.  I am

4     not here for this case to be blown up --

5          THE COURT:  Okay, I don't have this discussion in

6     front of me.  You guys can talk about that.  That has nothing

7     to do with me.  You can ask her whatever you want, but again,

8     do it professionally, with no --

9          MS. RYAN:  All right.

10          THE COURT:  -- harassment.  We'll be in recess.

11          (Whereupon, the within hearing was then in

12     conclusion at 12:30 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

83

```
 1                  TRANSCRIBER'S CERTIFICATION

 2   I certify that the foregoing is a correct transcript to the

 3   best of my ability to hear and understand the audio recording

 4   and based on the quality of the audio recording from the

 5   above-entitled matter.

 6

 7   /s/ Dyann Labo                  October 23, 2019

 8   Signature of Transcriber              Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```