Shawnee Ryan 10/18/2019
SHAWNEE RYAN v. CORRECTIONAL HEALTH PARTNERS, ET AL.



EXHIBIT
A-2

1        IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO

2
    Civil Action No. 18-cv-00956-MSK-MEH
3

4
    VIDEOTAPE DEPOSITION OF:  SHAWNEE RYAN
5                               October 18, 2019

6
    SHAWNEE RYAN,
7
    Plaintiff,
8
    v.
9
    CORRECTIONAL HEALTH PARTNERS, JENNIFER MIX, HILARY
10  VICTOROFF, N.P., and LAURA SOMMERSCHIELD, N.P.,

11  Defendants.

12
                    PURSUANT TO NOTICE, the videotape
13  deposition of SHAWNEE RYAN was taken on behalf of the
    Defendants Hilary Victoroff, N.P. and Laura
14  Sommerschield, N.P. at 901 19th Street, Denver,
    Colorado 80294, on October 18, 2019, at 9:07 a.m.,
15  before Sandra L. Bray, Registered Diplomate Reporter,
    Certified Realtime Reporter, and Notary Public within
16  Colorado.

17

18

19

20

21

22

23

24

25

H+G  Hunter + Geist, Inc.  800.525.8490  scheduling@huntergeist.com
     Court Reporting, Legal Videography, and Videoconferencing

```
 1                A P P E A R A N C E S

 2   Appearing Pro Se:

 3              SHAWNEE RYAN
               3531 South Logan Street
 4             Number 189
               Englewood, Colorado 80113
 5

 6   For the Defendants Correctional Health Partners and
     Jennifer Mix:
 7
               EDMUND MARTIN KENNEDY, ESQ.
 8             Hall & Evans, L.L.C.
               1001 17th Street
 9             Suite 300
               Denver, Colorado 80202
10

11   For the Defendants Hilary Victoroff, N.P. and Laura
     Sommerschield, N.P.:
12
               AMY C. COLONY, ESQ.
13             Office of the Attorney General
               130 Broadway
14             10th Floor
               Denver, Colorado 80203
15

16   Also Present:

17             Magistrate Michael E. Hegarty
               John Jensen, Videographer
18

19

20

21

22

23

24

25
```

14:59:13   1                    THE VIDEOGRAPHER:  Back on the record.

14:59:19   2    The time is 2:59 p.m.

14:59:21   3                    MS. COLONY:  I think that concludes my

14:59:24   4    questions, and I will turn things over to Mr. Kennedy.

14:59:29   5                         EXAMINATION

14:59:29   6    BY MR. KENNEDY:

14:59:32   7           Q.    Good afternoon, Ms. Ryan.

14:59:34   8           A.    Good afternoon.

14:59:34   9           Q.    We've met many times.

14:59:36  10           A.    Yes.

14:59:36  11           Q.    Just for the record, I'm Ed Kennedy.  I

14:59:38  12    represent CHP and Dr. Mix in this case.

14:59:41  13           A.    Yes.

14:59:41  14           Q.    Earlier, you testified that you're still

14:59:45  15    looking to get the bone transplant, correct, bone

14:59:52  16    marrow?

14:59:52  17           A.    Well, both types of transplant are bone

14:59:56  18    marrow transplants.

14:59:58  19           Q.    Okay.

14:59:58  20           A.    One is a stem cell transplant where they

15:00:03  21    use your own cells so your body can't reject them, so

15:00:08  22    it eliminates a lot of problems.  I think the

15:00:11  23    technology is about 15 years old now, and it's highly

15:00:15  24    successful; and it was successful in my case.

15:00:19  25                    When that fails, your next

15:00:24  1  recommendation is an allogenic transplant.  Stem cells

15:00:30  2  are called analogous, and allogenic is a marrow donor.

15:00:36  3  And you get a donor match through the match registry,

15:00:37  4  and you go through the old-fashioned way of getting a

15:00:40  5  bone marrow transplant.

15:00:41  6          Q.   Okay.  Thank you for that.  Why I asked

15:00:46  7  that question, the claims you have against my clients,

15:00:49  8  CHP and Dr. Mix, is for the denial of the stem cell

15:00:53  9  transplant?

15:00:54  10         A.   It's for denial -- at the time -- they

15:00:56  11  don't decide --

15:00:57  12         Q.   Which one.

