

**EXHIBIT A-5**

**Ⓐ** Neutral
As of: January 15, 2020 7:53 PM Z

## Denison v. Corr. Health Partners

United States District Court for the District of Colorado

August 26, 2015, Decided; August 26, 2015, Filed

Civil Action No. 13-cv-01584-PAB-MEH

**Reporter**
2015 U.S. Dist. LEXIS 113874 *

JEREMY NECHOL DENISON, Plaintiff, v.
CORRECTIONAL HEALTH PARTNERS, Utilization
Mgmt Comm., NEAL LOUSBERG, CSP Medical
Provider, and KATHLEEN BOYD, CSP Medical
Provider, Defendants.

**Prior History:** Denison v. Corr. Health Partners, 2015
U.S. Dist. LEXIS 113875 (D. Colo., Mar. 18, 2015)

## Core Terms

Recommendation, summary judgment, deliberate
indifference, settlement agreement, magistrate judge,
medication, genuine, appointment, objects, medical
need

**Counsel:** [*1] Jeremy Nechol Denison, Plaintiff, Pro se,
Ordway, CO.

For Correctional Health Partners, Utilization Mgmt
Comm., Defendant: Andrew David Ringel, Christina
Shavon Gunn, Hall & Evans, LLC-Denver, Denver, CO.

For Jill Lampela, CSP HSA, Neal Lousberg, CSP
Medical Provider, Richard Hodge, CSP Medical
Provider, Mark Wienpal, CSP Medical Provider,
Kathleen Boyd, CSP Medical Provider, Joseph Wright,
CSP Medical Provider, Defendants: Nicole S. Gellar,
Colorado Attorney General's Office, Denver, CO.

**Judges:** PHILIP A. BRIMMER, United States District
Judge.

**Opinion by:** PHILIP A. BRIMMER

## Opinion

### ORDER

This matter is before the Court on the Recommendation
of United States Magistrate Judge Michael E. Hegarty
("Recommendation") filed on March 18, 2015 [Docket
No. 125]. The magistrate judge recommends that the
Court grant the Motion for Summary Judgment [Docket
No. 101] filed by defendant Correctional Health Partners
("CHP") and the Motion for Summary Judgment filed by
defendants Boyd and Lousberg [Docket No. 103]. The
Recommendation stated that objections to the
Recommendation must be filed within fourteen days
after its service on the parties. See 28 U.S.C. §
636(b)(1)(C). The recommendation was served on
March 19, 2015, and Plaintiff filed objections to [*2] the
Recommendation on April 13, 2015. Although plaintiff's
objections were untimely, in the interest of justice, the
Court will consider them.

The Court will "determine de novo any part of the
magistrate judge's disposition that has been properly
objected to." Fed. R. Civ. P. 72(b)(3). In the absence of
a proper objection, the Court may review a magistrate
judge's recommendation under any standard it deems
appropriate. See Summers v. Utah, 927 F.2d 1165,
1167 (10th Cir. 1991); see also Thomas v. Arn, 474 U.S.
140, 150, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985) ("[i]t

does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings"). An objection is proper if it is specific enough to enable the Court "to focus attention on those issues — factual and legal — that are at the heart of the parties' dispute." *United States v. 2121 East 30th Street , 73 F.3d 1057, 1059 (10th Cir. 1996)*. In light of plaintiff's pro se status, the Court construes his filings liberally. See *Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)*; *Hall v. Bellmon, 935 F.2d 1106, 1110 & n.3 (10th Cir. 1991)*.

## I. STANDARD OF REVIEW

Summary judgment is warranted under *Fed. R. Civ. P. 56* when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; see *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50, 105 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition **[*3]** of the claim. *Wright v. Abbott Labs., Inc., 259 F.3d 1226, 1231-32 (10th Cir. 2001)*. Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cnty. of Denver, 423 F.3d 1192, 1198 (10th Cir. 2005)*. An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, 119 F.3d 837, 839 (10th Cir. 1997)*.

## II. ANALYSIS

Plaintiff is currently incarcerated at the Arkansas Valley Correctional Facility in Ordway, Colorado. Plaintiff initiated this action on June 17, 2013, alleging that defendants breached a settlement agreement that assured plaintiff of access to medical providers and that defendants subsequently violated his *Eighth Amendment* rights against cruel and unusual punishment. See Docket No. 1. On April 28, 2014, the Court accepted the April 3, 2014 Recommendation of United States Magistrate Judge Michael E. Hegarty and dismissed many of plaintiff's original claims. See Docket No. 64 (accepting Docket No. 59). Plaintiff's remaining claims are: (1) a claim for violation of the *Eighth Amendment* against defendant Boyd for her alleged failure in August 2012 to request an MRI for plaintiff's back problem, (2) a claim for breach of contract against

defendant Boyd, (3) a claim for violation of the *Eighth Amendment* against defendant Lousberg for discontinuing plaintiff's prescription for the **[*4]** drug gabapentin in July 2012, see Docket No. 1 at 2, and (4) a claim for violation of the *Eighth Amendment* against CHP. Further relevant facts are set forth in detail in the Recommendation, see Docket No. 125 at 2-20, and will not be recited here except as relevant to the Court's de novo review.

## A. Plaintiff's *Eighth Amendment* Claims

The magistrate judge recommends granting summary judgment as to plaintiff's *Eighth Amendment* claims against defendants Boyd, Lousberg, and CHP. The *Eighth Amendment's* ban on cruel and unusual punishment is violated if a defendant's "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain." *Self v. Crum, 439 F.3d 1227, 1230 (10th Cir. 2006)* (quoting *Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)*). A claim for deliberate indifference has both an objective and a subjective component. To satisfy the objective component, a prisoner must demonstrate that his medical need is "objectively, sufficiently serious." *Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)*. A medical need is sufficiently serious if "it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999)* (citation omitted). The magistrate judge found that plaintiff's condition satisfies the objective component, see Docket No. **[*5]** 125 at 27-28, 31, and no defendant objected to that finding. The Court has reviewed this aspect of the Recommendation to satisfy itself that there is "no clear error on the face of the record."[1] *Fed. R. Civ. P. 72(b)*, Advisory Committee Notes.

To satisfy the subjective component of deliberate indifference, a prisoner must demonstrate that the defendant acted with a "sufficiently culpable state of mind." *rmer. 511 U.S. at 834.* "'[D]eliberate indifference' is a stringent standard of fault." *Bd. of Cnty.*

---

[1] This standard of review is something less than a "clearly erroneous or contrary to law" standard of review, *Fed. R. Civ. P. 72(a)*, which in turn is less than a de novo review. *Fed. R. Civ. P. 72(b)*.

2015 U.S. Dist. LEXIS 113874, *5

_Comm'rs v. Brown, 520 U.S. 397, 410, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)_. "[T]he subjective component is not satisfied, absent an extraordinary degree of neglect." _Self, 439 F.3d at 1232_. Instead, the defendant must "know[] of and disregard[] an excessive risk to inmate health or safety." _Farmer, 511 U.S. at 837_. That is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." _Id._

### 1. Defendant Boyd

Plaintiff objects to the Recommendation's finding that no genuine issue of material fact exists concerning whether defendant Boyd disregarded a substantial risk of harm to plaintiff when she allegedly denied plaintiff's [*6] request for approval of an MRI in August 2012.[2] Docket No. 128 at 3. Specifically, plaintiff complains that defendant Boyd's notes from her examination of plaintiff in August 2012, in which she observed that plaintiff walked to the medical department with a "steady gait" and was in "no apparent distress," _see_ Docket No. 110-1 at 71, were "much too cursory to determine any medical need, let alone one necessitating the medical need for an MRI." Docket No. 128 at 3.[3] Plaintiff's

---

[2] The parties dispute whether plaintiff asked defendant Boyd about approval of an MRI on August 6, 2012. Plaintiff alleges that he did so, _see_ Docket No. 1 at 8, ¶ 17, and defendant Boyd did not recall the request. _See_ Docket No. 103 at 12-13, ¶ 73. For the purposes of this order, the Court assumes such a request was made.

[3] Plaintiff also argues that defendant [*7] Boyd demonstrated deliberate indifference based on her conduct after CHP denied an August 2011 request for an MRI that defendant Boyd made on plaintiff's behalf. _See_ Docket No. 128 at 3. In that instance, defendant Boyd requested an MRI and noted in the request that the request was originally made by another of plaintiff's treaters, Dr. Koons, and that the request was originally approved but the MRI was never performed. _See_ Docket No. 110-1 at 63-64. CHP denied defendant Boyd's request for an MRI in September 2011 and requested "notes with a physical exam." Docket No. 102-3 at 4. Defendant Boyd stated that, following CHP's denial, she was unable to justify a request for an MRI of plaintiff based on her own examinations of him. Docket No. 103-3 at 7, ¶ 47. Plaintiff argues that defendant Boyd should have either referred CHP to Dr. Koons' earlier notes or conducted an examination and submitted notes of her own to secure the MRI. Docket No. 128 at 3. Plaintiff's arguments relate to defendant Boyd's conduct in August 2011, and those claims have already been dismissed. _See_ Docket

argument is insufficient to create a genuine dispute of fact as to the subjective component of deliberate indifference. An "allegation that [an] examination was cursory," without more, "does not sufficiently allege deliberate indifference rather than mere medical malpractice." _Duffield v. Jackson, 545 F.3d 1234, 1239 (10th Cir. 2008)_. As such, the Court finds no error with respect to this aspect of the Recommendation.

### 2. Defendant Lousberg

Plaintiff objects to the Recommendation's finding that no genuine dispute of fact exists concerning whether defendant Lousberg violated plaintiff's _Eighth Amendment_ rights when he discontinued plaintiff's prescription for the medication gabapentin (brand name Neurontin). Defendant Lousberg discontinued plaintiff's gabapentin prescription after reports from the nursing department that plaintiff had been hoarding the medication. Docket No. 110-1 at 70. Defendant Lousberg further noted that he considered gabapentin to be "nonessential medication" for plaintiff. _Id._ The Recommendation found that plaintiff's complaints about defendant Lousberg amounted to a mere difference of opinion, which cannot sustain a deliberate indifference claim. Docket No. 125 at 32-33. Plaintiff states that defendant Lousberg knew that no other treatment would effectively treat his pain and argues that a dispute of fact exists as to whether defendant Lousberg believed in good faith that plaintiff was hoarding the medication. Docket No. 128 at 5. The Court overrules plaintiff's objection. Plaintiff points to no evidence other than his own statements that no other treatments were effective [*9] and identifies no evidence to suggest that defendant Lousberg did not believe in good faith that plaintiff was hoarding his medication. "In the absence of any evidence showing that plaintiff's medication was discontinued for a reason other than suspected abuse, plaintiff has failed to raise an issue of fact requiring resolution by a jury." _Atakpu v. Lawson, 2008 U.S. Dist. LEXIS 125099, 2008 WL 5233467 at *11 (S.D. Ohio Dec. 11, 2008)_; _see also Shea v. Wheeler, 2001 U.S. Dist. LEXIS 26632, 2001 WL 34376846 at *6 (W.D. Wisc. June 19, 2001)_ (granting summary judgment on _Eighth Amendment_ claim where healthcare provider relied on incidents that "indicate misuse of medication").

---

No. 64 at 2. Because these objections do not relate to defendant Boyd's conduct in August 2012, the Court does [*8] not consider them.

Case No. 1:18-cv-00956-MSK-MEH  Document 217-4  filed 01/17/20  USDC Colorado  pg 4 of 57

about:blank

Page 4 of 5

2015 U.S. Dist. LEXIS 113874, *8

### 3. CHP

Plaintiff objects to the Recommendation's finding that CHP could not be held responsible for the alleged tortious acts of its employee on a *respondeat superior* theory. Docket No. 128 at 8-10. "*[Section] 1983* liability for an entity cannot be predicated on *respondeat superior*," *Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1211 (10th Cir. 2007)* (citing *City of Canton v Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989))*. Rather, liability for an entity under *§ 1983* must be based on a "single decision by policymakers," *id. at 1212*, or an entity's wrongful policy or custom. *See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006)*. Plaintiff argues that CHP's four "automatic denial[s]" of requested treatment demonstrate a custom of denying initial requests for evaluation or treatment. Docket No. 128 at 8-9. The Court disagrees. Plaintiff points to no evidence that CHP's denials of his requested care were "automatic" or were not otherwise [*10] the product of the sincere opinions of CHP's employees. Nor does plaintiff provide any evidence from which a reasonable jury could conclude that CHP's employees acted pursuant to an official policy when they denied plaintiff treatment on four specific occasions. Accordingly, the Court finds no error with this aspect of the Recommendation.

### B. Breach of Contract

The Recommendation found that there is no genuine dispute of material fact concerning whether defendant Boyd's failure to schedule an MRI breached a February 24, 2009 settlement agreement. Docket No. 125 at 35-36. The magistrate judge found that the settlement agreement entitled plaintiff to (1) a priority appointment with Dr. Koons (which plaintiff received), (2) approval of additional facet block injections if Dr. Koons recommended them (Dr. Koons recommended a different treatment), and (3) a priority follow-up appointment with Dr. Koons (which plaintiff received in July 2010). *Id.* at 35. Plaintiff states that Dr. Koons did not request an MRI during plaintiff's May 2009 appointment because plaintiff's medical file showed that a request was already pending. Docket No. 128 at 7, that the settlement agreement provided for "evaluation," which [*11] entitled plaintiff to an MRI, and that defendant Boyd breached the settlement agreement by determining that the MRI was not necessary and by failing to inform a specialist that the MRI did not occur

and the specialist would have to request it himself. *Id.*[4]

Plaintiff's objection does not challenge the Recommendation's findings concerning the treatment to which he was entitled under the settlement agreement or the finding that he received that treatment. Plaintiff has not demonstrated that the settlement agreement entitled him to any specific treatment (besides facet block injections, which was conditioned on Dr. Koons' recommendation), and he does not dispute that he received the priority appointment and follow-up appointment to which the agreement entitled him. Plaintiff states that defendant Boyd was "obligated to ensure performance" of whatever medical recommendation occurred as a result of his follow-up medical appointment. Docket No. 128 at 8. Plaintiff, however, does not dispute the Recommendation's finding that the MRI that Dr. Koons ordered did [*12] not occur for reasons unrelated to defendant Boyd. In sum, the Court finds that plaintiff's objection does not challenge any of the Recommendation's legal or factual findings. Accordingly, his objection is not specific enough to "focus attention on those issues — factual and legal — that are at the heart of the parties' dispute." *2121 East 30th Street, 73 F 3d at 1059*. The Court has reviewed the Recommendation's finding and is satisfied that there is no clear error on the face of the record.

### III. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the Recommendation of United States Magistrate Judge [Docket No. 125] is **ACCEPTED**. It is further

**ORDERED** that defendant Correctional Health Partners' Motion for Summary Judgment [Docket No. 101] is **GRANTED**. It is further

**ORDERED** that defendants Neal Lousberg and Kathleen Boyd's Motion for Summary Judgment [Docket No. 103] is **GRANTED**. It is further

**ORDERED** that, within 14 days of the entry of judgment, defendants may have their costs by filing a bill of costs with the Clerk of the Court. It is further

---

[4] The MRI was initially approved in November 2010 but was never performed due to a misunderstanding. *See* Docket No. 110-1 at 12, ¶¶ 70-72.

of 6

1/15/2020, 12:53 PM

2015 U.S. Dist. LEXIS 113874, *12

**ORDERED** that this case is dismissed in its entirety.

DATED August 26, 2015.

BY THE COURT:

/s/ Philip A. Brimmer

PHILIP A. BRIMMER

United States District Judge

---

End of Document

  Positive
As of: January 15, 2020 7:47 PM Z

## *Wells v. Krebs*

United States District Court for the District of Colorado

September 1, 2010, Decided; September 1, 2010, Filed

Civil Action No. 10-cv-00023-LTB-KMT

**Reporter**
2010 U.S. Dist. LEXIS 98132 *

VINCENT E. WELLS, Plaintiff, v. STEPHEN R. KREBS, M.D., Medical Director, Physician health Partners, JOSEPH FORTUNATO, M.D., Sterling Correctional Facility, BARRY GOLDSMITH, M.D., Sterling Correctional Facility, PAULA FRANZ, M.D., Medical Director, Colorado Department of Corrections, JO ANNE STOCK, P.C., Sterling Correctional Facility, BEVERLY DOWIS, Health Service Administrator, and CHERYL SMITH, Clinical Chief of Operations, Colorado Department of Corrections, Defendants.

**Subsequent History:** Request denied by *Wells v. Krebs, 2010 U.S. Dist. LEXIS 98139 (D. Colo., Sept. 1, 2010)*

Adopted by, Injunction denied by, Dismissed by *Wells v. Krebs, 2010 U.S. Dist. LEXIS 116339 (D. Colo., Nov. 1, 2010)*

**Prior History:** *Wells v. Krebs, 2010 U.S. Dist. LEXIS 61802 (D. Colo., May 28, 2010)*

## Core Terms

Attach, medications, clot, pain, alleges, deliberate indifference, evaluated. Recommendation, explains, medical record, complaints, ultrasound, shoulder, patient, inmate, no evidence, blood clot, abdomen, summary judgment, medical care, prescribed, clinical, lupus, vein, blood, tests, arm, providers, rights, deep

**Counsel:** [*1] Vincent E. Wells, Plaintiff, Pro se, Sterling, CO.

For Stephen R. Krebs, M.D., Medical Director, Physician Health Partners, Joseph Fortunato, M.D., Sterling Correctional Facility, Barry Goldsmith, M.D., Sterling Correctional Facility, Paula Franz, M.D., Medical Director, Colorado Department of Corrections, Jo Anne Stock, P.A., Sterling Correctional Facility, Beverly Dowis, Health Service Administrator, Cheryl Smith, Clinical Chief of Operations, Colorado Department of Corrections, Defendants: Kathleen L. Spalding, Colorado Attorney General's Office-Department of Law, Denver, CO.

**Judges:** Kathleen M. Tafoya, United States Magistrate Judge.

**Opinion by:** Kathleen M. Tafoya

## Opinion

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

**Kathleen M. Tafoya**

**United States Magistrate Judge**

This case involves claims that Defendants violated Plaintiff's *Eighth* and *Fourteenth Amendment* rights. This matter is before the court on Defendants' "Motion for

Case No. 1:18-cv-00956-MSK-MEH  Document 217-4  filed 01/17/20  USDC Colorado  pg 7 of 57

Summary Judgment" (Doc. No. 57, filed June 15, 2010), "Plaintiff's Motion for Preliminary Injunction and Supporting Memorandum of Law" (Doc. No. 5, filed January 7, 2010), and "Plaintiff's Request for a Temporary Restraining Order" (Doc. No. 31, filed May 3, 2010).

## STATEMENT OF THE CASE

The [*2] following facts are taken from Plaintiff's Amended Complaint and the parties' submissions with respect to this Recommendation. Plaintiff is an inmate at the Sterling Correctional Facility (SCF) within the Colorado Department of Corrections (CDOC). (Am. Prisoner Compl. at 2 [Am. Compl.] [filed February 22, 2010].) Plaintiff names as defendants Stephen R. Krebs, M.D., the medical director of Physician Health Partners; Joseph Fortunato, M.D., staff physician at SCF; Barry Goldsmith, M.D., staff physician at SCF; Paula Franz, M.D.[1] , CDOC medical director; Jo Anne Stock, P.A., a physician assistant at SCF; Beverly Dowis, Health Services Administrator at SCF; and Cheryl Smith, Clinical Service Administrator at SCF. (Id. at 1—3.)

Plaintiff asserts the defendants have "failed to provide [him] with proper and adequate medical care and treatment for hi[s] serious health nedds [sic] . . . for . . . Polycythemia Vera, Deep vein thrombosis/Phlebitis, Hepatitis C. Lupus. degenerative disc disease, malignant neoplasm prostate, hypoglycemia, and an Acromio [*3] Clavicular seperation [sic.]." (Am. Compl. at 4.) Plaintiff alleges he was transferred to SCF in December 17, 2007, and the quality of medical care given to him has deteriorated ever since. (Id. at 5.) Plaintiff asserts two claims for relief. In Claim One, Plaintiff asserts Defendants have denied him adequate medical care and treatment with deliberate indifference in violation of his rights under the Eighth and Fourteenth Amendments. (Id. at 6.) In Claim Two, Plaintiff asserts Defendants have "established a pattern of denying [him] adequate and proper medical care ... in violation of Plaintiff's rights under the 'Due Process Clause' of the [F]ourteenth Amendment . . . and the Eighth Amendment . . . ." (Id. at 11.) Plaintiff seeks compensatory damages, punitive damages, and injunctive relief. (Id. at 19.)

---

[1] Plaintiff misspells Defendant Frantz's name as "Franz." Hereinafter the court will refer to this defendant with the correct spelling of "Frantz."

## PROCEDURAL HISTORY

Plaintiff filed his Amended Prisoner Complaint on February 22, 2010. (Am. Compl.) Defendants filed their Answer on June 15, 2010. (Doc. No. 56.) Defendants also filed their "Motion for Summary Judgment" on June 15, 2010. (Mot. Summ. J.) Plaintiff filed his "Response to Defendants' Motion for Summary Judgement [sic]" on August 2, 2010. (Resp.) Defendants filed their [*4] "Reply Brief in Support of Defendants' Motion for Summary Judgment" on August 12, 2010. (Reply.)

Plaintiff filed his "Motion for Preliminary Injunction and Supporting Memorandum of Law" on January 7, 2010 (Mot. Prelim. Inj.) and his "Request for a Temporary Restraining Order" on May 3, 2010 (Mot. TRO). Defendants filed their "Response to Plaintiff's Motion for Preliminary Injunctive Relief" (Defs.' Resp. Mot. Prelim. Inj.) and their "Response to Plaintiff's Request for a Temporary Restraining Order" (Defs.' Resp. Mot. TRO) on May 27, 2010. Plaintiff filed his "Response to Defendant's [sic] Response to Plaintiff's Motion for Preliminary Injunctive Relief and Temporary Restraining Orders" on June 8, 2010. (Reply. Mot. Prelim. Inj. and Mot. TRO.)

These motion are ripe for review and recommendation.

## PRO SE STANDARD OF REVIEW

Plaintiff is proceeding pro se. The court, therefore, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." Trackwell v. United States, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted). See also Haines v. Kerner, 404 U.S. 519, 520—21, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972) (holding allegations of a pro se complaint "to [*5] less stringent standards than formal pleadings drafted by lawyers"). However, a pro se litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). Acourtmay not assume that a plaintiff can prove facts that have not been alleged, or that a defendant has violated laws in ways that a plaintiff has not alleged. Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 526, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983). See also Whitney v. New Mexico, 113 F.3d 1170, 1173—74 (10th Cir. 1997) (court may not "supply additional factual allegations to round out a plaintiff's complaint"); Drake v. City of Fort Collins, 927

2010 U.S. Dist. LEXIS 98132, *5

*F.2d 1156, 1159 (10th Cir. 1991)* (the court may not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues"). plaintiff's *pro se* status does not entitle him to application of different rules. See *Montoya v. Chao, 296 F.3d 952, 957 (10th Cir. 2002)*.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there **[*6]** is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & County of Denver, 36 F.3d 1513, 1518 (10th Cir. 1994)* (citing *Celotex, 477 U.S. at 325*). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex, 477 U.S. at 324*; *see also Fed. R. Civ. P. 56(e)(2)*. A disputed fact is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, 119 F.3d 837, 839 (10th Cir. 1997)* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*).

When ruling on a motion for summary judgment, a court **[*7]** may consider only admissible evidence. See *Johnson v. Weld County, Colo., 594 F.3d 1202, 1209— 10 (10th Cir. 2010)*. The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works, 36 F.3d at 1517*. Moreover, because Plaintiff is proceeding *pro se*, the court, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Treckwell v. United States, 472 F.3d 1242, 1243 (10th Cir. 2007)* (citations omitted); *see also Haines v. Kerner, 404 U.S. 519, 520—21, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)* (holding allegations of a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers"). At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake County, 584 F.3d 1304, 1312 (10th Cir. 2009)*. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)*; **[*8]** *Thomson, 584 F.3d at 1312*.

## ANALYSIS OF SUMMARY JUDGMENT MOTION

### *1. Personal Participation*

Defendants argue that summary judgment should be granted in favor Defendant Frantz because she did not participate in the alleged violation of Plaintiff's *Eighth Amendment* rights. (Mot. Summ. J. at 24.) Defendants also argue that Defendant Smith did not have any role in alleged violations of Plaintiff's constitutional rights. (*Id.* at 26—27.)

Personal participation is an essential allegation in a § 1983 civil rights action. *Bennett v. Passic, 545 F.2d 1260, 1262-63 (10th Cir. 1976)*. To establish personal liability, a plaintiff must show that the official caused the deprivation of a federal right. *Kentucky v. Graham, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)*. There must be an affirmative link between the alleged constitutional violation and each defendant's participation, control or direction, or failure to supervise. *See Butler v. City of Norman, 992 F.2d 1053, 1055 (10th Cir. 1993)*. Morever, it is well established that a defendant may not be held liable for constitutional violations merely because he or she holds a supervisory position. *Pembaur v. City of Cincinnati, 475 U.S. 469, 479, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1985)*; *Mitchell v. Maynard, 80 F.3d 1433, 1441 (10th Cir. 1996)*. **[*9]** "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 1948, 173 L. Ed. 2d 868 (2009)*.

### *A. Defendant Frantz*

In Claim One of his Amended Complaint, Plaintiff alleges Defendant Frantz

2010 U.S. Dist. LEXIS 98132, *9

is cupable [sic] in her Supervisoral [sic] role because on September 22, 2008 an Ultrasound was requested and denied for Plaintiff's left arm, bloodclot basilic vein, defendant Franz, signed off on denial. October 24, 2008 requested Orthopedic Specialist request and denial was signed off by defendant Franz, and Defendant Franz recommended on-site steroidal injections for Plaintiff; shoulder injury, Recommendation never followed. December 2, 2008 a second request for Orthopedic specialist by defendant Fortunato, M.D., Denied by defendant Krebs, M.D. signed off by Defendant Franz, No treatment provided. Leaving plaintiff in connual [sic] pain and suffering until this very day.

(Am. Compl. at 9.)

In their Motion, Defendants rely on the Affidavit of Defendant Paula Frantz, M.D., currently the Chief Medical Officer for CDOC, but not **[*10]** Plaintiff's treating physician. (Mot. Summ. J., Ex. A, P 2.) Defendant Frantz explains that requests for consultations are reviewed by the Utilization Review Committee (UMC), which is comprised of two CDOC health care providers who review the requests for medical necessity. (Id., P 37.) Defendant Frantz states that the requests also are reviewed by Correctional Health Partners for appropriateness according to the nationally accepted Milliman Care Guidelines. (Id.) Defendant Frantz avers that the requests for Plaintiff's orthopedic consults and the request for an additional ultrasound were denied by UMC and Correctional Health Partners, and that she had no role in any of the denials of those consultations or tests. (Id.) Defendant Frantz states that she does not personally review consults for approval or denial unless a provider specifically appeals a consult denial by UMC or Correctional Health Partners. (Id.) Defendant Frantz states that, in Plaintiff's case, no denial appeals were ever filed, and she had no knowledge of the consult requests on behalf of Plaintiff until she reviewed his medical record for preparation of her Affidavit. (Id.)

