1

1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO

2

   Case No. 18-cv-00956-MSK-MEH

3    _____

4    SHAWNEE RYAN,

5        Plaintiff,

6    vs.

7    CORRECTIONAL HEALTH PARTNERS, JENNIFER MIX, M.D., personal
     and official capacity, HILARY VICTOROFF, personal and

8    official capacity LAURA SOMMERSCHIELD, personal and official
     capacity,

9

        Defendants.

10   _____

11

12         Proceedings before MICHAEL E. HEGARTY, United

13   States Magistrate Judge, United States District Court for the

14   District of Colorado, commencing at 10:38 a.m., October 7,

15   2019, in the United States Courthouse, Denver, Colorado.

16   _____

17         WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

18   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

19   _____

20                   APPEARANCES

21         SHAWNEE RYAN, appearing Pro Se.

22         EDMUND KENNEDY and AMY COLONY, Attorneys at Law,

23   appearing for the Defendants.

24   _____

25                 DISCOVERY CONFERENCE

2

PROCEEDINGS

1

2     (Whereupon, the within electronically recorded

3  proceedings are herein transcribed, pursuant to order of

4  counsel.)

5     THE COURT:  Case Number 18-cv-956, Shawnee Ryan vs.

6  Correctional Health Partners and others.

7     Ms. Ryan, please give us your name.

8     MS. RYAN:  Shawnee Ryan.

9     THE COURT:  Thank you.  And for the defense.

10    MS. COLONY:  Amy Colony for the DOC defendants.

11    THE COURT:  Okay.

12    MR. KENNEDY:  Ed Kennedy for the CHP defendants,

13  which includes Dr. Mix.

14    THE COURT:  Okay, thank you.  So Ms. Ryan, where

15  are you on your health?

16    MS. RYAN:  At this point dialysis is next.  We will

17  know, we're scheduling another biopsy, another kidney biopsy.

18  Both kidneys are affected and I'm holding at stage 4, which

19  is the preparatory severe stage.  Any higher and we're going

20  to either do -- hopefully it will be what they call a

21  preventive kind, you just do a few treatments of dialysis,

22  hopefully flush the kidneys out, get them working.  And what

23  that's going to do is lay the groundwork for transplant.

24    At this point there are five gene mutations.  The

25  one that is giving us a fit is the MDS, but it is still

1  holding at 3 percent.  If it climbs to 4 percent where it was

2  this fall and early on this year, earlier this year, then it

3  is an immediate go to transplant, we're ready for that.

4  Matching has been done, everything is ready, but we don't

5  want to go through that unless we get to that 4 percent mark,

6  and right now all I'm doing is trending downward in my labs.

7          So basically everything is --

8          THE COURT:  Is downward good or bad in that

9  context?

10          MS. RYAN:  Downward is bad for the diagnosis.

11  Upward is good for regular blood labs.  So it's a juggling

12  act.  The one that is the regular labs, I'm trending

13  downwards.  Right now I'm neutropenic and pancytopenic.  So

14  when that hits a certain mark -- Ms. Colony just received

15  some documents from Aurora South where she can actually see a

16  0.0 white blood count for the charge of defendant Victoroff.

17          That is -- when we get that, and it drops that low

18  that quickly, there is no recovery other than to do something

19  dramatic.  In that case, it was DT-PACE and a stem cell

20  transplant following that.  This time it will be an allogenic

21  marrow donor as I've explained before.

22          So the simplistic answer to your question is, I'm

23  holding my own, but when it comes, it will come with very

24  little warning.  There is usually about two to three weeks of

25  diagnostic tests is what I'm being told that has to be done,

1    so we would have a little bit of time, but not much.  And

2    then I will be incapacitated for three to five weeks,

3    hospitalized, and then another 120 days of 24/7 nursing care

4    in what they call a recovery type of a hospital environment

5    for orthopedic kind of things.  It's Craig Hospital,

6    Spaulding Rehabilitation, those might be some of the things

7    that you would recognize by seeing ads on TV.  At this point

8    that's as much as I can give.

9         THE COURT:  So what's -- what do you think in your

10   heart the timeframe will be for some of these things?

11        MS. RYAN:  In my heart I think that we are -- I'm

12   strong enough to be able to have the dialysis.  I'm looking

13   forward to just the agreement that I made with Dr. Cyjack

14   (ph) is we'll do a couple of treatments.  When my creatinine

15   and my GFR climb and -- or GFR lowers, creatinine climbs,

16   that's one of those balances.  Hopefully that will flush the

17   difficult disease of lambda light chain deposition, which is

18   the second terminal.  There are two terminal diagnosis.

19        And then my body will be able to work better, which

20   should give neutropenia and pancytopenia in the normal blood

21   up to where my body is battling.

22        So in my heart I think that we'll probably going to

23   be at dialysis somewhere around the holidays, first of

24   December maybe.  I'm told that it's exceptionally tiring.  I

25   have no idea how I'm going to react to it, but it is what it

1    is.

2            As far as transplant goes, I think that that will

3    be successful, and if my body is -- they've done some GI work

4    that has helped keep me out of neutropenia.  I was trending

5    downwards and I haven't sunk to the bottom like I had been

6    for so long.  So that GI work and those antibiotics and

7    medications have helped a lot to keep my levels up a little

8    bit.

9            THE COURT:  So if everything goes as good as it

10   possibly can, what is your expected longevity?

11           MS. RYAN:  What is my expected?  One of the reasons

12   multiple myeloma is the most expensive cancer to treat that

13   there is is because they live for so long.

14           THE COURT:  Okay.

15           MS. RYAN:  At 85 to around -- 80 to 85 is what my

16   life expectancy is if we have a successful transplant.

17           THE COURT:  And how old are you right now?

18           MS. RYAN:  I am 62, which is another factor in this

19   case.  I was 56 when I was diagnosed, and I am one of the

20   youngest that there is, that has been diagnosed with both of

21   these.  The light chain deposition is extremely rare.  The

22   multiple myeloma is uncommon.  The two together, usually

23   people in their 70s is the strong average for contracting

24   either one of those.

25           THE COURT:  So --

6

1            MS. RYAN:  And I did at 56.

2            THE COURT:  Would you potentially benefit from not

3   engaging in this lawsuit at the moment and waiting until all

4   that's on a track where you're stable and in the foreseeable

5   future there is no risk of you being incapacitated?

6            MS. RYAN:  I anticipated that question at some

7   point, so I've been continually bringing a copy of just one

8   of my Walgreens medications that says, Congratulations, your

9   insurance saved you $26,594.72.

