# EXHIBIT A-1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-00956-MSK-MEH

SHAWNEE RYAN,

    Plaintiff,

v.

CORRECTIONAL HEALTH PARTNERS
DR. JENNIFER MIX, M.D. (personal and professional capacity),
HILARY VICTOROFF N.P. (personal and professional capacity), and
LAURA SOMMERSCHIELD N.P. (personal and professional capacity);

    Defendants.

*[Handwritten annotations in margin: "Still no job description", "Per Internet 'bio': He is now V.P. of CHP (etc.)"]*

---

## DECLARATION OF KELLIE WASKO

---

I, Kellie Wasko, being duly sworn, in accordance with the requirements of 28 U.S.C. § 1746, under penalty of perjury, hereby declare:

1. I am the Vice President of Clinal Services for Correctional Health Partners ("CHP"). I have held that position since August 26, 2019. I have worked for CHP since August 26, 2019. Prior to my employment with CHP, I worked for the Colorado Department of Corrections ("CDOC") from 2003 to 2019 in a variety of different roles culminating in my holding the position of Deputy Executive Director from 2013 to 2019. This Declaration is based on my personal knowledge.

2. CHP is a private company that customizes comprehensive correctional healthcare services for county jails and state corrections systems across the United States.

3. The Vice President of Clinal Services job description accurately reflects the basic nature of my duties and responsibilities for CHP. A copy of this job description is attached to this Declaration.

4. CHP contracts with CDOC to review and provide prior authorization for medical care to be provided to CDOC inmates outside of the internal CDOC medical system. With respect to its contract with CDOC, CHP is a medical services organization, not a healthcare provider. CHP's responsibility pursuant to its contract with the CDOC is to evaluate information that is provided to CHP and determine whether to approve or disapprove particular outside medical services, office visits, tests, or procedures based on the clinical guidelines established by CDOC.

5. Neither CHP nor any healthcare provider working for or with CHP treats any CDOC inmates and neither CHP nor any healthcare provider affiliated with CHP makes any medical diagnoses for any CDOC inmates. Rather, CHP reviews the specific medical information provided to CHP by CDOC treating physicians and other treating health care providers for a utilization review to determine the medical necessity and propriety of specific treatment requested by that treating physician or treating health care provider for a particular CDOC inmate. CHP's role is to respond to specific requests made by CDOC healthcare providers and make adjudications of those specific requests based on the clinical guidelines established by CDOC, the information provided by the treating physician or treating health care provider, and the knowledge and experience of CHP's reviewing medical professionals.

2

6. As part of my job with CHP, I am familiar with the appeal process for any requests that are originally denied. This process is set forth in the CDOC Provider Manual.

7. Any appeal should include any additional information the requesting provider believes would be pertinent to reviewing the denial.

8. The healthcare provider has the right to appeal any denial through the process as outlined in the Provider Manual.

9. A step in the CDOC medical necessity appeal process is for an inmate's provider, upon receipt of the denial, to submit any additional and pertinent clinical information to CHP for a Level 1 Appeal.

10. At this stage, a different CHP Medical Director than the Medical Director who was involved in the original denial would consider the Level 1 Appeal.

11. This second Medical Director would again review all additional and pertinent clinical information and render a final decision for CHP, and the provider would be notified the determination on the Level 1 Appeal.

12. In the event the Level 1 Appeal is denied, the provider can file a Level 2 Appeal.

13. At that point, the Level 2 appeal is referred to CDOC's Chief Medical Officer, who makes the final and binding determination after reviewing all information pertinent to the Level 2 Appeal, including all materials previously submitted and any additional documentation from the Level 1 appeal.

14. CDOC retains all authority to make final decisions regarding any and all interpretations of, or modifications to, Covered Services. Neither CHP nor anyone with CHP is the final decision-maker respecting any determination related to outside medical care for any CDOC inmate. CDOC's Chief Medical Officer is the final decision-maker on all such issues pursuant to the appeal process I have described.

