**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Senior Judge Marcia S. Krieger**

Civil Action No. 18-cv-00956-MSK-MEH

**SHAWNEE RYAN,**

      **Plaintiff,**

**v.**

**CORRECTIONAL HEALTH PARTNERS,**
**JENNIFER MIX, M.D., and**
**HILARY VICTOROFF N.P.,**

      **Defendants.**

_____

**OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**
**AND OTHER PENDING MOTIONS**

_____

      **THIS MATTER** comes before the Court on the Plaintiff's Motion for partial Summary Judgment as to Claim Four (**# 180**), Defendant Hillary Victoroff's Response (**# 211**), and Plaintiff's Reply (**# 212**); Defendants Correctional Health Partners ("CHP") and Jennifer Mix's ("Dr. Mix) Motion for Summary Judgment (**# 217**), Plaintiff's Response (**# 238**), and Defendants' Reply (**# 235**); and Defendant Hillary Victoroff's ("Nurse Victoroff") Motion for Summary Judgment (**# 224**), Plaintiff's Response (**# 233**), and Defendant's Reply (**# 239**).

      Also pending are Plaintiff's Motion for Reconsideration of the Court's Order at Docket #183 (**# 220**), Defendants' Response (**# 234**), to which no reply was filed; Plaintiff's Motion for Sanctions Against Attorney Amy Colony (**# 236**), Ms. Colony's Response (**# 241**), and Plaintiff's Reply (**# 242**); and two motions for leave to restrict access to certain documents (**# 218, # 231**) filed by the Defendants.

## FACTS

**Background**

The Court summarizes the pertinent facts herein, elaborating as necessary in its analysis. When she commenced this suit, Plaintiff Shawnee Ryan was an inmate in the custody of the Colorado Department of Corrections ("CDOC") housed at the Denver Women's Correctional Facility ("DWCF").  **(# 1)**. On October 4, 2018, she was released on parole.  She proceeds in this matter *pro se*[1].

The operative pleading at this juncture is Ms. Ryan's Fifth Amended Prisoner Complaint **(#184)**.  It sets out seven claims brought under 42 U.S.C. § 1983 and Colorado law premised on factual allegations that during her incarceration Ms. Ryan's medical needs were left untreated or treated negligently. **(# 184)**.  Defendant Hillary Victoroff is and was a nurse practitioner employed by the CDOC.  Defendant Correctional Health Partners ("CHP") is a private entity that contracts with the CDOC to provide evaluation of the medical necessity of treatment requests by medical providers on behalf of inmates.  **(# 223-1)**.  Defendant Dr. Jennifer Mix was CHP's Medical Director at the times pertinent to this case.  In that capacity, she reviewed medical treatment requests for Ms. Ryan.  **(# 219, # 223-1)**.

The Fifth Amended Prisoner Complaint is verified, therefore the Court treats the factual

---

[1]     Ms. Ryan proceeds in this case without the assistance of an attorney.  Accordingly, the Court reads her pleadings liberally.  *Haines v. Kerner*, 404 U.S. 519, 520-521 (1972).  However, liberal construction is intended merely to overlook technical formatting errors and other defects in Ms. Ryan's filings.  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  Although she is not represented by counsel, Ms. Ryan must still comply with procedural rules and satisfy substantive law to be entitled to relief.  *See Murray v. City of Tahlequah*, 312 F.3d 1196, 1199 n.3 (10th Cir. 2008).

allegations of which Ms. Ryan would have personal knowledge as her proffer[2].   In addition to the Fifth Amended Complaint and arguments in the motions, the Court has considered excerpts of Ms. Ryan's deposition testimony (**# 224-4, # 217-2**); the CDOC, LabCorp, and Medical Center of Aurora medical records (**# 224-2, # 224-4, #224-7, # 233-1, # 233-2, #180-1, and #180-2**); Nurse Victoroff's Affidavit (**# 224-1**); Dr. Tiona's Affidavit (**# 224-3**); Dr. Mix's Declaration (**# 219**); Kellie Wasko's Declaration (**# 223-1**); internal CHP documents (**# 217-3**); and Medicaid documents (**# 226-1, # 226-2**).

The Court provides a brief summary of the undisputed facts, noting some that are controverted[3], but as necessary explores the record as part of its analysis.

### Ms. Ryan's Diagnosis and Treatment

In November 2012, Ms. Ryan entered the CDOC, reporting that she was in "excellent health".   (**# 184 at 7**).  During spring 2013, she became ill while housed at the LaVista Correctional facility.  She "could not fully recover", and thus was transferred to the DWCF. (**#184 at 7**).  Over the following year, she was diagnosed as suffering from Multiple Myeloma (a

---

[2]    The Court may treat a complaint submitted by a *pro se* litigant as an affidavit and use it as evidence on summary judgment where, as here, the complaint is sworn, dated, and signed under penalty of perjury pursuant to 28 U.S.C. § 1746.  (**# 183 at 25-26**).  Here, Ms. Ryan did not present an affidavit or declaration, as required by Fed. R. Civ. P. 56(c)(1)(A).  But her verified Fifth Amended Complaint (**# 184**) contains factual statements apparently made based upon her personal knowledge.  Because Ms. Ryan's papers are construed liberally as an unrepresented party, and because she presumably could (and would, if required) be able to present these facts in a sworn affidavit, the Court will treat the factual statements clearly within the scope of her personal knowledge as if they were properly asserted through an affidavit as required by Rule 56.  *See, e.g., Jackson v. Cheyenne Mtn. Conf. Resort*, 92 F. Supp. 2d 1118, 1122 n.3 (D. Colo. 2000).

[3]    For purposes of the motions for summary judgment, the Court recounts the facts in the light most favorable to the nonmoving party.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).  To the extent there are factual disputes, the Court notes them in the discussion.

blood cancer) and Light Chain Deposition/Cast Nephropathy (a kidney disease).  **(# 184 at 7-8).**
According to Ms. Ryan, the treatment recommended required three-phases: (i) intensive
chemotherapy; (ii) a bone marrow transplant; and (iii) a post-transplant recovery period of two
years to rebuild the immune system.  **(# 184 at 8)**.  By April 2014, her condition had worsened
and progressed to an advanced stage of Multiple Myeloma, causing 30% atrophy of her right
kidney, compromise of her immune system, and bone fractures. **(# 184 at 8)**.