15:00:59  13         A.   -- what you have until you successfully

15:01:02  14  get to a point with the first phase, which is the

15:01:04  15  chemotherapy phase.  They have to get your levels to a

15:01:09  16  certain point.  And as I've tried to say, it's a

15:01:13  17  juggling thing in my case because of both diseases,

15:01:18  18  which are interactive with each other.  So it was

15:01:20  19  finally determined in the workup that was done in --

15:01:24  20  there was the DTPACE, both of them, and the

15:01:28  21  neutropenic fever that lasted into, let's just say,

15:01:33  22  the end of March, and I believe that my transplant

15:01:36  23  workup was done, finally consented to by May 1st.  And

15:01:40  24  my actual stem cells were harvested during that time.

15:01:45  25  They take them from your body.

15:01:47   1          Q.    I appreciate it.  We're kind of running

15:01:50   2    out of time.  So I'm just -- I might have asked a bad

15:01:54   3    question.

15:01:54   4          A.    No, you're fine.

15:01:55   5          Q.    But my question is what you've already

15:01:57   6    talked about -- the stem cell transplant, your claims

15:02:03   7    against my client is that they denied that transplant?

15:02:06   8          A.    They denied the -- my claims are that

15:02:09   9    they denied the second phase treatment of a

15:02:12   10   transplant.

15:02:12   11         Q.    Okay.  The transplant you received in

15:02:15   12   June 2007 that you have testified was paid for by

15:02:20   13   Medicaid --

15:02:21   14         A.    Yes.

15:02:21   15         Q.    -- was that what you wanted from my

15:02:24   16   clients, and they denied that from you?

15:02:26   17         A.    Yes.

15:02:26   18         Q.    That's what I'm trying to get at from

15:02:29   19   you.  Is the transplant you did receive in June 2017,

15:02:32   20   my clients denied that transplant for you, and that is

15:02:35   21   the basis of your claim?

15:02:36   22         A.    Prior to 2017, and the other part to

15:02:41   23   that answer -- and I will be quick -- if you clearly,

15:02:46   24   just concisely can focus on the complaint itself, your

15:02:49   25   clients are not charged with anything to do with

15:02:53    1    multiple myeloma and the chain deposition disease.

15:02:57    2            Q.    Right.  And that's all I want to get at.

15:02:59    3    We're talking about the transplant?

15:03:04    4            A.    We're talking about transplant and the

15:03:06    5    extended damages because of chemotherapy because of

15:03:10    6    denials.

15:03:11    7            Q.    On Page 9 of your complaint, the second

15:03:14    8    bullet point, you describe what CHP -- and I assume

15:03:21    9    Dr. Mix -- what they do, which basically it says,

15:03:24    10   "Provides insurance and staffing services to various

15:03:28    11   contracted correctional entities within the State of

15:03:30    12   Colorado and nationwide."

15:03:33    13           A.    And you're on Page 9.

15:03:35    14           Q.    9, second bullet point.  And it's kind

15:03:38    15   of halfway through that bullet point I just read,

15:03:40    16   which starts with, "Provides insurance and staffing

15:03:44    17   services to various contracted correctional entities

15:03:47    18   within the State of Colorado and nationwide," correct?

15:03:50    19           A.    "Fully represents themselves publicly."

15:03:53    20           Q.    I want to get what they're doing.

            21           A.    Yes.

15:03:54    22           Q.    I understand what the company is.  In a

15:03:59    23   previous complaint, in your third amended complaint,

15:04:02    24   you used language that said that CHP and Dr. Mix were

15:04:08    25   third-party administrators.  Do you remember that?

15:05:58    1    have very limited time.

15:06:00    2           A.    Okay.

15:06:00    3           Q.    I don't care what the Court did.  I

15:06:02    4    don't care what the Court orders out there.  I don't

15:06:05    5    care anything about that.  What I care about is I'm

15:06:07    6    asking you to answer questions that you know.

15:06:09    7           A.    Okay.

15:06:09    8           Q.    If you don't know the answer, you don't

15:06:11    9    know the answer.  You don't need to go back to the

15:06:16   10    Court or anybody else.

15:06:16   11           A.    Got it.

15:06:17   12           Q.    If you don't know the answer, just tell

15:06:19   13    me you don't know, and I'll move on to my next

15:06:22   14    question.  And that's it.

15:06:23   15           A.    Got it.