In response, Plaintiff alleges that "Defndant **[*11]** [sic] Frantz denies any involvement with Medicla [sic] requests made by Providers who are her subordinates. Her name appears in all the denials by Corrections Health Partners, formely [sic] Physician's Health Partners" (Resp. at 5, P 8); that "Plaintiff notified Frantz in letters of the inadequate care and deleiberate [sic] indifferent attitude at Sterling Correctiona [sic] Facility" (id. at 9, P 13); that "Franz in her Supervisoral [sic] Role

Knows or should know the Standard of Medical treastment [sic] and care that is being provided" (id. at 10, P 14); and that "M.D. Franz becomes personally involved when she attests to all reviews, medical proffessional [sic] oppionion [sic], and states that the Plaintiff received 'exceptional' standard of medical treatment" (id. at 10, P 15).

Upon review of the extensive medical records submitted by both Plaintiff and Defendants, only two records contain Defendant Frantz's name. [2] One record is a letter dated September 22, 2008, from Defendant Krebs to Defendant Stock, in which "Paula Franz, MD (CDOC)" is copied. (Am. Compl. at 22.) In the letter, Defendant Krebs advised Defendant Stock that the ultrasound of the arm was determined not medically **[*12]** necessary. (Id.) The second record is a letter from Plaintiff to Defendant Frantz dated May 22, 2009, in which Plaintiff complains about his medical treatment and care decisions. (Mot. Summ. J., Ex. B, Attach. 6 at 1.) The court is unable to locate a single record showing that Defendant Frantz personally participated in Plaintiff's medical care or that she had any role in the denial of the orthopedic consults or in the denial of the ultrasound request. Plaintiff's suggestion that Defendant Frantz's supervisory authority as the CDOC Medical Director creates a basis for liability is unavailing since "liability under *section 1983* cannot rest upon the doctrine of *respondeat superior*." *Ware v. Unified Sch. Dist. No. 492, 902 F.2d 815, 819 (10th Cir. 1990)* (quotation omitted).

Plaintiff has failed to provide evidence—other than his bare assertions—supporting his position that Defendant Frantz acted in a manner that deprived Plaintiff of his constitutional rights. Plaintiff's bare allegations are insufficient to overcome a motion for summary judgment. *See Sullivan v. Scoular Grain Co. of Utah, 930 F.2d 798, 800 (10th Cir.1991)* ("A nonmoving party cannot survive a motion for summary judgment based on bare allegations in the pleadings without supporting

---

[2] Defendants have attached extensive medical records to their Motion. The court notes the exhibits have been arranged in reverse chronological order, but have not been bates labeled, and Dr. Frantz fails to reference any of the medical records by date. As such, the court has had to perform time consuming "needle-in-the-haystack" searches to follow the defendants' arguments. The court could strike or deny without prejudice **[*13]** the defendants' motion for this reason alone. However, in the interest of resolving this case in a more expeditious manner, the court declines the invitation to place form over substance.

evidence."). As Plaintiff has failed to present evidence showing Defendant Frantz personally participated in any of the acts forming the basis of his claims, this court recommends that summary judgment be granted in favor of Defendant Frantz.

## B. Defendant Smith

In his Amended Complaint, Plaintiff alleges Defendant Smith is "cupable [sic] in her supervisoral [sic] role because she investigated several complaints made by plaintiff via mail to Joanie Shoemaker and Paula Franz, defendant, as to plaintiff's serious health needs and [*14] the inadequate and lifethreatening [sic] deliberate indifference to plaintiff's health needs, June 20, 2008." (Am. Compl. at 10, P 7.) Defendants argue that Defendant Smith did not have any role in Plaintiff's medical care and did not take any action that violated Plaintiff's constitutional rights. (Mot. Summ. J. at 26—27.)

According to her Affidavit, in her role as Chief of Clinical Operations, Defendant Smith reviews and responds to inmate complaints about their medical care. (Id., Ex. B, P 2.) Defendant Smith states she does not provide medical care to inmates, nor does she make medical decisions about the care inmates should or should not receive. (Id.) In June 2009, Defendant Smith reviewed three letters Plaintiff had written to CDOC officials requesting review of his medical care. (Id. P 4.i; see id., Attachs. 1, 3, 6.) On June 10, 2009, Smith responded to Plaintiff by letter. (Id. and Attach. 7.) In the letter, Defendant Smith discussed the concerns raised by Plaintiff. (Id.) Defendant Smith states that the June 10, 2009, letter has been her only contact with Plaintiff. (Id. P5.)

To the extent Plaintiff asserts Defendant Smith is liable because of her supervisory role, "liability [*15] under section 1983 cannot rest upon the doctrine of respondeat superior." Ware, 902 F.2d at 819. Plaintiff states in his Response, "the plaintiff [c]ould choose to accept the evidence [Defendant Smith] offered to the pawning off of the Plaintiffs [sic] medical complaints, letters," but then infers that Defendant Smith has "been directed" to destroy or redact evidence. (Resp. at 10, P 17.) However, Plaintiff has failed to make any showing that defendants or anyone at the CDOC has destroyed evidence in this case. Moreover, Plaintiff has failed to provide any evidence of "affirmative link between the alleged constitutional violation and [Defendant Smith's] participation" in any alleged constitutional violation. See,

992 F.2d at 1055. As such, this court recommends that summary judgment be granted in favor of Defendant Smith.

## 2. Fourteenth Amendment

Despite Plaintiff's characterization of his claims as violations of his rights under the Eighth and Fourteenth Amendments (see, e.g., Am. Compl. at 6, 11), Defendants do not move for summary judgment on Plaintiff's Fourteenth Amendment claims in their Motion. Defendant asserts in his Response that his claims are not limited to alleged violations [*16] of his Eighth Amendment rights, and that Defendants' alleged denial of medical care violated his right to due process. (Resp. at 11.) Defendants argue in their Reply that Plaintiff has failed to make factual allegations to support a Fourteenth Amendment due process claim. (Reply at 7.)

It is unclear whether Plaintiff invokes the Fourteenth Amendment because the Eighth Amendment applies to the states only through the Fourteenth Amendment or because he is attempting to allege a violation of his substantive due process rights. The Tenth Circuit Court of Appeals has " noted that where constitutional protection is afforded under specific constitutional provisions, alleged violations of the protection should be analyzed under those provisions and not under the more generalized provisions of substantive due process." Riddle v. Mondragon, 83 F.3d 1197, 1202 (10th Cir. 1996) (citation omitted). While a claim made by a pretrial detainee for inadequate medical attention is recognized under the Fourteenth Amendment's due process clause, the same claim made by a convicted inmate such as Plaintiff is recognized under the Eighth Amendment test of deliberate indifference to serious medical needs. Frohmader v. Wayne, 958 F.2d 1024, 1028 (10th Cir. 1992) [*17] (citation omitted). Thus, the court reviews Plaintiff's claims for denial of medical care under the Eighth Amendment. See Riddle, 83 F.3d at 1202.

## 3. Eighth Amendment

The Eighth Amendment's ban on cruel and unusual punishment is violated if a defendant's "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain." Self v. Crum, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). To establish a

2010 U.S. Dist. LEXIS 98132, *17

claim for deliberate indifference, a plaintiff must first prove that, objectively, his medical need is "sufficiently serious." *Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).* A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir 1999)* (citation omitted). Second, the plaintiff must prove that, subjectively, the prison official "kn[ew] of and disregard[ed] an excessive risk to inmate health and safety." *Farmer, 511 U.S. at 837.* That is, "the official must both be aware of facts from [**18] which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* "[T]he subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment." *Self, 439 F.3d at 1232.* Medical judgment includes whether a specialist should be consulted, or whether additional medical testing is required. *Id.*

Although an *Eighth Amendment* claim regarding deliberate indifference to a serious medical need often involves an official's failure to treat a prisoner's serious medical condition properly, it may also arise when a prison official acts with deliberate indifference in preventing a prisoner from receiving treatment or denying him access to medical personnel capable of evaluating the need for treatment. See *Sealock v. Colorado, 218 F.3d 1205, 1211 (10th Cir 2000).*

### a. Serious Medical Need

Defendants argue that Plaintiff does not suffer from lupus, polycythemia vera, prostate cancer, and/or hypoglycemia. The court construes this argument as one that Plaintiff does not have a sufficiently serious medical need regarding these conditions.

First, Defendants argue there is no [**19] evidence that Plaintiff has lupus. (Mot. Summ. J. at 28.) Along with his Response, Plaintiff submits a medical record he states is from Swedish Medical Center that he contends "contradicts this allegation . . . ." (Resp. at 3, P 2.) The incomplete record indicates a lupus panel was performed on Plaintiff on March 24, 2004, and showed the presence of a lupus anticoagulant. (Resp. at 16.) According to Dr. Frantz, Plaintiff does have a history of coagulopathy (a bleeding/clotting disorder) due to the presence of a lupus anticoagulant in his system. (*Id.,* Ex. A, P 6.) Dr. Frantz explains that the lupus

anticoagulant may be associated with lupus, but the association is not consistent. (*Id.*) Dr. Frantz states that Plaintiff has been evaluated at least twice since 2004 for lupus and has not been determined to have lupus. (*Id.*) Dr. Frantz explains that the blood test most commonly evaluated to suggest the presence of lupus is the ANA titer. (*Id.* P 17.) According to Plaintiff's records, Plaintiff was seen by Defendant Fortunato on August 13, 2009, with "fear of dying, something wrong (*Id.,* Ex. A, Attach. 2, Part 1, at 32.) Defendant Fortunato noted that he "[r]eviewed with [Plaintiff] recent [**20] labs that are all normal to include ANA, . . ." (*Id.*) Defendant Fortunato also noted that Plaintiff had a "normal phy. exam." (*Id.*) The court has reviewed the extensive medical records provided by the parties and has located no record that indicates Plaintiff ever has been diagnosed with lupus.

Second, Defendants argue there is no evidence that Plaintiff has polycythemia vera. (Mot. Summ. J. at 28.) Dr. Frantz explains that polycythemia vera is a myeloproliferative disorder that is typically detected because a patient has either an elevated hematocrit or red blood cell mass. (*Id.,* Exh. A, P 18.) Dr. Frantz states that if a patient is found to have either an elevated hematocrit or red blood cell mass, further workup for polycythemia vera would be done. (*Id.*) Dr. Frantz states Plaintiff does not have an elevated hematocrit or red blood cell mass and that, without these findings, it is medically inappropriate to pursue this diagnosis. (*Id.*) Plaintiff, with his Response, submits a medical record in support of his contention that he has polycythemia vera. (Resp. at 3, P 2; Resp. at 17.) The incomplete record indicates Plaintiff "does have some mild splenomegaly, more consistent with a primary [**21] polycythemia vera." (*Id.* at 17 [emphasis added].) Other than this single reference to the possibility that Plaintiff had a symptom consistent with polycythemia vera in 2004, the medical records are devoid of any indication that Plaintiff ever has been diagnosed with the condition.

Third, Defendants argue there is no evidence that Plaintiff has prostate cancer. (Mot. Summ. J. at 28.) In his Response, Plaintiff fails to address this assertion by Defendants. Plaintiff's medical records show that Plaintiff had PSA tests in October 2001, October 2007, and January 2009, all showing results within normal limits. (*Id.,* Ex. B, Attach. 1 at 3; Attach. 2, Part 1, at 53.) Additionally, a colonoscopy with a biopsy performed on December 21, 2009, revealed "Pt had a normal colon throughout without lesions." (*Id.,* Ex. A, Attach. 2, Part 1, at 16.) Though Plaintiff's records do contain several references to a family history of "malignant neoplasm

2010 U.S. Dist. LEXIS 98132, *21

prostate" (*id.*, Ex. B, Attach. 1 at 3) and a reference to a history of prostate cancer in Plaintiff's father (*id.*, Ex. A, Attach. 2, Part 1, at 32), there is no evidence that Plaintiff has ever been diagnosed with prostate cancer.

Finally, Defendants argue Plaintiff **[*22]** does not have hypoglycemia. (Mot. Summ. J. at 28—29.) In her Affidavit, Dr. Frantz explains that a "[t]he true diagnosis of reactive hypoglycemia typically requires two low blood sugars." (*Id.*, Ex. A, P 25.) The records show that in the time Plaintiff has been incarcerated, there has been only one indication of low blood sugar on November 25, 2009. (*Id.*, Ex. A, Attach. 2, Part 1, at 22—23.) Dr. Frantz states that, as the diagnostic criteria for hypoglycemia has not been met, Plaintiff requires no treatment for hypoglycemia. (*Id.*) Plaintiff has provided no evidence that he has had more than one low blood sugar result or to dispute the evidence that a diagnosis of hypoglycemia requires at least two blood sugar results.

As Plaintiff has failed to provide evidence—other than the bare assertions in the Complaint—supporting his allegations that he has been diagnosed with lupus, polycythemia vera, prostate cancer, and hypoglycemia, this court cannot find that these conditions are "sufficiently serious" to meet the objective prong as to Plaintiff's *Eighth Amendment* claims on these conditions. *Farmer, 511 U.S. at 834.* As such, Plaintiff has not met his burden of demonstrating that a genuine **[*23]** issue for trial exists on his *Eighth Amendment* claims related to lupus, polycythemia vera, prostate cancer, and hypoglycemia, and Defendants are entitled to summary judgment claims related to on these conditions.

Defendants do not address the objective element of Plaintiff's remaining conditions, and instead argue that Plaintiff cannot meet the subjective portion of the legal standard.

**b. Deliberate Indifference**

**i. September 2008 Ultrasound**

Plaintiff asserts Defendant Krebs denied him an ultrasound to detect blood clots in his left arm on September 22, 2008. (Am. Compl. at 7.) Defendant alleges this "[d]enial[ ] caused plaintiff undue pain, suffering and rapid progression in the plaintiff's serious

bloodclotting disorder." (*Id.*) Defendants argue that Defendant Krebs did not violate Plaintiff's constitutional rights because whether the test was medically necessary is a matter of disputed medical judgment. (Mot. Summ. J. at 9.)

According to Dr. Frantz, Plaintiff suffers from deep vein thrombosis (DVT), a medical condition in which blood clots form in a vein deep within the body. (*Id.*, Ex. A, P 5.) Plaintiff had an ultrasound of his left arm on June 28, 2008, after he reported to SCF staff **[*24]** that he was experiencing pain in his left arm and chest. (*Id.*, Ex. A, Attach. 2, Part 2, at 17—19, 44.) The June 28, 2008, ultrasound revealed the presence of a non-occlusive clot in his left upper extremity. (*Id.* at 44.) Plaintiff was seen for follow-up on July 1, 2008, and the treating physician's assistant noted, "Even with all of the recent concern about blood clots, [Plaintiff] still missed yesterday's dose of Coumadin. Compliance has been an ongoing issue for him. He even refused several doses in June." (*Id.* at 17.) The physician's assistant increased Plaintiff's Coumadin dosage from 4 mg to 9 mg and noted that "Pt understands and agrees with the plan." (*Id.* at 17.)

On July 4, 2008, Plaintiff was evaluated by SCF medical staff and advised to continue to apply warm packs and to continue the Coumadin dosage as previously ordered. (*Id.* at 16.) On July 7, 2008, Plaintiff was seen again, and the medical staff noted "No palpable mass" and advised Plaintiff take his medications as prescribed. (*Id.* at 15.) On July 24, 2008, Plaintiff was seen by Defendant Stock, who noted, "Has been brought in and lectured about compliance many times. Is still missing several doses a month. Explained **[*25]** that he needs to take Coumadin as ordered, . . ." (*Id.* at 14.) Defendant Stock also noted, "There is no evidence of blood clots in the left arm as he is claiming this morning. He states they swell up by evening, and go down over night. This does not seem to be typical for blood clots." (*Id.*) On August 13, 2008, Plaintiff was seen again by Defendant Stock, who noted, "I don't see anything which would indicate a possible clot in the arm." (*Id.* at 13.) On August 19, 2008, Plaintiff's examination by Defendant Fortunato revealed "nomasses [sic], no axillary masses" and ordered a chest and shoulder x-ray. (*Id.* at 12.) On September 4, 2008, Defendant Fortunato reviewed Plaintiff's chart noted that the chest x-ray ordered at the time of Plaintiff's last visit was normal, but that the shoulder x-ray revealed a possible second-degree shoulder separation. (*Id.* at 11.) On September 16, 2008, Plaintiff was again evaluated by Defendant Stock for complaints of left arm swelling. (*Id.* at 10.) Defendant

Stock documented a normal exam of the left arm, but nonetheless requested another ultrasound. (Id.)

On September 22, 2008, Defendant Krebs sent a letter to Defendant Stock to advise her that

the PHP Medical **[*26]** Director reviewed [her] request for an ultrasound of [Plaintiff's] arm. The service(s) requested were determined not medically necessary/covered for the following reason: The information provided does not support the medical necessity for the service requested. Did swelling ever resolve? Is the patient on Coumadin? Is the patient on anti-platelet therapy?

(Am. Compl. at 22.) Defendant Krebs also notified Defendant Stock that she could obtain a coy of the review criteria or treatment guidelines and provided information regarding the appeal process if she disagreed with the decision. (Id.)

Defendants assert that Defendant Krebs correctly denied the ultrasound request, as the June 2008 ultrasound had shown the presence of a non-occluding clot, and there was no clinical change by September 2008 to suggest that the clot had progressed or that a new clot had formed. (Mot. Summ. J., Exh. A, P30.) Defendants argue that Plaintiff's symptoms were inconsistent with the presence of a clot and that, under these circumstances, an additional ultrasound of the left arm was not medically necessary. (Id.)

In the unpublished decision Fleming v. Uphoff, the Tenth Circuit addressed similar circumstances. 210 F.3d 389, 2000 WL 374295 (10th Cir. Apr. 12, 2000). **[*27]** In Fleming, the plaintiff brought a § 1983 claim for deliberate indifference, alleging that the defendants refused to allow plaintiff to keep an appointment at the Veterans Administration Center in Denver, and the prison institution's contracted health care service provider denied approval for medical tests requested by both Veterans Administration doctors and a private doctor. The district court denied the plaintiff's action for failure to state a claim, and the Tenth Circuit affirmed on the grounds that "plaintiff's complaint alleged only a difference of opinion regarding the type and timing of medical treatment, which did not constitute actionable deliberate indifference." Fleming, 210 F.3d 389, 2000 WL 374295, at *2 [published in full-text forma at 2000 U.S. App. LEXIS 6723]. Tha Tenth Circuit stated "neither medical malpractice nor disagreement with medical judgment constitutes an Eighth Amendment violation." Id. (citing Estelle, 429 U.S. at 106; Green v. Branson, 108 F.3d 1296, 1303 (10th Cir. 1997)). To

show deliberate indifference in such a situation, the plaintiff "must show a deliberate refusal to provide medical attention, as opposed to a particular course of treatment." Id.

Plaintiff bases his claim on a difference of medical opinion between Defendant **[*28]** Krebs and Defendant Stock as to the necessity of an ultrasound. As held by the Tenth Circuit, an exercise of medical judgment as to the course of treatment, without a showing of deliberate refusal to provide medical attention, does not represent cruel and unusual punishment and is not actionable under the . Fleming, 210 F.3d 389, 2000 WL 374295, at *3[published in full-text forma at .3] (citations omitted). As such, Defendant Krebs is entitled to summary judgment on this claim.

#### ii. 2008 Orthopedic Specialist Referrals

Plaintiff asserts Defendant Krebs denied him an orthopedic specialist for a shoulder separation on October 24, 2008, and December 2, 2008. (Am. Compl. at 7.) Plaintiff also claims that Defendant Fortunato and Defendant Stock denied adequate medical treatment for his alleged AC separation. (Id. at 8, P 2; 9 P 5.) Defendants argue that the defendants did not violate Plaintiff's constitutional rights because whether the evaluations were medically necessary is a matter of disputed medical judgment. (Mot. Summ. J. at 9, 13.)

On September 4, 2008, Defendant Fortunato conducted a lab and x-ray review of Plaintiff's chart. (Mot. Summ. J., Ex. A, Attach 2, Part 2, at 11.) Defendant Fortunato noted Plaintiff "had **[*29]** shoulder [x-ray] and was informed needs discussion as has a 2nd degree left acromioclavicular separation as a possibility." (Id.) Defendant Fortunato evaluated Plaintiff on October 2, 2008, and noted, "All discomfort today obj is Pect major esp as it borders ant shoulder." (Id. at 8.) Defendant Fortunato requested an orthopedic consult. (Id.) On October 12, 2008, Defendant Fortunato again saw Plaintiff and advised him "UMC denied Ortho cosult [sic] per my request 10/02/08." (Id.) On November 12, 2008, Defendant Fortunato noted that Plaintiff

has beeen [sic] denied further eval per consult by UMC and PHP. Recommendation for steroid injection is a can not do as inmate has 2 filters inserted both femoral as he has a colaganopathy. At this point honoring said ortho consult would be to assure possilly [sic] anxiety. No tx is expected a stge [sic] 2 separation is rarely repaired and the

mear [sic] fact of repairing this in indiv. would expose him to possibility of further clot generation.

(*Id.* at 5.) Defendant Fortunato noted he would "resubmit for ortho consult with clarification this inmate is not qa candidate for anti-inflam or steroid injection." (*Id.*) Upon a thorough review of Plaintiff's [*30] entire medical record, it appears Plaintiff last complained of left shoulder pain on November 17, 2008. (*Id.* at 4.)

On June 10, 2009, in response to letters from Plaintiff "regarding [his] concerns with [his] medical care," Defendant Smith, the Chief of Clinical Operations for the CDOC, sent Plaintiff a letter in which she stated, "because you are on lifetime anticoagulation due to a clotting disorder, you are neither a candidate for surgery or epidural steroid injections. For this reason, Physician Health Partners has denied your requests for surgery." (Am. Compl. at 25.)

Defendants argue there is a medical dispute as to whether Plaintiff suffered from a separated shoulder in the fall of 2008. According to Dr. Frantz, a long-time emergency room physician with extensive experience in the diagnosis and treatment of acromioclavicular (AC) separations, Plaintiff did not suffer from an acute shoulder separation. (Mot. Summ. J., Ex. A, P 31.) Dr. Frantz explains that AC separations are the result of acute trauma, are extremely painful, and the diagnosis is made based on clinical examination and confirmed by x-ray. (*Id.*) Dr. Frantz states that AC separation "has unmistakable clinical presentation [*31] and is not found incidentally on x-ray" and "[a] patient with an AC separation cannot move the affected arm due to pain." (*Id.*) Dr. Frantz believes that Plaintiff could not have had an AC separation in late 2008 because when Plaintiff was examined, he was able to move his arm freely, and he had no history of acute trauma. (*Id.; see* Ex. A, Attach 2, Part 2, at 4 [noting inmate does not appear to be in acute distress or pain]. 6 [noting "does not appear to be anything wrong at this time"], 7 [noting range of motion in left shoulder is normal], 8 [noting rotation of shoulder causes minor discomfort], 9 [noting no swelling or acute distress], 9 [noting normal looking arm with no swelling].) Dr. Frantz believes that an orthopedic consult was unnecessary in the fall of 2008 because Plaintiff did not suffer from an orthopedic condition requiring consultation. (*Id.*, Ex. A, P 32.)

The Tenth Circuit has stated that

> the subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment.

Matters that traditionally fall within the scope of medical judgment are such decisions as whether to consult a specialist or undertake [*32] additional medical testing. The *Eighth Amendment's* prohibition on cruel and unusual punishment is not violated when a doctor simply resolves the question whether additional diagnostic techniques or forms of treatment is indicated.

*Self, 439 F.3d at 1232* (internal citations and quotations omitted). "A claim is therefore actionable only in cases where the need for additional treatment or referral to a medical specialist is obvious." *Id.* Here, where there are differing opinions about whether Plaintiff had an AC separation, it cannot be said that the need for additional treatment was obvious.

Moreover, even if Plaintiff did have an AC separation, Plaintiff cannot satisfy the subjective component. Dr. Frantz states that the appropriate treatment for AC separations is to give the patient a sling and a prescription for pain medication for a short period of time, usually from two to three weeks. (*Id.*, Ex. A, P 32.) Dr. Frantz, Defendant Fortunato, and Physician Health Partners agreed that even if Plaintiff had an AC separation, no orthopedic treatment was indicated because AC separations typically are not surgically repaired, and, due to Plaintiff's lifetime anticoagulation therapy, surgical [*33] repair would expose Plaintiff to the risk of further clot generation. (*Id.* P 32; Attach. 2, Part 2, at 5; Am. Compl. at 25.)

A contention that an inmate was denied treatment from a specialist is generally a matter of medical judgment and, thus, insufficient to establish a constitutional violation. *Estelle, 429 U.S. at 107; Ledoux v. Davies, 961 F.2d 1536, 1537 (10th Cir. 1992)*. As was discussed in detail above, Plaintiff's complaints of shoulder pain and discomfort were thoroughly evaluated by the SCF medical staff. Based on Plaintiff's treatment options and medical history, it was determined an orthopedic consultation was unnecessary. Importantly, the medical record shows that Plaintiff did not complain of left shoulder pain or discomfort at any time after his exam on November 17, 2008. (*Id.* at 4.) "So long as a medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met." . Under such circumstances, deliberate indifference is not shown. ("[W]here a doctor orders treatment consistent with the symptoms presented and [*34] then continues to monitor the patient's condition,

an inference of deliberate indifference is unwarranted."). Furthermore, Defendants have provided evidence that the treatment provided for Plaintiff's shoulder was reasonable under the circumstances.

Plaintiff has not met his burden of demonstrating that a genuine issue for trial exists, and Defendants Krebs, Fortunato, and Stock are is entitled to summary judgment on Plaintiff's claims related to his alleged shoulder separation.

### III. Deep Vein Thrombosis and Clotting Disorder

Plaintiff alleges that Defendant Fortunato and the other defendants generally failed to treat his deep vein thrombosis and clotting disorder. (Am. Compl. at 4; 8, P 2.) Defendants argue that, to the contrary, they have provided extraordinary and thorough treatment of these conditions. (Mot. Summ. J. at 14.)

Plaintiff suffers from deep vein thrombosis (DVT), a medical condition in which blood clots form in a vein deep within the body. (Id., Ex. A, P 5.) Dr. Frantz explains that CDOC medical providers monitor Plaintiff's blood clotting rate through a lab test known as the International Normalized Ratio (INR). (Id., P 8.) The INR is a standardized interpretation of the [*35] prothrombin time (PT), which is one indicator of the speed at which an individual's blood clots. (Id.) The higher the INR number, the longer it takes for the blood to clot; the lower the INR number, the quicker the blood clots. (Id.)