10           I have a master's degree.  I am capable of making a

11  very good living.  I have to live at a sub-poverty level

12  right now.  $791, 600 goes to rent.  That lives $191 to live

13  on because I have to have Medicaid.  I can't be one day

14  without that life essential medication, plus half a dozen

15  more, and I see up to six specialists throughout 30 to 60

16  days.

17           There is nothing about this disease, the things

18  that I have, that is going to benefit from waiting any

19  longer.  The reason that we are so, in such bad shape with

20  organ damage and all the things that are on some of my

21  exhibit lists is because of waiting too long.

22           THE COURT:  Waiting, what do you mean waiting?

23           MS. RYAN:  For transplant.  I waited for almost

24  four years for the first transplant.  During that time the

25  damage from the chemotherapy -- the only way that these

1    diseases are treated are by chemotherapy and transplant.

2    Sometimes myeloma patients have multiple transplants

3    throughout their lifetime.  It extends life.

4           So my research for insurance is $1900 a month is

5    what the premium would cost me, cheapest that I can get, and

6    then I'm still 80/20.  That's with all of my other things

7    that have developed.

8           And the problem with that is that when I have to

9    suddenly go down, I'm incapacitated for months on end.  I

10   would never be able to sustain $20 -- 20 percent on an

11   average -- it's -- last year was $962,000 when I add up all

12   the financials of billings that are now available, that I

13   have given full access to all my medical records to Hall &

14   Evans, they can get those if they just choose to pull them.

15          The bottom line here is, is that if I choose to

16   never work again, never have a normal life, stay on

17   sub-poverty level so I can stay on Medicaid, it's -- it's not

18   the kind of life that I wish to be living.  The only way out

19   is through.

20          So the answer to your is, I wish it was, but it's

21   not.

22          THE COURT:  Okay.  So what do you think my question

23   was?

24          MS. RYAN:  I think your question was leading

25   towards putting this off --

1          THE COURT:  I'm not putting it off.

2          MS. RYAN:  -- this lawsuit.

3          THE COURT:  So I have another person who is a

4   plaintiff in a lawsuit and she needed a certain period of

5   time, and so that case is currently in what we call an

6   administrative closure, and at any moment when she wants to

7   come back in and litigate that case fully -- because we're

8   pretty close to being done with discovery in that case -- she

9   can, but it's her call.

10         So what I would not be that interested in is having

11  that judicial proceeding interfere with your ability to

12  improve your health, because there are mental and physical

13  aspects to our body, and this one I'm sure is very mentally

14  taxing.

15         So it's an option for you if you want and one I

16  would support for you.

17         MS. RYAN:  Thank you.

18         THE COURT:  And nothing would change in the

19  lawsuit.  It would kind of just pause.  Things like statute

20  of limitations aren't impacted, no new filing fees.  It's

21  just that when you may not be so distracted by trying to

22  live, you could say, I'm ready to go and I'm ready to go full

23  speed.  That's just an option that you -- you have and one I

24  would support.

25         So I want to see what your response to that is.

1          MS. RYAN:  On another level, another reason that I

2     would be -- that I am against that is that the very best

3     place for treatment for me is Washington State, for me to be

4     able to go back home to the Fred Hutchinson Cancer Center at

5     University of Washington Seattle.  They're the best that

6     there is.

7          And as soon as parole is done, which is coming up

8     soon --

9          THE COURT:  When?

10          MS. RYAN:  I am eligible for early release November

11     1, when that earn time is credited.

12          THE COURT:  Like three weeks from now.

13          MS. RYAN:  Yep.  And Dr. Scatton (ph) and I have

14     talked about it.  He is my parole guy, and at this -- we've

15     even decided that if everything is in place, one of the times

16     that -- the only -- let's put it this way.  The only way that

17     I would consider your offer, Your Honor, as being beneficial

18     to me would be is, I go in for labs tomorrow, and John looks

19     at me and says, Sorry, you're in the tank, we have to get

20     going.  Then I pick up the phone and call my parole officer.

21     He has already put everything into place, that he will go

22     straight to the parole board and say we need to get her out

23     of here on an interstate or just let her go so that she can

24     go home to Washington and have her work done up there where

25     she has support, she has all of these things.

1        Then I would be able to see there being a good

2   result from the offer that you're making.  Otherwise, I just

3   don't see it.  I'm here in Colorado.  The lawsuit will keep

4   me here, even after parole is done.  And while I will

5   (inaudible) specialist decisions.  I have the best team that

6   there is and that's where my care is and I would stay.

7        So there really is no benefit to me at this point

8   in time.  As far as mentally taxing, yes, it is.  As far as

9   physically taxing, very much so, but I appreciate knowing the

10  offer.  I will relay it to Dr. Scatton and say, Well, I've

11  been told that we can also put the lawsuit on hold, go home,

12  have the transplant, if I have to go and have it done, and

13  then I come back to Colorado, finish the lawsuit and be done.

14        THE COURT:  Okay.

15        MS. RYAN:  Those are my logical things to me.  The

16  only benefit -- I don't see any benefit to the plaintiff in

17  stopping this right now.  I see a lot of benefit to the

18  defense.

19        THE COURT:  That's not my point.  My point was

20  focusing solely on you.

21        MS. RYAN:  Thank you.

22        THE COURT:  Okay.  That being said, in order for

23  you to really make an educated decision, you have to

24  understand there is no in between.  There is either we're

25  fully litigating and we can't put things off for you, or we

1   do put things off for you, but the hybrid just doesn't work,

2   like put some things off and not other things.

3        So you need to be physically able to be fully

4   engaged in this lawsuit at all times until discovery is

5   complete and then trial, or motions, or you need to take a

6   pause.

7        So if you're saying that your health is adequate

8   enough to fully litigate this case, then we're going to go

9   through and I'm going to make some decisions right now on how

10  that's going to happen, okay.  So I'm going to take your word

11  for it, you're an adult, and if you say you're ready to

12  proceed with the lawsuit, that's what we're going to do.

13       MS. RYAN:  I am.

14       THE COURT:  All right.  So then the first issue,

15  I'll ask the defendants, do you agree with me that there is

16  no governmental entity that's a defendant in this case?  Do

17  you agree?

18       MS. COLONY:  I would agree, Your Honor.

19       THE COURT:  Okay.  So she's free to contact the

20  Government, no matter who it is, just not your clients.  Are

21  we agreeable to that?