15. I am also familiar with how Medicaid works within the CDOC system, which is actually similar to how it works outside the prions system. If, as here, the patient has a primary insurance plan that is not Medicaid (i.e. Medicaid is not the primary insurer), the procedures of that insurance plan are used and only after the fact would Medicaid get involved. In other words, in relation to Plaintiff's treatment, Medicaid would never be involved in any pre-approval process for any specific treatment or type of treatment. However, if the treatment approved is covered by Medicaid, Medicaid will reimburse the provider, in this case CDOC, after the fact for the treatment pursuant to applicable Medicaid statutes, rules, regulations and guidelines.

16. In short, in this case, Medicaid was not involved in any treatment decisions for Plaintiff at the time CHP was addressing any request for any outside treatment for her, as CDOC was the primary insurance provider not Medicaid. Medicaid would only be involved after the fact and would reimburse CDOC for any treatment it approved that would be covered by Medicaid, such as an overnight hospital stay, which is what Medicaid reimbursed CDOC for in this case. Medicaid would never be involved in pre-approval process unless it was the primary insurer for the patient which was not the case involving the Plaintiff.

4

Dated this _____ day of January, 2020.

                                      *s/Kellie Wasko*

                                      Kellie Wasko

5

Case No. 1:18-cv-00956-MSK-MEH   Document 227-8   filed 01/31/20   USDC Colorado   pg 6 of 15





Note: The Executive Director's Office includes 19.5 Parole Board FTE

**Linked in**  Join now | Sign in

Kellie Wasko

# Kellie Wasko

Correctional Health Partners

Vice President at Correctional Health Partners
Colorado Springs, Colorado · 7 connections

Join to Connect

## Experience

**Vice President**
Correctional Health Partners
Aug 2019 – Present · 6 months

**Colorado Department of Corrections**
8 years 3 months

**Deputy Executive Director**
Sep 2013 – Aug 2019 · 6 years
Deputy executive director to the cabinet position, executive director. Responsible for the management and oversight of 23 persons, 21,000+ offenders and over 10,000 parolees. Responsible health authority for the healthcare delivered through 23 clinics and two residential treatment programs as well as to high functioning infirmaries.

**Director Of Clinical Services**



Join now | Sign in

Kellie Wasko

**Assistant Director**
Jun 2011 – Sep 2012 · 1 year 4 months
Assistant Director of Prisons - appointing authority for the division of clinical services.

## View Kellie Wasko's full profile to

- ✓ See who you know in common
- ✓ Get introduced
- ✓ Contact Kellie Wasko directly

[Join to view full profile]

## People also viewed


**Ewa Podlacha**
Correctional Healthcare Management at Corizon

**Jen Mix**
Physician at Correctional Health Partners


**Deb Alderson**
CEO at GTL


**Madison Barr, MA**
Director Of Business Development and Communications at Correctional Health Partners


**Jeff Archambeau**
Chief Executive Officer at Correctional Health Partners


**Annette Coggins**
RN Regional Health Services Administrator

(5pp)

cc: Frost, Long, Wilcoxon, Shawnee Ryan 159496
Nelson, Jordan, Wasco                August 14, 2018
~~Sterling — under Tracy,~~
~~Catereen 850-04 begun 5/18/18~~

Dr. Burts:

1) → They claim, since 8/2 thru present day, that you gave them "no orders, notes, labs." Claimed by "Q", Sommerschield, Guin and multiple nurses. Not claimed by security who did accept all the above, 8a my return from you 8/a and who did to their knowledge, executed processing as always.

2) → No one picked up phone 8/9, 8/10, 8/13 to you to request duplicates.

3) Per: "Q": "No neutropenia exists" nor "lab level drops" because she "never sees labs", "no precautions orders given", "no meds orders" (including Reclimid → They are however selectively following that one (my word since 8/2) "order from you to hold 8/a), no nutrition meds, collections for Levine and Nash. And still, never once in nearly a year now — any exam by "Q" despite Frost's orders 7/11/18 to enforce, summarized as: your 8/a orders,

(2) are defied and the treatment of blame on me, continues.