From November 2013 to June 2017, Ms. Ryan's assigned specialist, Dr. Burke, requested
authorization of a bone marrow transplant five times[4], but CHP denied each request.  **(# 184 at
9)**.  In a report dated February 22, 2017, Dr. Burke recited that in April 2014, Ms. Ryan began
chemotherapy and achieved "partial remission with reduction in her marrow plasma cells down
to 5%.  She was unable to get an initial transplantation."  **(# 180-2 at 5).**  Dr. Burke reported that
Ms. Ryan underwent a different regimen of chemotherapy for "some time", but her "lambda light
chain levels [began] rising."  **(# 180-2 at 5)**.  Finally, Dr. Burke reported "[t]he decision was
made as a team for us to stop the current regimen and try DT-PACE therapy in order to get [Ms.
Ryan] going in the right direction.  The plan will then be to pursue an autologous cell
transplantation."  **(# 180-2 at 5)**.

On January 26, 2017, Ms. Ryan was admitted to the Medical Center of Aurora and
underwent a multi-day DT-PACE chemotherapy treatment preparatory to transplant.  She was
discharged from the hospital and returned "in stable condition" to DRDC on February 3, 2017.
**(# 180-2)**.  Dr. Burke stated in his discharge report that Ms. Ryan should be housed in the

---

[4]     The Fifth Amended Complaint states the first transplant request was made to CHP in
August 2014.  **(# 184 at 11)**.

"DRDC Infirmary over the Women's facility" in order to monitor her condition for complications due to the chemotherapy. **(# 180-2 at 12)**.  Dr. Burke's discharge instructions stated that should Ms. Ryan develop a fever of 100.3 and "become neutropenic", she should immediately be transferred to the hospital.  **(# 224-1 at 3)**.  He also scheduled weekly follow-up blood tests to be conducted at the DRDC Infirmary and a follow-up appointment with Ms. Ryan in two weeks.  **(#180-2 at 12)**.

When she arrived at DWCF, CDOC Nurse Practitioner Hillary Victoroff supervised her care.  **(# 224-1)**.  Consistent with Dr. Burke's suggestion, Ms. Ryan requested she be placed in the DRDC Infirmary.[5]  **(# 180-2)**.   Nurse Victoroff contacted Dr. Susan Tiona, the CDOC's Chief Medical Officer, who instructed Nurse Victoroff to deny Ms. Ryan request to be admitted to the infirmary based on her stable condition.  **(# 224-1 at 3)**.  Nurse Victoroff also conferred with Dr. Burke by telephone and told him that Ms. Ryan would be monitored in general DWCF. There is no evidence that he objected to this placement.  **(# 224-1 at 3)**.  Accordingly, Ms. Ryan was returned to her cell in the general population at DWCF.

Nurse Victoroff was scheduled to be off-duty for the following two days, February 4-5, 2017.  She advised the other scheduled nurses of Dr. Burke's discharge instructions.  The following day, February 4, Ms. Ryan felt ill and believed she had a fever.  **(# 184 at 14, # 224-4 at 7-8)**.  At her request, she was taken to the DWCF clinic to monitor her temperature, which

---

[5]     Ms. Ryan states that the "primary difference" between being returned to her cell and being housed in the infirmary is that if she was in her cell, she could not "access medical care at DWCF unless specific orders are given, each and every need/time by the assigned CDOC provider."  In her case, the provider was Nurse Victoroff."  **(# 180 at 2)**.  Also, the DWCF is densely populated and to receive care, inmates must sit in a crowded clinic waiting room. **(# 180 at 2)**.  In contrast, at the DRDC Infirmary, "vitals are regularly monitored … and access is a call button away."  **(# 180 at 2)**.

registered just below 100.3. No blood was drawn. (**# 184 at 14, # 180 at 3, # 224-7 at 7-9**). Ms. Ryan was returned to her cell where she felt increasingly ill. (**# 180 at 3**). The next day, she was found unresponsive in her cell by security staff who transported her to the clinic by wheelchair. (**# 233, # 224-7 at 9**). Ms. Ryan's blood test revealed neutropenia (a complication caused by the chemotherapy). (**# 224-7, # 233-1**). By February 7, Ms. Ryan had developed a fever of 100.7. (**#224-1 at 5**). She was admitted to the infirmary and then transported to the hospital. (**# 233**).

Upon admission to the hospital, Ms. Ryan had neutropenic fever, sepsis, influenza, and an open wound infected with MRSA. (**# 233-2**). She was hospitalized for 10 days, then transferred to the DRDC Infirmary where she was housed for the next 18 months. (**# 233, # 233-1**).

### Authorization for Medical Treatment of CDOC Inmates

CHP is a private company that contracts with the CDOC to review requests and determine what outside medical services should be provided to CDOC inmates. (**# 223-1**). In this role, CHP is not a medical provider, but instead a "gatekeeper" with regard CDOC inmate access to "particular medical services, office visits, tests, or procedures based on the clinical guidelines established by CDOC." (**# 223-1 at 2**). When CHP denies a request for medical treatment for lack of necessity, the medical provider may appeal. (**# 217-3**). This "First Level Appeal" is "conducted by a physician other than the CHP Medical Director who originally reviewed the request." (**#217-3 at 3**). If the denial is upheld, the CDOC provider may request a "Second Level Appeal". The CDOC Chief Medical Officer conducts the Second Level Appeal and makes a binding and final determination as to whether to approve the requested medical treatment for the inmate. (**# 217-3 at 3**).

At the times relevant here, Dr. Mix was CHP's Medical Director. She reviewed

numerous medical treatment requests related to Ms. Ryan's cancer.  **(# 219)**.  A complete record

of all requests and denials of treatment for Ms. Ryan is not before the Court, but it appears

uncontested that on September 29, 2016, Dr. Mix denied Dr. Burke's request for a stem cell

transplant for Ms. Ryan because she was then undergoing chemotherapy treatment with the goal

of "achiev[ing] better remission" and that after her chemotherapy was completed, the transplant

request would be "reevaluated."  **(# 219)**.  The record also notes that Dr. Mix discussed the basis

for the denial with Dr. Burke.  **(# 219)**.  Dr. Burke did not file an appeal of Dr. Mix's decision.