15:06:24   16           Q.    So do you understand my client as being

15:06:26   17    a third-party administrator?  Yes or no?

15:06:28   18           A.    As I answered, no, I do not.

15:06:29   19           Q.    You still don't?

15:06:31   20           A.    I still don't.

15:06:32   21           Q.    What -- but you believe my client

15:06:34   22    processes claims for the Department of Corrections?

15:06:40   23           A.    As short and plain as I can make it,

15:06:43   24    they are the next step when it goes from either the

15:06:47   25    outside specialist or the DOC provider.  Everything is

Case No. 1:18-cv-00956-MSK-MEH  Document 217-2  filed 01/17/20  USDC Colorado  pg 8 of 22

Shawnee Ryan  10/18/2019                                        Page 202
SHAWNEE RYAN v. CORRECTIONAL HEALTH PARTNERS, ET AL.

15:06:50    1    sent to CHP, and CHP says this is the next step.  It's

15:06:57    2    either denied for whatever reason they give or it is

15:07:00    3    approved, and then it goes to the next step of going

15:07:03    4    through the processes of scheduling and payment and

15:07:05    5    all of those things, which is handled, of course, by

15:07:08    6    DOC.

15:07:09    7        Q.   Okay.  What happens -- do you know what

15:07:11    8    happens when a request is denied?

15:07:14    9        A.   When a request is denied, then you're

15:07:17   10    allowed to appeal.  Actually, the prisoner isn't

15:07:20   11    allowed.  It has to go through the provider.  And that

15:07:23   12    goes through a process with DOC.  It goes through a

15:07:26   13    process with CHP, and it comes back; and it's either a

15:07:31   14    yes or no.  If it's a no and the appeal is denied,

15:07:36   15    then the prisoner is out of luck.

15:07:37   16        Q.   Do you know how many -- do you know how

15:07:40   17    many appeals they can make?  Do you know how many

15:07:43   18    appeals can be made?

15:07:44   19        A.   I was told that an appeal by Dr. June

15:07:47   20    Scott, by Dr. Adelina Longoria, by Dr. Sujatha

15:07:54   21    Nallapareddy, and Dr. Burke signed on in February --

15:07:57   22    mid-February of 2015 and questioned me heavily on how

15:08:03   23    many times it had been asked for and why I wasn't in

15:08:05   24    transplant, and he took it from there.  And from that

15:08:10   25    point, I don't know.

15:08:11    1          Q.    Do you know that it's a three-step

15:08:15    2    process?  Yes or no?

15:08:16    3          A.    I absolutely know that.

15:08:18    4          Q.    Do you know who the final appeal is

15:08:21    5    determined by?

15:08:22    6          A.    The final say after CHP gives their

15:08:27    7    final say, which according to her own resume is

15:08:30    8    Dr. Mix, is done by the Department of Corrections.

15:08:35    9          Q.    Okay.  So you know it's a --

15:08:37   10          A.    And they handle the Medicaid part of

15:08:39   11    this.

15:08:39   12          Q.    Who handles the Medicaid part?

15:08:41   13          A.    DOC and the clinical nurse case manager.

15:08:44   14          Q.    Okay.  So you do understand that it is

15:08:47   15    appealed -- you get the initial request.  It's denied.

15:08:51   16    You can appeal that.  If that's denied, you can appeal

15:08:55   17    that one more time, and the Department of Corrections

15:08:59   18    makes the final determination?

15:09:01   19          A.    Yes.

15:09:03   20          Q.    What do you think the relationship is

15:09:06   21    between my clients, CHP and Dr. Mix, and Medicaid?

15:09:13   22          A.    As your records show, that you've got a

15:09:18   23    pile of right there, anything of mine that went

15:09:25   24    through CHP first that later DOC overrode and put into

15:09:34   25    Medicaid was denied first by CHP, and that's my

15:09:40    1    contention.  If they knew that Medicaid existed and

15:09:44    2    that I had such a long sentence and that this was

15:09:48    3    complex and very expensive, then why would you deny

15:09:56    4    it?  And it's very clearly documented, their wording

15:09:59    5    and who did it, within your records that you sent me.

15:10:02    6         Q.   So --

15:10:06    7         A.   So to answer your question, I believe

15:10:08    8    that DOC obviously has CHP in place to get their

15:10:14    9    viewpoint, their professional medical viewpoint, and

15:10:17   10    then that viewpoint is taken to CDOC; and CDOC is the

15:10:23   11    ultimate authority.