According to the Plaintiff's medical record, since his arrival at SCF, he has been examined repeatedly by CDOC physician assistants, nurses, and physicians in response to his complaints and fears of possible blood clots. (See id., Ex. A, Attach. 1 at 5—6, 9—11, 13, 18— 20, 25—29, 32, 34—35, 39—41, 49—50, 52; Attach. 2, Part 2, at 5—6, 8—10, 13—16, 18—52.) On July 7, 2008, Plaintiff was seen for complaints of left arm numbness and worries about a clot, and the medical staff noted "No palpable mass." (Id., Attach. 2, Part 2, at 15.) On July 24, 2008, Plaintiff was seen for "concern about blood clots in his arm." (Id. at 14.) Defendant Stock found no evidence of blood clots. (Id.) On August 13, 2008, Plaintiff complained of numbness and tingling in his left arm." (Id. at 13.) On exam, Defendant Stock found "only the triceps muscle which he is stating is a lump" and nothing "that would indicate a possible clot in the arm." (Id.) On September 16, 2008, Plaintiff [*36] complained of left arm swelling. (Id. at 10.) His physical exam reveal[ed] a normal looking arm" with no swelling or distention of veins." (Id.) On October 12, 2008, Defendant Fortunato evaluated Plaintiff and noted

Plaintiff was "anxious that may have a clot to left shoulder and forearm." (Id. at 7.) Defendant Fortunato explained that "nothing suggtests [sic] clot . . . ." (Id.) On November 18, 2009, Plaintiff was evaluated for "concern with his clotting disorder." (Id. at 25.) The medical provider noted "no areas of erythema or tenderness of bil arms or legs" and "Last INR 10/30/09 2.6 which is WNL at 2.0-3.0 for prophylaxis for hx of DVT." (Id.) On December 11, 2009, the medical provider noted, "He is concerned with recurent [sic] clots. He has been told that ideal INR for recurrence is 2.5 and 3.5." (Id. at 20.) Plaintiff was told he was "at ideal as of lab 11/30/09 @ 3.0." (Id.) On December 30, 2009, Plaintiff was evaluated for concerns about his INR level getting too low and swelling or clots in his left leg. (Id. at 13.) The medical provider found "no occluding blood clot in leg." (Id.) On February 22, 2010, Plaintiff was with complaints of "knots on his lat right leg and in [*37] his lower abdomen." (Id. at 5.) Defendant Goldsmith noted, "No 'knots' evident on his legs or in his lower abdomen." (Id.)

On several occasions, the CDOC medical providers felt Plaintiff's complaints and fears of blood clots warranted further treatment or investigation. For example, on June 28, 2008, Plaintiff was evaluated for complaints of chest pain, which he believed was due to a blood clot. (Id., Ex. A, Attach. 2, Part 2, at 52.) The CDOC staff sent Plaintiff to Sterling Regional Medical Center, where Plaintiff was thoroughly evaluated. (Id. at 19—50.) On April 9, 2009, Plaintiff was examined for reports of "some new 'clots' now." (Id., Attach. 2, Part 1, at 40.) His exam showed "several focal indurated areas below skin that are tender on the left or more dependent leg." (Id.) Defendant Goldsmith ordered a repeat INR. (Id.) On December 15, 2009, Plaintiff was seen for complaints of left-sided leg pain. (Id. at 18.) Defendant Stock examined Plaintiff and then consulted with Defendant Goldsmith, who "agrees that there is probably a blood clot there and patient will need anticoagulated." (Id.) Defendant Stock requested an "urgent consult" and an ultrasound at Sterling Regional Medical [*38] Center. (Id.) On January 19, 2009, Plaintiff presented with "swelling left popliteal fossa." (Id. at 49.) Defendant Goldsmith ordered Jobst hose. (Id.)

Defendants reason that Plaintiff has received regular and continuous prescriptions for Coumadin, a blood-thinning medication, since he entered CDOC custody, and that CDOC medical staff perform regular testing to monitor his INR. (Id., Ex. A, P 9.) Defendants have attached a chronological list of the INR results of PT testing since Plaintiff's intake processing on March 17, 2005, to March 25, 2010. (Id., Attach. 3.) Defendants

2010 U.S. Dist. LEXIS 98132, *38

state that, from the time Plaintiff arrived at SCF in December 2007 through March 2010, CDOC medical staff have checked Plaintiff's INR approximately 59 times, that Plaintiff's Coumadin prescription has been adjusted as medically necessary, and that Plaintiff's INR has been well controlled. (*Id.,* Ex. A, PP 12, 13 and Attach. 3.) Dr. Frantz explains that medical studies have shown that most patients have INRs within the therapeutic range 68% of the time. (*Id.,* Ex, A, P 10.) Plaintiff's INR results show he has remained within his therapeutic range for almost his entire time at SCF, with the exception of low periods **[*39]** in May and June-2008, due to his non compliance with medication; a low period for approximately two weeks in April 2009; and a high period for approximately six weeks around February 2009. (*Id.;* Attach. 3.) Dr. Frantz explains that Plaintiff has had "exceptional control of INR's." (*Id.*)

In his response, Plaintiff argues that "the deliberate indifference attitude of defendants' [sic] has caused the Plaintiff several more clots to form, phlebitis to be diagnosed and untreated, and the eventual severe lifethreatening [sic] hospitalization of the Plaintiff, June 27, 28, 29 where he received a blood transfusion . . . ." (Resp. at 3.) It is undisputed that Plaintiff has deep vein thrombosis and that he was hospitalized in June 2008. However, Plaintiff's allegations are not supported by the record. *See Thomson, 584 F.3d at 1312.* "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007); Thomson, 584 F.3d at 1312.* Plaintiff fails to establish that defendants **[*40]** were deliberately indifferent under both an objective and subjective analysis. First, there is no evidence of a deprivation that was sufficiently serious to meet the objective component. A thorough review of Plaintiff's medical records reveals that the CDOC medical staff have monitored and treated Plaintiff's deep vein thrombosis regularly and have carefully and regularly monitored Plaintiff's INR levels. Second, there is no evidence of defendants knowingly disregarding risks to Plaintiff's health. When Plaintiff's blood tests showed abnormal INR levels, his healthcare providers acted reasonably and undertook steps to treat Plaintiff. Based on this record, no issue of disputed fact exists material to Plaintiff's *Eighth Amendment* claim of deliberate indifference to his deep vein thrombosis and clotting disorder.

### iv. Lymph Nodes/Cysts on Kidneys/Degenerative Disc Disease

Plaintiff alleges Defendant Stock denied him treatment for enlarged lymph nodes, cysts on his kidneys, and degenerative disc disease on June 23, 2009. (Am. Compl. at 9.) According to Plaintiff's records, he was seen on March 23, 2009, by Defendant Goldsmith, who noted Plaintiff "[h]as lost 19 lbs since 1/6/09." (Resp., **[*41]** Ex. A., Attach. 2, Part 1, at 43.) Defendant Goldsmith ordered an x-ray of Plaintiff's abdomen. (*Id.*) On March 27, 2009, Defendant Goldsmith saw Plaintiff in follow-up and noted "X-ray opf [sic] abdomen unremarkable .... Will seek CT scan with and wo contrast." (*Id.*) A CT scan of Plaintiff's abdomen was performed on June 27, 2009. (*Id.* at 37—38.) The radiology report revealed "[n]o cause for the patient's weight loss," but did note "L5-S1 degenerative disk disease" and a "minute cortical cyst in the left kidney." (*Id.*)

Plaintiff was seen in the SCF clinic by Defendant Stock on June 23, 2009, for "followup on CT scan." (*Id.* at 36.) Defendant Stock noted:

> Everything is normal, all organs in the abdomen were specifically mentioned. All labs have been normal. I am beginning to think there is nothing wrong with this patient. We cannot find anything abnormal at all. Will refer back to doctor, as I have exhausted my ideas about what to do next.

(*Id.*) Plaintiff was then seen on June 30, 2009, by Defendant Goldsmith, who noted, "Almost all labtests [sic] and CT scans have been normal." (*Id.* at 35.)

According to Dr. Frantz, asymptomatic degenerative disk disease does not require treatment. (*Id.,* **[*42]** Ex. A, P 28.) On March 21, 2005, in his intake "Self Reported History" form, Plaintiff marked that his medical history included "Backache/Joint Pain." (*Id.,* Ex. A, Attach. 2, Part 2, at 65.) The medical provider documented Plaintiff had a history of sciatica in 1997 which had resolved. (*Id.*) Dr. Frantz states upon review of Plaintiff's records she was unable to locate any time where Plaintiff complained of back pain to the CDOC staff. (*Id.,* P 27.) Likewise, this court has reviewed Plaintiff's records, which are devoid of any reference to back ache or back pain.

Dr. Frantz also explains that "The medical record clearly documents multiple examinations by multiple providers, all showing there is no evidence of lymphadenopathy. In addition, the CT scan of the abdomen revealed there

was no evidence of lymphadenopathy." (Id., Ex. A, P 29.) Indeed, on July 31, 2009, Plaintiff was evaluated in the clinic with complaints of "lymph nodes being swollen, stated there is something wrong with him. He is demanding there is something wrong with him and when I explain the cat scan was negative he then stated he remembered but still demanding something wrong with him." (Id., Ex. A, Attach. 2, Part 1, **[*43]** at 34.) The provider notes she "palpated the neck nodes and was normal but on the right arm unable to find any swollen nodes, but on the right side did feel small lump. Had another nurse Anita palpate the right arm unable to palpate any lumps." (Id.) On August 13, 2009, Plaintiff was evaluated in the clinic with "uncanny fear of dying, something wrong. no spec. body system .... Has multi nodules arms neck abd (not true)." (Id. at 32.) Defendant Fortunato documented a normal physical exam to include examination for evidence of lymphadenopathy, review of CT scan, and recent normal labs. (Id.) Defendant Fortunato documented Plaintiff did not appear to be relieved by the normal physical exam. (Id.)

Dr. Frantz states that Plaintiff did not require medical intervention beyond the treatment that SCF medical staff was providing already. (Id., Ex. A, P 41.) Regarding Plaintiff's kidney cysts, Dr. Frantz explains that "[t]his is a common finding and is benign. No treatment is medically necessary for this condition." (Id., P 28.)

In his response, Plaintiff states, "These medical conditions are well documented [sic] in the Plaintiff's medical history in which he has received medical treatment and **[*44]** therapy." (Resp. at 3, P 3.) However, Plaintiff has failed to provide evidence that Defendants "kn[ew] of and disregard[ed] an excessive risk to inmate health and safety."

837. As such, Plaintiff has not met his burden of demonstrating that a genuine issue for trial exists on his *Eighth Amendment* claims related to degenerative disk disease, swollen lymph nodes, or cysts on his kidney.

### *v. Weight Loss/Constipation/Pruritis/Abdominal Nodules/Improper Prescriptions*

In addition to the complaints addressed above, Plaintiff alleges Defendant Goldsmith "denied and or injured the Plaintiff with contra-medical treatment for the following serious needs: February 10, 2009, Defendant Goldsmith, M.D., diagnosis [sic] plaintiff with catastrophic weight loss, constapation [sic], puritis [sic], nodules in the abdomen swollen, thrombis [sic] upper

thighs." (Am. Compl. at 8, P 3.) Plaintiff also claims that on February 10, 2009, Defendant Goldsmith prescribed "three(3) Contra Hepatitis C liver medications causing palintiff [sic] to bleed profusely, severe headaches, and life threatening pro-thrombin and I.N.R. levels." (Id.) Finally, Plaintiff alleges that on March 20, 2009, Defendant **[*45]** Goldsmith "over compensates and lowers Plaintiff's anti-coagulant (Coumadin) to 6 mg. from 9 mg. causing thrombis (bloodclots) to form in lower and upper extremeties [sic]." (Id.)

On February 10, 2009, Defendant Goldsmith saw Plaintiff for complaints of weight loss, severe dermatitis with itching over the chest and back, and painful nodules in the abdomen and upper thigh. (Mot. Summ. J., Ex. A, Attach. 2, Part 1, at 47.) Defendant Goldsmith noted, "Intensely pruritic maculo papular dermatitis involving the anterior chest and the back. 5-6 mm. lesions in th subcu of the abdomen and upper aanterior [sic] thighs that are exquisitely tender." (Id.) Defendant Goldsmith ordered lab tests and an abdominal ultrasound and prescribed medications for the rash and narcotic pain medication. (Id.) Defendant Goldsmith scheduled Plaintiff to be evaluated by him two weeks later. (Id.)

On March 20, 2009, Defendant Goldsmith evaluated Plaintiff and noted he "[s]till has pruritis and has not recived [sic] ntihistamine [sic]. Will prescribe claritin. Complaoining [sic] of constipation. Feels colace is not working . . . . Will DC and Try lactulose." (Id. at 44.) Defendant Goldsmith noted Plaintiff's labs **[*46]** were "very good" and that the ultrasound "shows no elargement [sic] of liver and nrml anatomy . . . . INR is consistently elevated at 4.4. Will reduce coumadin to 6 mgm/D and recheck later in wk and for several weeks to come." (Id.)

Dr. Frantz explains that at Plaintiff's height of 5'11", and a normal body mass index (BMI) in a person of Plaintiff's height is 18 to below 25. (Id., Ex. a at 20.) Plaintiff gained weight after incarceration, and his weight peaked at 192 pounds on October 16, 2007. (Id.; Attach. 2, Part 2, at 64.) At this weight, Plaintiff had a BMI of 27.5, which is overweight. (Id.) Plaintiff then gradually lost weight, and by September 2008 his weight had declined to 186 pounds—a BMI of 26.7. (Id.; Attach. 2, Part 2, at 10.) Plaintiff explains that Plaintiff's baseline weight of 171 was recorded upon his intake in 2005, resulting in a BMI of 24.5. (Id.) Plaintiff returned to his baseline weight in the low 170s by April 2009. (Id.; Attach. 2, Part 1 at 40—41.) Plaintiff remained at that weight level through March 2010. (Id., Attach. 2, Part 1 at 3.) Dr. Frantz

2010 U.S. Dist. LEXIS 98132, *46

states that the SCF providers performed an exhaustive and medically appropriate workup of Plaintiff's complaints **[*47]** of weight loss. (*Id.*, Ex. A, P 20.) The findings were negative, and Plaintiff is now at a normal weight. (*Id.*)

There is no evidence that SCF providers, including Dr. Goldsmith, were indifferent to Plaintiff's complaints of weight loss, pruritis, or abdominal nodules. To the contrary, when Plaintiff presented with complaints of weight loss, the providers ordered tests—all with normal results—and scheduled Plaintiff for further evaluation. (Ex. A, Attach. 2, Part 1, at 44, 47.) On February 10, 2009, Defendant Goldsmith prescribed narcotic pain medication and other medication for Plaintiff's pruritis. (*Id.* at 47.) When Plaintiff complained on March 20, 2009, that the colace was not working for his constipation, Defendant Goldsmith prescribed a different prescription. (*Id.* at 44.) When Defendant Goldsmith noted on March 20, 2009, that Plaintiff still had pruritis, he prescribed Claritin. (*Id.*) On March 23, 2009, Defendant Goldsmith evaluated Plaintiff again and noted Plaintiff's weight loss of nineteen pounds since January 6, 2009. (*Id.* at 43.) Defendant Goldsmith noted that Plaintiff was no longer complaining of pruritis and his abdomen was not distended but that Plaintiff had no stool **[*48]** for five days. (*Id.*) Defendant Goldsmith ordered an x-ray and noted he would "consider CT scan of abdomen and pelvis." (*Id.*) Defendant Goldsmith also ordered lab tests and noted he would have the "results reviewed and patient seen by Dr. Fortunato." (*Id.*) On March 27, 2009, Defendant Goldsmith reviewed Plaintiff's abdominal x-ray and found the results to be "unremarkable." (*Id.* at 42.) Nevertheless, Defendant Goldsmith ordered a CT scan. (*Id.*) On April 9, 2009, Dr. Goldsmith evaluated Plaintiff again and noted that Plaintiff was "[d]oing much betterwith [sic] regards to abdominal pain. Much less abdominal pain following use of milk of magnesia and large bowel movement." (*Id.* at 40.)

Regarding Plaintiff's claims that Defendant Goldsmith improperly prescribed medication contraindicated for a person with Hepatitis C and his claims that he developed headaches and bleeding as a result, Dr. Frantz explains that many drugs can interact with Coumadin and affect a patient's INR. (*Id.*, Exh. A., P 11.) Dr. Frantz further explains that this does not mean that the drugs should be avoided; it simply means that a patient's INR should be closely monitored when initiating treatment with those medications. **[*49]** (*Id.*) As discussed in detail above, Plaintiff's medical records show that the CDOC medical staff monitored and

treated Plaintiff's deep vein thrombosis regularly and carefully and regularly monitored Plaintiff's INR levels. When Plaintiff's blood tests showed abnormal INR levels, his healthcare providers undertook steps to treat Plaintiff. Plaintiff's disagreement with the treatment protocol, including medications prescribed, does not amount to deliberate indifference. See *Perkins v. Kansas Dept. of Corrs., 165 F.3d 803, 811 (10th Cir.1999).*

Again, Plaintiff has failed to provide evidence that Defendants "kn[ew] of and disregard[ed] an excessive risk to inmate health and safety." *Farmer, 511 U.S. at 837.* Plaintiff has not met his burden of demonstrating that a genuine issue for trial exists on his *Eighth Amendment* claims related to weight loss, constipation, pruritis, abdominal nodules, or improper prescriptions for his clotting disorder.

### vi. Discontinued Medications

Plaintiff alleges that Defendant Dowis, the Health Services Administrator at SCF,

> instituted policy that discontinued plaintiff's prior prescribed prescription medications and treatment, deemed medically necessary by Dr. Oba, **[*50]** M.D., Bent County Correctional facility. This discontinuation caused plaintiff's serious complications with his bloodclotting disorder, pruritis, and extensive pain, suffering and potential life threatening bloodclots in upper and lower extremeties, enlarged lymph nodes, and catastrophic weight loss.

(Am. Compl. et 10, P 6.) Plaintiff also alleges Defendant Dowis has disregarded his serious medical needs in an effort to save money. (*Id.* and P 15; Am. Compl. at 11, P d.)

Dr. Frantz explains that there is no policy mandating the discontinuation of medication when an inmate moves from one facility to another. (Mot. Summ. J., Ex. A, P 44.) Dr. Frantz states that every inmate's medical status is reviewed periodically, and usually an inmate's medical status is reviewed when he changes facilities. (*Id.*) Defendants argue that even if there were such a policy, Plaintiff received medically appropriate medications at SCF. (Mot. Summ. J. at 27.)

Dr. Frantz explains that the primary prescription Plaintiff received at BCCF was for Coumadin to treat Plaintiff's deep vein thrombosis. (*Id.*, Ex. A, P 44.) As detailed

### 2010 U.S. Dist. LEXIS 98132, *50

above, Plaintiff has received that medication, and had his INR levels monitored, continuously **[*51]** since his arrival at SCF. In his response, Plaintiff asserts that Doxepin, Pepcid AC, and medicated lotion have been discontinued. (Resp. at 5, P 9.) The medical records show that Plaintiff was seen by Defendant Stock in the clinic on January 10, 2008, and the clinic notes state, "he was on Doxepin for chronic skin itching, and would like to have that renewed." (Mot. Summ. J., Ex. A, Attach. 2, Part 2, at 58.) Plaintiff was given a three-month prescription for Doxepin. (*Id.*) On February 10, 2009, Defendant Goldsmith saw Plaintiff for complaints of weight loss, severe dermatitis with itching over the chest and back, and painful nodules in the abdomen and upper thigh. (*Id.*, Attach. 2, Part 1, at 47.) Defendant Goldsmith noted, "Intensely pruritic maculo papular dermatitis involving the anterior chest and the back. 5-6 mm. lesions in th subcu of the abdomen and upper aanterior [sic] thighs that are exquisitely tender." (*Id.*) Defendant Goldsmith prescribed medications for the rash and narcotic pain medication. (*Id.*) On March 20, 2009, Defendant Goldsmith evaluated Plaintiff and noted he "[s]till has pruritis and has not recived [sic] ntihistamine [sic]. Will prescribe claritin." (*Id.* at 44.)

Other **[*52]** than these records over a three-month period, there is no indication Plaintiff ever complained of a rash or itching skin. Moreover, there is no evidence Plaintiff was given a prescription for Pepcid AC, or that Plaintiff ever requested a prescription for Pepcid AC. Finally, the record is devoid of any evidence that Defendant Dowis had any role in prescribing or discontinuing medications or that any decisions to discontinue medications were based on an effort to save money. Plaintiff has failed to establish an affirmative link between the alleged constitutional violations and Defendant Dowis's personal participation. *See 992 F.2d at 1055*.

As Plaintiff's allegations are not supported by the record, *see Thomson, 584 F. 3d at 1312*, Plaintiff has failed to satisfy the subjective prong of the deliberate indifference test as to his claims that medications were discontinued in violation of his                    rights.

#### vi. Hepatitis C

Plaintiff generally alleges that Defendants have failed to provide the Plaintiff with proper and adequate medical care and treatment for Hepatitis C. (Am. Compl. at 4.) Defendants argue that Plaintiff has failed to show any defendants' personal participation **[*53]** in denying him

care for Hepatitis C. (Mot. Summ. J. at 29.) Defendants also argue that Plaintiff is currently engaged in the CDOC's Hepatitis C protocol, and there is no evidence that he requires additional treatment at this time. (*Id.*)

The court agrees that Plaintiff has failed to allege that any defendant personally participated in denying him care for his Hepatitis C. Though Plaintiff states has been diagnosed with Hepatitis C (*see* Am. Compl. at 4, 11, 15 ), that he was treated for the disease while incarcerated in BCCF from April 2005 through December 2007 (*see id.* at 6), and that "[u]pon arrival at Sterling Correctional Facility, all previously prescribed medications and treatment for Plaintiff's chronic health conditions were discontinued without notice or medical evaluation" (*id.* at 11), Plaintiff wholly fails to allege any personal participation by any of the CDOC Defendants in the alleged constitutional violations. As such, Plaintiff has failed to show that any defendant caused the deprivation of a federal right. *Kentucky, 473 U.S. at 166*. Regardless, Plaintiff's claims regarding the treatment of Hepatitis C fail because Plaintiff has failed to meet the subjectiva prong for **[*54]** the deliberate indifference test.

Dr. Frantz explains that the CDOC's treatment protocol for Hepatitis C is directed and controlled by a clinical standard developed on the published recommendations of the American Society for the Study of Liver Diseases (ASSLD). (Mot. Summ. J., Exh. A, P 24.) The treatment is complex, and it involves a 48-week regimen of interferon and ribarvirin. (*Id.*) The treatment is not benign, and it is not suitable for all patients. (*Id.*) In order for offenders to be eligible for the treatment, they must first complete six months of drug and alcohol classes. (*Id.*) Once an offender has completed drug and alcohol classes, a liver biopsy is performed to determine the patient's degree of liver injury. (*Id.*) Whether or not treatment is recommended depends on the results of the liver biopsy, in accordance with ASSLD guidelines. (*Id.*) Treatment with interferon and ribarvirin is provided to offenders if testing indicates that the benefits of treating the disease outweigh the risks of treatment. (*Id.*) Hepatitis C most frequently is asymptomatic and may be present for decades without progression. (*Id.*) Because the treatment for Hepatitis C carries substantial risks, treatment **[*55]** is not recommended for all patients. (*Id.*)

In his Response, Plaintiff states, "The [defendants] have full knowledge of the Plaintiff's Hepatitis C. They have not done a recent blooddraw [sic] for liver enzymes, they will not provide placement in the needed Drug and

2010 U.S. Dist. LEXIS 98132, *55

Alcohol treatment Program, Plaintiff has been on a so called waitng [sic] list for longer than 5 years to attend." (Resp. at 11.) Plaintiff also states he "has made every posible [sic] effort to obtain Interfuron [sic] treatment, the defendants' only avoid or put off treatment for Hepatitis C." (Id. at 12.)

In his reply in support of his motions for injunctive relief, Plaintiff attaches a letter dated July 28, 2009, from Ms. Estrada, Drug/Alcohol Counsel, advising Plaintiff that he would need "six months of reportable treatment" before he could be considered for Interferon treatment. (Reply. Mot. Prelim. Inj. and Mot. TRO. at 16.) Ms. Estrada suggests to Plaintiff that he "attend AA groups as it is acceptable treatment" and that he "will receive 3 months of treatment from D & A group, and will need the additional AA to get the required 6 months." (Id.) Plaintiff states in his reply, filed June 8, 2010, that he "continues to [*56] request Interfuron [sic] treatment and attends N. A. weekly meetings." (Id. at 5, P 20.)

Dr. Frantz states that Plaintiff will be evaluated for interferon treatment if he completes the drug and alcohol classes. (Mot. Summ. J., Ex. A, P 24.) However, Dr. Frantz explains that based solely on Plaintiff's medical records, he has not shown clinical progression of Hepatitis C, and he does not require treatment at this time. (Id.) The records show that throughout his incarceration, Plaintiff has had numerous laboratory evaluations, including the evaluation of liver enzymes, to follow his Hepatitis C, and all of the tests have been normal. (Id.; see e.g., Ex. A, Attach. 2, Part 1, at 25, 40.) Plaintiff also had a CT scan of the abdomen on June 17, 2009, and his liver was specifically noted to be normal. (Id., Ex. A., P 24; 37—38.) Moreover, Dr. Frantz states, and upon review of the medical records this court agrees, there is no evidence in the record that Plaintiff has complained of or mentioned symptoms of Hepatitis C. (Id.)

To the extent Plaintiff believes that interferon and ribarvirin treatment would be effective for him but the medical providers do not, under controlling Tenth Circuit law, [*57] this disagreement over the best course of treatment does not amount to deliberate indifference. See Perkins v. Kansas Dept. of Corrs., 165 F.3d 803, 811 (10th Cir.1999) (disagreement about treating plaintiff's HIV with protease inhibitor was not deliberate indifference). Moreover, case law firmly establishes that prisoners do not have the right to receive any and all medical treatments that they choose. Estelle, 429 U.S. at 106.

All of the evidence led Dr. Frantz to conclude that Plaintiff has not shown clinical progression of Hepatitis C and that his Hepatitis C does not require treatment at this time. (Mot. Summ. J., Ex. A, P 24.) Plaintiff has offered no contradicting evidence to show Defendants acted with deliberate indifference to his serious medical needs. Thus, Plaintiff has failed to demonstrate a genuine issue for trial on this issue, and Defendants are entitled to summary judgment. Concrete Works, Inc., 36 F.3d at 1518.

### 4. Qualified Immunity

Defendants also argue that, in the absence of a constitutional violation, they are entitled to qualified immunity. (Mot. at 32.) The doctrine of qualified immunity shields government officials from individual liability for civil damages "insofar [*58] as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).

Because of the purpose underlying qualified immunity, courts address qualified immunity questions differently from other summary judgment decisions. Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001). After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, who must meet a "heavy two-part burden." Id. The plaintiff must establish both 1) that an officer's conduct violated the plaintiff's federal statutory or constitutional rights, and 2) that the rights in question were clearly established at the time of their alleged violation. See Thomas v. Durastanti, 607 F.3d 655, 662 (10th Cir. 2010). If the plaintiff fails to satisfy either part of this "heavy two-part burden," the court must grant the defendant qualified immunity and dismiss the [*59] deficient claims.

Plaintiff has not met his burden here. As described above, Plaintiff has not established that Defendants violated his rights under the Eighth Amendment. Accordingly, the court need not address whether such rights were clearly established. See Thomson v. Salt Lake Cnty. 584 F.3d 1304, 1312, n.2 (10th Cir. 2009). Defendants are entitled to qualified immunity.

## MOTIONS FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

Plaintiff seeks an order for "defendants, their successors, agents, employees, and all persons acting in concert with them to provide plaintiff with proper and adequate medical care and or transfer him to a full hospital facility that will provide said care." (Mot. Prelim. Inj. at 7.) Plaintiff also requests a temporary restraining order "to aid and Protect the Palintiff [sic] from more egregious and retaliative actions by Defendant(s) . . . ." (Mot. TRO at 2.)