22       MS. COLONY:  I wouldn't be agreeable to that, Your

23  Honor.  Under the Rule 4.2, Comment 7 of the Rules of

24  Professional Conduct, I believe they use the word

25  "constituents."  I mean, these are key people in the lawsuit

12

1    and in the claims.

2              THE COURT:  Who are key people?

3              MS. COLONY:  Some of the people she has been

4    contacting.

5              THE COURT:  You mean they're witnesses?

6              MS. COLONY:  They're witnesses.

7              THE COURT:  Okay.

8              MS. COLONY:  But they are either current or former

9    CDOC employees.

10             THE COURT:  Okay.  What -- you have to read the

11   rule you're relying on, please.

12             MS. COLONY:  I apologize, Your Honor.  I don't have

13   it with me, but the comment goes into detail about -- for

14   example, if the plaintiff was contacting the CEO, RBP or

15   someone at CHP, I'm sure Mr. Kennedy wouldn't tolerate that.

16   That is a high level employee that involved --

17             THE COURT:  They're a party.  CHP is a party, and

18   there are ethical rules that govern whether you can contact a

19   party.  She could contact nonsupervisory people at CHP

20   because they're not CHP.  CHP speaks through its supervisors.

21   That's how I've always applied the rule.

22             Mr. Kennedy, do you apply it in I differently than

23   that?

24             MR. KENNEDY:  I've always thought all employees

25   have right to counsel.

1          THE COURT:  Yeah, I don't know.  I think only

2     supervisory employees are covered within the privilege.

3          MR. KENNEDY:  I might agree with that, Your Honor.

4     Even nonparties to (inaudible - not speaking into mic).

5          THE COURT:  Yeah.  So she simply can try to contact

6     nonparties and see if she can get them to cooperate with her

7     as her witness if she wants.  They're free to say no, I'm not

8     speaking to you.  I don't know of any other rule.  So --

9          MS. COLONY:  Well, they're obviously alarmed by

10    contact by a former inmate that they dealt with when they

11    were employed by DOC and they have concerns for their own

12    personal safety and they don't want to be harassed.

13         THE COURT:  Well, and there are, number one, civil

14    laws that prevent harassment, and, number two, I -- Ms. Ryan

15    is under my jurisdiction since she has voluntarily submitted

16    to that jurisdiction insofar as it regards anything in this

17    lawsuit.  And a judge has a right to control the manner of

18    discovery.

19         And so if she's engaging in discovery efforts that

20    you think are inappropriate, that's something I will hear,

21    but there is no ethical prohibition.  There are other rules

22    and regulations and policies that we apply.  So I just want

23    to establish that, there is no State of Colorado entity

24    that's a defendant.  There are only individuals and CHP, so

25    that's that.

1          Now, we can move on to the next issue.  What

2     harassment do you allege she is engaging in?

3          MS. COLONY:  Well, these employees reached out to

4     CDOC to advise them that they've been contacted by her and

5     then they reach out to me and let me know what's going on and

6     they forward me the correspondence, including written

7     discovery that she's trying to directly serve on these

8     employees without serving -- I mean, I'm unaware that you can

9     serve written discovery on a witness.

10          THE COURT:  You can serve a subpoena duces tecum, a

11     Rule 45 subpoena in which a person is required to appear and

12     answer questions, but if you're talking about

13     interrogatories -- is that what they're entitled?

14          MS. COLONY:  Right.

15          THE COURT:  So, Ms. Ryan, discovery in terms of

16     interrogatories, requests for production, requests for

17     admissions can only be served against a party, and the only

18     parties in this case, as far as I know, are Ms. Mix,

19     Victoroff, Sommerschield and CHP.  If you're going to serve

20     discovery against them, it has to be in a certain form.  It's

21     your discovery request, and it's served either on Ms. Colony

22     or on Mr. Kennedy, depending on who the discovery is directed

23     to; but nonparties, you don't just serve discovery on them

24     and they're not required to answer; they can throw it in the

25     trash.  So they can throw it in the trash.

1          MS. RYAN:  I have a question, Your Honor.

2          THE COURT:  Go ahead.

3          MS. RYAN:  First of all, I would like to -- before

4  I ask this question, I need to address the words alarmed and

5  contacting her.  Ms. Colony put in other own writing that was

6  Ms. Perecha was called by one of the -- her defendants, one

7  of her clients, and that's how she -- Audrey had had that in

8  hand, that letter from me for quite some time.

9          THE COURT:  You're using names that I have no idea

10  who they are.

11          MS. RYAN:  Okay.

12          THE COURT:  They could be --

13          MS. RYAN:  These are -- the two people that she's

14  referring to or Ms. Perecha and Dr. Terrella.

15          THE COURT:  Okay.

16          MS. RYAN:  And for Dr. Terrella, he was contacted

17  by the State.  Neither one of them called CDOC and expressed

18  alarm that they had been contacted.  They were startled that

19  they could be found.  And my response, which I gave to the

20  Court and everyone, is everyone can be found.  We don't have

21  phone books anymore; we have online phone books.  And they

22  haven't contacted me back except Dr. Terrella through medical

23  channels, and I am -- have not contacted them.

24          THE COURT:  Now, are these people who would -- do

25  you suspect the people you're talking about who you've tried

1  to reach out to would be in your favor or adverse to you?

2          MS. RYAN:  Well, Ms. Perecha was a personal

3  contact.  These are people -- two people that are former

4  employees that left DOC literally years ago.

5          THE COURT:  Right.

6          MS. RYAN:  And so -- and Dr. Terrella is still

7  involved in my medical consulting, but I never see him or

8  talk to him because he confers with physicians.

9          THE COURT:  But you're not answering my question.

10          MS. RYAN:  And so --

11          THE COURT:  Do you think they would be for you or

12  against you?

13          MS. RYAN:  They're absolutely for me.

14          THE COURT:  Okay.

15          MS. RYAN:  And I think that that's one of the

16  reasons this is being done.

17          To answer -- to ask you my question, if

18  interrogatories -- I did serve or sent in the mail -- I

19  didn't serve her -- Teresa Stone (ph), who is a very -- a

20  current DOC employee who is a very influential on my behalf

21  witness to this case.  I sent her interrogatories and I

22  called them interrogatories.

23          Would it have been appropriate for me to simply in

24  the letter that I wrote to her ask her if she would write a

25  letter for me and address certain concerns?