4) Yes, I have vocalized current issue(s) since 8/a and done so all the way up chain of command.

~~~~ Here's what everyone has to work with now as I sit, for going on a/nx (8) weeks now at 1.0, 0.9, 0.7 and zero CDOC medical care in-house.

1) This 'round' is the 4th repeat over the years with April 2018 being most recent that the ongoing machinations of blaming AMCE and painting Ryan, have gone on. In Jan. and Feb 2017 — I nearly died during the last fast drop in ANC/neutrophils & whites occurred. Nearly all of latter 2015 and all the year 2016 saw multiple similar events. "Q" and Laurel executing ups and downs, with 2017-2018 that same pattern of "blame others and paint Ryan", with every supervisor in CDOC (et al) complacent, is/are now all culminating to everything is under the intervention ongoing since 8/1a and my body screaming at all with rapid

(3) drops.

2) From today forward, CDOC (etal) defying yours (or) anyone else they've assigned in specialty orders; will be no longer tolerated. ✱ If it takes legal — so be it. ✱ If it takes exposure and complaints to accrediting entities – public safety – regulatory entities (and/or) media — so be it. ✱ As always, the focus is on not one personally (or) entity, other than CDOC (etal). No one else.

3) I am <u>not</u> willing to now sit here, with this turn of events in my blood and body, and repeat certain ____ of CDOC (etal) to deny the standard of care necessary for Remicaid, the standard of care established by the caliber of my specialists; keep me so anxious that I literally will sit and physically suffer without P.R.N.'s (on) the shifts abusive and negative nurses are assigned to me (very well documented with goodstaff and mental health and RMCC) all the while watching my labs/body plummet downward. 1.0 → is lousy. (And you know it, Dr. Brekke) Anything under → is cause for serious. You ordered serious. CDOC (etal) defies.

(4)   4) "If" I am not returned to you when you order labs;

5) "If" I am not given standard of care for 1.0, 0, 9, 0.7, on and off temps; ENT/G.I./Eyes/Hematology (all pending); and a minimum of basic care enforced by all of you — then from this point forward — all of you — will be treated the same way as the abusive CDOC (total) staff is treated by me, with silence in person. You all have a conscience. You all gamble with your arguments between each other that you have "no power", "it's CDOC", "it's medical", "it's not security"; gamble, and close with me and my health.

I know, Dr. Burke, that even you have made similar comments.

Silence. You all live with it all → Fail to act is on CDOC (total). → lack of decency is on all of you.

※ So — the "offender" assumes:
※ → Tampoagon M.D. "Dr. Q" and a small minority of nurses backed up by one HSA, remain solely in charge (and

⑥ "the offender" and her specialist(s) will sit for at least ③ more weeks, blind, without Reitinid and no clue whatsoever how deep this plummet will go (and all the while) "watching" this "new standard" in healthcare that lab levels 8/a, 7/16 → are "not of concern."

✳ Dr. Frost:

"If" the Gwin's message via nursing this morning is true (and) Dr. Birdes 8/a issued orders for precautions etc. etc, are "not true", my personal word to you in May, is removed. My personal "word" a few weeks ago to keep my chin up, is removed. I never lack candor (and) I try to always be fair.

You, now, as all this mess continues, ask too much.

I'm also human. And tired of the lies.

Shawnee Ryan

(cc also to my files)

re: Revoke Medical Information Access
re: Ongoing Emerg. Intervene under AR 850-04
begun 5/19/18

cc: Wasco, Jordan, Nelson, Sparling, Wilcoxen, Long
cc: 18-cv-00956

All:

With this revocation (attached), and Jordan into Step 1 grievance process, and accumulation since 5/19/18 attempts to remedy, I see nothing in positive forward movement from you that comes anywhere near the rapid physical decline since 7/11/18 when Frost ordered Sommerschield bound by ROC, assigned Quarles, and Quarles not obeying his orders to care, examine, restore meds and meet needs. Compounding into what appears to be Sommerschield believing Frost's order and my ROC became "invalid" the minute he gave up and walked off, leaving her with license to resume. Until I can get the slow moving legal process to the right stage, and until I can get Wilcoxen up here to force them to give me a ROC for Quarles (which has a 99% chance of being defied anyway without Tinella (or Frost) the only thing I have control over is HIPPA and what's done physically to my body. This does not close out this 850-04 intervention. It just, hopefully, stops the battering of me (and) the machinations of Burke/BMCC. Please enforce with staff.

Shawnee Ryan