**(# 219 at 3, 5-6; # 217-2 at 16-18)**.

       **This Action**

       Upon Ms. Ryan's motions, the Court dismissed three claims.[6] **(# 193, #206)**.  This leaves

four claims.  Three are brought under 42 U.S.C. §1983 for violation of Ms. Ryan's Eighth

Amendment right to be free from cruel and unusual punishment by being deliberately indifferent

to her serious medical needs.  One claim is brought against Nurse Victoroff alleging that she was

deliberately indifferent to Ms. Ryan's serious medical needs: 1) in assigning Ms. Ryan to a cell

in the general population contrary to Dr. Burke's instruction that she be housed in the infirmary

following her in-patient chemotherapy treatments and 2) failing to leave appropriate orders in

place for Ms. Ryan's care in her absence.  Claims are also brought against CHP and Dr. Mix,

respectively, for denial of Ms. Ryan's requests for a bone marrow transplant and failure to

inform her of her eligibility for payment for the transplant under Medicaid.  Finally, Ms. Ryan

asserts a fourth claim against CHP for negligence (presumably asserted under Colorado law) for

---

[6]     Claims five and six allege Nurse Victoroff mishandled Ms. Ryan's medical records in violation of state law and Claim seven alleges that Nurse Laura Sommerschield was deliberately indifferent to Ms. Ryan's serious medical needs in violation of the Eight Amendment.  **(# 184)**.

denial of transplant requests and failing to inform her of Medicaid coverage for such treatment. **(# 184)**.

Ms. Ryan seeks summary judgment on her claim against Nurse Victoroff.  **(# 180)**. Nurse Victoroff seeks summary judgment on this claim, as well, contending that she is entitled to qualified immunity and that Ms. Ryan cannot make a *prima facie* showing.  CHP and Dr. Mix, also seek summary judgment on the claims against them, contending that Ms. Ryan has not and cannot make a *prima facie* showing.   **(# 217, # 224)**.

## ANALYSIS

### A.  Procedural Standards

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Produce's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish h a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

This case involves cross motions for summary judgment. Because the determination of whether there is a genuine dispute as to a material factual issue turns upon who has the burden of proof, the standard of proof and whether adequate evidence has been submitted to support a prima facie case or to establish a genuine dispute as to material fact, these motions must be evaluated independently. *See Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000); *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not

require the grant of another."); *In re Ribozyme Pharmaceuticals Inc. Securities Litig.*, 209 F. Supp. 2d 1106, 1112 (D. Colo. 2002).

### B.  Qualified Immunity

Qualified immunity protects individual state actors from civil liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012).  When that defense is raised, the burden shifts to Ms. Ryan to establish two prongs: (i) that she has adequately asserted a violation of a constitutional right, and (ii) the contours of that right were "clearly established" by existing Supreme Court or 10th Circuit precedent (or the weight of authority from other circuits) at the time of the events herein.  *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017).

The first analytical prong requires the plaintiff to produce sufficient evidence, which if true, would make a *prima facie* showing of a cognizable claim.  The Court considers the evidence in the light most favorable to the plaintiff and assesses whether it is sufficient to demonstrate the violation of a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court considers the evidence in the light most favorable to the plaintiff and assesses whether it is sufficient to demonstrate the violation of a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The second prong focuses upon whether the right was "clearly established" at the time it was violated.  The "clearly established" analysis examines whether there was existing precedent, at the time of the challenged events, that recognized a constitutional violation in similar circumstances.  Courts are required to conduct the "clearly established" analysis at a "high degree of specificity," rather than in generalities.  *District of Columbia v. Wesby*, 138 S.Ct. 577,

590 (2018).  However, the specificity requirement is not so exacting that "the very action in question [must have] previously been held unlawful." *Ziglar v. Abassi*, 137 S.Ct. 1843, 1866, 198 L.Ed.2d 290 (2017).

The Court may begin its consideration with either prong of the qualified immunity analysis, however, consideration of the first prong of the qualified immunity analysis is functionally the same as the analysis of whether there is sufficient evidence, which if true, to constitute a *prima facie* claim under Fed. R. Civ. P 56.

### C.  Deliberate Indifference to Serious Medical Needs

The Eighth Amendment protects convicted prisoners from cruel and unusual punishment. This includes the right to receive "humane conditions of confinement," which includes the basic necessities of adequate food, clothing, shelter, and medical care, and jail and prison officials must act reasonably to ensure that prisoners receive such basic needs.  *Barney v. Pulsipher*, 153 F.3d 1299, 1310 (10th Cir. 1998).  It is well established that prison officials violate the Eighth Amendment if they are deliberately indifferent to a prisoner's serious medical needs because such conduct constitutes the unnecessary and wanton infliction of pain.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

To  make a *prima facie* showing that the named defendants violated the Eighth Amendment, Ms. Ryan must come forward with evidence that, if true, would establish (1) that she had a "serious" medical need (the objective standard) and (2) that the defendant was aware that her serious medical need posed a substantial risk to Ms. Ryan's health or safety and, that notwithstanding such knowledge the defendant was deliberately indifferent to it (the subjective standard).  *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).  Deliberate indifference does not require a showing of subjective intent to harm Ms. Ryan, only that the official acted,

11

failed to act or delayed action such as authorizing treatment, referral or examination despite knowing that there was a substantial risk of serious harm to the inmate. *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005); *see also Farmer v. Brennan*, 511 U.S. 825, 836 (1994). A delay in medical care only constitutes an Eighth Amendment violation if the plaintiff can show that the delay resulted in substantial harm. Such harm can be shown by evidence that considerable pain resulted from the delay. *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001); *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000).[7]

With these precepts in mind, the Court turns its focus to Ms. Ryan's claims.

**Claim Against Nurse Victoroff**

The Court understands Ms. Ryan's claim to assert that with deliberate indifference to Ms. Ryan's serious medical condition, that Nurse Victoroff (i) refused to admit her to the DRDC Infirmary on February 3, 2017 and (ii) failed to give care orders during her absence February 3-7. (**# 233, #180-3**).

Turning first to the objective component of the deliberate indifference analysis, Nurse Victoroff argues that because Ms. Ryan returned to the DWCF on February 3, 2017 in stable condition following her inpatient chemotherapy treatment, she has failed to show that she had an objectively serious medical need. The Court disagrees.