15:10:24   12         Q.   Yes.

15:10:25   13         A.   But it is based on what you say, your

15:10:27   14    clients say.

15:10:27   15         Q.   That's what you think.  Okay.

15:10:30   16         A.   Yes.

15:10:34   17         Q.   Do you believe my client is supposed to

15:10:36   18    work with Medicaid?

15:10:38   19         A.   I believe that your client has a duty

15:10:40   20    and a responsibility to live up to the way that they

15:10:43   21    present themselves and the way that they're

15:10:47   22    contracted.  I only have a partial contract.  It

15:10:50   23    didn't come through as a full contract.  And that is

15:10:53   24    the purpose of having them at all, is that DOC has

15:10:59   25    given them -- tasked them with a duty to say what is

| | | |
|---|---|---|
| 15:16:46 | 1 | Q. Okay. |
| 15:16:46 | 2 | A. I'm just stating for the record that |
| 15:16:48 | 3 | there are more. |
| 15:16:49 | 4 | Q. Let's go to CHP-Ryan 179 to 180, and I |
| 15:16:59 | 5 | want you to look at Page 180. |
| 15:17:04 | 6 | A. Page 179, you say? |
| 15:17:07 | 7 | Q. Every one of these authorizations, |
| 15:17:08 | 8 | there's two pages. |
| 15:17:09 | 9 | A. So we have -- I see. So you want me to |
| 15:17:11 | 10 | look at Page 180? |
| 15:17:13 | 11 | Q. 180. And this is what it says -- and |
| 15:17:18 | 12 | read along and make sure I'm reading correctly. It |
| 15:17:21 | 13 | says, "Denied, she was not a candidate for a |
| 15:17:24 | 14 | transplant at CBCI," which I believe is the Colorado |
| 15:17:28 | 15 | Blood Cell Institute? |
| 15:17:29 | 16 | A. Blood Cancer Institute. My apologies. |
| 15:17:34 | 17 | Q. "Per the CDOC they do not authorize |
| 15:17:38 | 18 | second opinions." Did I read that correctly? |
| 15:17:40 | 19 | A. You did. |
| 15:17:41 | 20 | Q. And that denial happened on |
| 15:17:44 | 21 | January 18th, 2016? |
| 15:17:44 | 22 | A. It did. |
| 15:17:45 | 23 | Q. And you disagree with that conclusion by |
| 15:17:48 | 24 | Dr. Mix? |
| 15:17:48 | 25 | A. Yes. |

15:17:48    1              Q.    You believe that they could have

15:17:52    2    authorized a second opinion.  You should have been

15:17:54    3    able to go see --

15:17:55    4              A.    No.

15:17:55    5              Q.    No?

15:17:57    6              A.    No.  I'm disagreeing with what they

15:17:59    7    said, that she was not a candidate for transplant at

15:18:02    8    CBCI.

15:18:03    9              Q.    Okay.

15:18:04   10              A.    When you pull all of the CBCI records,

15:18:07   11    you will find that they absolutely did recommend a

15:18:10   12    transplant, and it was -- again, we will go off into

15:18:15   13    something that Ms. Victoroff and Jaime Harrelson were

15:18:21   14    not charged with, down a whole nother winding path.

15:18:25   15              Q.    My question is simple.  You disagree

15:18:27   16    with Dr. Mix on this?

15:18:29   17              A.    I disagree with the way that they

15:18:31   18    stated -- I was not denied, and I was a candidate for

15:18:34   19    transplant.  It was not done at that time by CBCI.

15:18:39   20    And so there's much more to the story than there is

15:18:43   21    here.

15:18:43   22              Q.    I understand there's much more to the

15:18:45   23    story.  I understand that.

15:18:45   24              A.    So that's my answer.

15:18:47   25              Q.    Again, you disagree with Dr. Mix?

15:18:50   1          A.   I do.

15:18:52   2          Q.   Okay.  That's what I want.  So if we can

15:18:55   3   turn to Page 188 now, which would be the next -- it

15:18:59   4   would be Page 2 -- 187, 188 should be together.

15:19:03   5          A.   Yes.

15:19:04   6          Q.   And I'm going to read what Dr. Mix wrote

15:19:06   7   in that one.  Read along and make sure I read it

15:19:09   8   correctly for the record.