A party seeking a preliminary injunction pursuant to *Fed. R. Civ. P. 65(a)* must show (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and **[*60]** (4) that the injunction is in the public interest. *RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1208 (10th Cir. 2009)* (citing *Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008)).* The Tenth Circuit has made it clear that "because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC, 562 F.3d 1067, 1070 (10th Cir. 2009)* (quoting *Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003))* (internal quotation marks omitted). Consequently, granting such "drastic relief," *United States ex rel. Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enter. Mgmt. Consultants, Inc., 883 F.2d 886, 888-89 (10th Cir. 1989),* "is the exception rather than the rule." *GTE Corp. v. Williams, 731 F.2d 676, 678 (10th Cir. 1984).* The same considerations apply to the issuance of a temporary restraining order. *See Lundgrin v. Claytor, 619 F.2d 61, 63 (10th Cir. 1980).*

Plaintiff has failed to establish each of the essential requirements for a temporary restraining order or preliminary injunction. First, as this court is recommending that Defendants **[*61]** be granted summary judgment on all of Plaintiff's claims for relief, there is not a substantial likelihood Plaintiff ultimately will prevail on the merits of this case. Second, Plaintiff has failed to show that he will suffer irreparable injury if his request for preliminary injunction is denied. Accordingly, Plaintiff's request for injunctive relief is properly denied at this time. Because Plaintiff has failed to satisfy each of the four prerequisites, his motions for preliminary injunction and temporary restraining order

should be denied.

WHEREFORE, for the foregoing reasons, the court respectfully

RECOMMENDS

1. Defendants' "Motion for Summary Judgment" (Doc. No. 57) be GRANTED;

2. "Plaintiff's Motion for Preliminary Injunction and Supporting Memorandum of Law" (Doc. No. 5) be DENIED; and

3. "Plaintiff's Request for a Temporary Restraining Order" (Doc. No. 31) be DENIED; and

4. This case be dismissed in its entirety, with prejudice.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for **[*62]** the District of Colorado. *28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); In re Griego, 64 F.3d 580, 583 (10th Cir. 1995).* A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla., 73 F.3d 1057, 1060 (10th Cir. 1996).* Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers, 195 F.3d 573, 579—80 (10th Cir. 1999)* (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop., 73 F.3d at 1059—60* (a party's objections **[*63]** to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc., 52 F.3d 901, 904 (10th Cir. 1995)* (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its

2010 U.S. Dist. LEXIS 98132, *63

right to appeal those portions of the ruling); *Ayala v. United States, 980 F.2d 1342, 1352 (10th Cir. 1992)* (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS, 418 F.3d 1116, 1122 (10th Cir. 2005)* (firm waiver rule does not apply when the interests of justice require review).

Dated this 1st day of September, 2010.

**BY THE COURT:**

/s/ Kathleen M. Tafoya

Kathleen M. Tafoya

United States Magistrate Judge

---

End of Document

 Positive
As of: January 15, 2020 7:49 PM Z

## Rivera v. Dowis

United States District Court for the District of Colorado

January 29, 2010, Decided; January 29, 2010, Filed

Civil Action No. 08-cv-02715-CMA-CBS

**Reporter**
2010 U.S. Dist. LEXIS 16439 *

ENCARNACION T. RIVERA, Plaintiff, v. BEVERLY
DOWIS, HSA, Physician Health Partners, WARDEN
KEVIN MILYARD, Sterling Correctional Facility,
ARISTEDES ZAVARAS, Executive Director of
C.D.O.C., P.A. JOANN STOCK, Sterling Correctional
Facility P.H.P., N.P. KATHRY [sic] RITTENHOUSE,
Sterling Correctional P.H.P., DR. JOSEPH GARY
FORTUNADO, Sterling Correctional Facility P.H.P., DR.
PAULA FRANTZ, Chief Medical Officer, Physician
Health Partners, CAPTAIN RICHIE MISHIARA, Sterling
Correctional Facility, CAPTAIN WEINGARDT, Sterling
Correctional Facility, DR. STEPHEN KREBS, Physician
Health Partners, CATHIE HOLST, A.D.A. Coordinator,
Colorado Department of Corrections, and JOHN DOE
AND JANE DOE 1-10, all named Defendants in their
official and individual capacities, Defendants.

**Subsequent History:** Accepted by, Dismissed by
_Rivera v. Dowis, 2010 U.S. Dist. LEXIS 16487 (D. Colo.,
Feb. 24, 2010)_

**Prior History:** _Rivera v. Dowis, 2009 U.S. Dist. LEXIS
25791 (D. Colo., Mar. 13, 2009)_

## Core Terms

alleges, inmates, prison, exhaust, disability, statute of
limitations, recommendations, grievance, deliberate
indifference, surgery, constitutional violation,
administrative remedy, impairment, bumps, red, motion
to dismiss, malpractice, damages, rights, legs, medical
care, certificate, quotation, marks, pain, civil action, the
Eighth Amendment, prescribed, services, personal

participation

**Counsel:** [*1] Encarnacion T. Rivera, Plaintiff, Pro se,
Denver, CO.

For Kevin Milyard, Sterling Correctional Facility, Beverly
Dowis, H.S.A. Physician Health Partner's, Cathie Holst,
ADA Coordinator Colorado Department of Corrections
and John and Jane Doe 1-10, Cathie (I) Holst, ADA
Coordinator Colorado Department of Corrections in her
individual capacity, Weingardt, Captain Sterling
Correctional Facility, (I) Weingardt, Captain Sterling
Correctional Facility. In his individual capacity, Richie
Mishiara, Captain Sterling Correctional Facility, Richie
(I) Mishiara, Captain Sterling Correctional Facility in his
individual capacity, Kathry (I) Rittenhouse, N.P., Sterling
Correctional Facility. in her individual capacity, Joann (I)
Stock, P.A. Sterling, Correctional Facility P.H.P. in her
individual capacity, Aristedes (I) W. Zavares, Executive
Director of C.D.O.C in his individual capacity, Kevin (I)
Milyard, Sterling Correctional Facility in his individual
capacity, Beverly Dowis (I), H.S.A. Physician Health
Partners in her individual capacity, Paula (I) Frantz, Dr.
Chief Medical Officer-Physician Health Partners- in her
individual capacity, Paula Frantz, Dr. Chief Medical
Officer-Physician Health [*2] Partners- in her official
capacity, Joseph Gary Fortunado (I), Dr. Sterling
Correctional Facility P.H.P. in his Individual capacity,
Joseph Gary Fortunado, Dr. Sterling Correctional
Facility P.H.P in his official capacity, Kathry
Rittenhouse, N.P., Sterling Correctional P.H.P, Joann
Stock, P.A., Sterling Correctional P.H.P, Aristedes W.
Zavaras, Executive Director of C.D.O.C., Defendants:
Christopher Wayne Alber, Colorado Attorney General's
Office-Employment Law, Denver, CO.

For Stephen Krebs, Dr. Physician Health Partners in his
official capacity, Stephen Krebs (I), Dr. Physician Health

2010 U.S. Dist. LEXIS 16439, *2

Partners in his individual capacity., Defendants: Andrew David Ringel, Joseph Patrick Sanchez, Hall & Evans. LLC-Denver, Denver, CO.

**Judges:** Craig B. Shaffer, United States Magistrate Judge.

**Opinion by:** Craig B. Shaffer

## Opinion

RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Magistrate Judge Craig B. Shaffer

This civil action comes before the court on: (1) Defendant Krebs' Motion to Dismiss (filed June 22, 2009) (doc. # 31); and (2) Defendants' Motion to Dismiss (filed June 22, 2009) (doc. # 34). Pursuant to the Order of Reference dated April 23, 2009 (doc. # 21) and the memoranda dated June 22, 2009 (docs. # 32 and # 35), these matters **[*3]** were referred to the Magistrate Judge. The court has reviewed the Motions, Defendant Krebs' Supplement (filed June 24, 2009) (doc. # 37), Mr. Rivera's "Combined Rebuttal of State Defendants' Motion to Dismiss and Dr. Stephen Krebs, M.D. P.H.P" ("Response") (filed July 22, 2009) (doc. # 38), Defendant Krebs' Reply (filed July 27, 2009) (doc. # 39), the pleadings, the entire case file, and the applicable law and is sufficiently advised in the premises.

I. Statement of the Case

At the time this civil action was filed, Mr. Rivera was incarcerated at the Sterling Correctional Facility ("SCF") of the Colorado Department of Corrections ("CDOC") in Sterling, Colorado. (See Second Amended Prisoner Complaint ("SAC") (doc. # 17)). Mr. Rivera was released from CDOC on September 30, 2009. (See doc. # 45). Mr. Rivera claims he received inadequate medical care for several medical concerns during his incarceration. Mr. Rivera alleges five claims for relief pursuant to 42 U.S.C. § 1983 for violation of his Eighth Amendment rights and for malpractice: (1) "Catera[ct] removal and

blindness;" (2) "Pain in both legs due to Erythema Nodosa;" (3) "Broken right wrist;" (4) "Malpractice;" and (5) "Eighth Amendment **[*4]** Deprivation of civil rights pattern of misconduct (all Defendants[)]." Mr. Rivera sues eleven named Defendants and John and Jane Does 1 through 10 "in their official and individual capacities." (See SAC). Mr. Rivera seeks declaratory relief, injunctive relief, compensatory damages in the amount of $ 500,000 against each Defendant, and punitive damages in the amount of $ 500,000 against each Defendant. (See SAC at p. 26 of 26). Defendants have moved for dismissal of the SAC on several grounds pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6).

In his first claim, Mr. Rivera alleges that while he was incarcerated in 2003, he was diagnosed with a cataract in his right eye. (See SAC at pp. 6, 8 of 26). Mr. Rivera alleges he was told that he did not qualify for surgery to remove the cataract because he was only serving a two-year sentence. (See id). Mr. Rivera was discharged from prison on October 28, 2004. (See id). In January 2005, Mr. Rivera was again sentenced to the CDOC to serve a four-year prison term at SCF. (See SAC at pp. 6, 9 of 26). Mr. Rivera alleges he informed the medical staff at SCF that he had a cataract in his right eye, and needed surgery to have it removed. (See id). Mr. **[*5]** Rivera alleges that his request for cataract surgery was denied because he is not a diabetic, he can still see out of his left eye, and there are not sufficient funds for the surgery. (See SAC at pp. 6, 9 of 26). Mr. Rivera alleges that his last visit to an eye doctor was in 2007. (See id. at p. 6 of 26). In his second claim, Mr. Rivera complains that he has pain in both of his legs due to Erythema Nodosa. (See SAC at p. 10 of 26). Mr. Rivera claims that on February 2, 2006, he was seen by Dr. Fortunato and Nurse Practitioner Rittenhouse complaining of red bumps that had appeared on both of his legs. (See id.). Mr. Rivera alleges that he was given steroid cream by Ms. Rittenhouse, despite telling her that he was allergic to steroids. (See id.).

In his third claim, Mr. Rivera alleges that on December 20, 2006, he slipped and fell and broke his right wrist. (See SAC at p. 12 of 26). His wrist was placed in a temporary splint. (See id.). Mr. Rivera claims that the Christmas and New Year's holiday delayed by two weeks a scheduled surgery to place pins and screws in his wrist. (See id.). After the holidays, he was seen by a medical provider and told that surgery was not necessary because **[*6]** his bones were already mending. (See id.). On January 26, 2007, Mr. Rivera was examined by a doctor who stated that his bones were "mending pretty well." (See id.). On June 4, 2007,

after returning to his job on the Ground Maintenance Crew, Mr. Rivera reported to Ms. Rittenhouse that his two fingers were going numb. (*See id.*). After more x-rays, Mr. Rivera was told that he has arthritis. Mr. Rivera alleges that he can no longer pick up anything weighing over three pounds with his right hand. (*See id.* at p. 13 of 26).

In Claim Four, Mr. Rivera alleges malpractice for the delay in treating the red bumps on his legs that were diagnosed as erythema nodosa, for the cream prescribed that caused additional burning, itching, and pain, and for failure to provide prescribed pain medicine. (See SAC at p. 14-16 of 26).

In Claim Five, Mr. Rivera alleges that on October 3, 2006, he was prescribed a steroid medication to which he was allergic and that caused internal bleeding. (See SAC at p. 18 of 26). Mr. Rivera also generally alleges that Defendants inadequately responded to various medical needs. (*See id.* at pp. 19-20 of 26). Mr. Rivera further alleges that Defendant Mishiara, as the housing captain [*7] at SCF, has failed to provide accommodations pursuant to the Americans with Disabilities Act of 1990 ("ADA") and knew of incidents in which correctional officers have closed the electric sliding doors on inmates. (See SAC at pp. 20-21 of 26). Mr. Rivera alleges that there are not enough ADA jobs, the medication line is not wheelchair accessible, there are not enough tables in the chow hall for inmates with wheelchairs, and the shower in Unit 1B does not have handicap railings. (*See id.*). Mr. Rivera alleges that Defendant Wingert responded inappropriately to his complaints about ADA compliance and that Defendant Holst has taken the role of ADA Coordinator without any proper training and has made a mockery of the ADA laws. (See SAC at pp. 22-23 of 26).

II. Standard of Review

While Defendants have cited *Rule 12(b)(1)*, they make no specific arguments pursuant to *Rule 12(b)(1)*. Under *Rule 12(b)(1)*, a motion to dismiss may be granted if the court does not have subject matter jurisdiction over the matter. In addressing a jurisdictional challenge, the court need not presume all of the allegations contained in the complaint to be true, "but has wide discretion to allow affidavits, other documents, [*8] and a limited evidentiary hearing to resolve disputed jurisdictional facts. . . ." *United States v. Rodriguez Aguirre, 264 F.3d 1195, 1204 (10th Cir. 2001)* (citation omitted).

*Rule 12(b)(6)* states that a court may dismiss a complaint for "failure to state a claim upon which relief

can be granted." To withstand a motion to dismiss, a complaint must contain enough allegations of fact "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. The burden is on the plaintiff to frame "a complaint with enough factual matter (taken as true) to suggest" that he or she is entitled to relief. *Twombly, 550 U.S. at 556*. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id. at 555*.

Because Mr. Rivera appears *pro se*, the court "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States Gov't, 472 F.3d 1242, 1243 (10th Cir. 2007)* (citations omitted). *See also Haines v. Kerner, 404 U.S. 519, 520-21, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)* (holding allegations of a pro se complaint "to less stringent standards than formal pleadings drafted [*9] by lawyers"). However, a *pro se* litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991)*. A court may not assume that a plaintiff can prove facts that have not been alleged, or that a defendant has violated laws in ways that a plaintiff has not alleged. *Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 526, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*. *See also Whitney v. State of New Mexico, 113 F.3d 1170, 1173-74 (10th Cir. 1997)* (court may not "supply additional factual allegations to round out a plaintiff's complaint"); *Drake v. City of Fort Collins, 927 F.2d 1156, 1159 (10th Cir. 1991)* (the court may not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues").

III. Analysis

A. Liability of Defendants in Their Official and Individual Capacities

*Section 1983* creates a cause of action where a "person . . . under color of any statute, ordinance, regulation, custom or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person . . . to [*10] the deprivation of any rights, privileges or immunities secured by the Constitution." *Section 1983* does not create any substantive rights; rather, it creates only a remedy for violations of rights secured by federal statutory and constitutional law. *Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 616-18, 99 S. Ct. 1905, 60 L. Ed. 2d 508 (1979)*.

To establish a claim under *§ 1983*, a plaintiff must prove he was deprived of a right secured by the Constitution or laws of the United States and that the alleged deprivation was committed under color of law. *American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999)*

To the extent that Mr. Rivera is suing Defendants in their official capacities, he is actually attempting to impose liability on Defendants' employer, the CDOC. *See Hafer v. Melo, 502 U.S. 21, 25, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991)* (suit against a state official in his or her official capacity is treated as a suit against the state). The CDOC is considered an agency of the State of Colorado. *See Colo. Rev. Stat. § 24-1-128.5.* States and state officials sued in their official capacities are not "persons" within the meaning of *§ 1983. Will v. Michigan Department of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989).* Absent a waiver, the *Eleventh Amendment* [*11] forbids a suit for damages against a state in federal court. *Ambus v. Granite Board of Education, 995 F.2d 992, 994 (10th Cir. 1993)* (citing *Edelman v. Jordan, 415 U.S. 651, 663, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974)).* Such entities cannot be sued for monetary damages arising from alleged conduct which deprives a plaintiff of his or her civil liberties. The *Eleventh Amendment* confers total immunity from suit, not merely a defense to liability. *Ambus, 995 F.2d at 994* (citation omitted). To the extent that Mr. Rivera seeks monetary damages against Defendants in their official capacities, his claims are properly dismissed with prejudice.

To the extent that Mr. Rivera is suing Defendants in their individual capacities, personal capacity suits pursuant to *§ 1983* seek to impose personal liability upon a government official for actions he or she takes under color of state law. *Kentucky v. Graham, 473 U.S. 159, 164, 105 S. Ct. 3099, 87 L. Ed 2d 114 (1985).* The *Eleventh Amendment* does not bar actions for damages against state officials in their individual capacities. *Graham, 473 U.S. at 165-67.*

### B. Statute of Limitations for *§ 1983* Claims

Defendants argue that a substantial portion of Mr. Rivera's claims are barred by the statute of limitations. To determine [*12] the timeliness of a claim under *§ 1983*, federal courts must look to the applicable state statute of limitations. *Blake v. Dickason, 997 F.2d 749, 750 (10th Cir. 1993).* Colorado law provides a two-year statute of limitations for actions brought pursuant to *§ 1983. See Colo. Rev. Stat. § 13-80-102(1)(g)* (establishing a two-year limitation period for "all actions upon liability created by a federal statute where no period of limitation is provided in said federal statute" and for "all other actions of every kind for which no other period of limitation is provided"); *Blake, 997 F.2d at 750* (applying *§ 13-80-102* to *§ 1983* claim).

The determination of when a *§ 1983* action accrues is controlled by federal rather than state law. *Smith v. Gonzales, 222 F.3d 1220, 1222 (10th Cir. 2000)* (citation omitted). "*Section 1983* claims accrue, for the purpose of the statute of limitations, when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Hunt v. Bennett, 17 F.3d 1263, 1266 (10th Cir. 1994). See also Industrial Constructors Corp. v. U.S. Bureau of Reclamation, 15 F.3d 963, 969 (10th Cir. 1994)* ("The statute of limitations begins to run when the plaintiff knows [*13] or has reason to know of the existence and cause of injury which is the basis of his action.") "[I]t is not necessary that a claimant know all of the evidence ultimately relied on for the cause of action to accrue." *Baker v. Board of Regents of State of Kansas, 991 F.2d 628, 632 (10th Cir. 1993).*

A prisoner's *pro se* complaint alleging a *§ 1983* action against state prison officials is treated as filed with the court on the date the prisoner gave it to prison authorities for mailing. *See Houston v. Lack, 487 U.S. 266, 271, 108 S. Ct. 2379, 101 L. Ed. 2d 245 (1988).* Mr. Rivera executed the original complaint on January 20, 2009. (*See* doc. # 5 at p. 35 of 35). Mr. Rivera's claims arise from conduct that he alleges occurred between December 2005 and October 2008, much of which is more than two years before Mr. Rivera initiated this civil action and outside the statute of limitations. (*See* SAC at pp. 9, 18 of 26). Mr. Rivera has not argued that his claims based on conduct occurring before January 20, 2007 had not yet accrued. *See Hunt, 17 F.3d at 1266* ("*Section 1983* claims accrue, for the purpose of the statute of limitations, when the plaintiff knows or has reason to know of the injury which is the basis of his action."); [*14] Response (doc. # 38)). Thus, under Colorado's applicable two-year statute of limitations provision, Mr. Rivera's claims that allege conduct before January 20, 2007 appear to be barred by the statute of limitations.

As an affirmative defense, the statute of limitations may be subject to certain defenses such as waiver, estoppel, or equitable tolling. *See Rotella v. Wood, 528 U.S. 549, 560, 120 S. Ct. 1075, 145 L. Ed. 2d 1047 (2000)* (federal statutes of limitations "are generally subject to equitable principles of tolling"). However equitable tolling

Case No. 1:18-cv-00956-MSK-MEH  Document 217-4  filed 01/17/20  USDC Colorado  pg 27 of 57

is employed as an "exception, not the rule." *Rotella, 528 U.S. at 561*. The issue of tolling, like the statute of limitations, is governed by Colorado state law. *Hardin v. Straub, 490 U.S. 536, 539, 109 S. Ct. 1998, 104 L. Ed 2d 582 (1989)*; *Fratus v. Deland, 49 F.3d 673, 675 (10th Cir. 1995)*. "Once the statute of limitations is raised as an affirmative defense, the burden shifts to the plaintiff to show that the statute has been tolled." *Overheiser v. Safewey Stores, Inc., 814 P.2d 12, 13 (Colo. App. 1991)*. Under Colorado law, there are two circumstances where equitable tolling may apply. The doctrine of equitable tolling "permits the statute of limitations to be tolled only where the defendant's wrongful conduct [*15] prevented the plaintiff from asserting the claims in a timely manner or truly exceptional circumstances prevented the plaintiff from filing the claim despite diligent efforts." *Morrison v. Goff, 74 P.3d 409, 412-13 (Colo. App. 2003)* (citation omitted). *See also Sandoval v. Archdiocese of Denver, 8 P.3d 598, 604-05 (Colo. App. 2000)* ("[i]n order for a statute of limitations to be tolled because of equitable considerations, it is the plaintiff's burden to establish that the defendant's actions prevented her from filing a timely claim.") (citation omitted). Mr. Rivera has not argued any basis for equitable tolling. (*See* Response (doc. # 38)).

"At the motion-to-dismiss stage, a complaint may be dismissed on the basis of a statute-of-limitations defense only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute." *Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275, 1288 n. 13 (11th Cir. 2005)* (internal quotation marks and citations omitted). *See also United States v. Lewis, 411 F.3d 838, 842 (7th Cir. 2005)* (complaint may be dismissed where the "allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense, such [*16] as when a complaint plainly reveals that an action is untimely under the governing statute of limitations") (citation omitted); *Bullington v. United Air Lines Co., 186 F.3d 1301, 1310 n. 3 (10th Cir. 1999)* (noting "that *Rule 12(b)(6)* is a proper vehicle for dismissing a complaint that, on its face, indicates the existence of an affirmative defense such a s noncompliance with the limitations period") (citation omitted), *implicitly overruled on other grounds as recognized by Boyer v. Cordant Technologies, 316 F.3d 1137, 1140 (10th Cir. 2003)*. Mr. Rivera's allegations plainly support dismissal of his claims based on conduct that occurred before January 20, 2007 as barred by the statute of limitations.

C. Claim One Relating to Treatment of Cataract

Defendants have moved to dismiss Claim One based upon Mr. Rivera's failure to exhaust his administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"), *42 U.S.C. § 1997e(a)*. The PLRA provides:

> No action shall be brought with respect to prison conditions under *section 1983* of this title, or any other Federal law, by a prisoner confined in a jail, prison, or other correctional facility until such administrative remedies as are [*17] available are exhausted.

*42 U.S.C. § 1997e(a)*. "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock, 549 U S. 199, 211, 127 S. Ct. 910, 166 L. Ed 2d 798 (2007)*. The PLRA requires "proper exhaustion" of administrative remedies, which means the plaintiff must utilize all administrative remedies provided and must comply with the deadlines and other procedural rules prior to filing a federal lawsuit relating to the conditions of his confinement. *Woodford v. Ngo, 548 126 S. Ct. 2378 165 L. Ed. 2d 368*. *See also Jones v. Bock, 549 U.S. at 218* ("to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules, -- rules that are defined not by the PLRA, but by the prison grievance process itself") (internal quotation marks and citation omitted).

In *Jones v. Bock, 549 U.S. 199, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007)*, "[t]he Supreme Court . . . set forth a new standard to govern PLRA lawsuits: 'failure to exhaust is an affirmative defense under the PLRA, and . . . inmates are not required to specially plead or demonstrate exhaustion in their complaints.'" *Roberts v. Barreras, 484 F.3d 1236, 1240 (10th Cir. 2007)* [*18] (quoting *Jones v. Bock, 549 U.S. at 216* and citing *Aguilar-Avellaveda v. Terrell, 478 F.3d 1223 (10th Cir. 2007)*). Now "the burden of proof for the exhaustion of administrative remedies in a suit governed by the PLRA lies with the defendant." *Roberts v. Barreras, 484 F.3d at 1241*. Dismissal under *§ 1997e(a)* for failure to exhaust administrative remedies therefore cannot usually be made on pleadings without proof. *See Freeman v. Watkins, 479 F.3d 1257 1260 (10th Cir. 2007)* ("'only in rare cases will a district court be able to conclude from the face of the complaint that a prisoner has not exhausted his administrative remedies and that he is without a valid excuse'") (quoting *Aguilar-Avellaveda v. Terrell. 478 F.3d at 1225*)).

At the time Mr. Rivera filed his grievances, the CDOC provided inmates an administrative grievance process as set forth in Administrative Regulation ("AR") 850-04, which consists of 3 steps. (*See* AR 850-04 (IV)(B)(4)(b), effective November 15, 2007, superseded December 1, 2008). The court may take judicial notice of the CDOC's administrative process. *See Ray v. Aztec Well Service Co., 748 F.2d 888, 889 (10th Cir. 1984)* (court can take judicial notice of agency **[*19]** rules and regulations); *Antonelli v. Ralston, 609 F.2d 340, 341, n. 1 (8th Cir.1979)* (judicial notice taken of Bureau of Prisons' Program Statement). AR 850-04 sets forth that inmates are required to first attempt to resolve any issue or complaint by filing a Step 1 grievance. (*See* AR 850-04 (IV)(B)(4)(b)). If the inmate is not satisfied with the result of the Step 1 grievance, the inmate must then file a Step 2 grievance. (*See id.*). If the inmate is still unsatisfied with the response to his Step 2 grievance, the inmate must then file a Step 3 grievance. (*See id.*). The Step 3 grievance is the final step in the CDOC grievance process. (*See* AR 850-04 (IV)(C)(4)). An inmate has not exhausted his administrative remedies unless and until the inmate files a Step 3 grievance and receives a response from the Grievance Officer. (*See id.*).

In his pleadings, Mr. Rivera admits that he did not fully exhaust the grievance process regarding Claim One, by failing to file a Step 3 grievance regarding the treatment of the cataract in his right eye. (*See* SAC at p. 9 of 26). While Mr. Rivera argues that "attached are the ex[h]austed grievances to support my case (*see* Response (doc. # 38) at p. 3 of 11), **[*20]** the grievances attached to the original Complaint substantiate Mr. Rivera's allegation that he did not fully exhaust the grievance process regarding Claim One, by failing to file a Step 3 grievance. (*See* doc. # 5 at pp. 11-12, 22-25, 30-33 of 35; SAC at p. 9 of 26). [1] As the SAC makes clear on its face that Mr. Rivera did not exhaust his administrative remedies, Claim One is properly dismissed.

D. *Section 1983* Claims and Personal Participation

Individual liability under *§ 1983*, regardless of the particular constitutional theory, must be based upon personal responsibility. *See Foote v. Spiegel, 118 F.3d 1416, 1423-24 (10th Cir. 1997)* (individual liability **[*21]** under *§ 1983* must be based on personal involvement in the alleged constitutional violation) (citation omitted); *Mitchell v. Maynard, 80 F.3d 1433, 1441 (10th Cir. 1996)* (personal participation is an essential allegation in a civil rights action) (citation omitted); *Bennett v. Passic, 545 F.2d 1260, 1262-63 (10th Cir. 1976)* ("Personal participation is an essential allegation in a *§ 1983* claim.").