1          THE COURT:  Yes.  In fact --

2          MS. RYAN:  Instead of calling it an interrogatory,

3   I could still do something like that?

4          THE COURT:  Right, yeah.  I mean, all the time --

5   like, let's say you need an affidavit.  Ms. Colony and

6   Mr. Kennedy do that all the time.  So I'm trying to -- I made

7   a docket sheet and I'm just trying to call up a docket entry,

8   which normally we have, no big deal, but in this case -- and

9   it's going to tell me that I can't reach it.

10         So, yes, let's say a motion, for example, a motion

11  for summary judgment, they're going to bring one some day.

12         MS. RYAN:  Yes.

13         THE COURT:  And -- thank you.  What was the

14  problem?

15         UNIDENTIFIED SPEAKER:  It wasn't set to Acrobat.

16         THE COURT:  Okay, thanks.

17         And they're going to go out and collect affidavits,

18  they're going to go talk to a witness, What do you know?  I'm

19  going to write it down for you, will you sign it.

20         MS. RYAN:  Okay.

21         THE COURT:  And they'll look it over and they'll

22  say, Yeah, I'll sign that, the declaration, probably under 28

23  U.S.C. Section 1746, self-authenticating declaration.  So

24  that happens all the time and you are allowed to do that with

25  witnesses.

1          MS. RYAN:  Okay.

2          THE COURT:  But they don't have to talk to you.

3    They can.

4          MS. RYAN:  I understand that.

5          THE COURT:  And if they don't want to, then you can

6    subpoena them and you can make them testify.

7          MS. RYAN:  Yeah.

8          THE COURT:  That's the means that you use when you

9    have a witness who you believe will say something good for

10   you, but they don't want to cooperate because they just don't

11   want to get involved.

12         So that's not that difficult, and I don't remember,

13   are you -- are you in forma pauperis?

14         MS. RYAN:  I am.

15         THE COURT:  Okay.  So the marshals would serve a

16   subpoena for you if you're IFP.  These are all very simple

17   things.

18         MS. RYAN:  Okay.

19         THE COURT:  And I know that our clinic downstairs

20   would help you walk through those.

21         MS. RYAN:  I do have that process down, I think,

22   very well.  Where it looks like it went off the rails is I

23   titled it an interrogatory, and for Ms. Stone all I have to

24   do is revise that and ask for her to write an affidavit

25   letter or a witness statement.

1          THE COURT:  Yeah, you can even draft the affidavit

2    yourself in the proper form, and if she agrees with

3    everything in it, you can ask her to sign it, and if she

4    signs it, it's done.  Do you guys see anything wrong with

5    what I just told her?

6          MS. RYAN:  She is able to have Ms. Colony, because

7    Ms. Colony would be a representative of CDOC.  The stumbling

8    block I think --

9          THE COURT:  Ms. Colony is not a representative of

10   CDOC.

11         MS. RYAN:  Okay.

12         THE COURT:  She represents CDOC as a lawyer when

13   she's called to.

14         MS. RYAN:  She's telling me that she needs to be

15   involved in everything for an employee or a nonemployee.

16   Like Ms. Stone, that it has to go through her.  Today I

17   discovered that's not the case.

18         So Ms. Stone can choose to do whatever she wishes.

19   If she wishes to call Ms. Colony, she can obviously.

20         THE COURT:  Right.

21         MS. RYAN:  If she does not, she does not have to.

22         THE COURT:  Well, so -- so with regard to current

23   employees --

24         MS. RYAN:  Okay.

25         THE COURT:  -- of any governmental agency --

1    Ms. Colony represents the Government, right?

2         MS. RYAN:  Uh-huh.

3         THE COURT:  And so she could -- I believe she could

4    tell you, Ms. Ryan, obviously you're free to petition your

5    government in any way you believe appropriate, but regarding

6    this lawsuit, if you seek evidence from anybody who is

7    employed with the State of Colorado, I would like you to go

8    through me.  That's permissible for Ms. Colony to say.

9         MS. RYAN:  To ask.

10        THE COURT:  As to ex-employees I would say that she

11   can't do that.  She can't tell you, You can't talk to them,

12   but she -- if an ex-CDOC employee calls Ms. Colony and says,

13   I have this Ms. Ryan calling me, what should I do, Ms. Colony

14   is free to tell her, You are free to talk to her or you're

15   free to not talk to her, whatever you choose.  That's the way

16   that goes in my opinion, my understanding of the law and

17   ethics rules.  Okay?

18        MS. RYAN:  Thank you so much.  So that this can be

19   finally, completely, and this discrepancy, because it's a

20   very, very big one --

21        THE COURT:  What discrepancy?

22        MS. RYAN:  This contention that Ms. Colony has put

23   in that she has to be a part of everything.  I understand

24   this now.

25        THE COURT:  Okay.

1          MS. RYAN:  And for the record, so that she hears it

2     now, Teresa Stone and Kelly Wasko (ph) are the only two

3     current employees.  And knowing Ms. Stone as well as I do, I

4     am absolutely certain that she is going to pick up the phone

5     and say, I have this, I'm going to answer it, I am fine.  If

6     she's not fine, I know her well enough that she will ask you

7     some questions or ask you to be involved.

8          THE COURT:  And so --

9          MS. COLONY:  May I speak, Your Honor?

10         THE COURT:  Hold on a second.  So generally the

11    rules are, you speak to me and then I speak to Ms. Colony,

12    Ms. Colony speaks to me and then I speak to you.  In a

13    proceeding like this, we don't normally have people speak to

14    each other.  Yeah, go ahead.

15         MS. COLONY:  Ms. Stone and Dr. Terrella do not want

16    to speak with the plaintiff.  That's what I have told her,

17    they do not want to be contacted by her.  And it's false to

18    the extent --

19         THE COURT:  Dr. what?

20         MS. COLONY:  Dr. Arolla Terrella.  It's false to

21    the extent that she contends that they didn't reach out to me

22    or CDOC, that I contacted them.  That is simply not true.

23    She has no way of knowing that.

24         CDOC contacted me and forwarded the e-mails to me.

25    Both of those parties have e-mailed me, including

1   Ms. Perecha, or I'm not sure how you say her name.  They do

2   not want to be contacted by her.

3          THE COURT:  Do you have the e-mails with you?

4          MS. COLONY:  Pardon?

5          THE COURT:  Do you have the e-mails with you?

6          MS. COLONY:  I don't have the e-mails with me, no.

7   I considered them attorney/client privilege so I didn't

8   attach them to the motion, but I understand as far as

9   subpoenas, those parties will expect them to be personally

10  served.  But as far as her letters or phone calls -- and this

11  includes the executive director's office as well.  She was

12  calling the executive director's office to discuss this

13  lawsuit.