---

[7]     A medical professional or prison official also can be liable under the deliberate indifference standard if the Plaintiff can prove that the professional is a "gatekeeper" for provision of medical care, and the gatekeeper either delays or refuses to obtain or direct provision of medical care due to deliberate indifference. *Sealock*, 218 F.3d at 1211. In order to establish gatekeeper liability, a plaintiff must establish that the need for medical care was obvious to the prison official. *Estate of Martinez v. Taylor*, 176 F. Supp. 3d 1217, 1227 (D. Colo. 2016). This circumstance can arise when "a medical professional recognizes an inability to treat the patient due to the seriousness of the condition and [her] corresponding lack of expertise but nevertheless declines or unnecessarily delays referral." *Self*, 439 F.3d at 1232.

The phrase "stable condition" is not defined in the record, but in general medical parlance it is used to indicate that a patient's status is consistent with a particular disease process, and that it has not recently changed significantly or precipitously. [8] Sometimes, the word stable refers to a patient's vital signs,[9] but in all events it is an assessment of patient's current condition relative to a particular disease or medical infirmity.  It is not an assessment of the seriousness of the patient's underlying disease or condition, or the need for treatment.  In determining whether Ms. Ryan suffered from a "serious medical condition", the question is not whether her condition was stable – meaning that it was consistent with having just completed a chemotherapy regimen – but instead whether Ms. Ryan's underlying condition combined with her condition upon return to DWCF following chemotherapy involved sufficiently serious medical needs.

A medical need is considered "sufficiently serious" if the condition "has been diagnosed by a physician as mandating treatment or ... is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (citations and quotation marks omitted).  *Chapman v. Santini*, 805 F'Appx. 548, 553 (10th Cir. 2020) (finding inmate's type I diabetes requiring specialized medical care to be sufficiently serious).

This is not a close call.  It is well documented that Ms. Ryan suffered from two serious illnesses – blood cancer and kidney disease – requiring extensive chemotherapy treatment. (**#180-2**).  These, by definition, are serious medical conditions.  But, in addition, Ms. Ryan had a serious medical condition as a result of her chemotherapy treatment.  When discharged from the

---

[8]      *See* Medical Dictionary "stable condition." Retrieved September 29, 2020 from https://medical-dictionary.thefreedictionary.com/stable+ condition.

[9]      *See:* https://www.hopkinsmedicine.org/news/media/patient_condition_updates.html.

hospital following a multi-day inpatient chemotherapy regimen, her treating oncologist, Dr. Burke, recommended that she be housed in the DRDC Infirmary for several reasons - her potential need for an immediate blood transfusion, follow-up blood tests, medication changes, and monitoring so that Ms. Ryan could be transported back to the hospital should she develop a fever of 100.3 and become neutropenic.[10] **(# 224-1)**.  Indeed, Ms. Ryan's chemotherapy left her vulnerable to a host of serious medical conditions resulting in her developing sepsis, and contracting influenza and MRSA, which required a 10-day hospitalization and approximately two months of antibiotics.  **(# 233-2)**.  Thus, Ms. Ryan made a sufficient showing that she had objectively serious medical needs diagnosed by a physician that required ongoing monitoring and treatment when she returned to DWCF.

Turning to the second element of the deliberate indifference analysis, Ms. Ryan must show that Nurse Victoroff was aware of her condition, and notwithstanding such knowledge, acted in a manner that was deliberately indifferent to it.  *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005); *see also Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  The record clearly shows that Nurse Victoroff was aware of Dr. Burke's discharge orders and concerns.  In his discharge orders, Dr. Burke specified his medical concerns, the monitoring that would be required and that Ms. Ryan would need to be in the infirmary to provide the appropriate supervision.  Nurse Victoroff obviously read those orders.  According to her affidavit,  she "contacted CDOC's then-Chief Medical Officer, Dr. Susan Tiona, to consult with her about the appropriateness of

---

[10]    Neutropenia is a decrease in an individual's number of white blood cells and is common after receiving chemotherapy.  It increases a patient's risk for infections, and even a minor infection can become a serious condition.
https://www.cdc.gov/cancer/preventinfections/pdf/neutropenia.pdf

admission of Ms. Ryan to the DRDC infirmary, as suggested by Dr. Burke in his discharge orders", and she "spoke directly via telephone with Ms. Ryan's oncologist, Dr. John Burke, confirming orders, medication changes, follow up appointments, labs and the potential need for a transfusion in the upcoming week to be given in the infirmary." **(#224-1 at 3)**  Thus, the uncontroverted evidence is that Nurse Victoroff  was fully aware of Ms. Ryan's medical needs.

Nurse Victoroff argues that Ms. Ryan was placed in the general population rather than housed in the infirmary because 1) her superior then-CDOC Chief Medical Officer Susan Tiona[11] denied the infirmary placement; and 2) when Dr. Burke was told of this decision, he did not object. **(# 224-1 at 4)**.  These undisputed facts rebut the suggestion that Nurse Victoroff deliberately controverted Dr. Burke's directions.  It may be that it would have been wiser to put Ms. Ryan in the infirmary but to do so contravened CDOC policy and apparently Dr. Burke had no objection to her placement in the general population.  Thus, as to Ms. Ryan's placement in the general population, she has not shown that Nurse Victoroff was deliberately indifferent to her medical needs.

Turning to the question of whether Nurse Victoroff was deliberately indifferent in failing to provide appropriate care in her absence, the Court begins with a timeline.  On February 3, Ms. Ryan was transported from the Medical Center of Aurora to DRDC.  **(#224-2 at 11)**.  According to CDOC medical records, Ms. Ryan arrived at about 1:00 p.m. **(#224-2 at 11)** and her vital signs included a temperature of 97.9 degrees F.  Nurse Victoroff recorded that she had reviewed

---

[11]    This consultation was in response to Dr. Tiona's July 2015 verbal mandate requiring all clinical staff to contact her prior to all transfers of inmates out of CDOC facilities into the DRDC infirmary, unless the condition was life-threatening.  Consistent with CDOC guidelines, Ms. Ryan was not eligible to be placed in the infirmary because she arrived at DWCF in stable condition and was alert, ambulatory and afebrile.  **(# 224-1 at 3, # 224-3)**.