15:19:10   9          A.   Okay.

15:19:10  10          Q.   I'd have you read it, but I figure you'd

15:19:14  11   rather have me read it.

15:19:16  12          A.   I'm fine.  Either way.

15:19:17  13          Q.   It says, "Denied, she is currently

15:19:23  14   undergoing chemo with Dr. Burke at Rocky Mountain

15:19:27  15   Cancer Center.  She has seen University one time for

15:19:29  16   consultation.  The current plan is if she achieves

15:19:32  17   better remission she will be reevaluated for

15:19:36  18   transplant.  This will need to be at an in network

15:19:41  19   provider.  This has been discussed with Dr. Burke."

15:19:44  20               Did I read that correctly?

15:19:46  21          A.   You did.

15:19:47  22          Q.   And my question again is you don't agree

15:19:49  23   with Dr. Mix's decision there?

15:19:51  24          A.   I do not.

15:19:51  25          Q.   Okay.  You believe you should have

| | | |
|---|---|---|
| 15:30:58 | 1 | A.    No.   They have to wait until the |
| 15:30:59 | 2 | proteins go down because -- I mean, I could explain, |
| 15:31:04 | 3 | but -- it would certainly help you. |
| 15:31:07 | **4** | **Q.    Would it -- do you agree that you needed** |
| 15:31:09 | **5** | **to achieve better remission at this point?** |
| 15:31:11 | 6 | A.    At this point?  I was in complete |
| 15:31:16 | 7 | disagreement to go to carfilzomib.  I was within a |
| 15:31:20 | 8 | range, even though it was more of a high-risk range, |
| 15:31:23 | 9 | and my problem with the whole thing was, is that I had |
| 15:31:27 | 10 | so much difficulty for many years getting out two |
| 15:31:30 | 11 | times a week that getting out four times a week would |
| 15:31:34 | 12 | be near impossible.  So I didn't want to do a new |
| 15:31:38 | 13 | treatment. |
| 15:31:38 | **14** | **Q.    I understand that.  What I want to** |
| 15:31:42 | **15** | **get -- so do you believe you were in -- your remission** |
| 15:31:45 | **16** | **was sufficient enough to get the transplant in** |
| 15:31:48 | **17** | **September of 2016?** |
| 15:31:50 | 18 | A.    I do. |
| 15:31:50 | **19** | **Q.    Okay.  So you disagree with Dr. Mix that** |
| 15:31:54 | **20** | **she felt you needed better remission?** |
| 15:31:56 | 21 | A.    I do. |
| 15:31:57 | **22** | **Q.    Okay.** |
| 15:32:09 | 23 | THE DEPONENT:  Can I ask where the water |
| 15:32:11 | 24 | jug went to?  I can grab it. |
| 15:32:16 | 25 | MR. KENNEDY:  Let's go off the record. |

| | | |
|---|---|---|
| 15:32:19 | 1 | THE DEPONENT:  I don't want you to take |
| 15:32:20 | 2 | a break. |
| 15:32:21 | 3 | MR. KENNEDY:  I'm almost done anyway. |
| 15:32:28 | 4 | THE VIDEOGRAPHER:  Going off the record. |
| 15:32:30 | 5 | The time is 3:32 p.m. |
| 15:32:50 | 6 | (Discussion off the record.) |
| 15:33:03 | 7 | THE VIDEOGRAPHER:  Back on the record. |
| 15:33:05 | 8 | The time is 3:33 p.m. |
| 15:33:07 | 9 | Q.   (BY MS. COLONY)  Do you believe your |
| 15:33:11 | 10 | treating physicians in September of 2016 appealed this |
| 15:33:16 | 11 | denial up the chain that we already talked about? |
| 15:33:20 | 12 | A.   No, no.  At that point, my understanding |
| 15:33:23 | 13 | was that is they had pretty much given up. |
| 15:33:27 | 14 | Q.   So your treating physicians did not |
| 15:33:31 | 15 | appeal this to either the second level appeal or, more |
| 15:33:34 | 16 | importantly, didn't take it up with the Department of |
| 15:33:37 | 17 | Corrections? |
| 15:33:37 | 18 | A.   I also believe that -- because I know I |
| 15:33:42 | 19 | was overridden with my objection to being put through |
| 15:33:46 | 20 | a whole nother chemo drug of carfilzomib, the reason |
| 15:33:55 | 21 | they wanted it to be done was because it was more |
| 15:34:00 | 22 | optimum going into a transplant to have lower |
| 15:34:02 | 23 | proteins, and they felt that I needed -- even though I |
| 15:34:05 | 24 | was in range, I was still -- they wanted me to be even |
| 15:34:10 | 25 | lower.  As it turned out, the carfilzomib did not |