A defendant may not be held liable merely because of his or her supervisory position. *Grimsley v. MacKay, 93 F.3d 676, 679 (10th Cir. 1996)*. Government officials are not vicariously liable for the misconduct of their subordinates. "There is no concept of strict supervisor liability under *§ 1983*." *Serna v. Colorado Dept. of Corrections, 455 F.3d 1146, 1151-52 (10th Cir. 2006)*. "Supervisors are only liable under *§ 1983* for their own culpable involvement in the violation of a person's constitutional rights." *Id.* There must be an affirmative link between the alleged constitutional violation and the defendant's own participation or failure to supervise. *Butler v. City of Norman, 992 F.2d 1053, 1055 (10th Cir. 1993)*. *See also McKee v. Heggy, 703 F.2d 479, 483 (10th Cir. 1983)* (an individual cannot **[*22]** be held liable in a *section 1983* action unless he "participated or acquiesced" in an alleged constitutional violation). A plaintiff must both allege in the complaint and prove at trial an affirmative link between the alleged constitutional violation and a defendant's participation. *See Stidham v. Peace Officer Standards and Training, 265 F.3d 1144, 1157 (10th Cir. 2001)* (for *§ 1983* claim, affirmative link between the defendant's conduct and any constitutional violation "must be alleged in the complaint as well as proven at trial").

Defendants Dowis, Milyard, Zavaras, Frantz, Mishiara, Wingert, Krebs, and Holst argue that Mr. Rivera's claims against them must be dismissed for failure to allege the requisite personal participation. (*See* Motion to Dismiss (doc. # 34) at pp. 7-9 of 19; Motion to Dismiss (doc. # 31) at pp. 9-10 of 11). Mr. Rivera makes no allegations regarding these Defendants in Claims Two, Three, or Four. (*See* SAC at pp. 10-17 of 26). In Claim Five, Mr. Rivera's allegations relate only to these Defendants' roles as supervisors. (*See, e.g.,* SAC (doc. # 17 at pp. 18-23). The court agrees that Mr. Rivera has failed to sufficiently plead the alleged unconstitutional acts of **[*23]** Defendants Dowis, Milyard, Zavaras, Frantz, Mishiara, Wingert, Krebs, and Holst.

---

[1] "[I]n deciding a motion to dismiss pursuant to *Rule 12(b)(6)*, a court may look both to the complaint itself and to any documents attached as exhibits to the complaint." *Oxendine v. Kaplan, 241 F.3d 1272, 1275 (10th Cir. 2001)* (citing *Fed.R.Civ.P. 10(c)* ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes"); *Hall, 935 F.2d at 1112* ("a written document that is attached to the complaint as an exhibit is considered part of the complaint and may be considered in a *Rule 12(b)(6)* dismissal.")).

2010 U.S. Dist. LEXIS 16439, *23

Mr. Rivera's only allegations relating to Defendant Dowis are that she was aware of the actions of Defendant Stock and relayed information to him in July 2007. (*See* SAC at pp. 18, 19, 20 of 26). Mr. Rivera merely conclusorily alleges that Defendant Dowis "intentionally interfered with prescribed treatment." (*See id.* at p. 19 of 26). "[C]onclusory allegations are not sufficient to state a constitutional violation." *Jenkins v. Wood, 81 F.3d 988, 994 (10th Cir. 1996)* (citation omitted). Mr. Rivera merely alleges vicarious liability against Defendants Milyard, Warden of SCF, and Zavaras, Executive Director of C.D.O.C. (*See* SAC at pp. 7, 22 of 26 (alleging that Defendant Zavaras, as "superior respondent . . . has an obligation to inmates to provide medical care," Defendants Zavaras and Milyard "are operating an extremely harsh regime," and Defendant Milyard "is my guardian at the S.C.F. prison" and "allows this to happen at his institution;" *see also* Response (doc. # 38) at p. 5 ("Whether or not those officials are actually aware of these statutory and constitutional responsibilities obligations [sic], they **[*24]** are presumed to know what the law requires and may be legally accountable for conduct that violates fixed standards"). Mr. Rivera's allegations relating to Defendant Frantz, Chief Medical Officer of Physician Health Partners ("PHP"), are that she was aware of his medical needs and the "bizarre" actions of Defendant Stock and "said my red bumps are excema [sic]." (*See* SAC at pp. 18, 19 of 26). Mr. Rivera also conclusorily alleges "ne[g]lect due to [her] deliberate indifference" and that she denied his surgeries. (*See id.* at pp. 19, 20 of 26; *see also* Response (doc. # 38) at p. 4 of 11 ("Dr. Paula Frantz, all their responsibilities are for the day today [sic] operations of all prisons in the Colorado prisons . . . .)).

Mr. Rivera alleges that Defendant Mishiara, as the housing captain at SCF, has failed to provide accommodations for disabled inmates pursuant to the ADA. (*See* SAC at pp. 20-21 of 26). Yet, Mr. Rivera also alleges "[b]ut by the time you read this, they'll have done something about it." (*See id.* at p. 20 of 26). Mr. Rivera also claims that Defendant Mischiara has knowledge of unspecified incidents in which correctional officers have closed the electric sliding doors on inmates. **[*25]** (*See id.* at 21 of 26). Mr. Rivera's only allegations relating to Defendant Wingert are that she "develop[s] an attitude" and that when asked about "my accommodations for the chow hall doors and showers," Defendant Wingerl responded "What do [you] expect. [You're] in prison." (*See id.* at 23). Mr. Rivera's only allegations relating to Defendant Holst are that she "as the ADA Coordinator has taken on these duties without any proper training or

medical license" and "has made a mockery of the ADA." (*See id.* at 23) (emphasis omitted). Mr. Rivera alleges that Defendant Krebs, a physician with PHP who treats inmates under a contract with the CDOC, denied his request for surgery on his right wrist. (*See* SAC at p. 21 of 26). Mr. Rivera's only allegations relating to Dr. Krebs are that he is "aware of my serious medical needs" and a conclusory allegation that he "intentionally interfered with prescribed treatment." (*See id.* at p. 19 of 26). [2]

Mr. Rivera's allegations do not plausibly support a **[*26]** claim for relief against these Defendants pursuant to *§ 1983*. The allegations do not support a claim that these Defendants had any direct involvement in, personal participation in, or supervisory liability for the alleged violation of Mr. Rivera's constitutional rights. Mr. Rivera has not adequately alleged "an affirmative link between the supervisor and the violation, namely the active participation or acquiescence of the supervisor in the constitutional violation by the subordinates." *Serna, 455 F.3d at 1151* (internal quotation marks and citations omitted). Mr. Rivera's failure to allege the requisite personal participation leaves no basis for holding Defendants Dowis, Milyard, Zavaras, Frantz, Mishiara, Wingert, Krebs, and Holst individually liable under *§ 1983*.

E. Defendants Fortunato, Rittenhouse, Stock, and Krebs

In Claims Two, Three, Four, and Five, Mr. Rivera alleges, among other things, violations of his *Eighth Amendment* rights by Defendants Fortunato, Rittenhouse, Stock, and Krebs. [3]

Mr. Rivera alleges that on February 3, 2006 he was seen by Dr. Fortunato regarding his complaints of red bumps on his legs. (*See* SAC at p. 10 of 26). Dr. Fortunato diagnosed Erythema Nodosa, not excema as previously diagnosed by a dermatologist. (*See id.* at pp. 10, 14 of 26). Mr. Rivera claims that both Dr. Fortunato and Defendant Rittenhouse prescribed treatment with the use of a steroid cream, despite being told that Mr. Rivera is allergic to steroids, causing the problem to

---

[2] Even if Mr. Rivera had adequately alleged personal participation by Defendant Krebs, the court concludes, *infra*, that he has not stated a claim for an *Eighth Amendment* violation against Defendant Krebs.

[3] Mr. Rivera names Defendants Krebs and Stock in Claim Five. Defendant Fortunato is named in Claims Two, Three, and Five. Defendant Rittenhouse is named in Claims Two, Three, Four, and Five. (*See* **[*27]** SAC).

2010 U.S. Dist. LEXIS 16439, *27

worsen. (*Id.* at pp. 10, 14, 18 of 26). Mr. Rivera was later provided a different ointment that also "made me itch and burn real bad." (*Id.* at pp. 10, 14 of 26). Mr. Rivera also alleges that on May 2, 2006, Defendant Stock examined him for his complaints of red bumps on his legs. (*See* SAC at p. 18 of 26). When Mr. Rivera inquired about when he would have a biopsy on the red bumps, Defendant Stock cancelled the appointment and instructed him to leave the office. (*See id.*) Mr. Rivera further alleges that Defendant Stock cancelled his trip to Denver Health Medical Center for a biopsy of the red bumps on his legs. (*See id.* at p. 19 of 26).

In Claim Three, Mr. Rivera alleges that on December 20, 2006, he slipped **[*28]** and fell and broke his right wrist. (See SAC at p. 12 of 26). Mr. Rivera alleges that the Christmas and New Year's holiday delayed by two weeks a scheduled surgery to place pins and screws in his wrist. (*See id.*). After the holidays, he was seen by a medical provider and told that surgery was not necessary because his bones were already mending. (*See id.*). On June 4, 2007, after returning to his job on the Ground Maintenance Crew, Mr. Rivera reported to Ms. Rittenhouse that two of his fingers were going numb. (*See id.*). After more x-rays, Mr. Rivera was told that he has severe arthritis. Mr. Rivera alleges that he can no longer pick up anything weighing over three pounds with his right hand. (*See id.* at p. 13 of 26).

In Claim Four, Mr. Rivera alleges malpractice for the delay in treating the red bumps on his legs, for the cream prescribed that caused additional burning, itching, and pain, and for failure to provide appropriate pain medicine. (See SAC at pp. 14-16 of 26). Mr. Rivera alleges that on February 24, 2006 Dr. Fortunato did not help with the red bumps on his legs, but instead discontinued his potassium pills. (*See id.* at p. 16 of 26).

In Claim Five, Mr. Rivera alleges that on **[*29]** October 3, 2006, he was prescribed a steroid medication to which he was allergic and that caused internal bleeding. (See SAC at p. 18 of 26). Mr. Rivera also generally alleges that Defendants inadequately responded to various medical needs. (See *id.* at pp. 19-20 of 26). Mr. Rivera alleges violation of his *Eighth Amendment* rights based on Dr. Krebs' refusal to approve surgery for Mr. Rivera's right wrist. (See SAC at pp. 19-20 of 26).

The *Eighth Amendment* prohibits the infliction of "cruel and unusual punishments." *U.S. CONST. Amend. VIII*. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the *Eighth Amendment*." *Farmer v.*

*Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)* (citation omitted). Certain conditions of confinement, if they inflict pain unnecessarily and wantonly, may constitute cruel and unusual punishment under the *Eighth Amendment. Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)*. The *Eighth Amendment* prohibits prison officials from being deliberately indifferent to the serious medical needs of prisoners in their custody. *See Estelle v. Gamble, 429 U.S. 97, 104-06, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)* ("[D]eliberate indifference to serious medical needs **[*30]** of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the *Eighth Amendment*.") (internal quotation marks and citation omitted).

An *Eighth Amendment* claim involves "a two-pronged inquiry, comprised of an objective component and a subjective component." *Self v. Crum, 439 F.3d 1227, 1230 (10th Cir. 2006)*. "Under the objective inquiry, the alleged deprivation must be sufficiently serious to constitute a deprivation of constitutional dimension." *Self, 439 F.3d at 1230* (internal quotation marks and citation omitted). *See also Hudson v. McMillian, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)* (*Eighth Amendment* violation recognized only if medical needs are "serious"). "[A] medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999)* (*quoting Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980)*).

Under the subjective inquiry, the defendant must have acted with a "sufficiently culpable state of mind." *Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)*. The subjective component follows **[*31]** from the principle that "'only the unnecessary and wanton infliction of pain implicates the *Eighth Amendment*.'" *Farmer, 511 U.S. at 834* (quoting *Wilson, 501 U.S. at 297*). An inmate's complaint of inadequate medical care amounts to an *Eighth Amendment* claim if the inmate alleges "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle, 429 U.S. at 106*. To meet the subjective component of an *Eighth Amendment* claim, a plaintiff must establish the defendant "knew he faced a substantial risk of harm and disregarded that risk, 'by failing to take reasonable measures to abate it.'" *Hunt, 199 F.3d at 1224* (quoting *Farmer, 511 U.S. at 847*).

Deliberate indifference requires a higher degree of fault

2010 U.S. Dist. LEXIS 16439, *31

than negligence or even gross negligence. _Berry v. City of Muskogee, Oklahoma, 900 F.2d 1489, 1495-96 (10th Cir. 1990)_ (citation omitted). An official acts with deliberate indifference if his or her conduct "disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights." _Berry, 900 F.2d at 1496_. The Supreme Court explained the test for deliberate indifference:

> We reject petitioner's invitation **[*32]** to adopt an objective test for deliberate indifference. We hold instead that a prison official cannot be found liable under the _Eighth Amendment_ for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

_Farmer, 511 U.S. at 837_. The level required to make out a claim for deliberate indifference is "more blameworthy than negligence," requiring "more than ordinary lack of due care for the prisoner's interests or safety." _Farmer, 511 U.S. at 835_. See also _Whitley, 475 U.S. at 319_ ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited . . . ."). For a prison official to be found liable of deliberate indifference under the _Eighth Amendment_, "the official must 'know[] of and disregard[] an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must draw the inference.'" **[*33]** _Perkins v. Kansas Dept. of Corrections, 165 F.3d 803, 809 (10th Cir. 1999)_ (quoting _Farmer, 511 U.S. et 837_). Where a plaintiff alleges refusal to render proper medical treatment, as Mr. Rivera asserts here, he must establish the defendant "deliberate[ly] refus[ed] to provide medical attention, as opposed to a particular course of treatment." _Fleming v. Uphoff, 210 F.3d 389 at * 2_ published in full-text format at _2000 U.S. App. LEXIS 6723 *6] (10th Cir. 2000)_. [4]

The court recognizes Mr. Rivera's medical problems as serious for purposes of the objective component of an _Eighth Amendment_ claim. See, e.g., _Clemmons v. Bohannon, 956 F.2d 1523, 1527 (10th Cir. 1992)_ (citing cases holding that broken bones are sufficiently serious for purpose of _Eighth Amendment_). But see, e.g.,

_Roberts v. Peters, 129 F.3d 119 (7th Cir. 1997)_ ("Whether a skin rash such as [plaintiff's] is the type of serious medical condition necessary to support an _Eighth Amendment_ violation is debatable") (unpublished decision). The court next examines whether Mr. Rivera has adequately pled that Defendants acted with deliberate indifference.

First, Mr. Rivera's allegations that the Defendants' conduct violated **[*34]** _§ 1983_ prior to January 20, 2007 are properly dismissed as barred by the statute of limitations. (See, e.g., SAC at pp. 10, 14-15, 18 of 26).

Second, Mr. Rivera's allegations amount to merely his disagreement with the medical care provided by the Defendants. Mr. Rivera's own allegations indicate that he was evaluated and treated with great frequency. Mr. Rivera simply claims that he needed more and different treatment than he received. He challenges the effectiveness and competence of the treatment given. Mr. Rivera asserts that he was provided the wrong ointments for his skin and that he should have been sent "to see a dermatologist specialist. . . and also for a biopsy to be taken from my red bumps," rather than the treatment that Defendants provided. (See SAC at pp. 16, 17, 18 of 26). Mr. Rivera presents conclusory allegations that amount to no more than his disagreement with the treatment provided. Mr. Rivera's disagreement with the medical treatment he received does not rise to the level of a constitutional violation. Whether a course of treatment is appropriate "is a classic example of a matter for medical judgment," that is insufficient to sustain a claim under the _Eighth Amendment_. **[*35]** _Estelle, 429 U.S. at 107_ (noting that medical decision to forego one form of treatment may be negligence but is not a constitutional violation). See also _Perkins, 165 F.3d at 811_ (disagreement with medical personnel "does not give rise to a claim for deliberate indifference to serious medical needs"); _Olson v. Stotts, 9 F.3d 1475, 1477 (10th Cir. 1993)_ ("[a] difference of opinion does not support a claim of cruel and unusual punishment"); _Ledoux v. Davies, 961 F.2d 1536, 1537 (10th Cir. 1992)_ (the Constitution does not guarantee a prisoner the treatment of his choice) (citations omitted); _Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)_ (difference of medical opinion as to treatment of prisoner did not establish constitutional violation); _Ramos, 639 F.2d at 575_ (difference of opinion between inmate and prison medical staff regarding treatment or diagnosis does not itself state a constitutional violation); _Henderson v. Secretary of Corrections, 518 F.2d 694, 695 (10th Cir. 1975)_ ("The prisoner's right is to medical care -- not to the type or

---

[4] Copies of unpublished decisions cited are attached to this Recommendation.

2010 U.S. Dist. LEXIS 16439, *35

scope of medical care which he personally desires.") (internal quotation marks and citation omitted.) Even if Mr. Rivera had alleged that another **[*36]** physician would have recommended different treatment, this would not serve to state an *Eighth Amendment* claim, as it would raise only a question of medical judgment and not deliberate indifference. Mr. Rivera's disagreement with his medical treatment cannot form the basis for relief pursuant to *§ 1983*.

Third, Mr. Rivera alleges no more than negligence by the Defendants. To the extent that Mr. Rivera alleges that the treatment he received was ineffective or improper, such allegation does not rise beyond mere negligence. (*See, e.g.*, SAC at p. 19 of 26 ("orders for CT scan ignored and surgery cancelled due to Dr. Fortuna[t]o misdiagnosis."). "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the *Eighth Amendment*." *Green v. Branson, 108 F.3d 1296, 1303 (10th Cir. 1997)* (internal quotation marks and citation omitted). *See also Self, 439 F.3d at 1234* ("a misdiagnosis, even if rising to the level of medical malpractice, is simply insufficient . . . to satisfy the subjective component of a deliberate indifference claim."). Mr. Rivera's allegations of medical negligence do not support a claim **[*37]** for relief pursuant to *§ 1983*.

Further, Mr. Rivera's allegations are too vague and conclusory to state a claim upon which relief can be granted. For example, Mr. Rivera's allegations that Defendant Rittenhouse "had to call the hospital for the results . . . ," "told me to slowly start removing the splint and try to move it," and "sending me for more exrays [sic]" are not sufficient to state a claim that she was deliberately indifferent to his medical treatment. (*See* SAC at p. 12 of 26). Mr Rivera alleges that Defendant Stock "is rogue, comb[ative], and evil." (*See* SAC at p. 18 of 26). Other than general conclusory allegations, Mr. Rivera has not sufficiently alleged specific dates for the Defendants' conduct. Mr. Rivera alleges conduct by individuals, such as P.A. Webster, Dr. Goldsmith, and Dr. Fenton, who are not named as Defendants in the case. In sum, Mr. Rivera's allegations are not adequate to state any *Eighth Amendment* violation by Defendants Fortunato, Rittenhouse, Stock, or Krebs.

To the extent that Mr. Rivera is alleging a state law malpractice claim separate from his *§ 1983* claims (*see* Claim Four), Defendant Krebs argues that such claim must be dismissed for failure to provide **[*38]** a certificate of review. Colorado law specifically requires a

certificate of review for "every action for damages or indemnity based upon the alleged professional negligence of . . . a licensed professional." *Colo. Rev. Stat. § 13-20-602(1)(a)*.

> In every action for damages or indemnity based upon the alleged professional negligence of . . . a licensed professional, the plaintiff's or complainant's attorney shall file with the court a certificate of review for each . . . licensed professional named as a party, as specified in subsection (3) of this section, within sixty days after the service of the complaint, counterclaim, or cross claim against such person unless the court determines that a longer period is necessary for good cause shown.

*Colo. Rev. Stat. § 13-20-602(1)(a)*. "The failure to file a certificate of review in accordance with this section shall result in the dismissal of the complaint, . . ." *Colo. Rev. Stat. § 13-20-602(4)*. More than 60 days has passed since this action was commenced on or about December 8, 2008 (*see* doc. # 1), and Mr. Rivera has neither filed a certificate of review nor sought an extension of time within which to file such a certificate. To the extent Mr. **[*39]** Rivera has alleged a malpractice claim, such claim is properly dismissed for failure to file a certificate of review. *See State v. Nieto, 993 P.2d 493, 496 (Colo 2000)* (holding that a certificate of review was a prerequisite to a malpractice claim brought by a prison inmate against a prison nurse and a failure to submit the required certificate of review warranted dismissal of the plaintiff's malpractice claim). [5]

### F. Additional Claims

To the extent that Mr. Rivera mentions violation of "the *First, Fourth, Fifth* and *Fourteenth Amendments*," that Defendants "have intentional[l]y inflicted me with emotional distr[e]ss," the "UN Convention Against Torture," *42 U.S.C. §§ "1985(2)(3), 1986* and *1988*," and "Title VI" (*See* SAC at pp. 21-22 of 26), he has not set forth any allegations to support such claims. Mere recitation of numerous Amendments, statutes, and common law torts is insufficient to state a claim for **[*40]** relief.

Mr. Rivera further alleges in Claim Five that Defendant

---

[5] As the court recommends dismissal of Mr. Rivera's federal claims, the court may decline to exercise supplemental jurisdiction over a state law claim. *See*

(district court may refuse supplemental jurisdiction over state-law claims if federal claims are dismissed).

Mishiara, as the housing captain at SCF, has failed to provide accommodations pursuant to the Americans with Disabilities Act of 1990 ("ADA"), *42 U.S.D. §§ 12131 et seq.*, and knew of incidents in which correctional officers have closed the electric sliding doors on inmates. (See SAC at pp. 20-21 of 26). Mr. Rivera alleges that there are not enough ADA jobs, the medication line is not wheelchair accessible, there are not enough tables in the chow hall for inmates with wheelchairs, and the shower in Unit 1B does not have handicap railings. (See *id.*). Mr. Rivera alleges that Defendant Wingert responded inappropriately to his complaints about ADA compliance and that Defendant Holst has taken the role of ADA Coordinator without any proper training and has made a mockery of the ADA laws. (See SAC at pp. 22-23 of 26).

To the extent that Mr. Rivera alleges violation of the ADA, the court notes that the ADA does not create liability against individuals who do not otherwise qualify as employers under the statutory definition. *See Butler v. City of Prairie Village, Kansas, 172 F.3d 736, 744 (10th Cir. 1999)* (noting reasons for precluding [*41] individual liability under Title VII apply equally to ADA); *U.S. E.E.O.C. v. AIC Security Investigations, Inc., 55 F.3d 1276, 1282 (7th Cir. 1995)* ("We hold that individuals who do not otherwise meet the statutory definition of 'employer' cannot be liable under the ADA."). The SAC fails to state a claim for relief against Defendant Mishiara or any of the individual Defendants based on the ADA.

The ADA contains three titles which address discrimination against persons with disabilities in three contexts. To the extent that Mr. Rivera sues Defendants in their official capacities, "[t]he ADA's Title II, prohibiting discrimination in the distribution of public services, is the only title" that plaintiff's allegations arguably implicate *White v. State of Colo., 82 F.3d 364, 367 n. 5 (10th Cir 1996). See also Pennsylvania Department of Corrections v. Yeskey, 524 U.S. 206, 118 S. Ct. 1952, 141 L. Ed. 2d 215 (1998)* (Title II of the ADA applies to state prisons and prison services).

Title II provides in pertinent part:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected [*42] to discrimination by any such entity.

*42 U.S.C. § 12132*. A" 'qualified individual with a disability'" is defined as:

an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

*42 U.S.C. § 12131(2)*.

While Mr. Rivera alleges that he uses a wheelchair due to the red bumps on his legs, he has failed to sufficiently allege that he is disabled under the ADA. To be "disabled" under ADA, a plaintiff must show he has a physical or mental impairment that substantially limits one or more major life activities *Holt v. Grand Lake, 443 F.3d 762, 765 (10th Cir. 2006)*. The ADA extends only to "a physical or mental impairment that substantially limits one or more of the major life activities of such individual. . . ." *42 U.S.C. § 12102(2)*. Merely having an impairment does not make one disabled for purposes of the ADA. *See Steele v. Thiokol Corp., 241 F.3d 1248, 1252 (10th Cir. 2001)* [*43] ("the ADA demands that we examine exactly how [plaintiff's] major life activities are limited by his impairment."). "Whether the plaintiff has an impairment within the meaning of the ADA and whether the conduct affected is a major life activity for purposes of the ADA are questions of law for the court to decide." *Barry v. T-Mobile USA, Inc., 490 F.3d 1211, 1216 (10th Cir. 2007)*.

Mr. Rivera has not alleged that he is substantially limited any major life activity. Therefore, Rivera has failed to sufficiently allege a "disability." A determination of disability "is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual." *Homeyer v. Stanley Tulchin Associates, Inc., 91 F.3d 959, 962 (7th Cir. 1996)*. "Some impairments may be disabling for particular individuals but not for others, depending upon the stage of the disease or disorder, the presence of other impairments that combine to make the impairment disabling or any number of other factors." *Id. But see Equal Employment Opportunity Comm'n v. J.H. Routh Packing Co., 246 F.3d 850, 854 (6th Cir. 2001)* ("[S]o long as the complaint notifies [*44] the defendant of the claimed impairment, the substantially limited major life activity need not be specifically identified in the pleading "). Nor has Mr. Rivera alleged any facts, which if proven would

show that he has been excluded from, or denied the benefits of, any CDOC program, service, or activity and that such denial such exclusion, denial, or discrimination was by reason of any disability.

Further, Mr. Rivera does not specifically seek any relief pursuant to the ADA. (*See* SAC at p  26 of 26). The injunctive relief Mr. Rivera seeks does not relate to his ADA allegations. His release from custody in September 2009 also moots his request for injunctive relief. *See Wirsching v. Colorado, 360 F.3d 1191, 1196 (10th Cir. 2004)* (inmate's release from prison moots his claims for declaratory and injunctive relief). Punitive damages may not be awarded in a private cause of action brought under Title II of the ADA. *Barnes v. Gorman, 536 U.S. 181, 189, 122 S. Ct. 2097, 153 L. Ed. 2d 230 (2002)*. The compensatory damages Mr. Rivera seeks relate to his medical treatment. (*See, e.g.*, SAC at p. 26 of 26 ("Plaintiff respectfully prays this court grants Plaintiff's rights to proper medical care/treatment and civil and constitutional **[*45]** rights," seeking "[a]n order from the court to have CDOC clinical services give him proper medical and humane medical treatment," seeking a "final and formal investigation and audit of CDOC Clinical Services")). The ADA does not provide an additional federal cause of action to challenge medical treatment provided to a prisoner. *See Moore v. Prison Health Services, Inc., 24 F. Supp. 2d 1164, 1168 (D. Kan. 1998)* ("Plaintiff's claim under the ADA is no more than a challenge to his medical care and therefore fails to state a claim for relief."). In sum, the court concludes that Mr. Rivera has failed to adequately state a plausible claim for relief under the ADA. [6]

In his Response, Mr. Rivera raises for the first time a breach of contract claim against Defendant Krebs, alleging that he is a third-party beneficiary of a contract between PHP and the CDOC to provide proper medical care to the inmates at SCF. (See doc. # 38 at p. 7 of 11). First, Mr. Rivera does not properly state a claim by

inserting an argument into his Response. A third-party beneficiary contract claim is entirely distinct from Mr. Rivera's claims pursuant to *§ 1983* or for malpractice. Second, Mr. Rivera has not alleged the elements of a breach of contract claim based on a third party beneficiary theory in any of his pleadings. (*See* Mr. Rivera's original Complaint (doc. # 5), Amended Complaint (doc. # 11), and SAC (doc. # 17)). Mr. Rivera has not alleged any facts or cited any basis in law to support his claim for breach of contract based on a third party beneficiary theory. Third, to the extent Mr. Rivera had any third party beneficiary interest at stake, he must rely on a contract rather than the Constitution or any federal **[*47]** law, and therefore no federal question is presented under *28 U.S.C. § 1331*. As the court recommends dismissal of Mr. Rivera's federal claims, the court may decline to exercise supplemental jurisdiction over a state law claim. *See 28 U.S.C. § 1367(c)(3)* (district court may refuse supplemental jurisdiction over state-law claims if federal claims are dismissed).