14         THE COURT:  Executive director of?

15         MS. COLONY:  CDOC.

16         THE COURT:  Okay.

17         MS. COLONY:  Dean Williams.

18         THE COURT:  Okay.  So -- well, that -- that would

19  be the kind of person that I just said you've instructed her

20  not to contact, so that's just the rule for this case, okay,

21  because it was a current, especially supervisor of CDOC and

22  that's your client, although not a defendant, then you can

23  tell Ms. Ryan not to contact them about the lawsuit.

24         MS. COLONY:  Ms. Stone is a current employee as

25  well.

1          THE COURT:  Okay.  So -- so, Ms. Ryan, you have to

2    decide if you want to subpoena them and do a deposition.

3          Where are we on the discovery deadline in this

4    case?

5          MS. COLONY:  I believe it's November 1, Your Honor.

6          THE COURT:  So we're kind hurtling toward that.  So

7    you've really got to decide today if you want to take their

8    depositions.  And you can also take a deposition on written

9    questions.  You can actually submit written questions to them

10   in writing and require them to answer it.  It's called a

11   deposition on written questions where you don't have to have

12   an oral deposition, it's a procedure in our federal rules.

13         So what do you want to do?

14         MS. RYAN:  I've addressed that as well in

15   everything that I've brought forward in the last two weeks.

16   Depositions, as far as I'm concerned, I am -- if I have to

17   decide right now, I need to have answer from Mr. Kennedy

18   regarding if Dr. Mix and Mr. Archiba (ph) are going to

19   finally get their interrogatories answered, which they are

20   behind on; if I am finally going to get corporate disclosures

21   and insurance information that was due when Mr. Rengel

22   entered the case for ECF 119, the fourth amended we're

23   working under, which I still have not received, that are now

24   121 days late.

25         THE COURT:  So if you get written discovery, you

1   won't be taking depositions?

2          MS. RYAN:  If I get written discovery, the chances

3   of me taking a deposition of anyone with CHP are slim to

4   none.  I cannot decide until I see what their answers are.

5          THE COURT:  Okay, so let's move onto that then.

6          MS. RYAN:  As far as --

7          THE COURT:  Well, hold on, we're going to do it in

8   my order.  Where are you in written discovery according to

9   Ms. Ryan?

10         MR. KENNEDY:  Again, she mentioned the CEO.  She

11  wrote these written discovery directly to him.  We explained

12  to her that --

13         THE COURT:  To who?

14         MR. KENNEDY:  To the CEO of CHP asking him his

15  personal knowledge.  He has none.  She can do a 30(b)(6) or

16  she can do interrogatories toward CHP.  We tried to

17  explain -- this is stuff we tried to explain to her without

18  getting you involved, but she seems to be reluctant to take

19  any advice from opposing counsel.

20         THE COURT:  So let me take it from there then.

21         Ms. Ryan, when you serve discovery against an

22  entity, it's solely against an entity and the defendant, and

23  you can't name any specific person within the defendant.  You

24  say, Answer these questions, and then they sign as an entity.

25         So --

1          MS. RYAN:  Mr. Archiba is the entity, according to

2     all of his advertising, all of the information, the little

3     bit of discovery that Hall & Evans has produced with Dr. Mix,

4     very clearly reports to the CEO.

5          THE COURT:  Well, I know that the CEO is the head

6     of any corporation, I agree, but I think I've had enough

7     cases with CCA and CHP, that they're pretty big entities, not

8     one person.  They're not a one-person shop.  There are

9     corporations with -- how many employees does CHP have?

10         MR. KENNEDY:  I don't even know, Your Honor.  I

11    mean, hundreds.

12         THE COURT:  So, yeah, they can speak through a CEO

13    in some context, but in this lawsuit, you have to do it the

14    way it's set to be done or you don't get an answer.  So if

15    you don't want to play by the rules, then you're not going to

16    get what you want.

17         MS. RYAN:  Should I then change all of the

18    questions directed to Mr. Archiba as directed to the person

19    with the most knowledge?

20         THE COURT:  No.  That is assumed.  So --

21         MS. RYAN:  And anybody who is the person with the

22    most knowledge would answer the interrogatories.  Is that not

23    correct?  It doesn't have to be Mr. Archiba.

24         THE COURT:  Well, give me an example of a question

25    that you asked.

1          MS. RYAN:  The primary foundation of this case has

2     to do with HC -- Colorado's HCPF 14-006, and it's tied to the

3     inmate catastrophic Medicaid provision within Title 42, the

4     Affordable Health Care Act.  And all along it's irrelevant,

5     she hasn't got a case, she hasn't got a case.  From the

6     little bit of discovery that I got from Mix's CV is --

7     repeatedly states that she is directly in charge of keeping

8     in compliance with all health plans, healthcare and

9     legislation.

10          And when I blocked -- I don't know what makes up

11     the corporation of CHP because Hall & Evans hasn't --

12     Mr. Rengel hasn't obeyed the rule that when he entered, he

13     was supposed to give those disclosures, and I have nothing.

14          So I do have very strong and detailed questions for

15     Dr. Mix and --

16          THE COURT:  And I'm talking -- so --

17          MS. RYAN:  And then she is the person with the most

18     knowledge.

19          THE COURT:  Well, you can ask Dr. Mix

20     interrogatories, she's a party.

21          MS. RYAN:  I did.  And I'm not getting those

22     either.  I'm not getting requests for documents.  I'm not

23     getting anything from from Hall & Evans.

24          THE COURT:  Okay.  So Mr. Kennedy, what about any

25     documents -- any discovery requests directed toward --

1          MR. KENNEDY:  We have provided -- we have a second

2     set of documents.  We provided a first set of what she asked.

3     I don't recall specifically what was in that first set.

4          THE COURT:  No, but did you respond to the

5     discovery requests within the time permitted by the rules?

6          MR. KENNEDY:  Yeah.

7          THE COURT:  Okay.  And do you have those with you?

8          MR. KENNEDY:  I do not have them with me.

9          THE COURT:  Do you have their response with you?

10         MS. RYAN:  They have -- I do not have the first

11    response, but the second set was due on the 30th of

12    September.  I have --

13         THE COURT:  Well, hold on.  Are you aware of the

14    second set -- is Mix a doctor?