Dr. Burke's discharge orders, reviewed medications, talked with Dr. Burke, scheduled a blood test for February 6 and that if Ms. Ryan's temperature rose to greater than 100.3 degrees F, she was to be returned to the hospital. **(#224-2 at 10-11).**  According to her affidavit, before Nurse Victoroff departed for two days off (February 4-5), she gave verbal orders to staff to provide medical care to Ms. Ryan per Dr. Burke's discharge orders – that should Ms. Ryan develop a fever of 100.3 or higher and become neutropenic, she was to be immediately transferred to the hospital.  **(# 224-1 at 3)**.  Nurse Victoroff  returned on February 6.  **(# 180-1 at 9)**.  As to this timeline, Ms. Ryan offers no evidence to the contrary.

Ms. Ryan states that she felt feverish on February 4, but admits that her temperature was lower than 100.3 degrees F.  There are no CDOC infirmary reports for February 4 and 5.  But on February 6, Ms. Ryan was transported to the infirmary by wheelchair by nursing staff.  Ms. Ryan states that she fell unconscious in her cell, but no evidence confirms that.  Her temperature, taken by the nursing staff, registered 98.1, well below the 100.3-degree threshold for hospitalization given by Dr. Burke in his discharge instructions.  The records reflect that Ms. Ryan's breathing was "unlabored" and she was resting in the infirmary.  The previously scheduled blood test was conducted and as soon as the results revealed neutropenia, Nurse Victoroff conferred with Dr. Burke and admitted Ms. Ryan to the infirmary per his instructions.  **(# 224-1 at 4)**.  The February 6 medical record again recites that Ms. Ryan should be hospitalized if she develops a fever of 100.3 F or higher.  **(# 224-2 at 6)**.

The medical records do not indicate any presence of fever until the morning of February 7 when Ms. Ryan's temperature registered 100.7 F.  **(# 224-2 at 3)**.  The CDOC provider-on-duty, Dr. Yegappan, spoke with Dr. Burke and then directed that Ms. Ryan be transported to the hospital.  **(# 224-2 at 3)**.

Viewing this evidence most favorably to Ms. Ryan, it is true that Nurse Victoroff did not personally treat her on February 4-5.  But that is not sufficient to show indifference.  Nurse Victoroff was not required to monitor Ms. Ryan personally, but she was required to assure that those caring for her did so in accordance with Dr. Burke's directives.  Ms. Ryan may believe that the DRDC nursing staff was not briefed as to her needs, but she has come forward with no evidence to rebut Nurse Victoroff's testimony and the contents of the CDOC records showing that the nursing staff at DRDC was instructed that if Ms. Ryan's temperature was to rise above 100.3 degrees F, she should be returned to the hospital.   This did not occur while Nurse Victoroff was absent.  Indeed, Ms. Ryan's temperature did not begin to spike until February 7 after Nurse Victoroff returned and Ms. Ryan's February 6 blood test showed neutropenia.  This was the first moment at which Ms. Ryan's return to the hospital was appropriate, and it was promptly accomplished.

Accordingly, the Court finds Ms. Ryan has not come forward with competent evidence to establish that Nurse Victoroff was deliberately indifferent to her serious medical need either by placing her in the general population at DRDC or in instructing DRDC staff in her absence.  As a consequence, she has not made a *prima facie* showing of a constitutional violation.  Nurse Victoroff is entitled to qualified immunity and judgment in her favor.

**Claims Against Dr. Mix and CHP**

The Court now turns to Ms. Ryan's Eighth Amendment claims against CHP and Dr. Mix. Construing her allegations liberally, Ms. Ryan appears to claim that Dr. Mix violated her constitutional rights by denying her bone marrow transplant request, and CHP violated her rights by restricting Ms. Ryan to treatment by its own network of providers, denying her requests for a bone marrow transplant and post-transplant care, and by failing to inform her that Medicaid was

available to cover her transplant.  (**# 184 at 9**).  CHP and Dr. Mix do not challenge Ms. Ryan's showing of an objectively serious medical need.  Thus, the issue is whether there is evidence of a subjective showing of deliberate indifference.

There is no dispute that Dr. Mix acted as a gatekeeper for medical services when she denied Ms. Ryan's request for bone marrow transplant on September 29, 2016.  But to establish an Eighth Amendment violation, Ms. Ryan must come forward with evidence sufficient to show that Dr. Mix "acted with a sufficiently culpable state of mind" when she did so.  *See Vega v. Davis*, 673 F.App'x 885, 890 (10th Cir. 2016); *Seiter*, 501 U.S. at 298.  The Eighth Amendment "does not give rise to claims sounding in negligence or medical malpractice."  *Sherman v. Klenke*, 653 F'Appx. 580, 586 (10th Cir. 2016).  Instead, it is concerned with "obduracy and wantonness, not inadvertence or error in good faith"  *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006).  In the gatekeeping role, a judge in another case in this circuit has characterized the legal standard as follows: in order to establish that CHP or its physician was subjectively, deliberately indifferent, a plaintiff must prove that the information in the authorization request showed an indisputably obvious need, and approval was, in effect, the only reasonable decision that a physician could make. *See Swan v. Physician Health Partners, Inc.*, No. 15-cv-0103-WJM-NYW, 2018 WL 4509528, at *4 (D. Colo. Sept. 20, 2018). This articulation of the legal standard is apt, here.

CHP records show that in September 2016, Dr. Mix denied Dr. Burke's request for a bone marrow transplant for Ms. Ryan because she was currently undergoing chemotherapy treatment, and the "plan" was to "achieve[] better remission" after which Ms. Ryan would be "reevaluated for [a] transplant".  (**# 219 at 6**).  CHP records show that Dr. Mix conferred with Dr. Burke as to this "plan" for Ms. Ryan, and it is undisputed that neither Dr. Burke nor any

other medical provider appealed Dr. Mix's denial of the transplant.  (# 217-2 at 15).

The Court appreciates that Ms. Ryan disagreed with Dr. Mix's conclusion because she believed that her remission was within "range" for a transplant and that she did not want to undergo more chemotherapy.  (# 217-2 at 14).  But this type of disagreement is insufficient to show a constitutional violation because it reflects only a "difference of opinion" between Ms. Ryan (or Dr. Burke) and Dr. Mix.  *Johnson v. Stephan*, 6 F.3d 691, 692 (10th Cir. 1993).  In addition, there is no medical evidence in the record that contradicts Dr. Mix's medical opinion and treatment plan.  Indeed, it is undisputed that Dr. Burke did not appeal from Dr. Mix's determination.  On this record, no reasonable jury could find that a reasonable physician would have approved the transplant.  Moreover, there is no evidence of specific animus by Dr. Mix in making the decision.