Case No. 1:18-cv-00956-MSK-MEH Document 217-2 filed 01/17/20 USDC Colorado pg 16
of 22

Shawnee Ryan 10/18/2019                                      Page 222
SHAWNEE RYAN v. CORRECTIONAL HEALTH PARTNERS, ET AL.

| 15:34:14 | 1 | work, and I never got below 10 percent, which was the |
| 15:34:17 | 2 | higher risk before you go into a transplant.  And |
| 15:34:20 | 3 | finally, they just, "Well, we'll do it at 10 percent," |
| 15:34:27 | 4 | which is what they could have done in September of |
| 15:34:29 | 5 | 2016.  But your life is in their hands, and that was |
| 15:34:34 | 6 | their diagnosis; and I trusted them.  There was no |
| 15:34:39 | 7 | reason to appeal -- |
| 15:34:40 | 8 | Q.  Okay. |
| 15:34:41 | 9 | A.  We would have appealed, I guess, if it |
| 15:34:44 | 10 | had been any sign of working.  It was the DPACE -- |
| 15:34:50 | 11 | DTPACE that brought me down -- I think it was about |
| 15:34:53 | 12 | 12 percent maybe in September of 2016. |
| 15:34:56 | **13** | **Q.  And they wanted to get you down below** |
| 15:34:59 | **14** | **10?** |
| 15:34:59 | 15 | A.  They wanted me down to 3 or 4, and it |
| 15:35:02 | 16 | was just . . . |
| 15:35:04 | **17** | **Q.  So did your doctors agree with Dr. Mix** |
| 15:35:07 | **18** | **then that you needed to get better remission?** |
| 15:35:09 | 19 | A.  No -- well, they wanted it.  That's why |
| 15:35:12 | 20 | they applied for transplant.  They put in for |
| 15:35:15 | 21 | transplant because I could have had it. |
| 15:35:16 | **22** | **Q.  Once she denied it with the explanation** |
| 15:35:19 | **23** | **that she believed that you needed to achieve better** |
|  | **24** | **remission, your doctors kind of agreed with her and** |
| 15:35:23 | **25** | **said, "Okay.  We'll try you some more, get you down,** |

Case No. 1:18-cv-00956-MSK-MEH Document 217-2 filed 01/17/20 USDC Colorado pg 17 of 22

Shawnee Ryan 10/18/2019                                    Page 223
SHAWNEE RYAN v. CORRECTIONAL HEALTH PARTNERS, ET AL.

| 15:35:24 | 1 | 3 percent would be better"? |
| 15:35:26 | 2 | A.   No.   She denied it because it was not an |
| 15:35:31 | 3 | in-network provider, and we were trying to get me to |
| 15:35:35 | 4 | University, which was the -- it's the optimum. |
| 15:35:38 | 5 | They're the best. |
| 15:35:39 | 6 | Q.   Okay. |
| 15:35:39 | 7 | A.   So that is why they didn't appeal it. |
| 15:35:42 | 8 | Q.   I don't want to argue with you.   That's |
| 15:35:44 | 9 | fine.   After your treating physicians got this denial |
| 15:35:47 | 10 | in September of 2016, it sounds like what you're |
| 15:35:50 | 11 | testifying to is that they talked to you about this |
| 15:35:53 | 12 | and decided that they were going to try to get you |
| 15:35:57 | 13 | down to a lower percentage rather than appeal this? |
| 15:36:03 | 14 | A.   I'm not trying to be argumentative, but, |
| 15:36:06 | 15 | again, we gave up.   Based on all of our experiences, |
| 15:36:12 | 16 | there is no way that we were going to be able in any |
| 15:36:15 | 17 | kind of a time frame to get anything done if this was |
| 15:36:21 | 18 | the position that Dr. Mix was taking.   It would need |
| 15:36:24 | 19 | to be done at an in-network provider.   She still was |
| 15:36:27 | 20 | very resilient -- very resistant towards not admitting |
| 15:36:35 | 21 | that a preauthorization under Medicaid could be done |
| 15:36:38 | 22 | and it could be done anywhere in the state of |
| 15:36:40 | 23 | Colorado. |
| 15:36:40 | 24 | Q.   But if you appealed this all the way up |
| 15:36:43 | 25 | to the Department of Corrections, they could have |