## G. Qualified Immunity

To the extent that Mr. Rivera is suing Defendants in their individual capacities under *§ 1983*, Defendants are entitled to qualified immunity. Whether Defendants are entitled to qualified immunity is a legal question. *Wilder v. Turner, 490 F.3d 810, 813 (10th Cir. 2007), cert. denied, 552 U.S. 1181, 128 S. Ct. 1229, 170 L. Ed. 2d 62 (2008)*.

> Resolution of a dispositive motion based on qualified immunity involves a two-pronged inquiry. First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, . . . the court must decide whether the right at issue was clearly established at the time of the defendant's alleged misconduct. With regard to this second [prong], the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would **[*48]** be clear to a reasonable officer that his conduct was unlawful under the circumstances presented.

*Herrera v. City of Albuquerque, 589 F.3d 1064, 1070 (10th Cir. 2009)* (internal quotation marks and citations omitted). "A reviewing court may exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* "Qualified immunity is applicable unless" the plaintiff can satisfy both prongs of the inquiry. *Id.* Having

---

[6] While the "failure to exhaust is an affirmative defense under the PLRA, and . . . inmates are not required to specially plead or demonstrate exhaustion in their complaints," *Roberts, 484 F.3d at 1240* (internal quotation marks and citations omitted), the court also notes that, other than checking "yes" on his form complaint (*see* SAC at p. 25 of 26), Mr. Rivera has not set forth in his pleadings that he fully exhausted administrative remedies on his ADA claim. While Mr. Rivera attached to his Amended Complaint documents reflecting **[*46]** the administrative exhaustion process as to his claims regarding his cataract, skin condition, and wrist, he has attached nothing regarding an ADA claim.

2010 U.S. Dist. LEXIS 16439, *48

concluded above that Mr. Rivera has failed to state a claim that Defendants' conduct violated any constitutional right, Defendants are entitled to qualified immunity on Mr. Rivera's *§ 1983* claims.

H. John and Jane Doe Defendants

There is no provision in the Federal Rules of Civil Procedure for the naming of fictitious or anonymous parties in a lawsuit. *Watson v. Unipress, Inc., 733 F.2d 1386, 1388 (10th Cir. 1984)*; *Coe v. U.S. Dist. Court for Dist. of Colorado, 676 F.2d 411, 415 (10th Cir. 1982)*. To the contrary, the Federal Rules provide:

"[e]very pleading shall contain a caption setting forth the name of the court, the title of the action, the file number, **[*49]** and a designation as in *Rule 7(a)*. In the complaint, the title of the action shall include the names of all the parties . . . ."

*Fed. R. Civ. P. 10(a)*. Because anonymous parties are not permitted by the Federal Rules and Mr. Rivera has not identified the anonymous Defendants, the John and Jane Doe Defendants are properly dismissed from this civil action.

Accordingly, IT IS RECOMMENDED that:

1. Defendant Krebs' Motion to Dismiss (filed June 22, 2009) (doc. # 31) be GRANTED and Defendant Krebs be dismissed from this civil action.

2. Defendants' Motion to Dismiss (filed June 22, 2009) (doc. # 34) be GRANTED and Defendants Dowis, Milyard, Zavaras, Stock, Rittenhouse, Fortunato, Frantz, Mishiara, Wingert, Holst, and John and Jane Does be dismissed from this civil action.

3. No claims remaining against any Defendants, this civil action be dismissed in its entirety. [7]

**Advisement to the Parties**

Within *fourteen days* after service of a copy of the Recommendation, **[*50]** any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado.

*28 U.S.C. § 636(b)(1)*; *Fed. R. Civ. P. 72(b)*; *In re Griego, 64 F.3d 580, 583 (10th Cir. 1995)*. A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma, 73 F.3d 1057, 1060 (10th Cir. 1996)*. Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers, 195 F.3d 573, 579-80 (10th Cir. 1999)* (District Court's decision to review a Magistrate Judge's recommendation **[*51]** *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc., 52 F.3d 901, 904 (10th Cir. 1995)* (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States, 980 F.2d 1342, 1352 (10th Cir. 1992)* (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS, 418 F.3d 1116, 1122 (10th Cir. 2005)* (firm waiver rule does not apply when the interests of justice require review).

DATED at Denver, Colorado, this 29th day of January, 2010.

BY THE COURT:

/s/ Craig B. Shaffer

United States Magistrate Judge

End of Document

---

[7] In his Response, Mr. Rivera includes a request for appointed counsel. (*See* Response (doc. # 38) at pp. 9, 10 of 11). As the court recommends dismissal of this civil action, Mr. Rivera's request for appointed counsel is properly declined at this time.

⚠ Caution
As of: January 15, 2020 7:51 PM Z

## *Grassi v. Corr. Corp. of Am.*

United States District Court for the District of Colorado

December 9, 2008, Decided; December 9, 2008, Filed

Civil Action No. 07-cv-00944-MSK-KMT

**Reporter**
2008 U.S. Dist. LEXIS 102746 *; 2008 WL 5172154

RONALD B. GRASSI and DEBRA GRASSI, Plaintiffs, v. CORRECTIONS CORPORATION OF AMERICA, Defendant.

For Jere Sutton, D.O., Defendant: Craig A. Sargent, Lonnell Grant Wylie, LEAD ATTORNEYS, Pryor Johnson Carney Karr Nixon, P.C., Greenwood Village, CO.

**Subsequent History:** Motion granted by, in part, Motion denied by, in part *Grassi v. Corr. Corp. of Am., 2009 U.S. Dist. LEXIS 37645 (D. Colo., Apr. 30, 2009)*

Affirmed by *Grassi v. Corr. Corp. of Am., 2009 U.S. App. LEXIS 26563 (10th Cir. Colo., Nov. 27, 2009)*

**Judges:** Honorable Marcia S. Krieger, United States District Judge.

**Opinion by:** Marcia S. Krieger

## Core Terms

transportation, infirmary, van, prison, inmate, staff, cell, arrived, deliberate indifference, minutes, surgery, complications, delayed, nurses, Seal, medical treatment, summary judgment, medical care, undisputed, summoned, pain, summary judgment motion, substantial harm, medical staff, circumstances, entitled to summary judgment, loss of consortium claim, negligence claim, abdominal pain, medical need

**Counsel:** [*1] For Ronald B. Grassi, Debra Grassi, Plaintiffs: James W. Avery, LEAD ATTORNEY, Avery Law Firm, Denver, CO; John Philip McDonnell, Jr., LEAD ATTORNEY, McDonnell Law Firm, P.C., Greenwood Village, CO; Judith K. Funderburg, Judith K. Funderburg, LLC, Law Office of, Denver, CO.

For Corrections Corporation of America, Defendant: Andrew David Ringel, LEAD ATTORNEY, Michael W. Jones, Hall & Evans, LLC-Denver, Denver, CO.

## Opinion

### OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

**THIS MATTER** comes before the Court pursuant to Plaintiff Debra Grassi's Objections [1] **(# 48)** to the March 6, 2008 Minute Order **(# 47)** of United States Magistrate Judge Kathleen M. Tafoya granting in part and denying in part Ms. Grassi's Motion for Leave to Appear at the Deposition of Plaintiff Ronald Grassi **(# 43)**; Defendant Corrections Corporation of America's ("CCA") Motion for Summary Judgment **(# 53)**, the Plaintiffs' response **(# 67)**, and CCA's reply **(# 77)**; and CCA's Renewed Motion to Seal Exhibit [*2] P **(# 81)** to its summary judgment motion. [2]

---

[1] Because these Objections relate to the conduct of a deposition that has already occurred, Ms. Grassi's Objections are overruled as moot.

[2] In light of the standards previously discussed in the Court's October 3, 2008 Opinion and Order Denying Motions to Seal

2008 U.S. Dist. LEXIS 102746, *2

## FACTS

For purposes of the Motion for Summary Judgment, the Court views the facts in the light most favorable to the Plaintiffs. [*3] [3] Mr. Grassi is an inmate of the Colorado Department of Corrections ("CDOC"), incarcerated at the Crowley County Correctional Facility ("CCCF"), a prison operated by CCA.

On the afternoon of May 8, 2005, Mr. Grassi began experiencing sudden abdominal pain and nausea. That evening, he obtained permission to visit CCCF's infirmary. He explained his symptoms and the staff nurse, indicating his supposition that he was suffering from appendicitis or food poisoning. The nurse conducted a preliminary examination, taking his vital signs, asking him a series of questions about the location and extent of his pain, and conducting a physical examination of his abdomen. After conferring by telephone [*4] with Dr. Jere Sutton, the facility's on-call doctor, the nurse administered Mylanta anti-gas pills and Pepto-Bismol. As directed by Dr. Sutton, Mr. Grassi was then sent to the infirmary's holding cell to remain under further observation by the infirmary's staff.

He experienced some relief when lying down, but continued to have abdominal pain when sitting up and requested from the nurse that he be permitted to see a doctor. The nurse advised him that the doctor would not be available "for a couple of days," but that Mr. Grassi

(# 80), CCA's renewed motion to seal Exhibit P to its summary judgment response is granted. The exhibit sought to be sealed is a CDOC policy governing the transportation of inmates. CDOC itself has designated this policy as confidential and of limited dissemination, because it contains material that, if publicly disclosed, would reveal sensitive security procedures and staffing levels to be used during inmate transportation outside of prison facilities. The Court finds that CDOC's security interests in keeping this material confidential outweighs the public interest in access to court records, particularly because the particular details of the transportation procedure are of fairly minimal relevance to the issues resolved herein. Accordingly, the motion to seal is granted.

[3] The bulk of the facts recited herein are derived from Mr. Grassi's affidavit (# 58), and to the extent not inconsistent with Mr. Grassi's affidavit, from medical records and other materials submitted by CCA. Ms. Grassi also supplied an affidavit (# 59) regarding many of the same events, but it is evident that she does not possess firsthand knowledge of the events that occurred at CCCF on May 8-9, 2005, and in those respects, her affidavit consists largely of hearsay that would not be admissible at trial.

could remain in the infirmary's holding cell until then. Mr. Grassi instead requested that he be permitted to return to his own cell, and upon being asked by the nurse if her thought he was well enough to do so, replied that despite his ongoing pain, he would rather return to his cell. Approximately 45 minutes later, nearing midnight, Mr. Grassi was allowed to return to his cell.

At 3:30 a.m., Mr. Grassi suffered more intense pain and nausea and summoned guards, requesting that he be permitted to return to the infirmary. The guards opened his cell door to permit him to go to the infirmary, but he was unable to walk. Guards brought a stretcher for Mr. Grassi and [*5] brought him to the infirmary. He asked the medical staff to summon an ambulance and was told that the staff was "taking care of it." In fact, prison staff summoned a prison van at 3:45 a.m. in case Mr. Grassi required transportation. At 4:15 a.m., after additional observation and treatment and consultations between the infirmary staff and Dr. Sutton, Dr. Sutton directed that Mr. Grassi be transported to the hospital. Mr. Grassi was prepared for transportation and was dispatched from the prison by van at 5:17 a.m. for the 42-mile trip to the hospital in Pueblo, Colorado.

Mr. Grassi arrived at the hospital at 6:04 a.m., received x-rays, and was diagnosed as having acute appendicitis. He immediately underwent surgery to remove his appendix, which was discovered to be perforated. Following the surgery, he experienced a variety of complications, [4] including an abdominal abscess, bowel obstruction, and a drug-resistant staph infection. He required several additional surgeries and extended healing time to recover.

The Plaintiffs commenced this action pursuant to *42*

[4] The Plaintiffs do not affirmatively assert that the complications were the result of actions or inaction of CCA, as opposed to having no known cause, or being caused by carelessness [*6] by the surgeon or hospital. The Plaintiffs point to testimony by Dr. Sutton, who responded to the question "If a patient has appendicitis and they're not timely treated by laparoscope or by surgery, they're more likely to have infections and ongoing problems, correct?" with the response "That's possible." *Docket #* 67-3 at 111-12. However, the doctor also responded to the question "Is it possible that if Mr. Grassi had received treatment earlier than by 6:00 that he would not have gone on to develop peritonitis, sepsis, bowl obstructions and those types of infections?" with the response that "I have no way of knowing that." *Id.* at 113. The Court notes that the Plaintiffs have not proffered any expert testimony as to the cause(s) of Mr. Grassi's complications.

*U.S.C. § 1983*, alleging six causes of action, some of which seem to overlap: (i) violation of Mr. Grassi's *Eighth Amendment* rights under the U.S. Constitution, in that CCA acted with deliberate indifference to his medical needs in failing to timely and adequately diagnose him, staff the infirmary, and transport him for further medical treatment; (ii) violation of Mr. Grassi's *Eight Amendment* [*7] rights, insofar as CCA acted with deliberate indifference to his medical needs by knowingly hiring inexperienced and unqualified medical staff; (iii) a claim for negligence under Colorado law, in that CCA failed to exercise reasonable care in staffing its medical department with personnel with adequate experience to diagnose abdominal complaints and in failing to provide for prompt transport of Mr. Grassi to a hospital for treatment; (iv) a claim for negligence asserted only against former Defendant Dr. Jere Sutton; (v) a "claim" that CCA and Dr. Sutton should be held jointly liable for any injuries to Mr. Grassi because they were engaged in a "joint venture"; (vi) a claim by Ms. Grassi against CCA under Colorado law for loss of consortium.

CCA moves for summary judgment (# 53) on all of the claims against it, arguing: (i) as to all of the *Eighth Amendment* claims, Mr. Grassi cannot show that any of CCA's employees manifested "deliberate indifference" to his medical needs, nor that such indifference resulted from a custom or policy of CCA; (ii) as to the negligence claim, Mr. Grassi cannot hold a corporation liable for the medical malpractice of a physician under Colorado's corporate [*8] practice of medicine doctrine, and further, that because Mr. Grassi has not endorsed any expert witnesses, Mr. Grassi cannot show that Dr. Sutton's treatment fell below established standards of medical care nor show that any negligent medical treatment was the cause of his complications; (iii) that with regard to any claim for "joint liability," Mr. Grassi cannot prove a tortious act, nor show that the relationship between Dr. Sutton and CCA constitutes a "joint venture"; and (iv) that Ms. Grassi's loss of consortium claim fails because she cannot show that CCA was negligent with regard to Mr. Grassi.

## ANALYSIS

### A. Standard of review

*Rule 56 of the Federal Rules of Civil Procedure* facilitates the entry of a judgment only if no trial is necessary. See *White v. York Intern. Corp., 45 F.3d 357, 360 (10th Cir. 1995)*. Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the [*9] party with the burden of proof. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Kaiser-Francis Oil Co. v. Producer's Gas Co., 870 F.2d 563, 565 (10th Cir. 1989)*. A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. See *Anderson, 477 U.S. at 248*. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. See *Garrett v. Hewlett Packard Co., 305 F.3d 1210, 1213 (10th Cir. 2002)*.

Where the moving party does not have the burden of production at trial, the movant must demonstrate the absence of sufficient evidence in the record to establish one or more elements of each challenged claim or defense. The burden then shifts to the respondent to come forward with sufficient competent evidence to demonstrate a genuine dispute of material fact with regard to each challenged element. If the respondent fails to produce sufficient competent evidence that, if accepted by the factfinder, would establish its claim or [*10] defense, the claim or defense must be dismissed as a matter of law. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*.

### B. *Eighth Amendment* claims

To establish an *8th Amendment* claim premised upon deliberate indifference to his medical needs, an inmate plaintiff must show: (i) a sufficiently serious deprivation of medical care; and (ii) that the defendant responsible for the deprivation acted with a sufficiently culpable state of mind. *Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)*. With regard to the element of intent, "deliberate indifference" requires a state of mind "more blameworthy than negligent," but this can be "something less than acts or omissions for the very purposes of causing harm or with knowledge that harm will result." *Farmer, 511 U.S at*

Case No. 1:18-cv-00956-MSK-MEH Document 217-4 filed 01/17/20 USDC Colorado pg 39 of 57

_835_. It is a state of mind akin to recklessness, and occurs when the defendant "knows of and disregards an excessive risk to [the] inmate['s] health or safety." _Id. at 837_. It is not enough to show that a defendant provided ineffective or even negligent medical treatment. _DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 198 n. 5, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989); Duffield v. Jackson, 545 F.3d 1234, 1238 (10th Cir. 2008)_. An _Eighth Amendment_ [*11] violation arises only where a defendant subjectively knows of an excessive risk to the plaintiff's safety but nevertheless disregards that risk. _Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000)_.

In this case, the facts, even when taken in the light most favorable to the Plaintiffs, fail to show deliberate indifference on the part of CCCF's staff. For purposes of this analysis, it is helpful to consider Ms. Grassi's two separate visits to the infirmary independently.

As to the first visit, the record shows that, at most, the CCCF medical staff may have misdiagnosed his condition upon his arrival and deferred to his request to return to his cell. But it is undisputed that the staff conferred with a doctor and attempted to treat the condition that was diagnosed by giving Mr. Grassi Mylanta pills and Pepto-Bismol. Moreover, rather than demonstrating indifference or disregard of his condition, the record shows that the infirmary staff placed him in an observation cell and checked up on his condition on several occasions in the ensuing hours. Mr. Grassi concedes in his brief that "it is a presumption that close monitoring of [Mr.] Grassi's condition" -- that is, continued observation [*12] by the infirmary staff -- "would have more readily led to a diagnoses and more timely transportation to a hospital for surgical treatment." _Docket_ # 67 at 26. Far from amounting to deliberate indifference, at best, the Plaintiffs have only shown that Mr. Grassi's first visit to the infirmary resulted in ineffective or negligent treatment. This is insufficient to establish an _Eighth Amendment_ claim. _DeShaney, 489 U.S. at 198 n. 5_.

The Plaintiffs contend that "it would be unjust to dismiss" Mr. Grassi's constitutional claims because prison officials "return[ed] him to his cell and fail[ed] to monitor and document his condition." This argument fails to acknowledge the undisputed fact that Mr. Grassi expressly requested to leave the infirmary's observation cell and return to his own cell. He represented to infirmary staff that he had experienced some relief of symptoms from lying down and that he felt well enough to return to his cell. Thus, the undisputed facts show

that the infirmary staff had selected a course of treatment that would have "more readily led to a diagnosis," but that Mr. Grassi himself chose to frustrate that treatment by electing to forego additional monitoring and instead, [*13] to return to his cell. Under these circumstances, the Court finds that no reasonable factfinder could conclude that the initial treatment of Mr. Grassi at the infirmary cannot be found to constitute deliberate indifference to his medical needs in violation of the _Eighth Amendment_.

The analysis differs somewhat with regard to Mr. Grassi's second trip to the infirmary. Mr. Grassi sought medical help again at approximately 3:30 a.m. the following morning. It is undisputed that he was quickly attended to by CCCF medical staff and transported to the infirmary. The Plaintiffs do not dispute CCA's assertion that a prison van was summoned almost immediately thereafter, at 3:45 a.m., in case Mr. Grassi required transportation. It is also apparently undisputed that medical staff monitored and treated Mr. Grassi throughout this period, including twice attempting electrocardiogram tests, and that the facility's staff contacted the on-call doctor by telephone for further instructions. At 4:15 a.m., Dr. Sutton gave authorization for Mr. Grassi to be transported to the hospital, and it is undisputed that the van containing Mr. Grassi left CCCF at 5:17 a.m. It completed the 40-mile trip to the hospital [*14] in a reasonable amount of time, arriving there at 6:04 a.m.

With regard to this portion of the incident, the Court does not understand Mr. Grassi to be asserting that he received inadequate medical attention from CCCF staff during this phase of the incident; were he to do so, the Court would reach the conclusion that he has failed to show that such attention could be considered to be "deliberate indifference." Rather, the Court understands his challenge to be limited to the delay in securing his transportation to the hospital. [5]

---

[5] Mr. Grassi's failure to follow the Court's formatting requirements for summary judgment responses, see MSK Practice Standards, Civil. § V.I.3.2, makes it particularly difficult to ascertain his position with regard to the claims and elements upon which CCA seeks summary judgment. Mr. Grassi's response does not address each of his claims independently, nor does he identify the elements of each distinct claim. His factual recitations occur in a single narrative, rather than separately identifying the particular evidence that supports each individual element of each claim. The Court has endeavored to give Mr. Grassi's response brief a fair reading, but to the extent [*15] Mr. Grassi's position on a certain issue

Case No. 1:18-cv-00956-MSK-MEH  Document 217-4  filed 01/17/20  USDC Colorado  pg 40
of 57

about:blank

Page 5 of 9

2008 U.S. Dist. LEXIS 102746, *15

The record is undisputed that, as a precaution, a prison van was summoned at 3:45 a.m., within 15 minutes of Mr. Grassi's request for additional medical treatment. While the van was en route, prison medical staff conducted various examinations and tests on Mr. Grassi, and continued to consult with Dr. Sutton by telephone, and at 4:15 a.m., Dr. Sutton directed that Mr. Grassi's be transported to the hospital. [6] The van, which is apparently located off-site and staffed by on-call corrections officers, arrived at the prison at 4:30 a.m. The record establishes that, typically, arranging transportation of a prisoner by van requires a period of 30-45 minutes of preparation from the time the van arrives at the facility, during which the corrections officers operating the van clock in and gather equipment, the inmate is dressed for transportation and fitted with appropriate restraints, and medical records are copied. The van containing [*16] Mr. Grassi left the facility at 5:17 a.m. and arrived at the hospital, 42 miles away, at 6:04 a.m.

An *Eighth Amendment* violation can occur where medical care for an inmate is unnecessarily delayed. *Sealock, 218 F.3d at 1210.* Courts commonly recite the rule that "delay in medical care only constitute an *Eighth Amendment* violation where the plaintiff can show that the delay resulted in substantial harm." *Id.; see also Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005); Oxendine v. Kaplan, 241 F.3d 1272, 1276 (10th Cir. 2001).* But this observation is not the entirety of an *Eighth Amendment* claim founded on delay, and an inmate alleging an *Eighth Amendment* claim based on delayed medical treatment does not prove the claim simply by showing that a delay in treatment caused additional pain or additional injuries. The *Eighth Amendment's* ban on cruel and unusual treatment is violated only when the deprivation (or delay) of medical treatment constitutes "the [*17] unnecessary and wanton infliction of pain." *Estelle, 429 U.S. at 104* (emphasis added). A delay in treatment that is unintentional or unavoidable, even though it may result in the inmate suffering additional harm, is not

is unclear, the Court will not abdicate its role as a neutral by combing the brief and the record in an attempt to make Mr. Grassi's case for him. *See e.g. Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir.1998).*

[6] The record appears to reflect that Dr. Sutton did not specifically direct the means (e.g. van. ambulance) by which the transportation, and simply assumed that the prison would effectuate the transport by the most expeditious means possible.

actionable. *See e.g. Estelle, 429 U.S. at 104-05* ("indifference is manifested . . . by prison guards in intentionally denying or delaying access to medical care") (emphasis added); *Hood v. Prisoner Health Services, Inc., 180 Fed.Appx. 21, 25 (10th Cir. 2006)* (unpublished) ("inadvertent or negligent failure to provide medical care, however serious the consequences," does not establish a constitutional violation) (emphasis added), *citing Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980).* Thus, to prove a claim of deliberate indifference predicated on the delay in providing medical care, an inmate must show: (i) that he suffered from a serious medical need; (ii) that medical care to address that need was unnecessarily delayed; (iii) that the delay manifested the defendant's subjective disregard for the inmate's needs; and (iv) that the delay caused the inmate to suffer substantial harm, whether in the form of significant pain or permanent physical injury. *See e.g. Estelle, 429 U.S. at 104-05.*

Here, [*18] Mr. Grassi has not come forward with facts that would show that the delay in effecting his transportation to the hospital was intentional or avoidable. For all practical purposes, the analysis of whether there was undue delay must begin at 4:15 a.m., when Dr. Sutton directed that Mr. Grassi be sent to the hospital. (To the extent Mr. Grassi complains of an *Eighth Amendment* violation during the period between 3:30 a.m. and 4:15 a.m., the record establishes that he received medical attention during this period and that absent a direction that he be transported to the hospital by the doctor, that could not have occurred.) The prison van arrived 15 minutes after Dr. Sutton's directive. If anything, the 15 minute delay between the transport order and the van's arrival is shorter than it [*19] might otherwise be. The record reflects that, once summoned from their homes, the on-call corrections officers can take half an hour or more to get the van to the prison. Thus, the infirmary staff's foresight in calling for the van before Dr. Sutton's directive actually shortened the time that Mr. Grassi had to wait, as compared to a situation in which the van was not summoned until Dr. Sutton directed transportation.

Next, there was a delay of approximately 45 minutes between the van's arrival at the prison and its departure at 5:17 a.m. with Mr. Grassi inside. This delay is consistent with evidence supplied by CCA (to which the Plaintiffs have offered no contrary evidence) that preparing an inmate for transportation typically requires anywhere from 30-45 minutes once the van arrives. *Docket # 53-7* at p. 40-42. While one may hope that, in a medical emergency, all efforts are made to expedite

5 of 10

1/15/2020, 12:52 PM

the process, in the absence of specific evidence suggesting that CCCF staff unnecessarily delayed Mr. Grassi's preparation for transport [7] -- much less evidence suggesting that the delay was recklessly indifferent to Mr. Grassi's situation -- the fact that his preparation required a typical amount [*20] of time does not suffice to show deliberate indifference.

Finally, the record reflects that it took approximately 45 minutes for the van to travel the 42 miles to the nearest hospital. [8] Beyond complaining that the van drivers "hit bumps without slowing," the Plaintiffs do not comment on the duration of this portion of the journey. If anything, Mr. Grassi's affidavit appears to complain that the van driver did not slow down during the journey. In the absence of evidence that would suggest that the van driver unnecessarily prolonged the trip, no *Eighth Amendment* violation can be found here. Accordingly, the Court finds nothing in the Plaintiffs evidence that would establish any unnecessary delay in effecting Mr. Grassi's transportation to the hospital.

Moreover, even assuming the Plaintiffs could show both an unnecessary delay in dispatching Mr. Grassi to the hospital [*22] and the requisite subjective intent of deliberate indifference, the Plaintiffs' *Eighth Amendment*

___

[7] Mr. Grassi's affidavit briefly alludes to the possibility that his transportation was delayed pending a determination whether another inmate should be transferred to the hospital at the same time. The entirety of the affidavit on this point reads: ". . . I was finally told they were going to transport me to the hospital by van. . . I could hear them saying the van was there, but hold it because there's another patient complaining of migraines that might also need to be transported and they need to check him out." *Docket* # 58 at 5.