15         MR. KENNEDY:  She's a doctor.

16         THE COURT:  Are you aware of a second set to

17    Dr. Mix?

18         MR. KENNEDY:  I believe we did respond.  I can

19    look, Your Honor.  The issues I had was with the CHP ones

20    that she was using the CEO, and I just asked her to resubmit

21    them.  And some of the questions were very specific to him

22    and not to the company that anybody could answer.  She did

23    not do that.

24         And the second documents, which I believe we --

25         THE COURT:  Do you have your discovery request of

1    Dr. Mix?

2              MS. RYAN:  I do believe that I do.

3              THE COURT:  Why don't you show me.

4              MS. RYAN:  Okay.  I would prompt Ed's memory by the

5    fact that we're here today is because of your filing of 157

6    and your extension of time to be able to answer.

7              THE COURT:  Well, you're here today because

8    somebody wanted to be here today.

9              MS. RYAN:  Yes.

10             THE COURT:  And whoever wants to be here today will

11   be here.

12             MS. RYAN:  Can be here today, but it will hopefully

13   jog his memory there.

14             I asked you where Dr. Mix's was at and you asked

15   for a little bit more time and then you submitted 157.

16             And so --

17             THE COURT:  Ms. Ryan --

18             MR. KENNEDY:  That was separate --

19             THE COURT:  Hold on.  Ms. Ryan, it's a very simple

20   question.  I want to see the discovery request that you gave

21   to --

22             MS. RYAN:  I'm looking.

23             MS. COLONY:  -- to Ms. Mix.

24             MS. RYAN:  I am looking for it, Your Honor.

25             THE COURT:  Let's do one thing at a time.

1          In the meantime, Mr. Kennedy, please call your

2   office and determine whether you responded to a second set of

3   discovery requests of Dr. Mix.

4          And by the way, Ms. Ryan, could you remind me what

5   your offensive conviction was.

6          MS. RYAN:  Request for felony theft, two six-year

7   consecutive.

8          THE COURT:  Who was the victim?

9          MS. RYAN:  The victim we seven people that were

10  taken out of my bankruptcy, and while you are discussing

11  that, let me address, if I can --

12         THE COURT:  I don't understand.

13         MS. RYAN:  Here it is, plaintiff's second set

14  defendant Dr. Jennifer Mix and they are entitled 33 --

15         THE COURT:  Chris, would you get that, please.

16         MS. RYAN:  And they were given to CHP on the

17  (inaudible) of September.

18         Any questions about my criminality or anything that

19  they want to know --

20         THE COURT:  No, no, I need to understand what the

21  underlying offense was, and it was theft from -- how did --

22  what was the alleged theft?  Was it theft --

23         MS. RYAN:  The alleged theft was money

24  white-collared crime.

25         THE COURT:  All right, thank you.

1          MS. RYAN:  To answer something for Ms. Colony and

2     Mr. Kennedy, they had some angst over my stating it's a

3     matter -- when asked, Are you felon, describe criminality,

4     blah, blah, blah.  I am still under active appeal, and

5     Ms. Colony can go back to her office and pull it up.  The

6     case number 18-ca-1740 and they can read all about my

7     children, my ex-husbands, my wife, my PSI report, absolutely

8     everything under the sun.

9          Ms. Colony, I still contend, it's -- she doesn't --

10    isn't going to need it, but we'll deal with that when

11    dispositive motion has come up.  Hall & Evans does need it

12    and they can access that information at any time.  It's a

13    matter of public record.

14          I do not have Mr. Archiba's.  They're actually very

15    similar to Dr. Mix's.

16          THE COURT:  Okay.  Yeah, I have it in front me, so

17    we're just going to see whether Mr. Kennedy has responded or

18    not.

19          MR. KENNEDY:  I was going to have my paralegal come

20    today because I figured questions, and she was in a meeting

21    at 11:00, so I might not get that -- I wanted her here

22    because I have thought --

23          THE COURT:  Sure.

24          MR. KENNEDY:  And you know how that goes.  I

25    believe we have -- the CHP ones we have not responded to.  I

1   believe we did respond to the other two, but, you know --

2          THE COURT:  Okay.  So why do you think you didn't

3   respond to the CHP?

4          MR. KENNEDY:  Well, that's the one we asked -- when

5   she asked for Mr. -- the CEO, asked for his.

6          THE COURT:  Well, I mean, she titles it:  Plaintiff

7   comes now with her fifth set of requests for production

8   against Correctional Health Partners, and nothing is directed

9   to an individual.  So --

10          MS. RYAN:  That's a second set --

11          MR. KENNEDY:  There is two sets to Dr. Mix.  I

12   don't know which one you're looking at.  One set to where

13   there is questions to Mr. Asin- -- how do you say his name,

14   the CEO?

15          MS. RYAN:  Archiba.

16          MR. KENNEDY:  Archiba.

17          MS. RYAN:  Archiba.  There are actually three.

18   There is Dr. Mix's second set that hasn't been answered,

19   there is the ones directed to Mr. Archiba, and then the fifth

20   set is the directed to CHP, could I please have corporate

21   disclosures and insurance that are overdue by --

22          MR. KENNEDY:  Is that the same one you asked for

23   the contract with the --

24          MS. RYAN:  No --

25          MR. KENNEDY:  -- department of Corrections?

1       MS. RYAN:  No.  And along with that fifth set, I

2   also provided documentation that is going to go to another

3   issue that I need to get resolved today.  I didn't just

4   blindly put in Physician Health Partners and all those other

5   entities alongside the CHP in my header.  My records, all the

6   outside records, financials, everything, list all of those

7   entities with CHP as a parent company.

8       In Jennifer Mix's own CV she states that she's

9   under contract not only with CHP, but Physician Health

10  Partners as well.  Physician Health Partners also has denials

11  of a transplant, which is what this case is about.

12      So without court disclosures, I don't have any idea

13  who did what to me.

14      MR. KENNEDY:  CHP --

15      THE COURT:  Okay, so hold on.  I mean, we're

16  devolving into something I've never seen before in a

17  discovery conference, so I've got to get control back here.

18      So plaintiff's second set of written

19  interrogatories defendant Dr. Jennifer Mix, first of all, has

20  some preference questions which you're not required to answer

21  concerning --

22      MS. RYAN:  I made my point.

23      THE COURT:  Yeah, I understand, but do you think

24  that you responded to the second written -- second set of

25  written interrogatories?

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

1           MR. KENNEDY:  Yes, I do, but I will check.

2           THE COURT:  Okay.

3           MR. KENNEDY:  It will be done this week if it's not

4    done.