As a consequence, Ms. Ryan has not made a *prima facie* showing that Dr. Mix's decision to deny a transplant in 2016 was indifferent to Ms. Ryan's serious medical needs.  Accordingly, judgment in favor of Dr. Mix is appropriate.

As noted, CHP is a private entity that contracts with the CDOC to review treatment requests by medical providers on behalf of inmates.  (# 223-1).  This type of entity can be sued under 42 U.S.C. § 1983 pursuant to the *Monell* standard[12] for constitutional injuries caused by its employees when those constitutional violations are part of the entity's policy and practice. *Dubbs v. Head Start, Inc*., 336 F.3d 1194, 1216–17 (10th Cir. 2003) (noting that the 10th Circuit

---

[12]     Under *Monell*, a municipality cannot be held liable under 42 U.S.C. § 1983 merely on account of the unauthorized acts of its agents.  To be liable, the municipality must have had an "official municipal policy of some nature," *Monell v. Dep't. of Soc. Servs*., 436 U.S. 658, 690-91 (1978), that was the "direct cause" or "moving force" behind the constitutional violations.  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 820 (1985).

along with other circuits have extended the *Monell* doctrine to private § 1983 defendants.);
*Smedley v. Corr. Corp. of Am.*, 175 F'Appx. 943, 946 (10th Cir. 2005).  In addition, a plaintiff
pursuing *Monell* liability must show that the identified policy and practice caused a
constitutional injury.  While Ms. Ryan complains that CHP's practices of (i) using its own
network of providers, (ii) denying her request for a bone marrow transplant; and (iii) failing to
inform as to the availability of Medicaid caused her injury (in the form of prolonged
chemotherapy which caused significant physical side effects), she does not identify a specific
CHP policy.  However, even assuming that Ms. Ryan identified an offending policy or practice
by CHP, implementation of that policy must cause a constitutional injury.  To the extent that Ms.
Ryan's injury was denial of a transplant as requested in 2016, the Court has previously found
that no constitutional injury occurred.[13]  *Myers v. Okla. County Bd. of County Comm'rs*, 151
F.3d 1313, 1316 (10th Cir. 1998).  Given the Court's determination that there has been no *prima
facie* showing of an Eighth Amendment claim of deliberate indifference to a serious medical
need against Dr. Mix, this claim cannot proceed against CHP and is therefore DISMISSED.

### D.  Negligence Claim

Ms. Ryan also brings a negligence claim against CHP based on Colorado law.  She
contends that CHP is liable for the alleged medical negligence of Dr. Mix and any other
employees who denied Ms. Ryan's transplant requests and additional requests for post-transplant
care.  **(# 184 at 9)**.  The Court also understands Ms. Ryan to contend that Medicaid was available

---

[13]     Also, even assuming Ms. Ryan had shown CHP had a policy or practice in place of
failing to inform inmates of the availability of Medicaid under the Affordable Care Act or
limiting inmates to in-network providers, there can be no entity liability without a showing that
an employee violated Ms. Ryan's constitutional rights.  *See Myers*, 151 F.3d at 1316; *City of Los
Angeles v. Heller*, 475 U.S. 796, 799 (1986)**.**

to cover the costs for all of her requested care, however, CHP negligently failed to inform her of this coverage.  **(#184 at 9)**.  CHP seeks summary judgment on this claim arguing it owes no duty to Ms. Ryan for the alleged negligent acts of Dr. Mix or other reviewing physician employees based on the corporate practice of medicine doctrine.  The Court agrees.

In order to establish a claim for negligence under Colorado law, the plaintiff has the burden of proving that a defendant had a legal duty of care, that the defendant breached that duty, there was injury to the plaintiff, and that the defendant's breach caused the plaintiff's injury.  *Greenberg v. Perkins*, 845 P.2d 530, 533 (Colo. 1993).  A negligence claim will fail if it is predicated on circumstances for which the law imposes no duty on the defendant.  *HealthONE v. Rodriguez*, 50 P.3d 879, 888 (Colo. 2002).  Thus, the initial question in any negligence action is whether the defendant owed a legal duty to protect the plaintiff against injury.  *Id.*  The question of whether the defendant owes a plaintiff a duty to act to avoid injury is a question of law to be determined by the court.  *Id.*

In Colorado, the corporate practice of medicine doctrine is a common law principle that recognizes it is impossible for a corporation or entity to perform medical actions or be licensed to practice medicine.  *Estate of Harper ex rel. Al–Hamim v. Denver Health and Hosp. Authority*, 140 P.3d 273, 275 (Colo. App. 2006).  Under this doctrine, a corporation that employs a physician may not interfere with the physician's independent medical judgment, and accordingly a corporate entity cannot be held vicariously liable for the negligent acts of their physician employees.  *Daly v. Aspen Center for Women's Health, Inc*., 134 P.3d 450, 452-53 (Colo. App. 2005).

Here, the unrebutted evidence shows that CHP is a private medical services organization, not a medical provider.  It contracts with entities like the CDOC to evaluate information and

21

determine whether to approve or deny outside medical treatments for inmates.  **(# 223-1 at 2)**. CHP employs medical professionals to review requests and make determinations regarding requested treatments.  These medical professionals do not treat inmates.  **(# 223-2 at 2)**.  Thus, to the extent that Ms. Ryan alleges Dr. Mix or some other CHP employee acted negligently in denying Ms. Ryan's medical requests and/or failing to inform Ms. Ryan that Medicaid was available to cover the requested treatments, CHP cannot be held liable under the corporate practice of medicine doctrine.  Thus, the Court finds Ms. Ryan has failed to state a claim for negligence against CHP.  It is DISMISSED.