Case No. 1:18-cv-00956-MSK-MEH  Document 217-2  filed 01/17/20  USDC Colorado  pg 18
of 22

Shawnee Ryan  10/18/2019                                    Page 224
SHAWNEE RYAN v. CORRECTIONAL HEALTH PARTNERS, ET AL.

15:36:45    1   decided you could go out of network?

15:36:48    2           A.    Actually, I was.  I was writing letters.

15:36:50    3   I was in administrative processes, all of those

15:36:54    4   things, asking for it.

15:36:54    5           Q.    I want to stick to the point of you had

15:36:56    6   talked with your treating physicians.

15:36:58    7           A.    Yes.

15:36:58    8           Q.    And if they really felt strongly about

15:37:03    9   this, they could have appealed it, and Department of

15:37:06   10   Corrections could have let you go out of network?

15:37:09   11           A.    Anything is possible.

15:37:10   12           Q.    Right.  That's exactly what I'm saying.

15:37:12   13           A.    Anything is possible.

15:37:13   14           Q.    They could.  But your doctors, your

15:37:16   15   treating providers talked to you and determined that,

15:37:19   16   "Let's just try to get your remissions down.  Let's

15:37:23   17   try to get a lower percent.  Let's try to go that

15:37:26   18   route as opposed to getting the transplant right now"?

15:37:29   19           A.    Consolidated to your client's favor,

15:37:31   20   that is not exactly what we were discussing.  What we

15:37:36   21   were discussing --

15:37:37   22           Q.    Well, you already testified what they

15:37:39   23   discussed.

15:37:40   24           A.    Okay.  Mine's on the record.  Yours is

15:37:45   25   on the record.  They both sound totally different for

15:37:48    1    the same end result.

15:37:49    2            Q.   Okay.

15:37:49    3            A.   Okay?  All right.

15:37:51    4            Q.   **What you're saying is there was a**

15:37:52    5    **disagreement among you, your treating physicians, and**

15:37:55    6    **Dr. Mix?**

15:37:56    7            A.   I am not saying that at all.

15:37:58    8            Q.   **We all agree then?  Are they all in**

15:38:01    9    **agreement or disagreement?  Had to be one or the**

15:38:04   10    **other.  Did they all agree?**

15:38:05   11            A.   I disagreed with Dr. Mix.

15:38:07   12            Q.   **And what did your doctors believe?**

15:38:09   13            A.   My doctors believed we could go ahead

15:38:12   14    and do the transplant.  They wanted it at University.

15:38:15   15    That was not being given.  CDOC will rely on Dr. Mix's

15:38:20   16    opinion.  We had no good experiences with Dr. Mix and

15:38:24   17    CHP to that date.  So as an alternative, the route was

15:38:29   18    taken to try a new treatment plan to get me down even

15:38:33   19    lower and see.  Maybe it would have worked to where it

15:38:39   20    knocked everything down to zero.  We didn't know.  So

15:38:41   21    we did it as a backup.  We really had no viable

15:38:45   22    choice.