Besides the evidentiary concerns arising from Mr. Grassi's overhearing an unidentified individual allegedly directing that they "hold it," the mere fact that the van had arrived does not indicate that Mr. Grassi was otherwise ready to be transported at that moment. As discussed above, the undisputed evidence indicates that as much as 30-45 minutes of preparation time is necessary once the van arrives at the prison. Even accepting Mr. Grassi's contention that the van was at the facility while medical staff contemplated transporting another inmate at the same time does not establish that Mr. Grassi was [*21] otherwise ready for departure and that his departure was needlessly delayed.

[8] Mr. Grassi's affidavit states that "we passed a hospital . . . further down the highway," but no reference to this assertion is made by Mr. Grassi in his brief. CCA's own policies, upon which the Plaintiffs rely, specifically identify the hospital 42 miles away as the nearest facility for emergency treatment.

claims relating to this delay would nevertheless fail because they have not shown that Mr. Grassi suffered any substantial harm as a result of the delay. As discussed above, an inmate alleging an *Eighth Amendment* violation resulting from delayed treatment must show that the delay caused him to suffer "substantial harm." *Sealock, 218 F.3d at 1210.* "Substantial harm" occurs when an inmate is forced to suffer substantial pain or experiences some permanent loss or disfigurement due to the delay. *See Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999).* Although the Court assumes that Mr. Grassi experienced severe abdominal pain from 3:30 a.m. through the moment his surgery began, and assumes that the various surgeries required to treat his complications left him with permanent disfigurements of one kind or another, the fact remains that the Plaintiffs have not come forward with evidence to show that the delay in transporting him to the hospital caused this harm. For example, they offer no evidence that, had the prison van left CCCF as early as 4:15 a.m. or had an ambulance been used for transport, [*23] Mr. Grassi would have been admitted for surgery an hour earlier, and thus spared an hour's worth of abdominal pain. [9] It is equally possible that, due to scheduling or availability at the hospital, Mr. Grassi's surgery would have occurred at the same time even if he had arrived earlier. Similarly, the Plaintiffs only speculate that the complications Mr. Grassi suffered after the surgery were the result of delayed treatment at CCCF. They offer no testimony that the complications occurred because of CCCF's delay in transporting him, as opposed to the complications arising inevitably out of the need for surgery or due to the negligence of the surgeon, among other possibilities. [10] Under these circumstances, the Plaintiffs have not shown that any delay in treatment necessarily caused Mr. Grassi to suffer substantial harm.

The Plaintiffs do offer a convoluted and confusing argument that appears to allege that, wholly aside from the particular treatment received by Mr. Grassi in this situation, CCA failed to enact (or perhaps comply with)

___

[9] The Court need not reach the question of whether, in these circumstances, Mr. Grassi suffering one additional hour's worth of pain is sufficient to constitute "substantial harm" for purposes of an                    claim.

[10] At best, they offer the deposition testimony of Dr. Sutton, who was not endorsed as an expert by either side, and who testified that he "ha[d] no way [*24] of knowing" whether Mr. Grassi would have developed complications had he received treatment earlier.

2008 U.S. Dist. LEXIS 102746, *24

policies that would have resulted in Mr. Grassi receiving more prompt transportation or more competent medical attention. The Court finds that this argument is not well-formed and well-presented in the Plaintiffs' brief, but even assuming the Court were to attempt to evaluate its on its merits, it is unsupported by evidence that would show that compliance with the policies they identify would have yielded a different results i n this case. For example, the Plaintiffs appear to believe that, had CCCF staff summoned an ambulance instead of the prison van, Mr. Grassi's transportation could have been effectuated more rapidly. However, beyond bald speculation in their brief, the Plaintiffs point to no evidence that would establish that, indeed, an ambulance would have been more expeditious in this situation.

Accordingly, CCA is entitled to summary judgment on Mr. Grassi's *Eighth Amendment* **[\*25]** claims.

## C. Negligence claim

11

CCA moves for summary judgment on Mr. Grassi's claim of negligence under Colorado law by invoking the "corporate practice of medicine doctrine." Under Colorado law, "it is impossible for a fictional entity, a corporation, to perform medical actions or be licensed to practice medicine. *Villalpando v. Denver Health and Hosp. Auth., 181 P.3d 357, 364 (Colo. App. 2007).* Because a corporation cannot interfere with a physician's independent medical judgment, Colorado law generally shields corporations from vicarious liability for the negligent **[\*26]** acts of its physician employees. 12 *Id.* CCA argues that, to the extent Dr. Sutton

---

11 The parties did not address the issue of whether the Court should continue to exercise supplemental jurisdiction over the remaining state law claims if the Court granted summary judgment on Mr. Grassi's constitutional claims.

*1367(c)(3)*. However, the Court exercises its discretion to retain supplemental jurisdiction over these claims, rather than dismissing them in contemplation of state court litigation. The case has been fully litigated before this court, and directing the Plaintiffs back to state court to begin anew in state court would not serve the goals of prompt and efficient judicial administration.

12 For these same reasons, CCA is entitled to summary judgment on the Plaintiff's fifth "claim," which alleges that CCA is jointly liable for negligence by Dr. Sutton. The Plaintiffs extensively argue common-law principles of joint and several

committed any medical malpractice in misdiagnosing Mr. Grassi, the Plaintiffs thus lack a remedy in negligence against CCA.

The Plaintiffs' response to this contention is not entirely clear. They argue that "a correctional facility can be held liable in negligence for the actions of its employees who are not licensed professionals." *Citing Nieto v. State of Colorado, 952 P.2d 834, 840-41 (Colo. App. 1997).* In other words, the Court understands the Plaintiffs to assert that CCA is vicariously liable for any negligence committed by its nurses. 13

*Nieto* recognizes that "[a]n employer can therefore be held liable for a nurse's negligence, so long as the nurse was one of its employees." *Id.* However, to establish CCA's vicarious negligence in these circumstances, the Plaintiffs must identify the particular act or omission of a non-physician employee that constitutes negligence. *Villalpando, 181 P.3d at 365.* Moreover, *Nieto* also contemplates an exception to this rule: an employer cannot be held liable for the negligence of a nurse who is acting at the direction of and under the supervision of a licensed medical professional. *Id. at 841.*

Here, **[\*28]** the Plaintiffs allege that, when Mr. Grassi presented at the infirmary, "Dr. Sutton took a verbal report [from the infirmary nurse] and ordered treatment and observation." *Docket # 67 at 2.* Dr. Sutton indicated that the nurses should "check [Mr. Grassi] regularly," and indeed, Mr. Grassi's own affidavit acknowledges that "several times the 2 nurses checked in on me and they would stand at the door and observe me." The only instance in which the Plaintiffs appear to allege that a nurse engaged in conduct that was not specifically

---

liability, but fail to recognize that the corporate practice of law doctrine shields CCA from liability for Dr. Sutton's negligence, regardless of the theory upon which that vicarious liability is premised.

13 This appears to deviate from the negligence theory articulated in the Complaint, which seems to allege that CCA is responsible **[\*27]** for its own negligence in making various policy choices before the events at issue with Mr. Grassi. The Court will consider only the iteration of the claim as articulated by the Plaintiffs in response to the summary judgment motion, and will assume their intent to abandon the claim in the Complaint to the extent it differs. In any event, for the same reasons discussed with regard to the *Eighth Amendment* claim, the Plaintiffs offer only supposition that enactment of different policies or more rigid compliance with existing policies would have yielded more expeditious or effective treatment for Mr. Grassi.

2008 U.S. Dist. LEXIS 102746, *27

directed by Dr. Sutton was when a nurse permitted Mr. Grassi to return to his cell. [14] Dr. Sutton testified that he was not consulted on whether Mr. Grassi should be permitted to return to his cell, but that the infirmary nurse had the discretion to allow that to occur "[i]f the person is getting along and doing well." Because this is the only instance in which a nurse made a treatment decision other than at the direction of Dr. Sutton, this is the only instance that would fall outside of the corporate practice of medicine doctrine and thus, the only action that could support a claim of negligence against CCA.

The Plaintiffs have not established facts that would show that the nurse's decision to release Mr. Grassi to return to his cell was negligent. To establish a claim of negligence, a plaintiff must establish, among other things, that the defendant deviated from an accepted standard of care. *Land-Wells v. Rain Way Sprinkler and Landscape Co., 187 P.3d 1152, 1153 (Colo. App. 2008).* Establishing the appropriate standard of care in a claim involving medical malpractice requires proof of what a reasonably careful physician in the same medical discipline as the defendant would have done in the circumstances. *Svendsen v. Robinson, 94 P.3d 1204, 1208 (Colo. App. 2004), overruled on other grounds, Trattler v. Citron, 182 P.3d 674 (Colo. App. 2008).* [*30] Unless the matter involves issues within the common knowledge and experience of ordinary persons, a plaintiff must establish the controlling standard of care by expert opinion testimony. *Id.; citing Melville v. Southward, 791 P.2d 383, 387 (Colo. 1990).*

The parties have devoted considerable effort to addressing whether expert testimony is required to establish a standard of care here, but that discussion misses a more fundamental point: nothing in the Plaintiffs' submissions offers any evidence, expert or otherwise, of the appropriate standard of care for nurses who consider whether to release an individual from observation in circumstances such as these. Similarly, there is no evidence that the infirmary nurse deviated from such standard.

---

[14] The nature of the medical treatment received by [*29] Mr. Grassi when he was readmitted to the infirmary after 3:30 a.m. the following morning is not clear from the record. Thus, it is unclear what, if any, treatment the infirmary nurses provided, much less whether they did so at the specific direction of Dr. Sutton. In any event, the Court discerns nothing in the Plaintiffs' response that would suggest that any of the actual medical treatment he received during the second infirmary visit was negligent.

The only evidence cited by the Plaintiffs in this respect is testimony from Dr. Sutton. He testified that the nurses had the discretion to release a patient in these circumstances if "the person is getting along and doing well." Nothing in the record defines what Dr. Sutton meant by "getting along and doing well" means, making it impossible on this record to determine whether the nurse's decision to release Mr. Grassi fell within or outside of that [*31] standard. [15] Dr. Sutton testified that he would have "wanted [Mr. Grassi] to be held until his abdominal pain subsided," but the record does not indicate whether such testimony was purporting to opine as to the standard of care applicable to the infirmary nurse or just expressing a personal opinion as to how Dr. Sutton would have hypothetically handled the situation. Because the Plaintiffs have not come forward with evidence that shows the standard of care applicable to the infirmary nurse in this situation, nor evidence that shows that the decision to release Mr. Grassi was a deviation from that standard, they cannot show that the infirmary nurse acted negligently. Without a showing of negligence by the nurse, there is no predicate for imposing vicarious liability against CCA. As a result, CCA is entitled to summary judgment on Mr. Grassi's negligence claim.

### D. Loss of consortium claim

Finally, CCA argues that it is entitled to summary judgment on Ms. Grassi's loss of consortium claim because the Plaintiffs are unable [*32] to show any negligence involving Mr. Grassi. The Plaintiffs' response brief does not address this issue.

Ms. Grassi's loss of consortium claim is derivative of Mr. Grassi's right to recover for legal wrongs done to him and is therefore subject to the same defenses as would be assertable against Mr. Grassi. *Schwindt v. Hershey Foods Corp., 81 P.3d 1144, 1148 (Colo. App. 2003).* In other words, if Mr. Grassi is unable to prove a claim entitling him to relief, Ms. Grassi's loss of consortium claim will automatically fail. Because the Court finds that CCA is entitled to summary judgment on all of the claims predicated on injury to Mr. Grassi, it is entitled to summary judgment on Ms. Grassi's loss of consortium claim as well.

---

[15] According to CCCF's medical records, Mr. Grassi stated at the time that he was "doing better," was having "decreased abdominal pain" and was "up and walking around."

2008 U.S. Dist. LEXIS 102746, *32

## CONCLUSION

For the foregoing reasons, Ms. Grassi's Objections (**# 48**) to the March 6, 2008 Minute Order (**# 47**) of United States Magistrate Judge Kathleen M. Tafoya are **OVERRULED AS MOOT.** CCA's Motion for Summary Judgment (**# 53**) is **GRANTED** in its entirety and judgment in favor of CCA on all claims in this case shall enter contemporaneously with this Order. CCA's Renewed Motion to Seal Exhibit P (**# 81**) to its summary judgment motion is **GRANTED.** In accordance with the Court's **[\*33]** prior Order (**# 80**), the Clerk of the Court shall unseal docket # 55. Docket # 68 [16] shall remain under seal.

Dated this 9th day of December, 2008

**BY THE COURT:**

/s/ Marcia S. Krieger

Marcia S. Krieger

United States District Judge

_____

**End of Document**

_____

[16] Docket # 68 is a single document that contains both Exhibit P, which the Court approves for sealing, and Exhibit Q. a letter offering Dr. Sutton employment with CCA. Because the Court has not considered Exhibit Q with regard to any of the issues raised herein, there is no public interest in access to that document. and the entirety of Docket # 68 can be sealed.

🛈 Cited
As of: January 15, 2020 7:55 PM Z

## *Quintana v. United States*

United States District Court for the District of Colorado

March 17, 2008, Decided; March 17, 2008, Filed

Civil Action No. 06-cv-01342-REB-CBS

**Reporter**

2008 U.S. Dist. LEXIS 20698 *; 2008 WL 731115

LUCY QUINTANA, Plaintiff, v. UNITED STATES OF
AMERICA, Defendant.

## Core Terms

supervision, Staff, temperature, summary judgment
motion, employees, allegation of negligence,
independent contractor, services, Fault, injuries,
Designation, Nonparty, judicial admission, proximately,
blood, entitled to summary judgment, summary
judgment, anesthesia, elevated, patient, plaintiff's claim,
standard of care, vital signs, contractor, diarrhea,
provides, nursing

**Counsel:** [*1] For Lucy Quintana, Plaintiff: Brian A.
Murphy, LEAD ATTORNEY, Brian A. Murphy &
Associates, LLC, Arvada, CO; Lee A. Berish, Berish
Law Firm, The, Denver, CO.

For USA, actually named as United States of America,
Defendant: Amy L. Padden, Kurt J. Bohn, U.S.
Attorney's Office-Denver, Denver, CO.

**Judges:** Robert E. Blackburn, United States District
Judge.

**Opinion by:** Robert E. Blackburn

## Opinion

### ORDER CONCERNING MOTIONS FOR SUMMARY
### JUDGMENT

**Blackburn, J.**

This matter is before me on the following: 1) the
plaintiff's **Motion for Summary Judgment with
Incorporated Brief in Support** [# 26], filed March 15,
2007; and 2) **Defendant United States of America's
Motion for Summary Judgment and Brief in Support**
[# 58], filed August 10, 2007. The United States has
filed a response [# 34] to the plaintiff's motion for
summary judgment, and the plaintiff has filed a reply [#
42] and a supplemental reply [# 51] in support of her
motion for summary judgment. The plaintiff has not
responded to the United States' motion for summary
judgment. I deny the plaintiff's motion for summary
judgment. I grant the defendant's motion for summary
judgment in part, and I deny it in part.

### I. JURISDICTION

I have jurisdiction over this case under *28 U.S.C. § 1331*
[*2] (federal question) and under *28 U.S.C. §
1346(b)(1)* (Federal Tort Claims Act).

### II. FACTS

Except as otherwise noted, the record reflects that the
facts outlined below are not disputed. This is an action
for damages under the Federal Tort Claims Act (FTCA)
arising out of the medical treatment of Jose Quintana,
who died on August 14, 2004, during his stay at the

Veterans Administration Medical Center (VAMC) in Denver, Colorado. The plaintiff, Lucy Quintana, Mr. Quintana's surviving spouse, brings a wrongful death claim against the United States, alleging that "[t]he negligence of Defendant's employees, including the negligence of Amit Goyal, M.D. and the staff who treated and provided care to Mr. Quintana, caused Mr. Quintana's death." *Complaint* [# 1], P 52. However, based on the opinions and deposition testimony of the plaintiff's lone designated expert, Marcia Eastlund, the plaintiff appears to have narrowed her claim to include only the alleged negligence of two nurses, Janice Yussef, a licensed practical nurse (LPN), and Tiffany Jara, a registered nurse (RN). *Def.'s S.J. Br.* [# 58], Exhibit A (Eastlund Report).

## A. Facts Relating to Mr. Quintana's Care at the VAMC

In early July 2004, Mr. [*3] Quintana, who was 71 years old, came to the VAMC complaining of abdominal pain. *Def.'s S.J. Br.* [# 58], Ex. D at VA0013. Mr. Quintana had many health problems, including high cholesterol, gastritis, and coronary artery disease. *Id.* He also had been diagnosed with prostate cancer in 200_, which condition was being followed with "watchful waiting." *Id.* Mr. Quintana was admitted to the hospital on August 9, 2004 and, after undergoing several tests and x-rays, was diagnosed with metastatic gastric cancer on August 11, 2004. *Id.* at VA0013-0014. He and his wife discussed treatment options with oncologists and planned to think about their options further before deciding what to do. *Id.* at VA0203, 0210. Mr. Quintana had an ongoing fever that was being treated by hospital staff. *Id.* at VA0210, 0378.

During the night and early morning of August 12-13, 2004, Mr. Quintana was observed by Nurse Yussef. Nurse Yussef took Mr. Quintana's vital signs at 12:20 a.m. and reported his elevated temperature to Nurse Jara, the RN on duty, between 12:30 a.m. and 1:00 a.m. Ex. D at VA0542, 0383. Nurse Jara assessed Mr. Quintana and noted that he was alert and complaining of leg pain and diarrhea. *Id.* at VA0383. [*4] She also paged Dr. Sarojkamal Bangaru to inform her of the complaints and was told to administer Tylenol and draw some blood cultures. *Id.* Nurse Jara placed the order for Tylenol and submitted blood samples to the lab. *Id.* She also asked Mr. Quintana if he had bloody stools and reported his negative response to Dr. Bangaru. *Id.*

At 1:30 a.m., Nurse Yussef again took Mr. Quintana's

vitals. *Id.* at VA0542. At that point, his blood pressure and heart rate had dropped to below normal levels and his temperature was elevated. *Id.* However, there is no indication that Nurse Yussef informed any physicians, nurses, or other staff about Mr. Quintana's condition. Nurse Yussef next checked on Mr. Quintana at 3:00 a.m., at which time his heart rate and blood pressure were still low and his temperature remained elevated. *Id.* Again, Nurse Yussef did not inform any staff about Mr. Quintana's condition.

Nurse Yussef next checked on Mr. Quintana at 6:40 a.m., at which time his blood pressure had improved, but his heart rate was still low and his temperature had dropped to 97.5. *Id.* At 6:45 a.m., Nurse Yussef informed Nurse Jara that she was having difficulty obtaining Mr. Quintana's pulse oximetry reading. [*5] *Id.* at VA0383. Nurse Jara went to Mr. Quintana and observed that he was responsive, but his fingernails were blue, his skin grey, and his blood pressure very low. *Id.* She called for assistance immediately. *Id.*

During Mr. Quintana's transfer to the ICU, a code was called. *Id.* at VA0015. Mr. Quintana was stabilized, but was determined to be septic. *Id.* He did not improve over the course of the day and was placed on "do not resuscitate" status with the approval of his family. *Id.* He was pronounced dead during the evening of August 14, 2004. *Id.*

## B. Facts Relating to Nurse Yussef's Employment Status with VAMC

The evidence relating to the procedure through which the VAMC obtained the services of Nurse Yussef is contained almost entirely in an affidavit attached to the defendant's summary judgment motion, the substance of which the plaintiff does not appear to dispute. *Def.'s S.J. Br.* [# 58], Exhibit B (Kupecz Aff.). According to the affidavit testimony, when the VAMC has staffing shortages, the Eastern Colorado Health Care System (ECHCS) of the Department of Veteran's Affairs issues procurement requests and purchase order agreements to allow the VAMC to meet its additional staffing needs on [*6] an as-needed basis. *Id.* PP 1-2. Nurse Yussef's services were retained through a procurement request from ECHCS for the services of All Staff Medical Resources (All Staff), which is one of over a dozen agencies used by ECHCS for supplemental staffing needs. *Id.* PP 4-5.

There was no written agreement between ECHCS and All Staff in August 2004. *Id.* P 4. However, the evidence

2008 U.S. Dist. LEXIS 20698, *6

indicates that the following procedures were in place. When ECHCS needed additional staffing, it would inform All Staff (or another of its agencies), and All Staff would then inform ECHCS which of its personnel was available for the needed coverage. *Id.* P 6. All Staff would submit an invoice to ECHCS for the services provided, and ECHCS would then prepare a form 1358, Miscellaneous Obligation Form, for the payment of All Staff. *Id.* P 4. ECHCS paid All Staff directly, on an hourly basis, for the services provided. *Id.* P 7. ECHCS paid All Staff a set rate for the type of staff, and that rate did not vary with the specific individual provided to work at ECHCS. *Id.*

ECHCS does not determine how much the All Staff individual is paid or how many total hours per week he or she works. *Id.* ECHCS does not pay any social security [*7] or workers' compensation taxes, does not withhold any income taxes, and does not provide liability insurance or any sort of benefits to the individual workers. *Id.* P 8. In addition, ECHCS is not involved in the hiring or firing of individuals by All Staff and is not involved in checking their background or experience, other than reviewing the information that All Staff provides. *Id.* P 6.

The plaintiff moves for summary judgment on the issue of the defendant's liability for the alleged negligence of Nurse Yussef. The plaintiff argues that Nurse Yussef was the defendant's employee when she treated Mr. Quintana and that the defendant has made a judicial admission that Nurse Yussef's negligence caused Mr. Quintana's death. The defendant moves for summary judgment on all claims, arguing that Nurse Yussef was an independent contractor, and not an employee of the United States, and that the United States thus is immune from suit based on any torts allegedly committed by Nurse Yussef. With respect to Nurse Jara, the defendant contends there is no evidence that her alleged negligence proximately caused Mr. Quintana's death. Finally, the defendant argues that there is no evidence to support any [*8] claim of negligence involving other VA employees.

### III. STANDARD OF REVIEW

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp., 45 F.3d 357, 360 (10th Cir. 1995)*. *FED. R. CIV. P. 56 (c)* provides that the court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *FED. R. CIV. P. 56(c)*; *see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Concrete Works, Inc. v. City & County of Denver, 36 F.3d 1513, 1517 (10th Cir.1994)*. Summary judgment may be granted if the court concludes that no "rational trier of fact" could find for the nonmoving party based on the showing made in the motion and response. *Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*.

### IV. ANALYSIS

#### A. Alleged Negligence of LPN Yussef

*1. Waiver of Sovereign Immunity* The FTCA operates as a consent to suit against the United States for certain torts committed by federal employees acting within the scope of their [*9] employment. *Woodruff v. Covington, 389 F.3d 1117, 1125 (10th Cir. 2004)* (citing *28 U.S.C. § 1346(b)*). This consent to suit "does not extend to acts of independent contractors or their employees." *Bird v. United States, 949 F.2d 1079, 1080 (10th Cir. 1991)*. Thus, the United States is immune from suit for the actions of LPN Yussef if she was an independent contractor, rather than an employee of the United States, at the time she treated Mr. Quintana. The question of whether one is an employee of the United States is to be determined under federal law. *Lurch v. United States, 719 F.2d 333, 337 (10th Cir. 1983)*, *cert. denied, 466 U.S. 927, 104 S. Ct. 1710, 80 L. Ed. 2d 182 (1984)*.

Under well-settled Tenth Circuit law, the "critical question in determining whether an individual is a federal employee or an independent contractor for purposes of the FTCA is 'whether the federal government has the power to control the detailed physical performance of the individual'"; that is, "whether the government supervises the individual's day-to-day operations." *Tsosie v. United States, 452 F.3d 1161, 1163 (10th Cir. 2006)* (quoting *Duplan v. Harper, 188 F.3d 1195, 1200 (10th Cir. 1999)*). The Tenth Circuit has set forth seven factors to [*10] consider in making this determination:

(1) the intent of the parties; (2) whether the United

about:blank

States controls only the end result or may also control the manner and method of reaching the result; (3) whether the person uses her own equipment or that of the United States; (4) who provides liability insurance; (5) who pays social security tax; (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others.

*Lilly v. Fieldstone, 876 F.2d 857, 859 (10th Cir 1989).*

The situation in this case is very similar to that in *Bird,* in which the Tenth Circuit held that a certified registered nurse anesthetist (CRNA) was an employee of a government hospital. *Bird, 949 F.2d at 1088.* The hospital in *Bird* was short on anesthesia staff and obtained an additional CRNA through a temporary placement service, Grinovich & Associates. *949 F.2d at 1080-81.* There was no written agreement between the government and Grinovich other than specific requisitions for service. The requisitions provided that Grinovich would furnish anesthesia coverage during a specified time period and stated that "the government would not be [*11] responsible for the negligence of 'the contractor'; that the 'vendor' would provide his own insurance; and that all equipment would be supplied by the government." *Id. at 1081.* The hospital paid Grinovich a lump sum for s services "with the understanding that it would pay the anesthetist." *Id.* Under state law, CRNAs administering anesthesia were required to be "under the supervision of end in the immediate presence of a physician licensed to practice medicine." *Id.*

In holding that the CRNA in question was an employee, the court noted that there was no provision in the requisition for service stating that the CRNA should not be considered an employee of the hospital and that "Grinovich's position . . . was similar to any other employment agency providing references of prospective employees to employers, in this case by form of contract-requisition in a course of practice to meet the special procedural requirements of the government." *Id. at 1084-85.* The court distinguished *Bird* from cases involving the employment status of physicians, which require courts to attempt to "apply[] control rationale to physicians who under professional standards must reserve to themselves free from outside [*12] control or supervision full responsibility for professional decisions whether employees or independent contractors." *Id. at 1085.* The court found persuasive both the existence of the statute placing the CRNA under the control and

supervision of employee physicians of the hospital as well as the fact that the CRNA "was under the control and supervision of the government surgeon at the hospital to the same extent" as other nurse employees of the hospital. *Id.*

In a more recent case involving the same issue, the United States District Court for the District of New Mexico distinguished *Bird* and found that the CRNA in question was an independent contractor of a government hospital. *Garcia v. Reed, 227 F. Supp. 2d 1183 (D.N.M. 2002).* The court found that, unlike in *Bird,* the written agreement between the hospital and the CRNA evidenced the intent of the parties to create an independent contractor relationship because the contract provided (1) the CRNA accepted the assignment to the hospital "as an independent contractor CRNA" and that she was "not an employee of [the placement coordinator agency] or the [hospital] for which I perform temporary anesthesia services"; (2) the CRNA was to provide [*13] her own liability insurance and was solely responsible for payment of taxes; and (3) the placement agency was responsible for sending and paying a relief contractor to fill in as needed. *Id. at 1191.* The court also found persuasive the fact that the state statute governing CRNAs did not contain language similar to the applicable statute in *Bird* requiring a physician to "supervise" or be "present" during a procedure administered by the CRNA. *Id. at 1193-94.* The absence of such language, along with the lack of evidence showing "that the hospital controlled or supervised the manner in which [the CRNA] rendered medical treatment or anesthesia to patients," led the district court to hold the CRNA was an independent contractor, rather than an employee, of the government hospital. *Id. at 1192-94.*

The facts of this case more closely resemble those in *Bird* than in *Garcia.* As in *Bird,* there is no written agreement between the VAMC and All Staff or the individual workers and there is no language in any of the relevant documents stating that LPN Yussef was an independent contractor and not an employee of the VAMC. In addition, Colorado law defines the "practice of practical nursing" as "the performance, [*14] under the supervision of a dentist, physician, podiatrist, or professional nurse authorized to practice in this state, of those services requiring the education, training, and experience, as evidenced by knowledge, abilities, and skills required in this article for licensing as a practical nurse . . . ." C.R.S. § 12-38-103(9). Under state law, Nurse Yussef may practice as an LPN only when she is under the supervision of a specified professional health

care provider. The defendant has stipulated that, during Nurse Yussef's relevant shift on the night of August 12, 2004, through the morning of August 13, 2004, she was "performing practical nursing services under the supervision of Nurse Jara, as those terms are used in C.R.S. § 12-38-103(9)," and that RN Jara was an employee of the VAMC. *Stipulation* [# 50], filed July 8, 2007.