5           THE COURT:  But you don't think you responded to

6    the fifth set to CHP?

7           MR. KENNEDY:  I don't believe so.

8           THE COURT:  Okay.  So you've got to get those in.

9           MR. KENNEDY:  I will.

10           THE COURT:  In fact, I want you to go ahead and

11    e-mail me by the end of the week the status of your responses

12    to Ms. Ryan's discovery request.  So, in fact, why don't you

13    go ahead and either scan and PDF -- yeah, why don't you do

14    that.  Scan and PDF your responses and attach it to that

15    e-mail so that I can be assured that you responded to all of

16    her discovery requests.

17           What do you contend they haven't responded to?

18    List them out, one by one.

19           MS. RYAN:  Dr. Mix's second set.

20           THE COURT:  Dr. Mix's second set.

21           MS. RYAN:  The interrogatories that I -- first set

22    that I a dressed to Mr. Archiba.

23           THE COURT:  Okay, and I'm going to --

24           MS. RYAN:  -- as CEO and that may have to be

25    adjusted --

34

1          THE COURT:  I'm going to strike that as directed to

2     the CEO and interlineate that it's directed to CHP.  However,

3     if a particular question could only be answered by -- is

4     directed to the CEO only within that person's knowledge, you

5     can -- well, I mean, it will be directed to the corporate

6     entity, okay.

7          MS. RYAN:  CHP?

8          THE COURT:  Yeah, CHP.

9          MR. KENNEDY:  So just treat every question as the

10    corporate entity and answer the best I can.

11         THE COURT:  I mean, so -- so, for example, I don't

12    think it would be an improper question for her to submit a

13    set of discovery requests to CHP, but a particular

14    interrogatory might say, Does your CEO know that blah, blah,

15    blah?  I mean, that's an appropriate question.

16         So you can say, The CEO has no responsive

17    information.  And, of course, if that's true, that's your

18    answer.

19         MS. RYAN:  So I'm talking -- in other words, revamp

20    that so that I am actually talking as if CHP was the person

21    sitting in front of me?

22         THE COURT:  Correct, I've just ordered that, okay.

23         MS. RYAN:  All right.

24         THE COURT:  Okay.  So I need every -- I need all

25    discovery responded to by the end of this week, and if that's

1  not possible, an explanation of why and then when it will be

2  responded to, okay.

3            MS. RYAN:  Okay, and then --

4            THE COURT:  So you listed to -- you listed the set

5  to the CEO, you listed the --

6            MS. RYAN:  Dr. Mix.

7            MR. KENNEDY:  Second set to publication.

8            THE COURT:  Mix, second set to Mix and the fifth

9  set to CHP.

10           MS. RYAN:  Yes.

11           THE COURT:  Of course, Mr. Kennedy, you know, I

12  assume I put limits on discovery, so if you think any of

13  these exceed the limits, then that's a proper objection as

14  well.

15           All right, those three we're talking about, right,

16  Ms. Ryan?

17           MS. RYAN:  Right.

18           THE COURT:  Okay.  Then I've set in course a

19  solution for that.

20           MS. RYAN:  So to answer your question about

21  depositions and what I'm going to do with them.

22           THE COURT:  Right.

23           MS. RYAN:  It's not what I would prefer to be

24  doing.  I would prefer to be able to have normal depositions

25  and be able to have an environment of that, but so far it has

1    been very contentious.  So I am not going to be doing

2    depositions.  You have me --

3            THE COURT:  Well, they're expensive by the way.  I

4    mean, an average deposition costs $1,000.

5            MS. RYAN:  I am -- everything on my end is in good

6    shape.

7            THE COURT:  Okay, good.

8            MS. RYAN:  But I am not going to be doing the

9    depositions on Mix and Archiba.  I am -- I am going to be

10   subpoenaing to bring them both -- to have witnesses at trial.

11           THE COURT:  And --

12           MR. KENNEDY:  Dr. Mix will be there because she's

13   --

14           THE COURT:  Look at me, Ms. Ryan, okay.

15           MS. RYAN:  Uh-huh.

16           THE COURT:  We will facilitate -- in the event that

17   the case goes to trial, the Court will facilitate any

18   subpoenas you need served, okay.

19           MS. RYAN:  Right.

20           THE COURT:  All right.  So I think that eliminates

21   the issue of deposition potential.  That was one of your

22   issues.

23           MS. RYAN:  There is also nobody else.  Everything

24   is going to go stone cold to trial.

25           THE COURT:  So any -- okay, good.  Now, what other

1   issues do you guys have on the defense side?

2           MS. COLONY:  Well, first of all, I want this -- I

3   would like the Court to enter an order stating that the

4   Attorney General's Office receipt of all of Ms. Ryan's

5   medical records and related CDOC records that were in CDO

6   custody was proper.  That's caused a huge problem in this

7   case.  I don't want to receive any more e-mails about that

8   topic.  I want that topic to be closed, I want it to end

9   today.

10          It has just been a repeat -- every single e-mail

11  brings it up, and it was not improper for me as CDOC counsel

12  to receive her records at the beginning of the case.  We have

13  shared everything we have that was turned over to me.  CDOC

14  has been transferred to her via compact disk.

15          And I would also like the order to state that I am

16  not required to give her an inventory that has repeatedly

17  come up all summer long that I was required by Court order to

18  provide an inventory of every single document I received from

19  DOC.  That seems to be an ongoing problem in this case where

20  Ms. Ryan represents repeatedly that this Court has entered

21  orders that it never has entered.  And it's very distracting,

22  it's very -- it's just making this case very difficult and

23  increasing the cost of this litigation far, far beyond what

24  it should be at this stage.

25          I think it would be very helpful at this stage to

1  have an order state that if she desires specific materials

2  from CDOC that she needs to go through me.  She keeps trying

3  to cut me out of the process.  I need to be involved if she

4  wants CDOC materials.

5        I have provided several items of things that she

6  has asked for in her subpoenas.  I've provided those to her,

7  and that apparently makes her angry that I had my hands on

8  them.  And it's just unreasonable, vitriolic and harassing,

9  and I want it to stop.

10        I think in light of all the issues going on and all

11  the delays and problems that we've encountered, Mr. Kennedy

12  and I discussed this just prior to the hearing this morning,

13  we would suggest that it would probably be a good idea to

14  extend the discovery deadline.