## REMAINING MOTIONS

### A.  Ms. Ryan's Motion for Reconsideration

On November 12, 2019, the Court issued an Opinion granting in part and denying part Ms. Ryan's Motion for leave to file a Fifth Amended Complaint.  **(# 183)**.  As part of that Opinion, the Court denied Ms. Ryan's request to add or "join" additional claims under Colorado law "governing negligence" against CHP, Dr. Mix, Nurse Victoroff, and Nurse Sommerschield for failure to comply with Local Rule 15.1.  **(# 183 at 5-6)**.  Rule 15.5 requires litigants to

> attach as an exhibit a copy of the proposed amended or supplemental pleading which strikes through (e.g., strikes through) the text to be deleted and underlines (e.g., underlines) the text to be added. Unless otherwise ordered, the proposed amended or supplemental pleading shall not incorporate by reference any part of the preceding pleading, including exhibits.

D.C. Colo. L. Civ. R. 15.1.  Here, Ms. Ryan's Motion to Join Negligence Claims **(# 133)** included no attachments of her proposed negligence claims, thus the Court denied it on this procedural basis.  On January 23, 2020, Ms. Ryan filed the instant motion **(# 220)** requesting reconsideration of the Court's Order as to the request for joinder of negligence claims.

Although the Federal Rules of Civil Procedure do not expressly contemplate a "motion for reconsideration," Rules 59(e), 60(b), and the Court's inherent authority all permit the Court, in appropriate circumstances, to revisit and revise its rulings if necessary, prior to the entry of final judgment, *Price v. Philpot*, 420 F.3d 1158, 1167 n. 9 (10th Cir. 2005).  The timeliness of the motion determines whether it is analyzed under Rule 59(e)—if filed within 10 days of the entry of the judgment or order—or Rule 60(b)—if filed later than 10 days.  *Id.,* (citing *Hawkins v. Evans*, 64 F.3d 543, 546 (10th Cir. 1995)).  Here, Ms. Ryan filed her motion more than 10 days after the entry of the Opinion and Order it seeks reconsideration of, thus, the Court analyzes the motion under Fed. R .Civ. P. 60(b).

Rule 60(b) permits the Court to reconsider an order due to, among other things, a substantive "mistake or law or fact" by the Court, Fed. R. Civ. P. 60(b)(1), *Yapp v. Excel Corp.*, 186 F.3d 1222, 1231 (10th Cir. 1999), "newly discovered evidence that, with reasonable diligence, could not have been discovered [earlier]," Fed. R. Civ. P. 60(b)(2), or as a result of "any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(6).  Nevertheless, reconsideration under Rule 60(b) is extraordinary, and may only be granted in exceptional circumstances. *Rogers v. Andrus Transp. Services*, 502 F.3d 1147, 1153 (10th Cir. 2007).  Reconsideration is not a tool to rehash previously-presented arguments already considered and rejected by the Court, nor properly used to present new arguments based upon law or facts that existed at the time of the original argument.  *FDIC v. United Pacific Ins. Co.*, 152 F.3d 1266, 1272 (10th Cir. 1998); *Van Skiver v. United States*, 952 F.2d 1241, 1243–44 (10th Cir. 1991).

Giving Ms. Ryan's motion a generous reading, the Court understands it to allege that the Court failed to "see" that Ms. Ryan "did file the joinder motion as attached to copy of complaint covering negligence claim(s) (doing so at ECF 133 attached as Exhibit Two)."  **(# 220 at 2)**.  Ms.

Ryan also contends that she filed the required Certificate of Review at ECF 137.  (**# 220 at 2**).  The Court carefully reviewed the docket sheet and disagrees.  In looking at the filing at Docket 133, there is no attachment as required by Rule 15.1.  Further, to the extent that Ms. Ryan did file a Certificate of Review at Docket 137 in support of her proposed negligence claims, this violates Rule 15.1 as it should have been attached to the motion to add claims and not filed separately.[14]  Thus, the Court finds that Ms. Ryan's motion does not make a showing sufficient to warrant reconsideration by the Court; it is denied.

### B.  Ms. Ryan's Motion for Sanctions

The Court notes that Ms. Ryan has filed a number of pleadings related to her belief that defense counsel for Nurse Victoroff, assistant Attorney General Amy Colony, both improperly obtained her medical records from the CDOC and failed to procure a complete set of Ms. Ryan's medical records as part of the discovery process.  (**# 112, # 147, # 164, # 166, # 168, # 179**).  The Magistrate Judge held five hearings pertaining to Ms. Ryan's discovery concerns (**# 116, # 139, # 149, # 213, # 237**) and issued numerous orders denying relief.  (**# 108, # 114, # 118, # 138, #163, # 181, # 182, # 183, # 213, # 237**).

In this motion, Ms. Ryan reiterates her contention that Ms. Colony improperly obtained her medical records from the CDOC -- records that Ms. Ryan claims are incomplete.  Ms. Ryan further asserts Ms. Colony prevented her from obtaining her own complete set of records from the CDOC.  (**# 236**).  Through this motion, Ms. Ryan requests the Court "quash all CDOC

---

[14]     Even assuming Ms. Ryan's Certificate of Review did comply with Local Rule 15.5, it does not appear to contain an endorsed expert witness as contemplated in Colo. Rev. Stat. 13-20-602.

evidence obtained by Attorney Colony and find her "guilty of failure to cooperate in discovery and resulting spoliation of discovery."  **(# 236 at 13)**.

Ms. Colony opposes the motion, arguing Ms. Ryan's objections to her procuring medical records from her client, the CDOC, have no basis in the law.  Ms. Colony further states that Ms. Ryan's "insistence" that she be permitted to work directly with the CDOC to obtain her records is unsupported by the governing rules of discovery.  Finally, although Ms. Colony is willing to obtain documents that are purportedly missing, Ms. Ryan has not identified such documents with any particularity "such that [Ms. Colony] could search for the same within the thousands of pages of records already produced, or, inquire with the Department as to whether the records even exist."  **(# 241 at 2)**.

Federal Rules of Civil Procedure 37 provides for remedies and sanctions resulting from a party's failure to provide discovery as contemplated by the Rules.  However, the imposition of sanctions under Rule 37 is permitted only upon a finding that a party has failed to comply with a rule or order.  Fed. R. Civ. P. 37(b); *see Matter of Baker*, 744 F.2d 1438, 1440-41 (10th Cir. 1984) (recognizing that imposition of sanctions pursuant to Rule 37(b) requires the court to find that a party or a party's lawyer is in violation of a prior court order).