15:38:45   23            Q.   **Well --**

15:38:46   24            A.   They could have appealed, and they felt

15:38:49   25    that it just -- as I did, it absolutely -- based on --

| | | |
|---|---|---|
| 15:38:57 | 1 | at that point, let's see.  We're at 2016, fall of |
| 15:39:01 | 2 | 2016.  So, what, four years of dealing with this same |
| 15:39:07 | 3 | repeated mantra.  This was a new -- I will say this |
| 15:39:11 | 4 | was a new approach by Dr. Mix. |
| 15:39:13 | 5 | **Q.   But there are options to have, and your** |
| 15:39:16 | 6 | **doctors decided to take the option of trying to get** |
| 15:39:19 | 7 | **your percentage down?** |
| 15:39:21 | 8 | A.   As something that they -- a second |
| 15:39:23 | 9 | choice, not the most optimum. |
| 15:39:28 | 10 | **Q.   Have you ever personally -- do you have** |
| 15:39:31 | 11 | **any knowledge of any employee, including Dr. Mix, at** |
| 15:39:36 | 12 | **CHP that ever treated you?** |
| 15:39:37 | 13 | A.   Employee of CDOC ever treating me? |
| 15:39:41 | 14 | **Q.   CHP.** |
| 15:39:44 | 15 | A.   CHP.  CHP does not treat patients. |
| 15:39:44 | 16 | **Q.   Okay.  You know that.** |
| 15:39:46 | 17 | A.   Yes.  I have stated all along, as I do |
| 15:39:48 | 18 | in my complaint, they provide insurance and staffing |
| 15:39:51 | 19 | services. |
| 15:39:53 | 20 | **Q.   But they were never your medical** |
| 15:39:55 | 21 | **providers?** |
| 15:39:55 | 22 | A.   No. |
| 15:39:56 | 23 | **Q.   Okay.** |
| 15:39:56 | 24 | A.   You will find in your notes that they do |
| 15:39:58 | 25 | have access to all medical records and numerous times |

| | | |
|---|---|---|
| 15:41:22 | 1 | to Rocky Mountain Cancer.  So I have always believed |
| 15:41:26 | 2 | that the same thing exists since it's all |
| 15:41:30 | 3 | electronically transferred.  That if Dr. Mix is |
| 15:41:33 | 4 | saying, "I need to see more records," which she very |
| 15:41:37 | 5 | rarely did, that it would go through that electronic |
| 15:41:42 | 6 | system, and then they would be electronically |
| 15:41:45 | 7 | transmitted back if she didn't already have access to |
| 15:41:48 | 8 | them. |
| 15:41:49 | 9 | The other half of that -- |
| 15:41:51 | **10** | Q.    But you -- |
| 15:41:52 | 11 | A.    The other half of that is that all of |
| 15:41:56 | 12 | those stacks in there of denials for all of the |
| 15:41:59 | 13 | residual effects of being on chemo for so long, it was |
| 15:42:05 | 14 | blatantly obvious, glaringly obvious that damages to |
| 15:42:10 | 15 | my body were occurring because every single thing, |
| 15:42:14 | 16 | from a prescription, the doses, all the stuff, has to |
| 15:42:18 | 17 | go through CHP for approval.  And so six years is a |
| 15:42:23 | 18 | long time.  They should know me by now. |
| 15:42:28 | **19** | Q.    So you don't agree with the pace upon |
| 15:42:31 | **20** | which your treatment was being done? |
| 15:42:33 | 21 | A.    I don't agree with the denials and how |
| 15:42:37 | 22 | they went about getting them.  I think that they had a |
| 15:42:39 | 23 | duty to follow through.  If they asked for medical |
| 15:42:43 | 24 | records on something and they didn't get them after a |
| 15:42:45 | 25 | certain period of time, I would assume that a |

15:42:47    1    responsible corporate entity of that caliber would

15:42:51    2    have some kind of a tickler that popped up to say,

            3    "Hey, we haven't gotten Ryan's medical records yet and

15:42:56    4    this is still pending authorization," and then put out

15:42:57    5    another request and/or just simply pick up the phone

15:43:01    6    and say, "Where are Ryan's documents?  I need to

15:43:04    7    review them because I think we have a serious issue on

15:43:08    8    our hands."

15:43:09    9         Q.   So it's your position, as I understand

15:43:13   10    it, that you believe it's CHP and Dr. Mix's

15:43:18   11    responsibility, not your treating physician's

15:43:21   12    responsibility, to make sure that the treatment they

15:43:24   13    want continues and doesn't get lost in the shuffle of

15:43:26   14    things?  It's Dr. Mix and CHP, not your treating

15:43:29   15    physicians, that should have that responsibility?

15:43:31   16         A.   No.  I believe that they are contracted

15:43:33   17    with each other, and they work so closely with each

15:43:38   18    other.  Dr. Mix's own words in her own documentation

15:43:43   19    given to me by you, she mentors them, she attends

15:43:48   20    their staffings, she provides guidance.  It is very

15:43:54   21    explicitly stated that they are commingled together,

15:43:58   22    and I believe that both of them have a duty.

15:44:00   23              So where that falls apart,

15:44:04   24    unfortunately, the Department of Corrections gets to

15:44:06   25    skate scot-free because they have immunity.