In light of these facts, I conclude that *Bird* is controlling and mandates a finding that Nurse Yussef was an employee of the VAMC under the FTCA. Although it is undisputed that the VAMC did not provide malpractice insurance for Nurse Yussef or withhold taxes on her behalf, applying the fourth and fifth *Lilly* factors, these facts are insufficient to show that Nurse [*15] Yussef was an independent contractor. Again, the "critical inquiry" in the analysis is "whether the federal government has the power to control the detailed physical performance of the individual." *Duplan, 188 F.3d at 1200*. The undisputed facts in the record demonstrate that the VAMC had the power to control the detailed physical performance of Nurse Yussef and that, under state statute, Nurse Jara was required to supervise Nurse Yussef. This factor weighs heavily toward a finding that Nurse Yussef was an employee for the purposes of the FTCA. In a similar vein, the Tenth Circuit came to its conclusion in *Bird* despite the fact that the hospital's requisition for services provided that the "vendor would provide his own insurance." *949 F.2d at 1081*.

The defendant attempts to distinguish this case from *Bird*, noting first that the statute at issue in *Bird* made it a crime for a CRNA to administer anesthesia without being "under the supervision of *and in the immediate presence of* a physician," while the statute at issue here is not a criminal statute and does not contain the language requiring "immediate presence" of a physician or professional nurse. *Bird, 949 F.2d at 1081; Def.'s Resp.,* [*16] p. 11. These distinctions are not meaningful because the Colorado statute at issue governs Nurse Yussef's practice as a licensed practical nurse and requires supervision by a physician or nurse. In this case, that supervision was provided by Nurse Jara, a VAMC employee. The defendant's reliance on case law holding that a physician is not rendered a hospital employee merely because he is subject to hospital rules or general regulation of his activities is misplaced. *Lilly, 876 F.2d at 860; Lurch, 719 F.2d at 338 n.9.* As was the case in *Bird,* this case does not involve a physician who necessarily must "reserve to [himself] free from outside control or supervision full

responsibility for professional decisions" regardless of employment status. *Bird, 949 F.2d at 1085.* Rather, Nurse Yussef was by statute and in fact supervised in the performance of her duties as an LPN while working at the VAMC.

In sum, some of the *Lilly* factors weigh in favor of independent contractor status. Considered together, however, the factors weigh in favor of the conclusion that Nurse Yussef was an employee of the VAMC, for the purpose of the FTCA, when she treated Mr. Quintana.

*2. Judicial Admission* The plaintiff [*17] contends that the defendant has admitted that Nurse Yussef's negligence caused Mr. Quintana's death and the plaintiff's resulting injuries. The plaintiff claims she is entitled to summary judgment on the issue of the defendant's liability based on this purported admission. The alleged admission is contained in a Designation of Nonparty at Fault [# 21] filed by the defendant under *§13-21-111.5(3)(b), C.R.S.* This statute provides that "[n]egligence or fault of a nonparty may be considered if . . . the defending party gives notice that a nonparty was wholly or partially at fault within ninety days following commencement of the action . . . ." *Id.* The designation is consistent with the defendant's position that Nurse Yussef was not an employee of the VAMC at the time she treated Mr. Quintana. The defendant stated in the designation that "[w]ith respect to her care on August 13, 2004, Nurse Yussef provided negligent and substandard care in the area of nursing. Further, these actions breached her duty of care and caused injuries to Mr. Quintana that resulted in his death, and thus also caused the related alleged injuries suffered by Ms. Quintana." *Designation of Nonparty at Fault* [# 21], [*18] p. 2.

Whether the plaintiff now is entitled to summary judgment on the defendant's liability depends on whether the statements made by the defendant in the designation qualify as judicial admissions. Judicial admissions are "'formal, deliberate declarations which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute.'" *U.S. Energy Corp. v. Nukem, Inc., 400 F. 3d 822, 833 n.4 (10th Cir. 2005)* (quoting *Kempter v. Hurd, 713 P.2d 1274, 1279 (Colo. 1986)).* However, "inconsistent statements made in the alternative are not formal, deliberate declarations that could reasonably be construed as judicial admissions." *Id.*

2008 U.S. Dist. LEXIS 20698, *18

I find that the defendant's statement regarding Nurse Yussef's negligence contained in the Designation of Nonparty at Fault is not a judicial admission. In its amended answer to the plaintiff's complaint, the defendant denies all allegations that the defendant's employees were negligent or that the negligence of the defendant's employees proximately caused Mr. Quintana's death and the plaintiff's injuries. *Am. Answer* [# 20], PP 51-54. The defendant asserts also as defenses **[*19]** that the plaintiff's injuries were caused by the negligence of third parties and that the defendant was not liable for the negligence of contractors. *Id.,* PP 11-12. The Designation of Nonparty at Fault obviously is related to those defenses. The defendant is entitled to maintain both the position that Nurse Yussef was a nonparty at fault and the inconsistent, alternative positions that, as an employee, Nurse Yussef was not negligent and that her negligence, if any, did not proximately cause the plaintiff's injuries. Thus, I conclude that the statements of made by the defendant in the Designation of Nonparty at Fault do not constitute a judicial admission that Nurse Yussef was negligent. The plaintiff is not entitled to summary judgment on the issue of the defendant's liability.

**B. Alleged Negligence of RN Jara**

Although it is stipulated that Nurse Jara was an employee of the VAMC when she rendered care to Mr. Quintana, the defendant contends it is entitled to summary judgment on the plaintiff's claims relating to Nurse Jara's conduct because it is "undisputed that any alleged negligence by Nurse Jara did not cause plaintiff's injuries." *Def.'s S.J. Br.,* p. 15 (emphasis in original). One **[*20]** of the *prima facie* elements a plaintiff must satisfy in a negligence case is that the breach of the standard of care was a proximate cause of the alleged injuries. *United Blood Servs. v. Quintana, 827 P.2d 509, 519 (Colo. 1992).* In addition, "[e]xpert testimony is required to establish a prima facie case of professional negligence in the great majority of cases." *Williams v. Boyle, 72 P.3d 392, 397 (Colo. App. 2003).* Although there is an exception to this requirement in cases in which the subject matter "lies within the ambit of common knowledge or experience of ordinary persons," *Svendsen v. Robinson, 94 P.3d 1204, 1208 (Colo. App. 2004),* the plaintiff does not contend, and there is no indication in the record, that this case falls within that exception. For the plaintiff's claim of negligence against Nurse Jara to survive summary judgment, there must be evidence in the form of expert testimony that Nurse Jara breached the applicable standard of care and that such breach was a proximate cause of the plaintiff's injuries.

The defendant contends that, while there may be a fact issue as to whether Nurse Jara breached the applicable standard of care, the plaintiff's own expert testified **[*21]** that any breach by Nurse Jara did not cause Mr. Quintana's death. Thus, the defendant argues, the plaintiff has presented no evidence in support of the causation element of her negligence claim against RN Jara.

The plaintiff's expert, Marcia Eastlund, provided an expert report opining that Nurse Jara deviated from the standard of care in treating Mr. Quintana during the early morning hours of August 13, 2004 in two ways: (1) she failed to perform and document a complete assessment of Mr. Quintana when Nurse Yussef informed her of his elevated temperature between 12:30 am. and 1:00 a.m.; and (2) she failed to properly supervise Nurse Yussef. *Def.'s S.J. Br.,* Ex. A, pp. 2-3. With regard to the first deviation, Eastlund elaborated in her deposition that Nurse Jara's assessment of Mr. Quintana was incomplete because she did not ask him about the nature of the quad pain he was having and she did not assess his bowel sounds or ask him about the nature of his stools despite the fact that he was having diarrhea. *Def.'s S.J. Br.,* Exhibit C (Eastlund Depo.), pp. 90-91. When asked whether these failures contributed to Mr. Quintana's death, Eastlund responded that she "can't say that [they] contributed **[*22]** to death. It just goes to show she did not do the job she needed to do." *Id.,* pp. 91-92. In light of this testimony, I agree with the defendant that the plaintiff has presented no evidence that Nurse Jara's assessment of Mr. Quintana, assuming it fell below the applicable standard of care, was a proximate cause of his death.

Eastlund opined also that RN Jara failed properly to supervise Nurse Yussef. Eastlund noted in her report and deposition that, after Nurse Jara assessed Mr. Quintana at approximately 1:00 a.m. and ordered Tylenol to address his elevated temperature, she "should have returned to the patient to determine if the medication was effective in bringing down the temperature." *Eastlund Depo.,* p. 94. However, Eastlund recognized that Nurse Yussef had taken Mr. Quintana's temperature after the Tylenol was administered, that his temperature had reduced slightly, and that Nurse Jara's "failure to personally determine whether the Tylenol was reducing Mr. Quintana's temperature" did not contribute to his death. *Id.*

2008 U.S. Dist. LEXIS 20698, *22

Eastlund then testified as follows with regard to her opinion as to Nurse Jara's failure to personally check on or assess Mr. Quintana between 1:00 a.m. and 6:45 a.m., [*23] at which time she was notified that Nurse Yussef was having difficulty obtaining a pulse oximetry reading on Mr. Quintana:

> Q In your opinion how many times should the RN have checked on Mr. Quintana between the time she was first alerted about the elevated temperature by the LPN?
>
> A Generally speaking the RN should check on patients every two hours.
>
> Q And is that in all circumstances?
>
> A Not necessarily. It's just a general rule of thumb that they should be checked on every two hours. And especially since the LPN had called her earlier and said that there was a problem. I would have been in the room every two hours.
>
> Q And when you say check on the . . . patient, what sort of things would the RN do if they were checking on a patient every two hours?
>
> A I would talk with the LPN, say[], What's going on with him? I would go into the room -- and especially at night I would not want to necessarily disturb this patient if they're sleeping, but I would at least eyeball them and check the record to see what's going on. Ask the LPN if they had taken the temperature again.
>
> I mean, there's no sense giving Tylenol if you're not going to check to see if it's effective. That's part of doing a complete job [*24] as I call it.
>
> So there were things that, you know, in my opinion she should have asked about. There again, he was having diarrhea. Was he still having diarrhea? You know, does this man need something further for the diarrhea? So there were several reasons she should have checked on Mr. Quintana.

*Eastlund Depo.*, pp. 95-96. Eastlund testified also that it would have been reasonable for the RN to delegate to the LPN the task of taking Mr. Quintana's temperature and his other vital signs after the Tylenol was administered. *Id.*, p. 97.

The defendant appears to argue that, because Eastlund testified it was reasonable for Nurse Jara to delegate the taking of Mr. Quintana's vital signs to the LPN, this negates any causal connection between Nurse Jara's failure to personally check on Mr. Quintana between 1:00 a.m. and 6:45 a.m. and his death. *Def.'s S.J. Br.,* p. 17. However, Eastlund faults Nurse Jara not merely for failing to personally take Mr. Quintana's temperature or

vital signs during those several hours, but for failing to check on him at all, either by personally assessing him or speaking to the LPN about his condition. *Def.'s S.J. Br.,* Ex. A (Eastlund Report), p. 3. Eastlund concluded [*25] that Nurse Jara "failed to continuously evaluate M[r]. Quintana's condition and report abnormalities that occurred on the night shift of 8/12/04 2330 to 0800." *Id.* Eastlund also testified that the LPN's failure to report Mr. Quintana's abnormal vital signs "greatly contributed to his death." *Eastlund Depo.,* p. 72. Because Eastlund also faults Nurse Jara for similar conduct, there is some evidence from an expert witness that Nurse Jara's negligence, which involved a failure to monitor and report Mr. Quintana's condition, proximately caused his death. Therefore, the defendant is not entitled to summary judgment on the plaintiff's negligence claims as they relate to Nurse Jara's alleged negligent failure properly to supervise Nurse Yussef.

**C. Alleged Negligence of Other VAMC Employees**

To the extent the plaintiff has not voluntarily abandoned her claims against the United States based on the alleged negligence of VAMC employees other than Nurse Jara and Nurse Yussef, the defendant is entitled to summary judgment on such claims. The plaintiff has provided no expert testimony to support these claims. *Williams, 72 P.3d at 397* (requiring expert testimony to establish *prima facie* case of negligence [*26] in medical malpractice case).

**V. ORDERS**

**THEREFORE, IT IS ORDERED** as follows:

1. That the plaintiff's **Motion for Summary Judgment with Incorporated Brief in Support** [# 26], filed March 15, 2007, is **DENIED;**

2. That the **Defendant United States of America's Motion for Summary Judgment and Brief in Support** [# 58], filed August 10, 2007, is **DENIED** to the extent the plaintiff's claims are based on the alleged negligence of Janice Yussef, LPN;

3. That the **Defendant United States of America's Motion for Summary Judgment and Brief in Support** [# 58], filed August 10, 2007, is **DENIED** to the extent the plaintiff's claims are based on the alleged negligence of Tiffany Jara, RN in supervising the work of Janice Yussef, LPN;

2008 U.S. Dist. LEXIS 20698, *26

4. That the **Defendant United States of America's Motion for Summary Judgment and Brief in Support** [# 58], filed August 10, 2007, otherwise is **GRANTED.**

Dated March 17, 2008, at Denver, Colorado.

**BY THE COURT:**

**s/ Robert E. Blackburn**

**Robert E. Blackburn**

**United States District Judge**

---

End of Document

.


Positive
As of: January 15, 2020 7:56 PM Z

## Farmers Truck Ins. v. MagneTek, Inc.

United States District Court for the District of Colorado

December 20, 2002, Decided ; December 20, 2002, Filed

Civil Action No. 00-RB-2218 (CBS)

**Reporter**
2002 U.S. Dist. LEXIS 27262 *

FARMERS TRUCK INSURANCE, Plaintiff, v.
MAGNETEK, INCORPORATED, Defendant.

**Disposition:** Defendant's motions for summary
judgment granted. Case dismissed.

## Core Terms

ballast, temperature, summary judgment, protector,
causation, thermal, degrees fahrenheit, long term,
ignition, warranty, expert testimony, defense motion,
investigator, deposition, overheated, fixture

the ballast caused the fire. The court agreed that
causation was a key element of each of plaintiff's
claims, and absent evidence that the ballast caused the
fire, the manufacturer could not be held liable. Whether
a ballast that reached temperatures ranging from 180 to
300 degrees Fahrenheit might have caused the fire at
the restaurant was beyond the experience of the
average layman. All of the expert testimony which
plaintiff sought to present to establish causation was
based on the hypothesis of long term, low temperature
ignition of wood, and the court had previously stricken
plaintiff's expert testimony, finding this hypothesis could
not be considered to be a reliable basis for the
admission of expert opinion testimony under *Fed. R.
Evid. 702*. Without this testimony, plaintiff did not have
any admissible expert testimony on the issue of
causation, and summary judgment was proper for the
manufacturer.

**Outcome**
The manufacturer was entitled to summary judgment on
each of plaintiff's claims.

## Case Summary

**Procedural Posture**
Plaintiff asserted several claims against defendant, the
manufacturer of a ballast, based on a theory that the
ballast overheated and caused a fire at a restaurant.
The manufacturer moved for summary judgment.

## LexisNexis® Headnotes

**Overview**

The manufacturer argued that it was entitled to
summary judgment on each of plaintiff's claims because
causation was a crucial element of each of the claims,
and plaintiff could not present sufficient evidence that

Civil Procedure > ... > Summary
Judgment > Motions for Summary
Judgment > General Overview

Civil Procedure > ... > Discovery > Methods of

2002 U.S. Dist. LEXIS 27262, *27262

Discovery > General Overview

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of Law > General
Overview

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of Law > Genuine
Disputes

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of Law > Legal
Entitlement

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of
Law > Materiality of Facts

Civil Procedure > ... > Summary
Judgment > Supporting Materials > General
Overview

Civil Procedure > ... > Summary
Judgment > Supporting Materials > Discovery
Materials

### HN1[⚓] Summary Judgment, Motions for Summary Judgment

The purpose of a summary judgment motion is to assess whether trial is necessary. *Fed. R. Civ. P. 56(c)* provides that the court may grant summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of Law > Genuine
Disputes

Civil Procedure > ... > Summary
Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary
Judgment > Burdens of Proof > Movant Persuasion
& Proof

Civil Procedure > ... > Summary
Judgment > Burdens of Proof > Nonmovant
Persuasion & Proof

Civil Procedure > ... > Summary
Judgment > Entitlement as Matter of Law > General
Overview

### HN2[⚓] Entitlement as Matter of Law, Genuine Disputes

The moving party on a motion for summary judgment bears the initial burden of showing an absence of evidence to support the nonmoving party's case. Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter. The nonmoving party may not rest solely on the allegations in his or her pleadings, but must instead designate specific facts showing that there is a genuine issue for trial. *Fed. R. Civ. P. 56(e)*. The factual record must be viewed in the light most favorable to the nonmoving party.

Evidence > ... > Testimony > Expert
Witnesses > General Overview

Torts > ... > Elements > Causation > Causation in
Fact

### HN3[⚓] Testimony, Expert Witnesses

When causation is not apparent to the average layperson from common knowledge and experience, expert testimony is required to prove causation.

**Counsel:** [*1]  For FARMERS TRUCK INSURANCE, plaintiff: Colin C. Campbell, Clifton J. Latiolais, Jr., John David Halepaska, Campbell, Latiolais & Ruebel, P.C., Denver, CO USA.

For MAGNETEK, INCORPORATED, defendant: Brent Donald Anderson, Snell & Wilmer, LLP, Denver, CO USA.

**Judges:** Robert E. Blackburn, United States District Judge.

**Opinion by:** Robert E. Blackburn

2002 U.S. Dist. LEXIS 27262, *1

**Opinion**

*Corp., 477 U.S. at 324*. The factual record must be viewed in the light most favorable to the nonmoving party. *Concrete Works, Inc., 36 F.3d at 1517* (citing *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990))*.

## ORDER GRANTING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

### Blackburn, J.

This matter is before the court on the defendant's Motion for Summary Judgment on Plaintiff's Breach of Implied Warranty Claims [# 50], filed July 6, 2001, and defendant's Motion for Summary Judgment on Plaintiff's Strict Liability and Negligence Claims [# 47], filed July 6, 2001. Oral argument would not assist the court in the determination of the motion. For the reasons discussed below, the Motions for Summary Judgment are granted.

## I. STANDARD OF REVIEW

$HN1[\overline{?}]$ The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp., 45 F.3d 357, 360 (10th Cir. 1995)*. *FED. R. CIV. P. 56 (c)* provides that the court may grant summary judgment when "the [*2] pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *FED. R. CIV. P. 56(c)*; *see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*; *Concrete Works, Inc. v. City & County of Denver, 36 F.3d 1513, 1517 (10th Cir. 1994)*.

$HN2[\overline{?}]$ The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc., 36 F.3d at 1518* (citing *Celotex Corp., 477 U.S. at 325*). The nonmoving party may not rest solely on the allegations in his or her pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *FED. R. CIV. P. 56(e)* [*3] ; *Celotex*

## II. FACTS

This products liability suit arises from a fire at Sammy's Restaurant in Lakewood, Colorado on November 9, 1999. Except for the key questions of whether a flourescent light ballast was capable of causing the fire, and whether the ballast actually caused the fire, the facts are undisputed. Defendant MagneTek manufactured the ballast.

After the fire, investigators from the West Metro Fire Protection District investigated the fire by "digging out" the fire scene. This includes a layer by layer sifting through the fire debris to identify burn patterns and other evidence of the fire's origin and path. Via this method, investigators Dan Pfannenstiel and Thomas McAdam determined that the fire originated in the void between the ceiling of the basement storage room and the floor of the kitchen above. *Response to motion to strike Pfannenstiel's* [*4] *expert opinions*, Exhibit 1 (Fire Investigation Report). p. 7. The MagneTek ballast in question was part of a flourescent light fixture that was mounted on the ceiling in the basement storage area. McAdam concluded that the flourescent fixture likely caused the fire because "the flourescent fixture was the only item in the area of origin, and other items were eliminated." *Motion to strike*, Exhibit 1 (McAdam deposition), p. 80. Pfannenstiel appears to have undertaken a similar process of elimination in determining that the light fixture was the cause of the fire. *Motion to strike Pfannenstiel's expert opinions*, Exhibit 1 (Pfannenstiel deposition), pp. 37-38.

Focusing on the MagneTek ballast as a potential cause of the fire, the plaintiff hired experts to determine if the ballast might have caused the fire. These experts say they discovered evidence that one of the coils in the ballast had a short, which likely caused the ballast to overheat. The ballast included a device called a thermal protector. The thermal protector shuts off power to the ballast if the thermal protector reaches a temperature over 232 [degrees] Fahrenheit. When the temperature at the protector is reduced, [*5] the protector restores power to the ballast. It is undisputed that the thermal protector in the ballast in question functioned properly both before and after the fire.

2002 U.S. Dist. LEXIS 27262, *5

The plaintiff's experts conducted tests to determine how hot the ballast might have become, in light of the suspected short. Joe Romig, one of the plaintiff's experts, concluded that the MagneTek ballast overheated because of a short. Romig says the overheating caused the ballast's thermal protector to cycle on and off, as the ballast over-heated and then cooled when power was cut off by the thermal protector. This cycling permitted the overheating to continue for some unknown period of time. At one point, a tested ballast reached 340 degrees Fahrenheit in one spot. Romig concluded that, if the thermal protector in the ballast was cycling, the temperature in the ballast varied between 180 degrees and around 300 degrees Fahrenheit. *Plaintiff's Response to Motion to Strike Joe Romig's Expert Opinions,* [# 74], filed August 6, 2001, Exhibit 1 (Romig Deposition), pp. 83, 178-79.

Pfannenstiel, the West Metro Fire Protection District investigator, testified that a fire investigator determines whether an appliance is [*6] a possible source of ignition for a particular fuel by determining the ignition temperature of the fuel, and then determining if the appliance can generate that much heat. Motion to Exclude Expert Testimony of Dan Pfannenstiel [# 51], filed July 6, 2001, Exhibit 1 (Pfannenstiel deposition), p. 18-19. To establish that the MagneTek ballast caused the fire, the plaintiff sought to present expert opinion testimony by Joe Romig and George Hodge. Romig and Hodge would testify that the fire at Sammy's Restaurant was caused by the MagneTek ballast, due to the long term, low temperature ignition of wood. Both Romig and Hodge concluded that heat from the MagneTek ballast passed through the metal light fixture in which the ballast was mounted, through the 5/8 inch gypsum board ceiling and into a wooden furring strip above the gypsum board. According to Romig and Hodge, long term heating of the furring strip by the ballast, at temperatures in the range of 180 degrees to 300 degrees Fahrenheit, likely caused the furring strip to catch on fire.

Romig's and Hodge's opinions about how the ballast could have caused the fire are based on a hypothesis that long term heating of wood at temperatures [*7] above 212 degrees Fahrenheit can, under some circumstances, cause the wood to catch on fire. By separate order, I have stricken the causation testimony of Romig, Hodge and a third expert witness, because their testimony is inadmissible under *Federal Rule of Evidence 702.* As I explain in detail in that order, based on the record in this case, the hypothesis of long term, low temperature ignition of wood cannot be considered

to be a reliable basis for the admission of expert opinion testimony under *Rule 702.*

## III. EVIDENCE OF CAUSATION

Relying on the theory that the ballast overheated, and thus caused the fire at Sammy's restaurant, the plaintiff asserts four claims against MagneTek: 1) strict products liability based on design defect; 2) negligent design; 3) breach of implied warranty of merchantability; and 4) breach of implied warranty of fitness for a particular purpose. The defendant argues that it is entitled to summary judgment on each of these claims because causation is a crucial element of each of these claims, and the plaintiff cannot present sufficient evidence that the MagneTek ballast caused the fire.

Causation is key element [*8] of each of the plaintiff's claims against MagneTek. Colorado Jury Instructions Civil 4th (2001), 14:1 (strict liability); 14:10 (warranty of merchantability); 14:13 (warranty of fitness for a particular purpose); and 14:17 (negligence). Absent evidence that the MagneTek ballast caused the fire, a reasonable fact finder could not find MagneTek liable on any of these claims. Whether a ballast that reaches temperatures ranging from 180 to 300 degrees Fahrenheit might cause a fire, under the circumstances present at Sammy's Restaurant, is beyond the experience of the average layman. *HN3*[↑] When causation is not apparent to the average layperson from common knowledge and experience, expert testimony is required to prove causation. *See, e.g., Gust v. Jones, 162 F.3d 587, 594 (10th Cir. 1998)* (applying Kansas law).

All of the expert testimony which the plaintiff sought to present to establish causation in this case is based on the hypothesis of long term, low temperature ignition of wood. Again, I have stricken this expert testimony because the hypothesis of long term, low temperature ignition of wood cannot be considered to be a reliable basis for the admission of expert [*9] opinion testimony under *Rule 702 of the Federal Rules of Evidence.* Without this testimony, the plaintiff does not have any admissible expert testimony on the issue of causation. Absent evidence that the MagneTek ballast caused the fire, no "rational trier of fact" could find for the plaintiff on any of its four claims against the defendant. Therefore, the defendant is entitled to summary judgment on each of the plaintiff's claims.

2002 U.S. Dist. LEXIS 27262, *9

## CONCLUSION

**THEREFORE IT IS ORDERED** as follows:

1. That the defendant's Motion for Summary Judgment on Plaintiff's Breach of Implied Warranty Claims [# 50], filed July 6, 2001, is **GRANTED;**

2. That the defendant's Motion for Summary Judgment on Plaintiff's Strict Liability and Negligence Claims [# 47], filed July 6, 2001, is **GRANTED;**

3. That this case is **DISMISSED** with prejudice;

3. That any other pending motions are **DENIED AS MOOT;**

4. That **JUDGMENT SHALL ENTER** in favor of defendant, MagneTek, Inc., and against the plaintiff, Farmers Truck Insurance;

5. That the trial preparation conference currently set for January 3, 2003, is **VACATED;**

6. That the jury trial **[*10]** set to commence on January 6, 2003, is **VACATED;** and

7. That the defendant is awarded its costs to be taxed by the Clerk of the Court pursuant to *FED. R. CIV. P. 54(d)(1)*.

Dated at Denver, Colorado, this 20th day of December, 2002.

BY THE COURT:

Robert E. Blackburn

United States District Judge

---

End of Document