15        We have had a problem with releases.  Ms. Ryan

16  wants to limit the scope of the releases.  The problem with

17  that is, is Mr. Kennedy and I don't know what has been going

18  on since she has been released from incarceration, and if we

19  don't know what has been going on since she has been released

20  from incarceration, we have no way to assess her alleged

21  damages.  And so we do need to see the materials that go

22  beyond --

23        THE COURT:  As far as you're understanding, she's

24  alleging continuing damages?

25        MS. COLONY:  That's the way I read her complaint.

1   If --

2           THE COURT:  Are you alleging continuing damages;

3   that anything that has happened by any of these defendants,

4   anything they did is causing you continuing harm?

5           MS. RYAN:  I cannot stop the daily life essential

6   medications that are simultaneously life-threatening.  I

7   cannot stop my kidneys from getting worse.  All of these

8   things, if we have -- change every day.

9           There is no way to assess economic damages until we

10  get to where, if you tell me -- if you were to say to me

11  today, Ms. Ryan, we're going to trial on May 1 for two weeks

12  and you'll definitely be done, then I could give a

13  projection.  I could go along and say, Well, this is X amount

14  of a range --

15          THE COURT:  Well, no, no, I'm not asking you for a

16  dollar amount.  This is a very simple question.

17          MS. RYAN:  They are, Your Honor.

18          THE COURT:  Okay.  So you are saying that you are

19  suffering continuing harm from the actions of the defendants?

20          MS. RYAN:  Exactly.

21          THE COURT:  So that means that they get to discover

22  continuing medical records.  That's just the law.  So --

23          MS. RYAN:  Here is the catch, Your Honor.

24          THE COURT:  Okay.

25          MS. RYAN:  Ms. Colony is implying that her clients,

1    I am asking for continuing damages.  I am not.

2              THE COURT:  Okay.

3              MS. RYAN:  Only Hall & Evans, only the CHP

4    defendant group.

5              THE COURT:  So when did the damages associated with

6    Ms. Victoroff and Ms. Sommerschield, when did those end?

7              MS. RYAN:  Those ended, for defendant Victoroff, on

8    the 7th of February of 2017.

9              THE COURT:  And what about Sommerschield?

10             MS. RYAN:  And Sommerschield, that ended I believe

11   that the retina tear was between -- it was late spring of

12   2017.  Ms. Colony has that information.

13             THE COURT:  Okay.

14             MS. RYAN:  And so where she's concerned, which

15   takes us into this problem of DOC that she's upset about, as

16   gently and as respectfully as I can say, I'll say it again, I

17   challenge anyone present to look at absolutely every word

18   that I have spoken regarding the DOC issues with Ms. Colony.

19             Never once have I said she is not entitled to see

20   all discovery.  I object strenuously to her being able to use

21   all discovery.  In her own words at hearings -- one of them,

22   let's see, I've got it right here.

23             THE COURT:  Well, let me make sure Ms. Colony

24   understands.  Do you understand that you're dealing with your

25   clients with a closed period of damages?

1          MS. COLONY:  Yes.

2          THE COURT:  Because that was and admission that the

3   plaintiff just made, it's binding, you can count on it, okay.

4          MS. COLONY:  Okay.

5          THE COURT:  Now, as to Mr. Kennedy, it sounds like

6   you're continuing with an open period of damages, and so you

7   would be entitled to ongoing records of her treatment as it

8   is associated with damages she alleges arise from CHP or Mix,

9   okay.

10         MS. RYAN:  Am I correct, Your Honor --

11         THE COURT:  Hold on, I have --

12         MS. RYAN:  Sorry.

13         MR. KENNEDY:  Ms. Ryan mentioned earlier that we

14   have access, that she gave -- we sent out standard releases.

15   She didn't want to sign those.  She signed some -- made her

16   own releases sent to us which aren't working.  So we don't

17   have the access.

18         THE COURT:  Well, I'll give you the access, but the

19   point, is it shouldn't be continuing.  I mean, we should

20   say -- I mean, do you have her medical records up to a

21   certain point right now?  Do you have any post-incarceration

22   medical records?

23         MR. KENNEDY:  Some that Ms. Ryan has sent, I

24   believe, but you have some.  I don't know if I've seen them.

25         MS. COLONY:  And I apologize, Your Honor.  We did

1  get some materials from Aurora South, but I believe they are

2  limited to a specific time period while Ms. Ryan was still

3  incarcerated. I would have to go back and double-check

4  those. My paralegal took a look at them and told me some

5  information about them, but I don't believe they contain

6  anything post-incarceration because when we sent a standard

7  release seeking, you know, up to date --

8  up-to-the-present-date information, Ms. Ryan refused to sign

9  that release and she sent back her own release with a very

10  limited time period.

11       THE COURT:  Well, so they're not going to come from

12  you, they're going to come from Mr. Kennedy.  Go ahead and

13  draft up releases that will get us current as of now, and

14  then you will be entitled to one more set of documents,

15  reasonable time before trial.  I mean, it has to stop

16  sometime.

17       She's going to -- she's alleging probably that it's

18  going to affect her for the rest of her life, but we have to

19  pick a date sometime before trial and the records will stop

20  there.  She's entitled to say it's going to go ongoing.

21  That's something we're all used to.  So we can't have all the

22  records up to the moment of trial.

23       MS. RYAN:  Your Honor, may I --

24       THE COURT:  Yes, go ahead.

25       MS. RYAN:  -- clarify a couple points here?

1         Ms. Colony's continued use of "we" as associated

2   with Correctional Health, you just hopefully resolved that

3   for all time.  Ms. Colony was given revised releases specific

4   to being contained, for example, to the days of Hilary

5   Victoroff and the days of Laura Sommerschield.

6         I would ask Mr. Kennedy to ask his paralegal again,

7   did she -- Marion was the one who e-mailed me and confirmed

8   her receipt of all of the releases that I gave him for

9   everything in my initial disclosures.  It is SKR01 is the

10   exhibit, and it absolutely gave you access to anything,

11   everything completely.

12         THE COURT:  Well, when was that, Ms. Ryan?

13         MS. RYAN:  When was that?

14         THE COURT:  Yeah, because --

15         MS. RYAN:  I will look here while I'm finishing.

16         THE COURT:  -- these releases tend to only last six

17   months and then they're stale.

18         MS. RYAN:  Actually mine until it is executed.

19   That's one of the phrases that I put in there so that they

20   wouldn't have this issue.

21         THE COURT:  Well, I know, but you don't control the

22   law; the law controls you.  And so if the law says anything

23   over six months is useless, that's just the law.

24         MS. RYAN:  Then I would be glad to redo them.

25         THE COURT:  Isn't it six months typically?