The Court has carefully reviewed the relevant record, including the transcripts of the hearings held by the Magistrate Judge addressing this very issue, and finds no court order or rule that has been violated.  Indeed, at the October 7, 2019 discovery hearing, the Magistrate Judge engaged in a lengthy discussion with the parties about Ms. Ryan's concerns as to Ms. Colony's alleged improper actions obtaining discovery and purported missing documents.  **(# 213)**.  An excerpt of the discussion follows:

THE COURT: So, Ms. Colony, do you believe you  received her entire medical

file from DOC?

MS. COLONY: Yes, I do. That's what –

THE COURT: You turned over everything that you have?

MS. COLONY: Yes, I did.

THE COURT: Okay, that's all I can do, Ms. Ryan.

MS. RYAN: I understand.

THE COURT: She said you got it all, you say it's 40 percent.  I'm not going to decide that.  I'm going to take her word for it, because if an attorney says something to a Court and they misrepresent it, they're in a whole lot of trouble and I'm going to assume that didn't happen.

(**# 213 at 49:2-11**).

Ms. Colony has maintained her position that she has discovered and turned over all of the CDOC's documents related to Ms. Ryan, and Ms. Ryan has failed to show otherwise.  She has not pointed to specific documents that are missing.  Rather, she claims that large, general blocks of information are missing (e.g. all medical and administrative records from November 2, 2012 through October 4, 2018; all medical records "that have not been chosen as selective and/or condensed encounters" or "the medical chronological inmate record"; "all kites entered by any staff on any shift"; "all internal communications referencing Shawnee Ryan both internal between staff and outside parties"; and all scheduling records including transport and pharmacy records).  (**# 236-5 at 12-15**).  Further, at the October 7, 2019 hearing, Ms. Ryan indicated that she does not need Ms. Colony to provide the missing information; she can "get what's missing through open records.  I can go pay for it, I can go do all of that.  And I also am not adverse to pointing out, as we go along down the road, that these were the things that were missing".  (**#213 at 51:13-17**).

The Magistrate Judge has repeatedly and soundly rejected Ms. Ryan's arguments on this issue, and the Court sees nothing to change the prior outcome.  On this record, there are no grounds for imposition of sanctions because there is no showing other than Ms. Ryan's conjecture and speculation that Ms. Colony has failed to comply with a rule or Court order.  The Court denies Ms. Ryan's motion for sanctions.

### C.  Motions to Restrict Access

The Defendants move to restrict public access to several exhibits filed in support of the summary judgment briefing pursuant to D.C. Colo. L. Civ. R. 7.2.

"Courts have long recognized a common-law right of access to judicial records." *United States v. Bacon*, 950 F.3d 1286, 1292 (10th Cir. 2020) (citing *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1241 (10th Cir. 2012)).  "Although this common law right is not absolute, there is a strong presumption in favor of public access."  *Id.*  The strong presumption of openness can "be overcome where countervailing interests heavily outweigh the public interests in access" to the judicial record.  Thus, in exercising their discretion to restrict access to judicial records, courts must "weigh the interests of the public, which are presumptively paramount, against those advanced by the parties."  *Id.*

Motions seeking restriction of public records must articulate a sufficiently significant interest that will justify continuing to override the presumption of public access and must demonstrate that no remedy short of restricted access can adequately protect the identified privacy interests. *Id.*  D.C. Colo. L. Civ. R. 7.2. specifically requires that  a motion to restrict public access must describe: (1) the nature of the materials or proceedings at issue; (2) the legitimate private or public interests that warrant the relief sought; (3) the clearly defined and serious injury that would result if the relief sought is not granted; (4) why a less restrictive

alternative to the relief sought is not available; and (5) identify the level of restriction sought. With those considerations in mind, the Court briefly addresses each motion.

Dr. Mix moves **(# 218)** to restrict public access to her Declaration filed at Docket # 219, and Nurse Victoroff moves **(# 231)** to restrict public access to Ms. Ryan's medical records filed at Docket # 224-2, 5, and 7. The Defendants generally state that these documents contain private and confidential medical information of Plaintiff for which Plaintiff has a legitimate privacy interest. The Court has some questions as to whether a Defendant has standing to assert privacy interests on behalf of the Plaintiff. However, assuming they can, the Court nevertheless must deny the motions.

Dr. Mix's Declaration contains information about Ms. Ryan's request for a stem cell transplant and the process by which Dr. Mix denied such request. The medical records attached to Nurse Victoroff's motion for summary judgment are from the DWCF, DRDC, Aurora Medical Center, and LabCorp and pertain to events forming the basis for Ms. Ryan's claim against Nurse Victoroff.

These exhibits are not appropriate for restriction. Ms. Ryan put her medical condition at issue as part of her claims, testifying to her various medical conditions during her deposition and attaching many of the same medical records to her pleadings. Further, the records contain information that is central to the issues implicated in this case. Her privacy interests in concealing information about her own health condition does not overcome the strong public interest in understanding the pertinent facts of this case. Accordingly, the Court denies the Defendants' motions to restrict access.

## CONCLUSION

For the foregoing reasons, it is ORDERED that:

1.      Plaintiff's Motion for partial Summary Judgment as to her Claim against Hillary Victoroff **(# 180)** is **DENIED**.

2.      Defendant Hillary Victoroff's Motion for Summary Judgment **(# 224)** is **GRANTED.** Judgment is entered in favor of Hillary Victoroff and against Shawnee Ryan on the grounds of qualified immunity.

3.      Defendants Correctional Health Partners and Jennifer Mix's Motion for Summary Judgment **(# 217)** is **GRANTED**.  Ms. Ryan's claims against CHP and Jennifer Mix are **DISMISSED.**

4.       Plaintiff's Motion for Reconsideration of the Court's Order filed at Docket # 183 (# **220)** is **DENIED**.

5.      Plaintiff's Motion for Sanctions Against Attorney Amy Colony **(# 236)** is **DENIED**.

6.      Defendants' motions for leave to restrict access to certain documents  **(# 218, # 231)** are **DENIED**.  The Clerk of the Court shall lift all access restrictions on Docket # 219, # 224-2, # 224-5, and # 224-7.

The Clerk of the Court is directed to close this case.

Dated this 19th day of October, 2020.

**BY THE COURT:**

Marcia S. Krieger
Senior United States District Judge